John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile:  (949) 369-3701

*Attorneys for Defendant
Hon. Jeffrey Lane Fortenberry*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　*Plaintiff,*<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>　　　*Defendant.* | Case No. 2:21-cr-491-SB<br>Hon. Stanley Blumenfeld, Jr.<br><br>**HON. JEFFREY LANE FORTENBERRY'S NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY**<br><br>Hearing Date: Dec. 21, 2021<br>Hearing Time: 8:00 a.m.<br>Time Estimate: 20 minutes<br><br>Indictment: Oct. 19, 2021<br>Pretrial Conference: Feb. 8, 2022<br>Trial: Feb. 15, 2022<br>Last Day: Mar. 2, 2022 |

HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

**TO THE HONORABLE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** at the above date and time, in the courtroom of the Honorable Stanley Blumenfeld, Jr., United States District Judge, located at 350 West 1st Street, Los Angeles, California 90012, Courtroom 6C, by and through his attorneys of record, the Honorable Jeffrey Lane Fortenberry will move, and hereby does move, to compel discovery. This motion is based on this Notice, the Memorandum of Points and Authorities concurrently filed herewith, the files and records in this case, and any evidence and argument that may be presented at the hearing on this matter.

Counsel for Congressman Fortenberry has attempted to meet and confer with the government to resolve this dispute. By letters dated October 22, November 10 and November 17, 2021, attached as Exhibits A, B, and C, Fortenberry's counsel requested the government produce the discovery at issue in this motion. On November 19, 2021, defense counsel sought to meet and confer with the government to avoid having to file a discovery motion. On November 23, 2021, the government responded in writing, declining to produce documents responsive to the requests at issue here. *See* Exhibit D.

Date: November 29, 2021

BIENERT KATZMAN
LITTRELL WILLIAMS LLP

By:_____
John L. Littrell
Ryan V. Fraser
*Attorneys for Hon. Jeffrey Lane Fortenberry*

HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... II

MEMORANDUM OF POINTS & AUTHORITIES .......... 1

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. Background on pending charges .......... 2

B. Prior discovery requests .......... 2

C. Trial and scheduling orders .......... 5

III. ARGUMENT .......... 5

A. The government must disclose all communications relating to the materiality of Congressman Fortenberry's statements .......... 6

B. The government must disclose all communications relating any promises made to Informant H in exchange for his cooperation. .......... 11

C. The government must disclose information in its possession related to anti-Muslim or anti-Arab bias of FBI Special Agent Todd Carter. .......... 12

D. The government must disclose whether it complied with its own policies set forth in the Justice Manual during the Federal Investigation. .......... 14

IV. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Barker v. Wingo*,
    407 U.S. 514 (1972)......................................................................................................... 7

*Brady v. Maryland*,
    373 U.S. 83 (1963)................................................................................................. *passim*

*Cudjo v. Ayers*,
    698 F.3d 752 (9th Cir. 2012)......................................................................................... 11

*Giglio v. United States*,
    405 U.S. 150 (1972)............................................................................................ 4, 6, 11

*Gollaher v. United States*,
    419 F.2d 520 (9th Cir. 1969)......................................................................................... 10

*Morris v. Ylst*,
    447 F.3d 735 (9th Cir. 2006)......................................................................................... 10

*Paradis v. Arave*,
    240 F.3d 1169 (9th Cir. 2001) ..................................................................................... 10

*United States v. Abel*,
    469 U.S. 45 (1984).......................................................................................................... 12

*United States v. Bernal-Obeso*,
    989 F.2d 331 (9th Cir. 1993)......................................................................................... 11

*United States v. Doe*,
    705 F.3d 1134 (9th Cir. 2013) ........................................................................................ 6

*United States v. Gaudin*,
    515 U.S. 506 (1995)......................................................................................................... 6

*United States v. Ghailani*,
    687 F. Supp. 2d 365 (S.D.N.Y. 2010).............................................................. 7, 8, 10

*United States v. Hernandez-Meza*,
    720 F.3d 760 (9th Cir. 2013)............................................................................... 6, 7, 9

*United States v. Kennedy*,
    890 F.2d 1056 (9th Cir. 1989) ....................................................................................... 6

