John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile:  (949) 369-3701

*Attorneys for Defendant*
*Hon. Jeffrey Lane Fortenberry*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            *Plaintiff,*<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>            *Defendant.* | Case No. 2:21-cr-491-SB<br>Hon. Stanley Blumenfeld, Jr.<br><br>**HON. JEFFREY LANE FORTENBERRY'S NOTICE OF MOTION AND MOTION TO SUPPRESS STATEMENTS**<br><br>Hearing Date: Jan. 11, 2022<br>Hearing Time: 8:00 a.m.<br>Time Estimate: One hour<br><br>Indictment: Oct. 19, 2021<br>Pretrial Conference: Feb. 8, 2022<br>Trial: Feb. 15, 2022<br>Last Day: Mar. 2, 2022 |

**TO THE HONORABLE COURT, PARTIES, AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** at the above date and time, in the courtroom of the Honorable Stanley Blumenfeld, Jr., United States District Court Judge, located at 350 West 1st Street, Los Angeles, California 90012, Courtroom 6C, by and through his attorneys of record, the Honorable Jeffrey Lane Fortenberry will move, and hereby does move, to suppress his statements of March 23 and July 17, 2019.  This motion is based on this Notice, the Memorandum of Points and Authorities concurrently filed herewith, the files and records in this case, and any evidence and argument that may be presented at the hearing on this matter.

Counsel for the respective parties met and conferred on November 30, 2021, concerning the subject of this motion but were unable to resolve their differences.

Date: November 30, 2021

BIENERT KATZMAN
LITTRELL WILLIAMS LLP

By: _____
John L. Littrell
Ryan V. Fraser
*Attorneys for Hon. Jeffrey Lane Fortenberry*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

MEMORANDUM OF POINTS & AUTHORITIES .......................................... 1

I.    INTRODUCTION ........................................................................................ 1

II.   STATEMENT OF FACTS .......................................................................... 2

     A.    The Indictment ................................................................................. 2

     B.    The government was plotting to indict Congressman Fortenberry even before he was interviewed by the FBI. ..................................... 4

     C.    AUSA Mack Jenkins falsely represented to attorney Trey Gowdy that Congressman Fortenberry was not a target of the investigation. ............. 4

     D.    Washington, D.C., interview (July 17, 2019) .................................. 6

     E.    Fundamental fairness and promissory estoppel call for suppressing the Nebraska and Washington, D.C., statements. ............................. 7

          1.    Promises ................................................................................. 8

          2.    Reasonably likely to induce reliance ..................................... 9

          3.    Reliance was, in fact, induced ............................................. 10

          4.    Reasonableness of the reliance induced .............................. 11

          5.    Injustice can be avoided only through enforcement ........... 11

III.  CONCLUSION ........................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Brogan v. United States*,
  522 U.S. 398 (1998)..................................................................................................9
*Johnson v. Lumpkin*,
  769 F.2d 630 (9th Cir. 1985) ................................................................................7, 12
*Morrow v. Super. Ct.*,
  36 Cal. Rptr. 2d 210 (Cal. Ct. App. 1994).............................................................11
*Santobello v. New York*,
  404 U.S. 257 (1971)..................................................................................................7
*United States v. Carrillo*,
  709 F.2d 35 (9th Cir. 1983) .....................................................................................7
*United States v. Dudden*,
  65 F.3d 1461 (9th Cir. 1995) ...................................................................................8
*United States v. Goodrich*,
  493 F.2d 390 (9th Cir. 1974) ...................................................................................7
*United States v. Hudson*,
  609 F.2d 1326 (9th Cir. 1979) ..........................................................................7, 11
*United States v. Jensen*,
  996 F. Supp. 2d 1151 (D. Utah 2014)...................................................................12
*United States v. Moore*,
  No. 2:16-CR-00090-JAM,
  2016 WL 5340649 (E.D. Cal. Sept. 23, 2016)..................................................8, 11
*United States v. Thompson*,
  403 F.3d 1037 (8th Cir. 2005) ...............................................................................12

