TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:     (213) 894-3289
        Facsimile:     (213) 894-0141
        E-mail:        mack.jenkins@usdoj.gov
                       jamari.buxton@usdoj.gov
                       susan.har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00491-SB |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY; DECLARATION OF FBI SPECIAL AGENT TODD CARTER; EXS. 1-9 |
| v. | |
| JEFFREY FORTENBERRY, | |
| Defendant. | Hearing Date:     1/11/2022<br>Hearing Time:     8:30 a.m. |
| | Indictment: 10/19/2021<br>Pretrial Conference: 2/8/2022 at 8:00 a.m.<br>Trial: 2/15/2022 at 8:00 a.m.<br>Last Day: 3/2/2022 |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby files its

opposition to defendant JEFFREY FORTENBERRY's ("defendant") motion to compel discovery (Dkt. No. 30).

This opposition is based upon the attached memorandum of points and authorities, the supporting declaration and exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 14, 2021

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

     /s/
SUSAN S. HAR
MACK E. JENKINS
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTON                                                                            PAGE(S)

TABLE OF AUTHORITIES ................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.      INTRODUCTION ........................................................................................ 1

II.     RELEVANT FACTS .................................................................................... 2

        A.      Discovery to Date ........................................................................... 2

        B.      The Parties' Discovery Requests and Responses .......................... 5

        C.      Without the Court-Ordered Meet and Confer, Defense Counsel
                Unilaterally Files His Motion and Makes Baseless Allegations of
                Bias in a Public Filing ................................................................... 9

III.    LEGAL STANDARD .................................................................................. 11

IV.     ARGUMENT .............................................................................................. 13

        A.      The Defense Makes Inflammatory Claims of Bias Without Any
                Evidence ......................................................................................... 13

        B.      The Defense's Demand for Privileged, Internal Communications
                Fails .............................................................................................. 166

                1.      The Government Has Already Produced Discoverable
                        Evidence Pertaining to Materiality ...................................... 16

                2.      The Defense Demands Internal Communications That Are Not
                        Discoverable Under Rule 16(a)(2) ...................................... 18

                3.      The Defense Demands Internal Communications That Are Not
                        *Brady* ................................................................................ 19

        C.      The Defense's Demands for Information Regarding the "Department
                of Justice's Requirements" Fails ................................................... 24

V.      CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

<u>Brady v. Maryland</u>,
    373 U.S. 83 (1963) .............................................................................. 12

<u>Brogan v. United States</u>,
    522 U.S. 398 ...................................................................................... 16

<u>Giglio v. United States</u>,
    405 U.S. 150 (1972) ........................................................................ 6, 12

<u>Gollaher v. United States</u>,
    419 F.2d 520 (9th Cir. 1969) ............................................................ 18

<u>Jencks v. United States</u>,
    353 U.S. 657 (1957) .......................................................................... 12

<u>Kungys v. United States</u>,
    485 U.S. 759 (1988) .......................................................................... 16

<u>Marshall v. Jerrico, Inc.</u>,
    446 U.S. 238 (1980) .......................................................................... 23

<u>Morris v. Ylst</u>,
    447 F.3d 735 (9th Cir. 2006) ............................................................ 23

<u>Pennsylvania v. Ritchie</u>,
    480 U.S. 39 (1987) ...................................................................... 12, 19

<u>United States v. Serv. Deli Inc.</u>,
151 F.3d 939 (9th Cir. 1998) ............................................................ 16-17

<u>United States v. Adamson</u>,
    291 F.3d 606 (9th Cir. 2002) ............................................................ 17

<u>United States v. Armstrong</u>,
    517 U.S. 456 (1996) .......................................................................... 22

<u>United States v. Bagley</u>,
    473 U.S. 667 (1985) .................................................................... 12, 19

TABLE OF AUTHORITIES (CONTINUED)

CASES                                                                                              PAGE(S)

United States v. Blinder,
  10 F.3d 1468 (9th Cir. 1993) ....................................................................... 17

United States v. Edwards,
  42 F.R.D. 605 (S.D.N.Y. 1967) ................................................................... 18

United States v. Garcia-Paz,
  282 F.3d 1212 (9th Cir. 2002) ..................................................................... 17

United States v. Ghailani,
  687 F. Supp. 2d 365 (S.D.N.Y. 2010) ........................................................ 18

United States v. Hernandez-Meza,
  720 F.3d 760 (9th Cir. 2013) ....................................................................... 18

United States v. Hopkins,
  2008 WL 4453583 (E.D. Cal. Oct. 3, 2008) ............................................... 15

United States v. Jack,
  263 F.R.D. 640 (E.D. Cal. 2010) ................................................................ 18

United States v. Kohring,
  637 F.3d 895 (9th Cir. 2011) ....................................................................... 23

United States v. Lucas,
  841 F.3d 796 (9th Cir. 2016) ................................................................. passim

United States v. Mayes,
  917 F.2d 457 (10th Cir. 1990) ............................................................... 12, 23

United States v. Michaels,
  796 F.2d 1112 (9th Cir. 1986) ................................................. 13, 20, 21, 23

United States v. Peterson,
  538 F.3d 1064 (9th Cir. 2008) ........................................... 16, 17, 21, 22

United States v. Mincoff,
  574 F.3d 1186 (9th Cir. 2009) ........................................................... 20, 23

United States v. Price,
  566 F.3d 900 (9th Cir. 2009) ............................................................... 12, 19

TABLE OF AUTHORITIES (CONTINUED)

<u>United States v. Rinn,</u>
   586 F.2d 113 (9th Cir. 1978) ........................................................ 15

<u>United States v. Welton,</u>
   2009 WL 2390848 (C.D. Cal. Aug. 1, 2009) ............................... 15

<u>Weatherford v. Bursey,</u>
   429 U.S. 545 (1977) ...................................................................... 11

**Statutes**

18 U.S.C. § 3500 ................................................................... 11, 13

**Other**

Fed. R. Crim. P. 16 .......................................................... 6, 8, 11-12

Cal Bar Rule 3.1 ......................................................................... 1

Local Civ. Rule 7-3 ...................................................................... 10

Local Civ. Rule 37-1 .................................................................... 10

Local Crim. Rule 57-1 .................................................................. 10

1

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

2

## I.  INTRODUCTION

3

Defendant's motion seeking to compel already-produced, forthcoming, or

4

privileged records again relies on false facts and misconstrued law.  The government has

5

broadly provided discovery, including numerous records demonstrating why defendant's

6

lies—denying what he knew about the illicit foreign and conduit contributions made to

7

his re-election campaign to federal investigators looking into illegal campaign

8

contributions—were material.  To date, the government has produced over 12,000 pages

9

of records documenting the lifespan of the federal investigation going back to 2015—all

10

months before trial.  Defendant's demand for internal, privileged communications by

11

government attorneys and agents in connection with investigating or prosecuting the

12

case—none of which contain discoverable facts under <u>Brady</u>—fails, as such

13

communications are explicitly exempt from discovery.  Defendant's claim that he is

14

immediately entitled to <u>Giglio</u> records also fails because the government has already

15

explained that such records, to the extent not already produced, will be provided at a

16

reasonable date in advance of trial once it has determined which witnesses it will call.