*United States v. Kohring*,
    637 F.3d 895 (9th Cir. 2011)......................................................................................... 11

*United States v. Price*,
    566 F.3d 900 (9th Cir. 2009).......................................................................................... 6

*United States v. Soto-Zuniga*,
    837 F.3d 992 (9th Cir. 2016) .................................................................................. 6

*United States v. Stever*,
    603 F.3d 747 (9th Cir. 2010) .................................................................................. 6

*United States v. Sudikoff*,
    36 F. Supp. 2d 1196 (C.D. Cal. 1999) ............................................................. 6, 11

**Statutes**

18 U.S.C. § 1001 ............................................................................................. 2, 9, 16, 17

**Rules**

Fed. R. Crim. P. 16 ............................................................................................. *passim*

# MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

Despite the government's bold and colorful claims to the contrary, *see* Dkt. Nos. 27–29, its case against nine-term Congressman Fortenberry is replete with problems.

Even as the government accuses Congressman Fortenberry of lies and obstruction, it has, itself, obstructed the fact-finding process by refusing to turn over documents requested by the defense that may cast doubt on the integrity of its investigation. The defense's requests for discovery are designed to answer the primary question posed in many of the briefs submitted to the Court: Did the government pursue a legitimate law enforcement goal when it investigated Congressman Fortenberry, or was this just a setup?

To answer those questions, the defense needs a straight answer about how the government viewed Congressman Fortenberry's statements in the Nebraska and Washington, D.C., interviews at the time they were made, and whether those statements actually influenced the investigation, or were even capable of influencing the investigation. The best evidence of the government's assessment of the materiality of those statements is the government's own, contemporaneous communications about them.

The defense also needs a straight answer about the deals the government made with its informants, including Individual H, the person the government recruited to set up Congressman Fortenberry by placing a surreptitious ten-minute call to him that the government would later quiz the Congressman about nearly one year later.

The defense needs a straight answer about whether this investigation was tainted because of the anti-Muslim, anti-Arab bias of the government's lead case agent, FBI Special Agent Todd Carter, who appears to have been sharing and "liking" racist images and content on social media platforms even as he led an investigation against Congressman Fortenberry, a legislative leader in Middle Eastern affairs, and advocate for the protection of religious minorities and persecuted peoples both home and abroad.

Finally, the defense needs a straight answer regarding whether the government followed its own guidelines governing how and when to investigate members of

Congress. These rules exist for a reason—to prevent the executive branch from overstepping its authority to intrude on the legislative branch, a co-equal arm of government. Following these rules is particularly important now, in an era of profound division between political parties and growing distrust of federal law enforcement.

With the trial scheduled for less than two months after the hearing on this motion, the government has declined most of Congressman Fortenberry's particularized requests for discovery. Federal Rule of Criminal Procedure 16 and *Brady v. Maryland* entitle the defense to the discovery at issue. An order compelling prompt disclosure is required.

## II.   STATEMENT OF FACTS

### A.   Background on pending charges

This motion incorporates by reference the statement of facts in support of Congressman Fortenberry's *Motion to Dismiss the Indictment for Failure to Allege Materiality*. *See* Dkt. No. 17 at 1–3. To recap briefly here, the Indictment charges nine-term Congressman Jeffrey Fortenberry with violating 18 U.S.C. § 1001 through his statements in two interviews—one with law-enforcement agents in Lincoln, Nebraska, and the other in Washington, D.C., in the presence of AUSA Mack Jenkins and law-enforcement agents. *See id.* The government contends that Congressman Fortenberry knew his statements were false because they conflicted with information the government directed its informant (referred to as "Individual H" in the Indictment) to insinuate to him during a secretly recorded call about nine-and-a-half months before the Nebraska interview, and about thirteen-and-a-half months before the Washington, D.C., interview. *See* Gov.'s Opp. to Mot. Dismiss for Lack of Venue, Dkt. No. 18, at 7–8. The Indictment charges that Fortenberry's statements "affect[ed]" an investigation conducted by the Federal Bureau of Investigation and Internal Revenue Service. Dkt. No. 1, at 1, 6, 10, 11.