**Statutes**

18 U.S.C. § 1001 .........................................................................................................2
Cal. Bus. & Prof. Code § 6106 ................................................................................11

**Other Authorities**

Restatement (Second) of Contracts § 90 (1981)......................................................8
Restatement (Second) of Contracts § 153 (1981)..................................................11

# MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

Can a prosecutor mislead a defense attorney to induce a waiver of his client's right to silence and then use the resulting statements to convict the client? If so, there will be no way for pre-indictment cooperation by represented parties to take place, because defense counsel will have no reliable means of assessing and managing the potentially life-altering risks involved. As a result, such pre-indictment meetings will simply not occur. Fortunately, pre-indictment cooperation by represented parties can and does happen because the law does provide a remedy for prosecutorial deceit in this context. The representations by which a prosecutor induces a defendant to speak are binding on the government if the defendant reasonably relies on them.

Here, Assistant United States Attorney Mack Jenkins induced Congressman Fortenberry to speak with him by assuring his then-counsel, Trey Gowdy, that Congressman Fortenberry was not a "target" of the government's investigation, but merely a "subject" who was trending toward becoming a "witness." That representation was false and misleading. At the time, the government had already surreptitiously recorded the Congressman twice: when the government's informant, Individual H, called the Congressman in June 2018 to tell him that he had "probably" received illegal campaign contributions from Gilbert Chagoury, and when Special Agent Todd Carter interviewed the Congressman in his home in Nebraska in March 2019. Moreover, FBI documents show that even before the Nebraska interview, the government <u>already had plans to charge the Congressman with multiple crimes</u>.[1] But neither the Congressman nor his counsel knew of those plans. Desiring to help the FBI, and relying on AUSA Jenkins' representation to his counsel that he was not a target of the investigation, Congressman Fortenberry agreed to be interviewed by AUSA Mack Jenkins in Washington, D.C.

---

[1] The government's intention to charge Congressman Fortenberry was not based on the strength of the evidence. He had not committed any crime, and the government knew that. But the FBI's internal reports show that it intended to charge him anyway.

1

HON. JEFFREY LANE FORTENBERRY'S MOTION TO SUPPRESS STATEMENTS

When the questioning in the Washington, D.C. interview took an accusatory turn, Mr. Gowdy attempted again to confirm the government's intentions. Mr. Gowdy asked AUSA Jenkins whether the interview was, as it had begun to sound, a set-up for a "bullshit 1001," referring to 18 U.S.C. § 1001, which criminalizes false statements within the jurisdiction of the United States government. AUSA Jenkins assured Mr. Gowdy that it was not a setup for a "bullshit 1001" charge. Again, relying on AUSA Jenkins' assurance, Congressman Fortenberry continued with his interview.

Unfortunately, Mack Jenkins' representations to Trey Gowdy were false, and Congressman Fortenberry's trust in the government was misplaced. As a result of Congressman Fortenberry's desire to help the FBI in its investigation, he is now the defendant in a baseless prosecution under § 1001. The Constitution's guarantee of fundamental fairness and contract principles bar using these statements to convict him.

## II.   STATEMENT OF FACTS

### A.   The Indictment

The Indictment alleges that in January 2016, a foreign national named Gilbert Chagoury gave $30,000 in cash to Toufic Baaklini to be contributed to Congressman Fortenberry's reelection campaign that year. Dkt. No. 1 at ¶ 11. Baaklini gave the money to "Individual H," who, in turn, recruited others to donate the money to Congressman Fortenberry. Ultimately, the campaign received the $30,000 directly from conduits who were United States citizens. *See id.* In this way, Chagoury, Baaklini, Individual H, and the other conduits concealed from Congressman Fortenberry and his campaign the fact that the $30,000 had a foreign source. The government caught and reached agreements with Chagoury, Baaklini, and Individual H. By spring 2018, Individual H was a government informant. *See* Dkt. No. 1 at ¶ 13.