17

(<u>See</u> Dkt. No. 31, Ex. D ["Nov. 23 Letter"].)   In short, much of defendant's motion is

18

unnecessary or premature and not tethered to any recognized legal basis for relief.

19

This motion is problematic for another reason.  Defense counsel, John Littrell,

20

uses this motion to broaden his personal attacks, this time by publicly accusing a career

21

federal agent by essentially calling him a racist without mustering <u>any</u> evidentiary

22

support.[1]  Moreover, despite being previously put on notice of the Court's meet-and-

23

confer requirements[2],  Mr. Littrell again violated both this Court's Criminal Standing

24

25

26

27

[1] (<u>See</u> Mot. at 13 ("Special Agent Carter's apparent anti-Middle Eastern bias . . ."); <u>see</u> also Cal. Bar Rule 3.1(a) ("A lawyer shall not . . . assert a position in litigation . . . without probable cause and for the purpose of harassing or maliciously injuring a person.").

28

[2] Specifically, government counsel put the defense on notice after defense counsel failed to comply with those requirements before filing the motion challenging venue. (<u>See</u> Dkt. No. 14; see also Ex. 9.)

Order and the Local Rules for this district by filing the motion without engaging in the requisite meet and confer with government counsel.  As a result, the government was deprived of the opportunity to correct these (and other) false allegations prior to the public filing of defendant's motion and was further deprived of the opportunity to seek relief by way of an under-seal filing or protective order—the common procedure when litigating purported <u>Giglio</u>/<u>Henthorn</u> material, particularly when, like here, the veracity of such information is dubious and the risk of unnecessary and significant damage to a public servant is high.

Mr. Littrell's vague, equivocal, and passive accusation, made without any attribution whatsoever ("defense counsel <u>is informed</u> that FBI Special Agent Todd Carter . . . <u>may have</u> approved" the images) is demonstrably false, and he has provided no reasonable basis for believing otherwise.  (<u>See</u> Mot. at 12.)  As explained below (<u>see</u> Section IV, subsection (a), <u>infra</u>) and in the attached declaration, Agent Carter has <u>never</u> "approved, 'liked,' or shared" the images displayed in the motion—or any other images or messages reflecting an anti-Muslim or anti-Arab bias.

This Court should deny defendant's motion in full.  Because defendant's motion contains unsubstantiated, false allegations against a federal agent, filed in violation of the Court's Order, the Local Rules, and arguably the State Bar Rules, the government additionally requests that this Court strike the motion in its entirety and order Mr. Littrell to file a clean motion.  While the damage to Agent Carter has already been done, such incendiary falsehoods should not be permitted to remain on a public docket absent any supporting evidence.

## II.    RELEVANT FACTS

### A.    Discovery to Date

The Indictment charges the following counts: Count One alleges that defendant engaged in a scheme to falsify and conceal material facts from on or about June 4, 2018 to about July 18, 2019.  Counts Two and Three allege that defendant made false statements on or about March 23, 2019, and July 18, 2019, respectively.

2

Notwithstanding the relatively constrained date range of the charged offenses, the government has taken a very broad approach to discovery and provided records documenting the steps taken in the investigation going back to its inception in 2015.  By way of summary, the investigation began when Los Angeles FBI learned of suspicious wire transfers from Gilbert Chagoury, a Nigerian-born, billionaire businessperson of Lebanese descent (whom defendant has personally met with on multiple occasions) to Individual H, who then routed similar amounts of money close in time to the campaign of a U.S. Representative in California.  (See Dkt. No. 18 at 4.)  In the investigation that followed, the federal government learned that Chagoury provided approximately $180,000 in illegal political contributions to four different United States political candidates—including defendant—with the assistance of Toufic Baaklini (a good friend of defendant), Individual H (an acquaintance of defendant who hosted a fundraiser for him in 2016), and others.  (Id.)  Thus, from the start, the federal investigation was focused on illicit foreign and conduit contributions to recipient politicians; whether any person sought to impermissibly influence the recipient politician in exchange for the contributions; and whether any recipient politician took any official acts in connection with the illicit contributions.   (Indictment ¶ 1; see also Dkt. No. 18 at 3-9 (setting forth detailed Statement of Facts).)

Government's Exhibit 1 is a detailed, 21-page discovery log of all productions made to the defense so far.  That log shows that the government has produced over 12,000 pages of records dating back to 2015, including various reports; emails and text messages; witness statements; draft transcripts; court process; and relevant internal FBI administrative papers, including agency approvals.  The government has also produced over 60 audio/video recordings—all months before trial.

The log itself deliberately acts as a comprehensive chronology of the steps taken during the federal investigation, complete with dates and detailed descriptions of each event and/or evidentiary item.  As Exhibit 1 demonstrates, the government has provided records pertaining to the investigation into defendant, including:

- Evidence of the approximately $30,000 of illegal funds that defendant's campaign (indisputably) received in 2016, including witness statements and interview reports of the conduits, Baaklini, Chagoury, and Individual H;

- Communications between defendant and Baaklini, the main facilitator of the illegal campaign funds and evidence of defendant's friendship with Baaklini;

- Evidence of defendant's relationship with Chagoury and their strongly shared political and pro-Christian interests, including defendant's official acts he conducted at relevant times in furtherance of those interests;

- Defendant's communications with Individual H, including defendant's requests to Individual H to host another fundraiser in 2018;

- Defendant's communications with Individual H discussing the fact that $30,000 in contributions from the 2016 fundraiser had been provided by Baaklini (originating from Chagoury);

- Evidence of defendant's contact of Baaklini where he sought an in-person meeting immediately following his communication with Individual H about Baaklini being the source of the illegal funds;

- Defendant's Federal Election Commission filings, which remained uncorrected after learning he had received illicit funds;

- Defendant's recorded statements and affirmative lies to federal investigators denying knowledge of the illegal campaign funds he received;

- Records showing the subsequent investigative steps taken after defendant's interviews, such as conducting additional interviews of witnesses, including (1) a witness who specifically recalled warning defendant to be aware of illegal conduit contributions at the Los Angeles fundraiser, and (2) Baaklini, who specifically recalled that defendant expressed concern about the legality of the contributions defendant received at the Los Angeles fundraiser immediately after the event; and

4

- Records showing investigators obtaining and reviewing additional documents and phone data.