### B.   Prior discovery requests

On October 22, 2021, the defense requested that the government produce, among other things, "[a]ny implicit or explicit promises of benefit or consideration which have been made by any government agent or agency, state or federal, to or on behalf of any

2
HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

witness the government intends to call at trial, or any such promises or consideration expected or hoped for by any such witness on behalf of themselves." **Exhibit A** at ¶ 13c. In the same letter, the defense requested that the government produce "[a]ll evidence that any prospective government witness is biased or prejudiced against the defendant or any other person or has a motive to falsify or distort his testimony." *Id*. at ¶ 13g.

On November 10, 2021, the defense requested production of "[a]ll communications, whether oral, written or otherwise, involving or including Mack Jenkins; Aron Ketchel, Scott Garringer, Tracy Wilkison; Susan Har; Todd Carter; Edward Choe; or any other person, relating to your allegation that Congressman Fortenberry's statements 'affected' the 'Federal Investigation' referenced in the indictment. *See* Dkt. No. 1 at ¶¶ 18, 20, 21." **Exhibit B**. The defense also requested "[a]ny and all writings or oral communications (summarized in writing if no recording exists) setting forth and/or related to any and all agreements—express or implied, definite or indefinite, enforceable or unenforceable, between Individual H or any other government informant related to the indictment's allegations or the Federal Investigation referenced in the indictment, and any prosecutor, FBI agent, IRS agent, or other representative of the DOJ." *Id*. Finally, the defense requested "[a]ny and all evidence (summarized in writing if no recording exists) of bias on the part of any prospective government witness," and specifically "any expression of anti-Muslim bias by Special Agent Todd Carter, whether in the form of social media posts (i.e., Instagram), Facebook messages, chats, message boards, or other media." *Id*.

On November 17, 2021, the defense requested production of all communications related to (1) "authorization or requests for authorization to interview Congressman Fortenberry and/or record him without his consent during the course of the [Federal] Investigation," (2) "authorization or requests for authorization to employ a 'ruse' or any deception or misleading methods in interviewing or seeking to interview Congressman Fortenberry during the course of the Investigation." **Exhibit C.**

On November 23, the government responded by letter as follows:

With respect to Congressman Fortenberry's request for internal communications regarding the materiality of Congressman Fortenberry's statements, the government stated that the request was "overbroad, unduly burdensome and not supported by any identified legal authority." **Exhibit D** at 1. The government also claimed it is entitled to withhold its communications under the work product doctrine and Fed. R. Crim. P. 16(a)(2). *Id.*

With respect to Congressman Fortenberry's request for the government to produce its agreements with informants, *see* Exhibit B, and witnesses, *see* Exhibit A, the government ignored the request for the government's agreements with informants, and responded only with respect to the request for agreements with "witnesses." *See* Exhibit D. The government stated "[r]elevant Giglio[1] evidence will be produced reasonably in advance of trial and will be determined by which witnesses the government calls at trial." *Id*. at 2. "The government has not made such final determination." *Id*. It also stated "[n]o agreements with witnesses exist with the government that are not in writing and expressly agreed to by both parties." *Id*. The government's letter points to "preliminary, responsive documents" related to agreements with Joseph Arsan, Toufic Baaklini, Gilbert Chagoury, and Ray LaHood. *Id*. It makes no mention of Individual H.

With respect to Congressman Fortenberry's request for evidence of bias by a prospective witness, *see* Exhibit A, and specifically, anti-Muslim bias by Special Agent Todd Carter, *see* Exhibit B, the government likewise demurred, using the same language it relied upon to withhold evidence of an agreement with Individual H: "Relevant Giglio evidence will be produced reasonably in advance of trial and will be determined by which witnesses the government calls at trial." *Id*. at 2. The government also re-stated the same caveat as before: "The government has not made such final determination." *Id*.