On June 4, 2018, the government directed Individual H to place a surreptitiously recorded phone call to Congressman Fortenberry. During that call (hereinafter, "the 2018 call"), which lasted about ten minutes, and spanned multiple topics unrelated to the 2016 fundraiser, Individual H told Congressman Fortenberry <u>something that he did not know</u>

before: that his campaign had received an illegal contribution from a foreign national in 2016. Specifically, the government alleges that during the 2018 call, "Individual H" told Congressman Fortenberry that "prior to the 2016 Fundraiser, [Toufic] Baaklini provided Individual H with '$30,000 cash' to give to defendant FORTENBERRY's campaign." Dkt. No. 1 at ¶ 14. During the same call, "Individual H" allegedly told Congressman Fortenberry that he "distributed the $30,000 cash to other individuals to contribute to defendant FORTENBERRY's campaign at the 2016 Fundraiser," and that the money "***probably*** did come from Gilbert Chagoury . . . ." *Id*. at ¶ 15a (emphasis added).

On March 23, 2019, the government sent agents, including FBI Special Agent Todd Carter, to Congressman Fortenberry's home to interrogate him. *See id*. at ¶ 19a. Congressman Fortenberry invited the agents into his home and tried to help them. He was not asked about the 2018 call from Individual H. But according to the government, Congressman Fortenberry's responses to Carter's questions were false, because he said he was unaware of Baaklini making illegal contributions or directing others to do so, *id*. at ¶ 19a(i), and stated that "the individuals who contributed to the 2016 Fundraiser were all publicly disclosed." *Id*. at ¶ 20b. The Congressman also stated that "every campaign contribution that he had received was publicly disclosed." *Id*. at ¶ 20c.

On July 17 or 18, 2019—more than one year later—Congressman Fortenberry was questioned again, this time by Assistant United States Attorney Mack Jenkins himself.[2] *See id.* at ¶ 19b. Again, Congressman Fortenberry cooperated with the government and tried to help. This time, Congressman Fortenberry was asked about the 2018 call from Individual H. *See id*. at ¶ 19b(i). According to the government, Congressman Fortenberry made false statements when he denied that he had been "told by Individual H during the 2018 call that Baaklini had given Individual H $30,000 cash to help fund the 2016 Fundraiser," *id*. at ¶ 21(a), and stated that he was "not aware of any illicit donation made during the 2016 Fundraiser." *Id*. at ¶ 21(b). The Congressman also allegedly said

---

[2] Although the Indictment alleges the Washington, D.C., interview occurred on July 18, 2019, the defense is informed and believes the actual date was July 17, 2019.

that he ended the 2018 call with Individual H after Individual H made a concerning comment, and that he would have been "horrified" if he learned illegal campaign contributions were made. *Id.* at ¶ 19(b)(i)–(iv); *id.* at ¶ 21.

### B. The government was plotting to indict Congressman Fortenberry even before he was interviewed by the FBI.

FBI records reveal that even before Special Agent Carter interviewed the Congressman in Nebraska, the government was already planning to charge the Congressman with multiple crimes, and was already contemplating a false-statement case. In particular, FBI documents note that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

But AUSA Jenkins told Congressman Fortenberry's then-attorney, Trey Gowdy, a very different story. *See* Exhibit A, Declaration of Harold Watson Gowdy, III (Trey).

### C. AUSA Mack Jenkins falsely represented to attorney Trey Gowdy that Congressman Fortenberry was not a target of the investigation.