(See Ex. 1.)

But the government has not only produced evidence of the investigation into defendant. In furtherance of the government's decision to provide discovery broadly in this matter, the government has also produced discovery relating to the investigation into the three other campaign contribution schemes involving Chagoury's money.[3]

**B.   The Parties' Discovery Requests and Responses**

On November 10, 2021 and November 17, 2021, the defense requested information and discovery falling into five categories. (See Dkt. No. 31, Exs. B, C.) On November 23, 2021, the government provided a letter that included enumerated responses to the requests, identified relevant discovery already produced, and asked several clarifying questions. (Nov. 23 Letter.) The parties' requests and responses are as follows:

1) **Privileged Internal Communications.** The defense sought all communications involving AUSAs Jenkins, Ketchel, Har; the U.S. Attorney; the Chief of the Criminal Division; FBI Special Agents Carter and Choe; or "any other person" relating to the allegation that defendant's statements affected the Federal Investigation. (See Ex. B at 1.) The defense sought "any and all communications" supporting allegations of materiality and venue in the Central District of California. (See id. at 1-2.)

   a. **The government's response was three-part:**

      i. **Records Regarding Materiality and Venue Had Already Been Produced:** Discovery was produced on November 1, 3, 8, and 12, 2021 detailing the chronology of the Federal Investigation from 2015 to present,

---

[3] Because of the sensitivities inherent in the other aspects of the federal investigation—some of which are still ongoing—as well as the highly detailed nature of its discovery log, the government has concurrently filed an application to seal Exhibit 1.

including the events leading up to and following defendant's interviews demonstrating how they were material to and affected the Federal Investigation.  (<u>See</u> Nov. 23 Letter at 1; <u>see also</u> Ex. 1.)

ii. **<u>Privileged Records Were Withheld:</u>**  Internal communications and documents are privileged under the government work product privilege.  (<u>See</u> Nov. 23 Letter at 1 (citing Fed. R. Crim. P. 16(a)(2)).

iii. **<u>Request for Clarification.</u>**  In light of the plain language of the privilege under Rule 16(a)(2), the government requested that the defense provide "specific legal authority" supporting their request for internal communications.  (<u>Id.</u>)

2) **Agreements Under <u>Giglio</u>.**  The defense requested writings or oral communications setting forth agreements with various witnesses "or any other government informant" and cited <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  (<u>See</u> Ex. B at 2.)

a. **The government's response was three-part:**

i. **<u>Records of Most Agreements Had Already Been Produced:</u>**  Early productions of the requested agreements had already been made at JF00011270-00011360 (Agreements with Joseph Arsan, Toufic Baaklini, Gilbert Chagoury, and Ray LaHood).  (<u>See</u> Nov. 23 Letter at 2.)

ii. **<u>Additional Records Were Forthcoming:</u>**  The government advised that any remaining relevant <u>Giglio</u> evidence will be produced reasonably in advance of trial

after the government determines which witnesses it will call.  (Id.)

iii. **Clarification:**  With regard to the defense request for "oral" agreements, the government advised that there were no agreements between the government and witnesses that were not in writing and expressly agreed to by both parties.  (Id.)

3) **Giglio of Government Witnesses.**  The defense sought evidence of bias of "any prospective government witness," including any expression of anti-Muslim bias by Special Agent Todd Carter.  (See Ex. B at 2.)

   a. **The government explained that relevant records were forthcoming:**  The government advised that relevant Giglio evidence will be produced reasonably in advance of trial after the government determines which witnesses it will call.  (Nov. 23 Letter at 2.)

4) **Records Regarding DOJ "Requirements."**  The defense requested information and communications relating to purported Department of Justice "requirements" for "secretly recording Congressman Fortenberry" and for "using a 'ruse' to interrogate Congressman Fortenberry."  (See Ex. C.)  The defense referenced only section 9-7.302 of the Justice Manual.  (Id. at 1.)  No other sections of the Justice Manual or "requirements" were cited. (See id.)

   a. **The government's response was four-part:**

      i. **Records of Internal Approvals Had Already Been Produced:**  FBI approvals for the investigation had already been provided at the specified Bates-numbered documents.  (Nov. 23 Letter at 2-3.)

ii. **Privileged Records Were Withheld:** Internal communications and documents are privileged under the government work product privilege.  (Id. at 3-4 (citing Fed. R. Crim. P. 16(a)(2)).

iii. **Request for Clarification.**  The government requested that the defense specify the purported Department of Justice "requirements."  The government also referred the defense to its explanation of the inapplicability of Section 9-7.302.  (Nov. 23 Letter at 2-3 (citing to Dkt. No. 28 at 7).)  The government also reminded the defense that it had made the same baseless allegations regarding the failure to obtain approvals directly in its charging decision appeal to the Office of the Deputy Attorney General ("ODAG") and that ODAG permitted the indictment to proceed and made no reference to any lacking approvals.  (Nov. 23 Letter at 3.)

iv. **Clarification.**  The government also clarified that it was not clear to what "ruse" they were referring, that defendant was not interviewed pursuant to a ruse, but that approval for the use of a ruse had been obtained and directed the defense to already produced documents at JF0002453-2460 and JF0002482-2487.  (Id. at 3-4.) [4]

The government concluded by reminding defense counsel of its four requests for reciprocal discovery.  (Id. at 4.)  The government asked defense counsel to confirm it would provide reciprocal discovery and an expected date for the production.  (Id.)

---

[4] The defense also requested audio and/or video recordings and copies of transcriptions or summaries of witness statements and interviews related to the investigation.  (Def.'s Ex. B at 2.)  The government advised that it had already provided the requested records and that any additional such records that are made or created would be promptly provided.  (Nov. 23 Letter at 2.)  Defendant's motion does not seek to compel these records.