Regarding Congressman Fortenberry's request for the government to confirm that it followed Department of Justice guidelines relating to secretly recording members of Congress and using a "ruse" to investigate a member, the government cited to a recent

---

[1] *Giglio v. United States*, 405 U.S. 150 (1972).

brief filed by the government in which it contends that it was not required to comply with Section 9-7.302 of the *Justice Manual* (which requires written authorization "to monitor an oral communication without the consent of all parties to the communication . . . when it is known that the monitoring concerns and investigation into an allegation of misconduct committed by a Member of Congress . . . ."). *See* Exhibit D at 2, citing Dkt. No. 28 at 7.[2]

The government's letter made no reference to Section 9-85.110; however, the portion of the Justice Manual that required it to consult with the Department of Justice Public Integrity Section prior to interviewing a member of Congress. Citing to the fact that the Office of the Deputy Attorney General ("ODAG") "had no questions about missing approvals, and this indictment proceeded," the government asked the defense to *infer* that "all necessary approvals were obtained in this investigation," even though it refused to say so directly. *Id*. The government also noted in its letter that the FBI had obtained approvals to secretly record Congressman Fortenberry, and to use a "ruse" to investigate him. Exhibit D at 3. But it stated that no "ruse" was ultimately used. *Id*.

### C.     Trial and scheduling orders

On November 15, 2021, the Court postponed the trial from its original date of December 14, 2021, to February 15, 2022, advising in its Order that "**the parties should not expect a further continuance**." Dkt. No. 23 at 2 (original emphasis).

### III.    ARGUMENT

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the prosecution must produce documents and data that are within its "possession, custody or control" and that

---

[2]     The government appears to be correct. Although the Department of Justice requires written authorization to intercept communications with members of Congress without "the consent of all parties to the communication," *see* JM 9-7.302, two exceptions appear to swallow the rule completely: one for "interceptions of telephone communications," *see* JM 9-7.302IIB(6), and the other for monitoring "during an interview conducted by a law enforcement officer in the course of his or her official duties, provided that the law enforcement officer consented to the monitoring," *see* JM 9-7.302IIB(7). In other words, law enforcement can surreptitiously record members of Congress without any written authorization, so long as they either do it by phone or using a federal agent. This is a frightening lack of oversight that makes the requirement to at least consult with the Public Integrity Section of DOJ pursuant to JM § 9-85.110 even more important.

are "material to preparing the defense." This Rule "grants criminal defendants a broad right to discovery." *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010) (rejecting district court's holding that the defendant was not entitled to discovery of law-enforcement reports, officer-training materials, and other materials relating to drug trafficking operations as "illogical"). In the context of Rule 16, "[m]ateriality is a 'low threshold; it is satisfied so long as the information . . . would have helped." *United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016) (internal citations omitted). In fact, the defense is even entitled to information that undermines its case. "Information is material even if it simply causes a defendant to 'completely abandon' a planned defense and 'take an entirely different path.'" *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013) (quoting *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013)).

In addition, the government also has due process-based discovery obligations under *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); and their progeny. To satisfy these constitutional requirements, "the government is obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to the defendant's case." *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1199 (C.D. Cal. 1999). The information need not be admissible to be produced; "suppression of inadmissible evidence could create a due process violation if the suppressed inadmissible evidence [merely] would have *led to* admissible evidence." *Id.* at 1200 (emphasis added) (citing *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989)); *see also United States v. Price*, 566 F.3d 900, 913 n.14 (9th Cir. 2009) (noting *Sudikoff* "favorably" and explaining that information is discoverable under Rule 16 even if "not admissible so long as it is reasonably likely to lead to admissible evidence").

### A. The government must disclose all communications relating to the materiality of Congressman Fortenberry's statements.

Because materiality is an element of a false statement charge under 18 U.S.C. § 1001, *see United States v. Gaudin*, 515 U.S. 506, 509 (1995), information that supports or undermines the government's claim that a statement is material is discoverable. *See*

Fed. R. Crim. P. 16(a)(1)(E); *Hernandez-Meza*, 720 F.3d at 768; *Brady*, 373 U.S. at 83.

Defense counsel therefore requested, and is entitled to, all communications between and among the prosecutors and their agents relating to the claim that Congressman Fortenberry's statements "affect[ed]" the Federal Investigation. *See* Exhibit B.