After the Nebraska interview, in spring 2019, Mr. Gowdy, who had previously served as a federal prosecutor and then a United States Representative for South Carolina, took up Congressman Fortenberry's legal representation. *See* Exhibit A at ¶¶ 7–8. Mr. Gowdy contacted the FBI to discuss the possibility of Congressman Fortenberry providing the government further assistance and was referred to AUSA Jenkins. *See id.* at ¶ 8. FBI records state that ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

4
HON. JEFFREY LANE FORTENBERRY'S MOTION TO SUPPRESS STATEMENTS

███████████████████████████████

Mr. Gowdy did so. He and AUSA Jenkins discussed the general nature of the government's inquiry and the prospect of further cooperation by Congressman Fortenberry. *See* Exhibit A at ¶¶ 9–11. In performing his due diligence as Fortenberry's attorney, Mr. Gowdy asked AUSA Jenkins whether Fortenberry was "considered a subject, target, or witness" in the investigation. *Id.* at ¶ 10. Mr. Gowdy's question referenced a term that is commonly understood among federal criminal practitioners. *See id.* A "target" is, in the prosecutor's judgment, a "putative defendant"; someone whom "substantial evidence" links to the commission of a crime. *Id.* (quoting *Justice Manual* ("JM") § 9-11.151). A "subject" of an investigation is a person whose "conduct is within the scope" of an investigation, but who is not a target. *Id.* (quoting JM § 9-11.151). And finally, a "witness" would be someone with potentially relevant knowledge but who "is not suspected of a crime and is therefore unlikely to be charged." *Id.*

Despite the government's by then documented plan to charge Congressman Fortenberry with multiple crimes, and despite possessing recordings of both the 2018 call with Individual H and the 2019 Nebraska interview with Special Agent Carter, AUSA Jenkins told Mr. Gowdy that Congressman Fortenberry was not a target, but merely a *subject* "trending toward" a *witness* in the investigation. *See* Exhibit A at ¶ 12. AUSA Jenkins withheld from Mr. Gowdy the fact that the government had secretly recorded the 2018 call. He did not reveal to Mr. Gowdy his own apparent belief that Congressman Fortenberry made a false statement during the Nebraska interview. *Id.* at ¶¶ 13–14.

On the basis of AUSA Jenkins's representation and omissions, Mr. Gowdy concluded that a further interview was not unduly risky for his client. *See id.* at ¶¶ 11–12. *Without* the assurance given by AUSA Jenkins, on the other hand, a further interview would not have taken place. *Id.* Mr. Gowdy "relied on AUSA Jenkins' representations to [him,] and Congressman Fortenberry," in turn, "relied on [Mr. Gowdy's] representations" of his conversation with AUSA Jenkins. *Id.* at ¶ 12. "Based on the representation of

AUSA Jenkins, and Mr. Fortenberry's desire to help in the government's investigation," Mr. Gowdy arranged for a meeting in his office in Washington, D.C. so Mr. Fortenberry could answer any additional questions the prosecutors or agents might have. *Id.*

### D. Washington, D.C., interview (July 17, 2019)

On July 17, 2019, as arranged by Mr. Gowdy and AUSA Jenkins, Congressman Fortenberry, Mr. Gowdy, AUSAs Jenkins and Ketchel, Special Agent Carter, and IRS Agent Edward Choe met at Mr. Gowdy's law office in Washington, D.C. *Id.* at ¶ 15. AUSA Jenkins led the questioning on behalf of the government. *See id.* at ¶ 16.

The interview focused, at first, on Congressman Fortenberry's long history of congressional work on behalf of religious minorities in the Middle East. But questioning eventually turned to the 2018 call with Individual H. At that point, AUSA Jenkins's questioning took on an increasingly accusatory character. *See id.* ¶ 16.

During a twenty-minute pause in the interview, which was not recorded, Congressman Fortenberry and Mr. Gowdy conferred in the lobby area outside the interview room because the Congressman was "confused at the accusatory tone of the questioning." *Id.* ¶ 17. Mr. Gowdy "then returned to the interview room and asked AUSA Jenkins pointedly whether 'this was some bullshit 1001 case.' AUSA Jenkins assured [Mr. Gowdy] it was not." *Id.* Mr. Gowdy used the term "bullshit 1001 case" because he "believed AUSA Jenkins when he told [Mr. Gowdy] the Congressman was a subject trending toward a witness during [their] initial call." *Id.* at ¶ 18. Mr. Gowdy "wanted to know immediately" if AUSA Jenkins's view had somehow changed in that regard. *Id.* Mr. Gowdy "would not have advised Congressman Fortenberry to return to the interview room had the government not answered in the negative when [Mr. Gowdy] asked if this was a 'bullshit 1001 case.'" *Id.* "AUSA Jenkins did not seem confused by [Mr. Gowdy's] question," and did not ask Mr. Gowdy what he meant, but rather responded, "no, that's not what this is." *Id.* at ¶ 19. Mr. Gowdy was "satisfied by AUSA Jenkins's reassurances, so the interview resumed." *Id.* at ¶ 20.