8

### C.   Without the Court-Ordered Meet and Confer, Defense Counsel Unilaterally Files His Motion and Makes Baseless Allegations of Bias in a Public Filing

After the government provided its Nov. 23 Letter, the defense did not respond to any of the government's requests for clarification as to what Department of Justice requirements the defense was referencing or provide any legal authority for requiring the production of privileged internal communications.  Nor did the defense respond by providing any legal authority as to why it was entitled to any forthcoming <u>Giglio</u> disclosures <u>immediately</u>, as opposed to reasonably in advance of trial, or by proposing its own schedule for such disclosures.  The defense also did not respond to the government's inquiries about reciprocal discovery.

Rather, on the Sunday of Thanksgiving weekend (November 28, 2021 at 12:24 p.m.), Mr. Littrell sent an email to government counsel announcing that he would file a motion to compel discovery along with a motion to suppress defendant's statements "this week" with a hearing date for both motions of Tuesday, "December 21".  (<u>See</u> Ex. 2 at 3.)  Although the email provided a paragraph full of specific details supporting its motion to suppress, the motion to compel simply referenced "the discovery that you declined to produce as set forth in your November 23, 2021 letter."  (<u>Id.</u>)  But the government's letter was not a blanket declination; in fact, it agreed to produce some of the exact discovery that is the subject of this motion.  Mr. Littrell concluded his email by asking, "Please let us know if you think we can resolve either of these disputes without filing these motions."  (<u>Id.</u> at 4.)

The very next morning (Monday, November 29, 2021 at 10:41 a.m.), before the government had a chance to respond to Mr. Littrell's Sunday email that purported to solicit the government's views, without any meet and confer, and a day early according to his proposed briefing schedule,[5] Mr. Littrell filed a 15-page motion to compel discovery.  (<u>See</u> Ex. 3 (ECF Notice).)  Among other things, the motion publicly alleged

_____

[5] Consistent with normal scheduling, defendant did not file his motion to suppress until the next day, and after the government again raised the issue of defendant's failure to meet and confer.

that Agent Carter "appear[ed] to have been sharing and 'liking' racist images and content on social media platforms" and, based on that unattributed and speculative fact alone, accused him of harboring an "anti-Muslim, anti-Arab bias." (Mot. at 1.)

Under this Court's Criminal Standing Order, a moving party must "[m]eet and confer before filing a motion and describe the resolution efforts in the notice of motion." (Dkt. No. 8 ["Court's Standing Order"] at 4.) The Local Rules for the Central District of California set forth similar meet and confer requirements. See Local Crim. Rule 57-1; Local Civ. Rule 37-1 (requiring parties to "confer in a good-faith effort" to eliminate or narrow need for motion; requiring "counsel for the moving party to arrange for this conference); see also Local Civ. Rule 7-3 (requiring a meeting, "preferably in person," to "thoroughly" discuss the substance of any motion and any potential resolution "at least" seven days prior to filing the motion).

By filing this motion without a meet and confer in violation of the Court's Standing Order and the Local Rules, defense counsel prematurely and unilaterally cut off the parties' ongoing discussion regarding the scope and timing for the production of discoverable records; failed to provide any notice that it would make public allegations of bias against a federal agent without citing to any evidence; failed to engage in any discussion with the government regarding its anticipated allegations of bias prior to the filing; and deprived the government of the opportunity to seek relief by way of an under-seal filing or protective order. Each of these avoidable results is precisely why meet-and-confers exist. Violation of the meet-and-confer requirement had real and foreseeable consequences. As Mr. Littrell knows, the press has closely followed this case. (See, e.g., Ex. 4 (also available at https://nebraskapublicmedia.org/en/news/news-articles/protective-order-filed-in-congressman-fortenberrys-federal-indictment-case/ (Mr. Littrell providing a statement to the press); Ex. 9 (noting that the defense provided a copy of its venue motion to the press).) The damage from Mr. Littrell's baseless accusations of bias was nearly immediate; within a day, multiple news outlets had reported on these allegations, regurgitating the allegations of "anti-Muslim" and "anti-

Arab" bias against the federal agent, while glossing over the critical fact that they were made without any attribution or evidence.  (See, e.g., Exs. 5-7 (various news articles).)

As stated above, this is not Mr. Littrell's first violation of the meet and confer requirement.  The defense failed to meet and confer prior to filing its motion to dismiss for lack of venue.  (See Dkt. No. 14; Ex. 9.)  Tellingly, the notice for that motion does not describe any meet and confer efforts as required.  (Dkt. No. 14 at 1; see Court's Standing Order at 4 (ordering moving party to "[m]eet and confer before filing a motion and describe the resolution efforts in the notice of motion").)  At the time of that filing, government counsel put Mr. Littrell on notice of his violation and advised that, as a professional courtesy, it would not raise the issue with the Court but that the government expected compliance with the Court's order moving forward.[6]

## III.   LEGAL STANDARD

"There is no general constitutional right to discovery in a criminal case, and Brady did not create one."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  There are three sources of the government's discovery obligations in a criminal case.

*First*, Rule 16 of the Federal Rules of Criminal Procedure establishes guidelines for pretrial production by the government of seven categories of material (set forth in subsections(a)(1)(A)-(G)), including documents and objects within the government's possession, custody, or control that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  The rule contains a carve-out for items that are otherwise discoverable under Rule 16(a)(1)(E).  Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), the rule "does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P. 16(a)(2).  Rule 16(a)(2) also excludes discovery or inspection of statements

---

[6] Consistent with that representation, the government opposition to defendant's venue motion makes no reference to defendant's failure to meet and confer.

11

made by prospective government witnesses except as provided in 18 U.S.C. §3500 (the Jencks Act).[7]  Id.

*Second*, under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), the government must turn over evidence in its possession that is favorable to the defense or that may be used by the defense for impeachment purposes.  Specifically, Brady "requires disclosure only of evidence that is both favorable to the accused and material either to guilt or to punishment.  United States v. Bagley, 473 U.S. 667, 674 (1985) (citations omitted).  Evidence is material under Brady only if there is a "reasonable probability" of a different result, had the evidence been disclosed to the defense.  Id. at 682.  Put another way, a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.  Id.  The Ninth Circuit has suggested, without explicitly so holding, that "inadmissible evidence can be material under Brady, if it could have led to the discovery of admissible evidence."  United States v. Price, 566 F.3d 900, 911 (9th Cir. 2009) (citation omitted).