The government refuses to turn over its internal communications on the ground that they are "work product" and therefore exempt from disclosure under subparagraph (a)(2) of Federal Rule of Criminal Procedure 16 ("Rule 16"). *See* Exhibit D at 1 (citing Fed. R. Crim. P. 16(a)(2)) ("this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case"). But Congressman Fortenberry's targeted request for communications by prosecutors and agents about the impact of his statements relies not only on Rule 16, but also *Brady*. And although some of the responsive communications may be work product, others may not be. Finally, because the government must prove that Congressman Fortenberry's statements had an actual or a potential effect on its investigation, *Brady* requires the government to produce its internal communications about those statements, even if some of those communications may be work product or fall within Rule 16(a)(2).

In *United States v. Ghailani*, 687 F. Supp. 2d 365 (S.D.N.Y. 2010), the defendant, who was accused of conspiring to bomb United States Embassies, moved to dismiss his indictment for pre-indictment delay based on the government's decision to delay his arrest and transportation to the United States, and instead transfer him to the custody of the CIA, and later to Guantanamo Bay, Cuba. *Id*. at 369; *see Barker v. Wingo*, 407 U.S. 514 (1972). In opposition to the motion to dismiss, the government contended that its decision to delay his arrest and transportation to the United States was justified by national security concerns. *Id*. at 369. The defendant then requested, pursuant to Federal Rule of Criminal Procedure 16, production of internal government communications between, *inter alia*, the United States Attorney's Office, the FBI, the CIA, and the Department of Justice related to its decision to delay the defendant's arrest and delay transporting him to the United

States to face trial. *Id*. at 367–68. "In light of the government's stated position on this issue," the Court held that the communications at-issue were material to the defense, at least insofar as they tended to undermine the government's contention that the reason for the delay was a purported interest in national security. *Id*. at 369. The Court noted "[t]he defendant has a substantial interest in obtaining any such responsive documents that may exist because they likely would provide significant new information as to why a series of decisions of great importance were taken with respect to this defendant. The reasons for those decisions bear directly on the speedy trial motion." *Id*.

The Court acknowledged that some of the communications requested by the defense may be protected from disclosure under Rule 16(a)(2), an issue that had not been briefed by either party. *Id*. at 372, n. 27. If the government were to take that position, however, the Court required the government to "serve and file a log enumerating these documents and providing the information that would be required by S.D.N.Y. Local Civ. R. 26.2 in respect of documents withheld on grounds of privilege." *Id*.

Likewise, here, the government should produce all internal communications between the USAO and the FBI related to its assessment of Congressman Fortenberry's statements and the investigative steps that were taken as a result of those statements. This is necessary under the circumstances presented in this case because the government must prove beyond a reasonable doubt that Congressman Fortenberry's statements are material, and the best evidence of the materiality (or lack thereof) of those statements are the contemporaneous assessments of them by the prosecutors and agents themselves.

The government may backtrack, as it did in its recent briefing, and argue that it is not required to prove that Congressman Fortenberry's statements *actually affected* its investigation. *See* Gov.'s Opp. to Mot. to Dismiss, Dkt. No. 27, at 4. Instead, the government may argue it need only prove that the statement was "capable of influencing" or affecting a federal agency. *Id*. That is not the theory that the government pled in the Indictment. *See* Dkt. No. 1 at ¶¶ 18, 10, 21 (alleging that Congressman Fortenberry's statements "affect[ed] the Federal Investigation in the Central District of California.").

8

HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

But even if the government is permitted to present a "capable of affecting" theory of materiality to the jury, evidence that *these* prosecutors were not *in fact* influenced by Congressman Fortenberry's statements is admissible to rebut the claim that the statements were even "capable of influencing" them. After all, what evidence could be more probative of the actual or potential influence of Congressman Fortenberry's statements on the prosecutors in this case than the contemporaneous communications by the prosecutors and agents regarding Congressman Fortenberry's statements, the government's interpretation of them, and further investigative actions to take based on those statements? The absence of such communications by the prosecutors and agents would also be probative, as it would tend to undermine the notion that the statements were material.