After the Washington, D.C., interview, Mr. Gowdy followed up with AUSA Jenkins several times on the status of the government's investigation. *Id.* at ¶ 21. On Congressman Fortenberry's behalf, he continued to provide information in an attempt to assist the government. In January 2020, Mr. Gowdy emailed AUSA Jenkins to ask next steps; AUSA Jenkins replied with "a caveat of no promises on the timing, . . . he hoped to let [Mr. Gowdy] know something by mid-February of 2020." *Id.* at ¶ 22.

It was not until nearly sixteen months later that AUSA Jenkins advised Mr. Gowdy he "was likely to indict Congressman Fortenberry based on both the initial Nebraska interview and the subsequent Washington, D.C., interview." *Id.* at ¶ 23.

### E. Fundamental fairness and promissory estoppel call for suppressing the Nebraska and Washington, D.C., statements.

"The federal courts have long been cognizant of the responsibility of federal prosecutors meticulously to fulfill their promises." *United States v. Hudson*, 609 F.2d 1326, 1328 (9th Cir. 1979). Thus, "as a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected." *Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985) (citing *Santobello v. New York*, 404 U.S. 257, 262–63 (1971); *Hudson*, 609 F.2d at 1328; *United States v. Goodrich*, 493 F.2d 390, 393 (9th Cir. 1974)). The Ninth Circuit applies this principle to "cooperation agreements," as well, and has affirmed dismissal of an indictment as a remedy for breach of a promise not to prosecute, ruling that dismissal is "not outside the district court's discretion." *United States v. Carrillo*, 709 F.2d 35, 37 (9th Cir. 1983) ("[A]n obligation to testify did not become a condition [of the cooperation agreement] and . . . Carrillo fulfilled all other obligations under the agreement, [so,] under settled notions of fundamental fairness the government was bound to uphold its end of the bargain.").

///
///
///
///

Along with the constitutional guarantee of fundamental fairness, the equitable principles of contract law apply to prosecutors' promises to criminal defendants. *See, e.g.*, *United States v. Dudden*, 65 F.3d 1461, 1467–68 (9th Cir. 1995); *United States v. Moore*, No. 2:16-CR-00090-JAM, 2016 WL 5340649, at *1 (E.D. Cal. Sept. 23, 2016). These equitable principles include the notion of "promissory estoppel," so that (1) a promise by a prosecutor (2) that the prosecutor should reasonably expect to induce action by the defendant, and (3) which does induce such action, is binding if (4) the reliance was reasonable and (5) injustice can be avoided only by enforcement of the promise. *Moore*, No. 2:16-CR-00090-JAM, 2016 WL 5340649, at *1; *see also* Restatement (Second) of Contracts § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). In *Moore*, the district court enforced the prosecutor's statement to defense counsel that the indictment would be dismissed because defense counsel reasonably relied on it by notifying the defendant and ceasing to expend resources on the case. 2016 WL 5340649, at *1–*3.

Here, the Court should hold the government to the necessary implications of its representations that Congressman Fortenberry was not a target after the Nebraska interview and that the Washington, D.C., interview was not "some bullshit 1001 case" by suppressing the statements he made in reliance on the government's misrepresentations. The elements of promissory estoppel are satisfied, and suppression is the only way to avoid fundamental unfairness.