Under Brady, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."  Bagley, 473 U.S. at 675 & n.7 (collecting cases).  That is because "Brady does not permit a defendant to sift through information held by the government to determine materiality."  United States v. Lucas, 841 F.3d 796, 807 (9th Cir. 2016) (citing Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987)); see also United States v. Mayes, 917 F.2d 457, 461 (10th Cir. 1990) ("The constitution does not grant criminal defendants the right to embark on a 'broad or blind fishing expedition among documents possessed by the Government.'" (quoting Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rather, "[i]t is the government, not the defendant or the trial court, that decides prospectively what information, if any, is material and must be disclosed

---

[7] It is worth noting that Rule 16 also provides for reciprocal discovery by the defendant.  Fed. R. Crim. P. 16(b)(1).  To date, despite requests, defendant has not provided any reciprocal discovery.  In the same way that Rule 16(a)(2) limits a defendant's access to certain, privileged documents, Rule 16(b)(2) affords the defense the same protections.  Fed. R. Crim. P. 16(b)(2).

12

under <u>Brady</u>."  <u>Lucas</u>, 841 F.3d at 807 (emphasis in original).  The government need not submit "close questions regarding materiality to the court for <u>in camera</u> review."  <u>Id.</u>; <u>United States v. Michaels</u>, 796 F.2d 1112, 1116 (9th Cir. 1986) ("Nor does <u>Brady</u> require the trial court to make an <u>in camera</u> search of the government files for evidence favorable to the accused." (citation omitted)).

Third, under 18 U.S.C. § 3500 (the Jencks Act), statements by a government witness that relate to the subject matter of the witness's testimony are required to be disclosed to the defense <u>after</u> the witness has testified.

## IV.   ARGUMENT

### A.   <u>The Defense Makes Inflammatory Claims of Bias Without Any Evidence</u>

After ignoring the government's response that it will provide relevant <u>Giglio</u> reasonably in advance of trial and after failing to meet and confer with the government, defense counsel filed a public motion making inflammatory allegations of anti-Arab and anti-Muslim bias against a federal agent.

Defense counsel dedicates a single sentence to "explaining" the basis for the unsubstantiated allegation.  Mr. Littrell claims that "defense counsel <u>is informed</u> that FBI Special Agent Todd Carter . . . <u>may have approved, "liked," or shared multiple violent images and messages</u> on <u>various</u> social media platforms that demonstrate bias[ . ]. . ." (Mot. at 12 (emphasis added).)  This statement is followed by two inflammatory illustrated images depicting what appears to be Christian Crusaders attacking people of Middle Eastern descent and/or Muslims.  Bewilderingly, defense counsel presents absolutely no attribution or authentication for the source of this alleged "information." Most tellingly, he does not even offer a conclusory declaration averring to the truth of any of it.   The images are devoid of any context; for instance, they do not indicate the specified social media platform (let alone "various" ones) or display, as one would expect consistent with the accusation, some sort of evidence of Agent Carter's alleged "approval," "liking," or "sharing" of the images vis-à-vis a social media platform, as Mr.

Littrell claims.[8]  (See Mot. at 17.)  The images have no reference to Agent Carter anywhere.

Because defense counsel omits any details of the source of his allegations, the government is left to infer that Mr. Littrell obtained his playbook from the defense team of another individual who was the subject of a national security aspect of this same federal investigation.  That other defense team previously made the same baseless accusations against Agent Carter but at least provided the (ultimately erroneous) basis for the allegations.  According to that defense team, the two images displayed in Mr. Littrell's motion had purportedly been posted to Facebook "Pages"; one was posted by the Page "Knights Templar" on October 22, 2015 and the other by the "Page" "Cavalieri Templari e Templarismo" on September 12, 2016.  (See Ex. 8.)  The other defense team claimed that Agent Carter "liked,"[9] at some undefined time, these two "Pages" and therefore, by extension, implicitly expressed an approval of every single image on the Pages, including these specific images.  Unlike Mr. Littrell here, they did not allege that Agent Carter had liked, shared, or approved the images directly.

These—and any other claims of bias—are utterly baseless.  As set forth in his declaration, Agent Carter has never intentionally used any social media platform (including Facebook) to post, like, share, comment on, or otherwise "approve" any post, photograph, image, or meme that expresses violence or hatred towards Muslims or people of Middle Eastern descent, including the two images displayed in Mr. Littrell's motion.  (Carter Decl. ¶ 9.)  Agent Carter has never even seen these two images on Facebook or any other social media platform.  (Id. ¶¶ 6-7.)  Indeed, according to a review of Agent Carter's Facebook Activity Log, he never even "liked" the Pages of

---

[8] The use of the word "or" here further underscores the lack of credibility behind this allegation.  Presumably, if someone had evidence of social media activity sufficient to publicly attribute bias against another individual, the accuser would at least know how that manifestation of bias occurred since it would be the entire basis of the claim—and would provide proof of the alleged social media activity by way of a screenshot, timeline, or something similar.

[9] On Facebook, a user can "like" a "Page" by clicking a "like" button even without navigating to the Page itself.

these two groups that apparently posted the offending images.[10]  (Id. ¶ 8.)  Agent Carter does not have and has not demonstrated any anti-Muslim or anti-Arab bias period, and he certainly did not have an improper bias against defendant that may have "influenced the course of the investigation," as the defense opaquely speculates.  (Mot. at 14.)  An agent's nonexistent bias did not cause defendant to lie repeatedly to federal investigators during voluntary interviews about the illicit contributions that were funneled to his re-election campaign by his good friend and acquaintances—lies for which he had multiple obvious motives.

As the government already explained to defense counsel in its November 23 Letter, relevant Giglio evidence (to the extent it exists) will be provided reasonably in advance of trial for the witnesses the government decides to call.  The government's intended timing for the disclosures—reasonably in advance of trial, as opposed to prior to the witness testifying—already goes above what Giglio requires.  See United States v. Rinn, 586 F.2d 113, 119 (9th Cir. 1978) (explaining that because Giglio material "merely goes to the credibility of the witness, it need not be disclosed prior to the witness testifying"); United States v. Welton, No. CR 09-00153 MMM, 2009 WL 2390848, at *7 (C.D. Cal. Aug. 1, 2009) ("Because evidence which is potentially impeaching merely goes to a witness' credibility, courts generally hold that disclosure in advance of trial is not required" (citation omitted)) (collecting cases).   That includes any agreement with Individual H, which, in any event, has now been produced.  Rinn, 586 F.2d at 119 ("[S]ince information concerning 'favor or deals' merely goes to the credibility of the witness, it need not be disclosed prior to the witness testifying."); United States v. Hopkins, No. CR S-05-0538 EJG GGH, 2008 WL 4453583, at *2 (E.D. Cal. Oct. 3, 2008) ("[T]he common sense perception that a witness' bias or reputation for prevaricating, for example, is only important if the witness actually testifies.").