Moreover, it is disingenuous for the government to withhold its communications about the impact of Congressman Fortenberry's statements and their influence on the government while simultaneously arguing that the defense failed to identify evidence to support the proposition that AUSA Jenkins has testimony favorable to the defense concerning materiality. *See* Gov.'s Opp. to Mot. to Disqualify AUSA Jenkins, Dkt. No. 28, at 6 n.4. The government boldly states, for example, that AUSA Jenkins' testimony regarding materiality would be "unhelpful to defendant's case." *Id*. But discovery in a criminal case is not supposed to be a game, and the defense does not have to guess; rather, the defense is entitled to evidence of how AUSA Jenkins would testify on the issue of materiality, even if the government believes that it would be "unhelpful." *See Hernandez-Meza*, 720 F.3d at 768 ("Information is material even if it simply causes a defendant to 'completely abandon' a planned defense and 'take an entirely different path.'").

The government's internal communications may undermine the government's case that Fortenberry's statements were material to the investigation, for example, if they reveal bias or animus by its agents. If prosecutors or agents believed that Congressman Fortenberry lied to them, they may have expressed anger or indignation about it. The government may believe that this would be "unhelpful to the defendant's case," but it should not make that decision unilaterally. If Congressman Fortenberry's statements were

9

HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

personally upsetting to one or more prosecutors or agents, who then went on to focus the investigation on Congressman Fortenberry out of spite, that would undermine the government's theory that Congressman Fortenberry's statements were material. A jury is entitled to weigh both alternatives and decide for itself which is more persuasive.[3]

For these reasons, the government's blanket refusal to produce any of its internal communications regarding Congressman Fortenberry's statements cannot be sustained under Rule 16(a)(2) or the work product doctrine. To the extent the government contends any of its internal communications are exempt from disclosure under Rule 16(a)(2), it should, at a minimum, produce all relevant communications to the Court *in camera* and disclose to the defense and Court an itemized list of the communications, justifying its position as to each one in a privilege log. *See Ghailani*, 687 F. Supp. 2d at 372 n.27.

Finally, even if the government's internal communications regarding the materiality of Congressman Fortenberry's statements are protected from disclosure under Rule 16(a)(2), they must still be produced pursuant to *Brady* if they are favorable to the defense. *See Paradis v. Arave*, 240 F.3d 1169, 1173 (9th Cir. 2001). "[I]n general, a prosecutor's opinions and mental impressions of the case are not discoverable under *Brady* unless they contain underlying exculpatory facts." *Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). However, where, as here, the defendant's statements are alleged to have "affect[ed]" an investigation and thus, to have been material under § 1001, the prosecutors' opinions and mental impressions—as evidence of the "effect" or lack thereof—**are part of a core disputed *factual* issue in the case**. Therefore, they must be

---

[3] The Ninth Circuit approved the district court's denial of request to produce internal communications among agency investigators for the purpose of probing institutional bias in pursuing a prosecution based on Rule 16(a)(2) in *Gollaher v. United States*, 419 F.2d 520, 528 (9th Cir. 1969). But that case is distinguishable. Even though *Gollaher* involved charges under 18 U.S.C. § 1001, at that time, the Ninth Circuit did not interpret the "false statements" portion of the statute to require materiality. *Id*. at 528. Moreover, the defendants in *Gollaher* sought evidence of institutional bias solely to show the Federal Housing Authority's "attitude in pursuing the prosecution." *Id*. In this case, the defense seeks evidence of internal communications for the purpose of undermining the government's contention that the statements were material; that is, that they actually influenced the government's investigation or were capable of doing so.

produced to the defense if they are exculpatory, even if they are work product or fall within Rule 16(a)(2). *See United States v. Kohring*, 637 F.3d 895, 907–08 (9th Cir. 2011) (holding that prosecutor's handwritten notes containing both facts and opinion work product were *Brady* and should have been disclosed prior to trial); *id*. ("even some of the facts contained in the opinion work product should have been disclosed").

Because the government has the burden of proving that Congressman Fortenberry's statements were material to its investigation, the prosecutors' impressions of Congressman Fortenberry's statements at the time they were made are material to the defense under Rule 16(a)(1)(E), and if those opinions and impressions are favorable to the defense, they are *Brady*. If Rule 16(a)(2) is in tension with *Brady*, then it must yield to the constitutional rule. *See Cudjo v. Ayers*, 698 F.3d 752, 767 (9th Cir. 2012).