1. **Promises**

AUSA Jenkins represented to Mr. Gowdy that, even after the Nebraska interview, Congressman Fortenberry was not a "target" of the government's investigation but merely a subject "trending toward" a witness. Exhibit A at ¶ 12. Given that the Nebraska interview had already taken place, with AUSA Jenkins's approval and upon his instruction, this representation necessarily implied that the government was not planning

8

HON. JEFFREY LANE FORTENBERRY'S MOTION TO SUPPRESS STATEMENTS

to charge Congressman Fortenberry with any crime based on the Nebraska interview. In fact, the opposite was true. FBI records dating from before contact between Jenkins and Gowdy make clear that the government was already plotting to indict the Congressman, before even interviewing him in Nebraska. By the government's own definition, then, Congressman Fortenberry was a target by the end of March 2019, *see Justice Manual* § 9-11.151 ("A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."), contrary to AUSA Jenkins's representation.

Later, even after AUSA Jenkins elicited the Washington, D.C., statements from Congressman Fortenberry, Jenkins assured Gowdy further that the interview was not an effort to make a "bullshit 1001 case." *Id.* at ¶ 17. In the context of Jenkins's prior representation that Fortenberry was not a target—and even trending away from becoming a target—as well as the known potential misuse of § 1001 by law enforcement to *create* crimes—[3] Jenkins's denial that the Washington, D.C., interview was a "bullshit 1001 case" implied that the D.C. interview would not be used in support of a § 1001 charge based on what the government knew by that time. But in fact, AUSA Jenkins asked Congressman Fortenberry about the precise amount of money the government's informant had insinuated to him had come from a foreign source during the 2018 call. That was not an accident; the most reasonable inference is that AUSA Jenkins asked that question because he believed it would elicit a statement from the Congressman that he could use to form the basis for a false-statements prosecution, as he ultimately did.

## 2. Reasonably likely to induce reliance

Under the circumstances, AUSA Jenkins reasonably should have expected his representations to induce action by Congressman Fortenberry. AUSA Jenkins knew that

---

[3] *See, e.g., Brogan v. United States*, 522 U.S. 398, 416 (1998) (Ginsburg, J., concurring) ("the prospect remains that an overzealous prosecutor or investigator—aware that a person has committed some suspicious acts, but unable to make a criminal case—will create a crime by surprising the suspect, asking about those acts, and receiving a false denial").

Mr. Gowdy was not asking out of idle curiosity whether his client was a target. "The answer to the question of whether a client is a target, subject, or witness often dictates what level of engagement a client will subsequently have with federal agents or prosecutors." Exhibit A at ¶ 11. Thus, while Congressman Fortenberry was keenly interested in assisting the government, "it was also critical for [Mr. Gowdy] to know how those authorities viewed him, so [Gowdy] could best advise [Fortenberry]." *Id.* "Had Mr. Jenkins told [Gowdy] Congressman Fortenberry was a target . . . there would not have been a subsequent interview." *Id.* at ¶ 12; *see also id.* at ¶ 14 ("If I had known AUSA Jenkins thought Mr. Fortenberry made a false statement to an FBI agent during the initial field interview in Nebraska, there would not have been a second interview.").

Similarly, in the context of AUSA Jenkins's assurance that the Washington, D.C., interview was not an attempt to make a "bullshit 1001 case," Jenkins knew that any other response would have brought that interview to an immediate end. Jenkins did not evince any confusion at Mr. Gowdy's question or ask what he meant by it. *See id.* at ¶ 19. Gowdy's use of the phrase "bullshit 1001 case" was clear in light of his prior conversation with AUSA Jenkins in which Jenkins advised Gowdy that Fortenberry was a subject trending toward a witness, and not a target. *See* Exhibit A at ¶ 18. Mr. Gowdy would have advised ending the interview if AUSA Jenkins had "not answered in the negative when [Gowdy] asked if this was a 'bullshit 1001 case.'" *Id.* In this context, it was clear that both the "subject trending toward a witness" and not a "bullshit-1001" representations would induce Congressman Fortenberry to act differently than he would have otherwise.