_____

[10] These allegations, which were previously submitted to FBI's Internal Affairs Section by the other defense team, never made it out of the FBI's Initial Processing Unit due to the lack of any credible basis for further investigation.  No adverse findings were made against Agent Carter and the matter was closed.

**B.     The Defense's Demand for Privileged, Internal Communications Fails**

Defendant demands privileged internal communications involving the U.S. Attorney; the Chief of the Criminal Division of the U.S. Attorney's Office; Assistant U.S. Attorneys currently or previously assigned to this matter; and FBI special agents assigned to the investigation relating to the materiality of defendant's statements, as well as venue in this district.  (Ex. B. at 1-2.)

Defendant's demand should be rejected because: (1) the government has already produced discoverable evidence pertaining to the materiality element under section 1001, as well as venue in this district; (2) the internal communications that the defense seeks are explicitly exempt from discovery pursuant to Rule 16(a)(2); and (3) the internal communications are not discoverable under Brady because they are neither "favorable to the accused" nor "material either to guilt or to punishment."

      1.     The Government Has Already Produced Discoverable Evidence Pertaining to Materiality

Again, defendant chooses to ignore binding Supreme Court and Ninth Circuit law on materiality, rather than contend with Kungys v. United States, 485 U.S. 759 (1988), Brogan v. United States, 522 U.S. 398 (1998), United States v. Serv. Deli Inc., 151 F.3d 938 (9th Cir. 1998), United States v. Peterson, 538 F.3d 1064 (9th Cir. 2008), and the rest.

The government will not repeat its extensive explanation and analyses of controlling precedent defining materiality within the meaning of section 1001.  (See Dkt. No. 27 [Consolidated Opp'n to MTD for Failure to State and Offense]; see also Dkt. No. 18 at 14-16 [Opp'n to MTD for Lack of Venue].)  The government only briefly summarizes that materiality is satisfied if the statement "had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities."  (Ninth Circuit Model Jury Instruction No. 8.73.)  As the Ninth Circuit has explained ad nauseam, the false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material.  See, e.g., Serv. Deli

1  Inc., 151 F.3d at 941 (citations omitted) (emphasis added).  Accordingly, the materiality

2  inquiry looks to the statement's "intrinsic capacity to influence, not its probability of

3  causing influence."  Peterson, 538 F.3d at 1072.[11]

4      To that end, the government has provided to the defense all recordings of

5  defendant's false and misleading statements to federal investigators, draft transcripts of

6  those statements, and FBI reports summarizing those statements.  (See Ex. 1.)  Proof of

7  materiality can be found by even a cursory skim through that evidence.  The government

8  has also provided evidence of each step taken in the investigation into defendant, from

9  the events leading up to the 2016 fundraiser where defendant's campaign received illicit

10 funds, to the follow-up steps federal investigators took after defendant repeatedly lied in

11 a second interview that defendant requested, and everything in between.  The

12 government even voluntarily provided evidence of the investigative steps it took in

13 connection with other recipient politicians (including seeking interviews of other

14 politicians) so that the defense could have a complete picture of the scope and nature of

15 the larger federal investigation.

16     The discovery that the government provided thoroughly documents defendant's

17 false statements and shows why lying about the illegal foreign and conduit contributions

18 to his campaign by his friends and associates—to federal investigators looking into

19

20     [11] Contrary to defendant's characterization, the government has always faithfully
and consistently adhered to the controlling definition of materiality under binding

21 Supreme Court and Ninth Circuit precedent.  (See Dkt. Nos. 18, 27; see also Dkt. No. 28
at 4-5.)  The Indictment expressly alleges that defendant is charged with falsifying,

22 concealing, and covering up by trick, scheme, and device material facts and knowingly
and willfully making materially false statements and representations.  (Dkt. No. 1 ¶¶ 18,

23 21, 21 (emphasis added).)  The Indictment also alleges venue in this district by alleging
defendant's interviews affected the investigation "in the Central District of California,"

24 where the investigation was ongoing.  (See id. (emphasis added).)  The Indictment
provides more than fair notice to defendant by "inform[ing] the accused of the specific

25 offense with which he is charged."  United States v. Blinder, 10 F.3d 1468, 1476 (9th
Cir. 1993) (citation omitted).  Nothing about the language of the Indictment restricts the

26 government's ability to apply the correct law of materiality.  Nor does applying the
correct law of materiality constitute a constructive amendment, which occurs only when

27 there is either a different complex of facts presented at trial or a new crime charged.
United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002); accord United States v.

28 Garcia-Paz, 282 F.3d 1212, 1217 (9th Cir. 2002) (government not required to prove
specific knowledge of smuggling marijuana when indictment alleged importing
marijuana and the statute did not require specific knowledge).

illegal foreign and conduit contributions to politicians by those same actors—"had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities."  (Ninth Circuit Model Jury Instruction No. 8.73.)

   2.   The Defense Demands Internal Communications That Are Not Discoverable Under Rule 16(a)(2)

Defendant's demand for internal communications should be rejected because they are exempt from discovery under Rule 16(a)(2) and defendant offers no credible argument to overcome this Rule.

Although Rule 16(a)(1)(E) generally requires production of government-possessed documents and objects "material to preparing the defense," there is an exception to this general rule.  Specifically, "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case" are exempt from discovery.  Fed. R. Crim. P. 16(a)(1)(E)(i), (a)(2).  Accordingly, defendant's citations to United States v. Ghailani, 687 F. Supp. 2d 365 (S.D.N.Y. 2010), and United States v. Hernandez-Meza, 720 F.3d 760 (9th Cir. 2013)—which only deal with Rule 16(a)(1)(E) and not the carve-out—are inapposite.  (See Mot. at 7-9.)

Courts routinely deny requests for internal government communications, even when, as here, the defense suggests the communications might show bias.  Gollaher v. United States, 419 F.2d 520, 527 (9th Cir. 1969) (defense not entitled to discovery of intra-agency communications, despite defense's claim that such communications might show agency bias in pursuing prosecution); see also United States v. Jack, 263 F.R.D. 640, 645 (E.D. Cal. 2010) (internal government communications exempt from discovery under Rule 16(a)(2)); United States v. Edwards, 42 F.R.D. 605, 606 (S.D.N.Y. 1967) (internal Government memoranda of conversations between the defendant and government agents exempt from discovery under Rule 16).  So too should the Court deny defendant's request here for internal government communications.