> **B.     The government must disclose all communications relating any promises made to Informant H in exchange for his cooperation.**

Prosecutors also must turn over "all material information casting a shadow on a government witness's credibility." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993); *see also Giglio*, 405 U.S. 150. The process by which a government informant and the government "reach a leniency agreement is relevant to the witness's credibility because it reveals the witness's motive to testify against the defendant." *Sudikoff*, 36 F. Supp. 2d at 1203. Here, the government appears to have reached an agreement with Individual H, its informant who was not charged with an offense. *See* Indictment ¶ 13 ("In September 2016, Individual H began cooperating with law enforcement.").

Although the government has produced some evidence of agreements with other cooperators, it has provided no evidence of an agreement with Individual H, the primary informant in this case. The government appears to be attempting to avoid turning over evidence of its agreement with Individual H by construing the defense request narrowly to cover only requests for agreements with "witnesses," insinuating that it has not made a "final determination" as to whether Individual H will be called as a witness. But Congressman Fortenberry specifically asked for, and is entitled to, the government's

promises of leniency or deals with *informants*, even if they are not called as witnesses.

In any case it would be quite surprising if the government attempted to prove its case at trial without calling the witness who placed the surreptitious call to Congressman Fortenberry in June 2018. The government announced at Congressman Fortenberry's arraignment that it *did* intend to call Individual H as a witness and insisted on an order precluding the Congressman from having contact with him. *See* Dkt. No. 9.

If the government is not going to call Individual H as a witness, it should say so. But even if the government does not call Individual H at trial, the government should still be compelled to reveal the terms of any deal with Individual H. After all, any incentive for the informant to cooperate with the government to set up the Congressman could undermine the integrity of the investigation and be therefore material to the defense.

### C. The government must disclose information in its possession related to anti-Muslim or anti-Arab bias of FBI Special Agent Todd Carter.

In addition to informants' agreements with the government, defendants have the right to discover other information that could be used to impeach government witnesses. This includes, among other things, information related to bias. *United States v. Abel*, 469 U.S. 45, 50 (1984). Here, defense counsel is informed that FBI Special Agent Todd Carter, the lead agent in this case, may have approved, "liked," or shared multiple violent images and messages on various social media platforms that demonstrate bias against people of Middle Eastern descent and/or Muslims, including the two images below:

 

HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

Special Agent Carter's apparent anti-Middle Eastern bias may have led to hostility toward Congressman Fortenberry because of the Congressman's longstanding engagement with predominantly Arab or Muslim countries and his leadership on behalf of religious minorities. In fact, Congressman Fortenberry has, for many years, been a champion for the safety and freedom of minority groups in the Middle East. On March 27, 2019, Congressman Fortenberry brought forth a bipartisan resolution supporting the future security and "safe return of displaced indigenous people of the Nineveh Plain and Sinjar to their ancestral homeland." H. Res. 259, 116th Cong. (2019); *available at* https://www.congress.gov/bill/116th-congress/house-resolution/259/text (last visited Nov. 23, 2021). Congressman Fortenberry has also fostered engagement and partnership with Arab, non-Arab Middle Eastern, and Muslim-majority groups. Five years of work led by Fortenberry and Democratic United States Representative Nita Lowey of New York culminated in Congress's December 2020 passage of the Middle East Partnership for Peace Act. *See also* H.R. 3104, 116th Cong. (1st Sess. 2019); Don Walton, *Fortenberry initiative provides new Mideast peace tool*, LINCOLN JOURNAL STAR, Jul. 3, 2021 (updated Aug. 8, 2021), *available at* https://journalstar.com/news/state-and-regional/govt-and-politics/fortenberry-initiative-provides-new-mideast-peace-tool/article_c70c5588-31d0-5b37-b5c0-57d0741a395e.html (last visited Nov. 23, 2021). Congressman Fortenberry also represents the largest Yazidi community in America, in and around his hometown of Lincoln, Nebraska. Many of Congressman Fortenberry's Yazidi constituents were translators for the United States Army during the height of the Iraq war. He was instrumental in providing them with international humanitarian assistance and preventing the slaughter of refugees by ISIS militants on Mount Sinjar. *See* Cong. Rec., vol. 145, no. 40, H1329 (Mar. 14, 2016), *available at* https://www.govinfo.gov/content/pkg/CREC-2016-03-14/html/CREC-2016-03-14-pt1-PgH1328-4.htm (last visited Nov. 23, 2021).