### 3. Reliance was, in fact, induced

AUSA Jenkins's representations did induce action by Congressman Fortenberry. Relying on AUSA Jenkins's assurances, the Congressman agreed to answer the government's questions in Washington, D.C., and then agreed to proceed further with the interview only after the intermission during which AUSA Jenkins confirmed to Mr. Gowdy it was not a "bullshit 1001 case." *See id.* at ¶¶ 12, 20.

### 4. Reasonableness of the reliance induced

Congressman Fortenberry's reliance on AUSA Jenkins's representations was reasonable. As the Ninth Circuit has noted, "federal courts have long been cognizant of the responsibility of federal prosecutors meticulously to fulfill their promises." *Hudson*, 609 F.2d at 1328. "A prosecutor's word is his bond." *Moore*, 2016 WL 5340649 at *3. And, while no California attorney may commit "any act involving . . . dishonesty," which "constitutes a cause for disbarment or suspension," Cal. Bus. & Prof. Code § 6106, "[c]ourts expect even higher ethical standards from prosecutors." *Morrow v. Super. Ct.*, 36 Cal. Rptr. 2d 210, 217 (Cal. Ct. App. 1994), as *modified* (Jan. 5, 1995). Moreover, once Mr. Gowdy suspected that he may have initially been deceived by AUSA Jenkins's representation that Fortenberry was not a target, he followed up with AUSA Jenkins to clarify, asking him if the Washington, D.C., interview was part of a "bullshit 1001 case." This placed the onus on AUSA Jenkins to set Mr. Gowdy and Congressman Fortenberry straight regarding the government's true intentions—or to seek clarification of Mr. Gowdy's question, if AUSA Jenkins found it ambiguous. *See* Restatement (Second) of Contracts § 153 (1981) (making a contract voidable by a party who palpably mistakes their counterparty's intent). AUSA Jenkins did neither; he simply affirmed that the interview was not a "bullshit 1001."

### 5. Injustice can be avoided only through enforcement

Finally, injustice can be avoided only by an order prohibiting the government from using the Nebraska or Washington, D.C. statements as a basis for § 1001 charges. Here, the government knew that Congressman Fortenberry did not know of his campaign receiving illegal contributions in 2016. Nevertheless, the government fed the nine-term Congressman insinuations about the foreign source of the money through an informant two-and-a-half years later in one secretly recorded ten-minute call, nearly an entire year before questioning him about that call under false pretenses, withholding its recordings of him, and then doubling down on the initial deception of defense counsel concerning the government's intentions to prosecute Congressman Fortenberry under § 1001.

Defendants have a due process right to enforce governmental promises. *See, e.g.*, *Lumpkin*, 769 F.2d at 633. And, for their part, the courts have wider concerns "for the honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." *United States v. Thompson*, 403 F.3d 1037, 1039 (8th Cir. 2005); *see also United States v. Jensen*, 996 F. Supp. 2d 1151, 1154 (D. Utah 2014) ("Conduct by government prosecutors that in the market place would constitute breach of contract or give rise to promissory estoppel will practically always reflect constitutionally unfair conduct in transactions between sovereign and citizens in matters of liberty and punishment." (citations omitted)).

Rather than promoting public confidence in the fair administration of justice, allowing the government to use Congressman Fortenberry's statements in the Nebraska or Washington, D.C., interview against him would only encourage prosecutors to deceive defense counsel in the pre-indictment context. This would make due diligence by defense counsel in preparing for pre-indictment cooperation meaningless, which would mean, as a practical matter, that individuals represented by counsel would only virtually never cooperate before indictment. That is why the government's promises must be enforced, where the defendant has detrimentally relied on them.

### III.   CONCLUSION

For the foregoing reasons, Congressman Fortenberry respectfully moves the Court to suppress his Nebraska and Washington, D.C., statements.

Date: November 30, 2021

BIENERT KATZMAN
LITTRELL WILLIAMS LLP

By:_____
John L. Littrell
Ryan V. Fraser
*Attorneys for Hon. Jeffrey Lane Fortenberry*