3.    The Defense Demands Internal Communications That Are Not *Brady*

Defendant now attempts to recast his request for internal communications by claiming he is entitled to them under Brady.  But there are no internal communications with exculpatory facts or evidence bearing on materiality, as the defense speculates.  And defendant has not even attempted to satisfy, let alone satisfied, the required threshold showing he must make that the government is withholding favorable evidence.  Nor could he, legally or factually.

To be discoverable under Brady, the evidence must be both favorable to the accused and material either to guilt or to punishment.  Bagley, 473 U.S. at 674.  Here, defendant cannot and has not established even the first of these two requirements—that there are internal communications "favorable to the accused"; that is, evidence that "helps bolster the defense case or impeach the prosecutor's witnesses . . ."  Price, 566 F.3d at 913 n.14 (citations omitted).

United States v. Lucas is controlling on Brady disclosures.  In that case, the defendant sought internal communications between the U.S. Attorney's Office, state prosecutors, and local law enforcement that might support the defense's suspicion that "federal and state authorities had colluded in prosecuting" the defendant—a legally valid defense that could bar the federal prosecution.  841 F.3d at 800-01, 803.  Like defendant here, the defendant in Lucas claimed he was entitled to these communications under Brady, despite the government's affirmative representation that it did not possess evidence of inter-sovereign collusion.  Id. at 807.  In rejecting the defendant's request, the Ninth Circuit reaffirmed Supreme Court precedent holding that "it is the State that decides which information must be disclosed."  Id. (quoting Ritchie, 480 U.S. at 59-60.)  "[I]t is the government, not the defendant or the trial court, that decides prospectively what information, if any, is material and must be disclosed under Brady."  Id. (emphasis in original).  Under that "settled practice," the prosecutor is "the initial arbiter of materiality and disclosure and is not required to submit even "close questions regarding materiality to the court for in camera review."  Id. at 809.

1    Moreover, the Court explained, the prosecutor's decision on disclosure is final,

2 "[u]nless defense counsel becomes aware that other exculpatory evidence was withheld

3 and brings it to the court's attention." Id. at 808.  In other words, the defendant must "do

4 more than speculate that Brady material exists" and "demonstrate that the government

5 improperly withheld favorable evidence." Id. at 808, 809 (emphasis added); see also

6 United States v. Mincoff, 574 F.3d 1186, 1200 (9th Cir. 2009) (burden on the defendant

7 to "identif[y] any potentially exculpatory evidence that was not disclosed to him").

8    In support of its argument that the internal communications contained exculpatory

9 evidence of collusion, the defense in Lucas proffered a news article on federal

10 "intervention" into state firearm prosecutions; two affidavits, one from the defendant and

11 one from defense counsel; an argument of the allegedly "weak" federal interest in the

12 case; and a claim based on the perfect or suspicious timing of when the state sentence

13 concluded and federal prosecution began. Id. at 801-02, 806.  The Ninth Circuit held

14 that the defendant's proffer was insufficient to compel discovery and that he had had not

15 made the requisite showing that the government improperly withheld favorable

16 evidence.[12] Id. at 808; see also Michaels, 796 F.2d at 1116 (the defendant's "mere

17 speculation about materials in the government's files" does not require making the

18 materials available for the defendant's inspection or an in camera search of the

19 government files for evidence favorable to the accused" under Brady).

20    Defendant's argument here is much less meritorious than the defendant's failed

21 argument in Lucas.  For one, defendant does not even argue that the privileged

22 communications contain evidence "favorable to the accused"; instead, defendant

23 seemingly grafts the broader Rule 16(a)(1)(E)(i) "material to preparing the defense"

24 standard onto the Brady standard and demands all communications "relating to" the

25 materiality of defendant's statements; the "impact of his statements"; "about

26 [defendant's] statements"; and "related to [the government's] assessment of

27

28    [12] In the alternative, the defense also argued they were entitled to these records
under Rule 16. Id. at 802.  The Court held that the defendant had not even met the
requisite materiality threshold to bring it within the contours of discoverable material
under Rule 16. Id. at 806.

1    [defendant's] statements and the investigative steps that were taken as a result of those

2    statements." (See Mot. at 7-8; Ex. B.)  In other words, defendant suggests that if

3    government actors simply talked about defendant's statements, this would constitute

4    exculpatory evidence under Brady.  It does not.  Defendant's claim fares no better than

5    the rejected defense argument in Michaels, where the defendant sought to compel the

6    agents' rough interview notes (not just typed interview summaries), arguing that the

7    "more inherently reliable" notes could "substantiate and prove" that the package

8    containing the explosive device was never actually mailed, an element of the charged

9    crime of mailing an explosive device.  Michaels, 796 F.2d at 1115.  The defendant's

10   attempt to invoke Brady and tie the discovery request to an element of the crime fell flat

11   where the defendant merely speculated that "arguably, based on the sanitized summaries,

12   it appeared that the notes also would be material or helpful" and reveal potential

13   discrepancies. Id. at 116.  The Court called out the defendant's request for what it was: a

14   fishing expedition "so that he could search through [the notes] for anything useful." Id.

15          Indeed, defendant has neither (1) articulated what exculpatory evidence he

16   believes is contained within the government communications nor (2) attempted to proffer

17   anything to support that non-articulated theory.  It is unclear what internal government

18   communications could even say that would be exculpatory on the issue of materiality

19   when, again, materiality turns on the "intrinsic capacity [of defendant's false statements]

20   to influence" the agency and "not its probability of causing influence." Peterson, 538

21   F.3d at 1072.  Moreover, common sense dictates that any internal government

22   communications discussing a politician caught on multiple recordings lying about his

23   knowledge of his receipt of illicit campaign funds during a government investigation into

24   illicit campaign funds would bolster materiality, not diminish it.