Despite repeated requests by the defense, the government refuses to acknowledge any such bias or turn over evidence that tends to show it. Instead, the government says only that "[r]elevant *Giglio* evidence will be produced reasonably in advance of trial and

will be determined by which witnesses the government calls at trial." Exhibit D at 2.

Surely the government does not intend to proceed to trial without calling Special Agent Carter. Special Agent Carter is the lead case agent and was present for both statements by Congressman Fortenberry that the government charged as false in this case. He was present for nearly every witness interview. He was also the lead case agent in the investigation against Gilbert Chagoury, Toufic Baaklini, and others. And Special Agent Carter, no less than the prosecution team, was responsible for making key decisions about what leads to pursue in the investigation. He, like AUSA Jenkins, is also a key witness on the topic of whether Congressman Fortenberry's statements were material.

If the government does not intend to call Special Agent Carter at trial, then it should say so. But even in that scenario, it cannot avoid producing evidence that tends to show Carter's anti-Arab and anti-Muslim bias, because Congressman Fortenberry is entitled to probe whether that bias—as opposed than anything Congressman Fortenberry said when he was trying to help the government—influenced the course of the investigation.

At a minimum, defense counsel is entitled to, and seeks an order compelling the government to disclose, information and evidence concerning bias on the part of Special Agent Carter, as requested in his November 10, 2021, discovery letter. *See* Exhibit B.

**D.   The government must disclose whether it complied with its own policies set forth in the Justice Manual during the Federal Investigation.**

Policies of the Department of Justice ("DOJ") set forth in the *Justice Manual* ("JM"), formerly known as the *United States Attorneys' Manual*, https://www.justice.gov/jm/justice-manual, mandate consulting with the DOJ's Public Integrity Section before investigating a member of Congress. JM § 9-85.110. This means the Public Integrity Section of the Criminal Division of the DOJ, not a U.S. Attorney's Office's Public Integrity Section. *See* JM § 9-85.100 (referring to the supervisory jurisdiction of the "Public Integrity Section of the Criminal Division"), § 9-1.000 (making evident that references to "the Criminal Division" refer to Main Justice, not a U.S. Attorney's Office). Here, the investigation involved not only interviewing the

14
HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY

Congressman, but using an undercover informant and repeatedly recording the Congressman without his knowledge or consent. Congressman Fortenberry requested that the government confirm or deny that it complied with the *Justice Manual*'s provisions on investigating members of Congress. Exhibit C. The government still refuses to provide a straight answer. In its November 23, 2021, letter to the defense, the government argued that it wasn't *required* to comply with JM § 9-7.302, but it made no mention of whether the USAO consulted with DOJ's Public Integrity Section as required by JM § 9-85.110.

Finally, the government was just wrong when it stated that the government did not employ a ruse in its investigation of Congressman Fortenberry. *See* Exhibit D. As the government knows, Special Agent Carter deliberately lied to Congressman Fortenberry to gain entry to his home in Nebraska. He falsely claimed to be from the Omaha FBI field office, when he was in fact from California. And he falsely claimed to be conducting a "national security investigation," when in fact he was investigating the Congressman himself. If the United States Attorney's Office did consult with the Public Integrity Section prior to using a "ruse" to investigate Congressman Fortenberry, it should just say so, but it cannot deny that a ruse was used in the first place. Clearly it was.

## IV. CONCLUSION

Given the scheduling of trial less than two months from the date of the hearing on this motion, Congressman Fortenberry respectfully requests the Court order the government to make these disclosures no later than December 31, 2021.

Date: November 29, 2021

BIENERT KATZMAN
LITTRELL WILLIAMS LLP

By:_____
John L. Littrell
Ryan V. Fraser
*Attorneys for Hon. Jeffrey Lane Fortenberry*

15
HON. JEFFREY LANE FORTENBERRY'S MOTION TO COMPEL DISCOVERY