25          Defendant's only attempt to articulate why the internal communications might be

26   "favorable to the accused" rests on a chain of unsupported speculations that would paint

27   the collective prosecutorial decision-making process as a series of petty reactions by

28   irascible actors.  Defendant speculates that the communications may "reveal" that

prosecutors or agents "expressed anger or indignation about" defendant's lies, then speculates that one or more prosecutors or agents might have found defendant's statements "personally upsetting" and, because of this hypothetical upset, speculates that they "went on to focus the investigation on Congressman Fortenberry out of spite." (Mot. at 9-10.)  In addition to being based exclusively on conjecture, this argument is illogical and legally devoid.  In defendant's fanciful scenario, he would have already rendered his false and misleading statements in furtherance of his scheme to conceal material facts.  Thus, how would an agent's "upset" cause <u>defendant to reach out and voluntarily request another interview</u>, so that he could make more false and misleading statements and further his scheme to conceal material facts?  (<u>See</u> Dkt. No. 35, Decl. of Trey Gowdy ¶¶ 11-12 (defendant "was keenly interested in sharing information with federal authorities"; defense counsel "arranged for a second meeting.")  This same insinuation of nefarious intent could be made any time a defendant lies, and diligent federal investigators conduct additional investigation to confirm the lies were willful or to explore motive —are those investigators acting out of spite when they do so or are they simply following basic investigative steps?[13]  In any event, even if every single one of defendant's wild suppositions were true, this <u>still</u> would not constitute exculpatory evidence that undermines the capability of defendant's false statements to influence or affect the federal agency.  <u>See, e.g.</u>, <u>Peterson</u>, 538 F.3d at 1072; <u>cf. United States v. Armstrong</u>, 517 U.S. 456, 464, 116 (1996) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."); <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238, 248

---

[13] Paradoxically, defendant attempts to distinguish the Ninth Circuit holding in <u>Gollaher</u> that government communications were not discoverable by arguing that, there, the defense was denied internal communications that would show bias in pursuing the prosecution.  (<u>See</u> Mot. at 10.)  There is no daylight between what the defense in <u>Gollaher</u> sought to prove via internal communications (alleged bias in pursuing a prosecution) and what defendant seeks (alleged bias in pursuing the investigation leading to prosecution).

(1980) (prosecutors "are necessarily permitted to be zealous in their enforcement of the law").[14]

Defendant makes no attempt to proffer any support for his theory. For instance, he does not point to any existing discovery (like typed interview summaries) that might indicate there is exculpatory evidence elsewhere. See Michaels, 796 F.2d at 1115. Defendant may protest that he does not know what the communications contain because he has not received them—but that is exactly what Brady contemplates. See id. at 1115-16; Lucas, 841 F.3d at 808-09; Mincoff, 574 F.3d at 1200. And that is because "Brady does not permit a defendant to sift through information held by the government to determine materiality," Lucas, 841 F.3d at 807, or "embark on a 'broad or blind fishing expedition among documents possessed by the Government,'" Mayes, 917 F.2d at 461, especially when the claim to discovery is based on nothing more than speculation.

Finally, even if there were internal government communications with evidence "favorable to the accused," production of the communications is not required. At most, defendant would be entitled to the "underlying exculpatory facts" contained or described in the communications—not the communications themselves. Morris v. Ylst, 447 F.3d 735, 742 (9th Cir. 2006); United States v. Kohring, 637 F.3d 895, 908 (9th Cir. 2011) ("[W]hile the prosecution did not have a duty to disclose the e-mail itself or the opinion work product in the e-mail, it did have a duty to disclose the non-cumulative underlying exculpatory facts in the e-mail." (citation omitted)). But the Court need not reach that speculative hypothetical.

---

[14] This reasoning is particularly apt, given defense counsel's statement at the end of the motions hearing in this matter on December 13, 2021. There, Mr. Littrell proclaimed that the "core defense" was that defendant's case was the result of a "political prosecution." As an initial matter, of course, this claim does not actually amount to a legal or factual defense to section 1001 violations (as opposed to, for example, factual innocence). In addition, this claim ignores the clear record that defendant's case was opened and every substantive investigative step was taken and approved from 2015 to 2020 (see Ex. 1), during a prior presidential administration and under prior attorneys general. As the Court pointed out at the hearing, questioning the motive of a collective prosecution can be done in every federal case. But such proclamations, without more, do not create discovery rights.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.**    **The Defense's Demands for Information Regarding the "Department of Justice's Requirements" Fails**

The government voluntarily disclosed in discovery the internal agency requests and approvals for this case, even though the government asserts such internal documents fall outside the government's discovery obligations and are not ordinarily provided.  The government directed defense counsel to those approvals in the discovery.  (Nov. 23 Letter at 2-3.)  Next, the government clarified for defendant that section 8-7.302 of the Justice Manual—the sole "requirement" that the defense cited in its letter—did not apply to this case.  (Id. at 2; see also Dkt. No. 28 at 7.)  The government did so notwithstanding the fact that the Justice Manual does not confer any rights on defendants (see Justice Manual, Section 1-1.200), and after defendant had—without a modicum of supporting evidence—vehemently and repeatedly asserted as fact the applicability of this section, going so far as to push another misguided attack on the integrity of the investigation that the government failed to adhere to internal policies and misled the Office of the Attorney General to secure the "required" approvals.  (See Dkt. No. 21 at 2-3.)  Yet, in a footnote, defendant now correctly walks that false claim back and concedes that the government "appears to be correct" regarding the non-applicability of Section 9-7.302.  (Mot. at 5.)

Even before indictment, although under no obligation to do so and not the typical practice, the government reached out to Mr. Gowdy and then Mr. Littrell and accommodated defendant's multiple requests to push back the date of his indictment to allow him to make an internal appeal to ODAG, which prepares the Justice Manual, and under which the Public Integrity Section sits.  Mr. Littrell made the same baseless allegations of noncompliance with the Justice Manual directly to the Deputy Attorney General and Principal Associate Deputy Attorney General.  ODAG permitted this indictment to proceed and did nothing to give credence to defendant's claims about lack of approvals.  (Nov. 23 Letter at 3.)

Despite defense counsel's sole citation to section 8-7.302, failure to respond to the government's inquiry for clarification, and violation of the meet-and-confer obligations, counsel's latest pivot is to attack the government for not disclosing privileged documents

24

as to whether the Public Integrity Section was consulted, pursuant to a different section (9-85.110) of the Justice Manual.  (Mot. at 14-15.)  While it is specious on what grounds defendant is "entitled" to this information, the fact remains that all necessary approvals and consultations were obtained and conducted, and government counsel has so apprised defense counsel.   Defendant's persistent attempts to spin his narrative otherwise cannot change that fact.

## V.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to compel discovery and further strike the filing from the docket and order the defense to file a clean copy.