TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone:     (213) 894-3289
        Facsimile:     (213) 894-0141
        E-mail:        mack.jenkins@usdoj.gov
                       jamari.buxton@usdoj.gov
                       susan.har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00491-SB |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS; EXHIBITS A-C |
| v. | |
| JEFFREY FORTENBERRY, | Hearing Date:    1/11/2022 |
| Defendant. | Hearing Time:    8:30 a.m. |
| | Indictment: 10/19/2021 |
| | Pretrial Conference: 2/8/2022 at 8:00 a.m. |
| | Trial: 2/15/2022 at 8:00 a.m. |
| | Last Day: 3/2/2022 |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, J. Jamari Buxton, and Susan S. Har, hereby files its opposition to defendant JEFFREY FORTENBERRY's ("defendant") Motion To Suppress Statements.  (Dkt. No. 35, "Mot.")

This opposition is based upon the attached memorandum of points and authorities and attached exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 14, 2021

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

           /s/
J. JAMARI BUXTON
MACK E. JENKINS
SUSAN S. HAR
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                          PAGE

TABLE OF AUTHORITIES ...................................................................................i

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

I.      INTRODUCTION .................................................................................. 1

II.     FACTUAL BACKGROUND................................................................... 2

III.    RELEVANT LAW ................................................................................. 6

        A.      There Is No Duty to Warn of Target Status and Failures to Warn Do
                Not Immunize False Statement Crimes........................................... 6

IV.     ARGUMENT........................................................................................ 8

        A.      AUSA Jenkins' Representation Before the July 2019 Interview That
                Defendant Was a Subject Was Accurate and Not Misleading and, In
                Any Event, Is Not Grounds for Suppression................................... 8

        B.      AUSA Jenkins Correctly Confirmed During the July 2019 Interview
                That the Government's Investigation Was Legitimate ..................... 14

        C.      The Government Neither Induced Defendant to Participate in the July
                2019 Interview Nor Misled Him About the Nature of the Interview ........ 15

        D.      AUSA Jenkins Neither Made Nor Broke Any Promises to Defendant,
                Thus Invalidating Defendant's Due Process and Contract-Based
                Arguments .................................................................................. 18

        E.      There Is No False Statements Trap Defense ................................. 20

V.      CONCLUSION.................................................................................... 21

i

# **TABLE OF AUTHORITIES**

CASES                                                                                    PAGE

Bishop v. Wood,
426 U.S. 341 (1976).........................................................................................10

Bryson v. United States,
    396 U.S. 64 (1969) .....................................................................................7, 9

Butz v. Economou,
    438 U.S. 478 (1978) ......................................................................................17

Johnson v. Lumpkin,
    769 F.2d 630 (9th Cir.1985) ..........................................................................18

Morgan v. Gonzales,
    495 F.3d 1084 (9th Cir. 2007) .......................................................................18

Santobello v. New York,
    404 U.S. 257 (1971) ......................................................................................19

United States v. Ash,
    464 F. Supp. 3d 621 (S.D.N.Y. 2020)..................................................7, 13, 16

United States v. Awadallah,
    202 F. Supp. 2d 82 (S.D.N.Y. 2002) ..............................................................21

United States v. Carrillo,
    709 F.2d 35 (9th Cir. 1983) ...........................................................................19

United States v. Chen,
    933 F.2d 793 (9th Cir. 1991) ....................................................................20, 21

United States v. Dudden,
    65 F.3d 1461 (9th Cir. 1995) .........................................................................19

United States v. Goodwin,
    57 F.3d 815 (9th Cir. 1995) .............................................................................8

United States v. Hudson,
    609 F.2d 1326 (9th Cir.1979) ........................................................................18

United States v. Lee,
    106 U.S. 196 (1882) ......................................................................................17

United States v. McKenna,
    327 F.3d 830 (9th Cir. 2003) .........................................................................21

United States v. Moore, No. 2:16-CR-00090-JAM,
    2016 WL 5340649 (E.D. Cal. Sept. 23, 2016)................................................20

United States v. Okwumabua,
    828 F.2d 950 (2d Cir. 1987) ........................................................................7, 9

United States v. Olivieri,
    740 F. Supp. 2d 423 (S.D.N.Y. 2010)...........................................................6, 8

United States v. Smith,
    659 F. App'x 908 (9th Cir. 2016)..................................................................6, 8

## **TABLE OF AUTHORITIES (CONTINUED)**

CASES                                                                                                    PAGE

United States v. Washington,
    431 U.S. 181 (1977) ...................................................................................6, 8, 14
United States v. Wong,
    431 U.S. 174 (1977) ..........................................................................................7, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

In March 2019, defendant Jeffrey Fortenberry dug himself a medium-sized hole when he voluntarily provided incomplete and inaccurate information to federal investigators who interviewed him about his knowledge of illicit contributions received by his campaign from his friends and associates.  Aware of the perilous situation he created for himself by his misleading statements in that first interview, defendant promptly engaged with criminal counsel, Trey Gowdy, and urged his counsel to re-contact the government seemingly in the hopes of ameliorating his self-inflicted wound. Mr. Gowdy, an experienced lawyer and former Assistant United States Attorney, by his and defendant's own admission, <u>knew defendant had additional information to provide.</u> Mr. Gowdy presumably expected defendant would seek to do so by telling the truth during the second interview in July 2019.  But defendant chose a different path; he lied – more times and more unequivocally – and he dug himself a deeper hole.  Even accepting defendant's factual narrative as set forth in the declaration of Mr. Gowdy, the record is clear that: (a) defendant knew his first interview was, at minimum, incomplete; (b) the government apprised defendant that he had potential criminal liability and was a subject of their investigation into illegal contributions; (c) defendant proactively sought out the second interview ostensibly to provide additional information; (d) the second interview was entirely voluntary; (e) it occurred with defendant's counsel at their chosen venue; (f) defendant knew the topics of the second interview; (g) it was entirely recorded; and (h) it was conducted without any promise from the government or request of any protections from defendant or Mr. Gowdy.  Now, finding himself in this bigger hole for his own choices and voluntary statements, defendant blames the prosecutors and the agents for his predicament and requests a legal windfall—that his multiple material lies to the federal government during his second interview receive no sanction.  But neither the law nor the facts support suppression here.

1    The object of defendant's motion is again Assistant United States Attorney Mack
2    Jenkins, who defendant claims induced him to lie to federal investigators during the July
3    2019 interview by (a) representing to Mr. Gowdy ahead of the interview that defendant
4    was a subject, as opposed to a target, of the investigation, and (b) assuring Mr. Gowdy
5    during a break in the already occurring interview that the government's investigation
6    was not, in Mr. Gowdy's words, "some bullshit 1001 case."  For the reasons outlined
7    below, defendant's inducement claim fails and his requested remedy should be denied.

8    ## II.    FACTUAL BACKGROUND[1]

9    In February 2016, defendant attended a political fundraiser in Los Angeles hosted
10   by Individual H (the "2016 Fundraiser") that netted defendant's re-election campaign
11   $30,200.  (Dkt. No. 1 at ¶¶ 5, 11.)  The source of that money was Gilbert Chagoury, a
12   billionaire foreign national and associate of defendant who was prohibited under federal
13   law from contributing to defendant's campaign.  (Id. at ¶¶ 3, 11.)  To disguise the illegal
14   foreign contribution, Chagoury enlisted Toufic Baaklini, a United States businessman
15   whom defendant knew well, to give Individual H $30,000 in cash.  (Id. at ¶¶ 4, 11.)
16   Individual H, in turn, recruited individuals to make the illegal conduit contributions to
17   defendant's campaign at the 2016 Fundraiser and then reimbursed them using the cash
18   Individual H received from Baaklini.  (Id. at ¶ 11.)

19   In March and April 2018, defendant contacted Individual H to inquire about
20   hosting another fundraiser.  (Id. at ¶ 14.)  Unbeknownst to defendant, Individual H had
21   begun cooperating with the government, (id. at ¶ 13), which was investigating, among
22   other things, "if and when defendant . . . knew about any conduit contributions to his
23   campaign at the 2016 Fundraiser," "if and when defendant . . . knew about any illegal
24   foreign contributions from his congressional campaign received indirectly from
25   Chagoury at the 2016 Fundraiser," and "if and when defendant . . . had any direct or

26

27

28   _____

[1] A more detailed Statement of Facts describing the allegations of the Indictment
are set forth in the government's Opposition to Defendant's Motion to Dismiss the
Indictment for Lack of Venue.  (Dkt. No. 18 at 3-9.)   For brevity, it is not repeated here.

2

indirect communication with Chagoury or Baaklini about the contributions his campaign was to and did receive at the 2016 Fundraiser."  (Id. at ¶ 12.)

In June 2018, Individual H placed a recorded call to defendant to discuss his requests for another fundraiser (the "2018 Call").  (Id. at ¶ 14.)  During the call, Individual H told defendant, among other things, that Baaklini had provided Individual H $30,000 cash ahead of the 2016 Fundraiser, that Individual H had distributed the $30,000 cash to other individuals to contribute to defendant's campaign at the fundraiser, and that Chagoury was probably the original source of the money.  (Id. at ¶¶ 14, 15.)

Federal agents interviewed defendant at his home in Nebraska on March 23, 2019 (the "March 2019 Interview").  (Id. at ¶ 19(a).)  During the interview, which agents surreptitiously recorded, and in which defendant was warned that lying to the FBI was a crime, defendant stated, among things, that he was not aware of Baaklini making any illegal contributions or of Baaklini directing or facilitating others to do so.  (Id. at ¶ (19(a)(i).)  Defendant also stated that he was not aware of any contributions made by foreign nationals to his campaign.  (Id. at ¶ 19(a)(iii).)

Ahead of the March 2019 interview, an FBI agent submitted an internal memo to FBI headquarters seeking approval to interview defendant and describing the government's investigation to date.  (Mot., Ex. B.)  The agent explained in the document that defendant was "a subject of the investigation."  (Id. at JF00002484.)  The agent went on to state the following: "In the event [defendant] agrees to be interviewed, the information he provides may be used to pursue the indictment of . . . Baaklini . . . and Chagoury.  Case agents will also seek to indict [defendant] with Misprision of a Felony and Conduit Contributions.  In addition if case agents determine from the interview that [defendant] is making false statements he will be charged with False Statement."  (Id. at JF00002486.)  In another section of the document, the agent stated that AUSA Jenkins "was notified and concurred with the interview."  (Id.)

Soon after the March 2019 Interview, defendant enlisted Mr. Gowdy, a former member of Congress and former federal prosecutor, to represent him.  (Mot., Ex. A at

1   ¶¶ 3, 5, 7).  Mr. Gowdy contacted the FBI, which referred him to AUSA Jenkins.  (Id. at

2   ¶ 8.)  Mr. Gowdy later called AUSA Jenkins and discussed the general nature of the

3   investigation.  (Id. at ¶ 9.)  During the call, Mr. Gowdy asked AUSA Jenkins whether

4   defendant was considered a subject, target, or witness in the investigation, referencing

5   terms defined in the Department of Justice's internal Justice Manual, which provides

6   guidance to federal attorneys.  (Id. at ¶ 11.)  According to Mr. Gowdy, AUSA Jenkins

7   told Mr. Gowdy that defendant was "a subject trending toward a witness."  (Id. at ¶ 12.)

8   Mr. Gowdy thereafter arranged for defendant to participate in a second interview with

9   federal agents on July 18, 2019 at Mr. Gowdy's office in Washington, D.C.  (the "July

10  2019 Interview").  (Id.)  At the time, defendant claimed he was "keenly interested in

11  sharing information with federal authorities" and "wanted to assist in the investigation."

12  (Id. at ¶ 11.)

13        Before the July 2019 Interview, AUSA Jenkins sent Mr. Gowdy an email

14  identifying the prosecutors and agents that would be attending the interview, as well as

15  the topics the government planned to cover with defendant.  (Ex. A at 1.)  Specifically,

16  AUSA Jenkins told Mr. Gowdy: "[W]e do not have anything we intend to have

17  [defendant] review in advance.  But the topics of the interview will be consistent with

18  what you and I have discussed and will include his prior interview with the FBI at his

19  home and any conversations he has had regarding donations to his campaign with or

20  regarding [Individual H], Baaklini, and Chagoury."  (Id.)

21        As he had been before the March 2019 Interview, defendant was advised, this time

22  by AUSA Jenkins, before the July 2019 Interview that it was a crime to lie to the federal

23  government.  (Dkt. No. 1 at ¶ 19(b).)  Indeed, AUSA Jenkins provided defendant with a

24  fulsome discussion of all the ways in which the interview was voluntary and made clear

25  to defendant he had various options—including not answering questions—except for

26  one: lying.  Specifically, AUSA Jenkins advised:

27        We will again sort of go over just a few. . call them admonitions or house-
         keeping matters. uh. particulars that we explain to everyone that we
28       interview.  This is a voluntary interview which is important, for the reasons

4

that most people understand. Voluntary that means that you can stop, you can take a break, you can have private time with your counsel, private time with yourself, you can tell us to go home, you can tell us to stop the recording, all those options are available to you and will remain available to you as long as you sit through the interview. Sort of counterpoint or part of that contract if you will, is that obviously, . they are the FBI we're the Federal Government. lying to the FBI or Federal Government is a Federal crime, not to say that you have any motive or plan to do that, or intend to do that, we just got to make that admonition as your counsel alluded to beforehand. Uh, part of that comes with.. if and when we do ask you questions that you may not want to tell us the answer, or may not think it's any of our business or may just wonder why we're asking. You can let us know all of those things, uh, why are you asking? We may not give an answer or, give you an answer to your satisfaction, but we may also say "you know what, let's move on", or we'll come back to that", or we'll, maybe we'll explain to you why we want to know. Um, so you have all those options available to you. Again, the only option, uh, you do not have or at least we would advise against is obviously lying. So if we do ask you a question where you think to yourself, um, no, I'm not sure if I want to answer that right now, or I want to think about it, again, all those answers totally fine, we won't judge you, we'll try and move on, try to get to an answer we think, try to refresh your recollection if possible depending on what the issue is we think, but, we'll try to work through that so don't let stop you from, participating,

(Ex. B at 2:20-44) (cleaned up.)

The government thereafter asked defendant about the same topics AUSA Jenkins had described in his July 17, 2019 email, focusing on defendant's contact with Individual H. (Mot., Ex. A at ¶ 17.) During a break in the interview, Mr. Gowdy purportedly asked AUSA Jenkins whether "this was some bullshit 1001 case." (Id.) According to Mr. Gowdy, AUSA Jenkins replied that it was not. (Id.)

During the July 2019 Interview, and despite AUSA Jenkins' advisement, defendant made a number of false and misleading statements. Among others, defendant stated that he had not been told by Individual H during the 2018 Call that Baaklini had given Individual H $30,000 cash to help fund the 2016 Fundraiser, and that he was not aware of any illicit donation made during the 2016 Fundraiser. (Dkt. No. 1 at ¶¶ 19(b)(i), 19(b)(ii).) Defendant now seeks to suppress the false statements he made to the government during the July 2019 Interview.

1

## III.    RELEVANT LAW

### A.    There Is No Duty to Warn of Target Status and Failures to Warn Do Not Immunize False Statement Crimes

The law is clear: there is no duty to warn an individual of their target status and a failure to so warn does not immunize an individual's false statement crimes.  "It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury[.]" United States v. Washington, 431 U.S. 181, 189 (1977).  "Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights."  Id.  Accordingly, the Supreme Court has rejected the argument that it is "fundamentally unfair to elicit incriminating testimony from a potential defendant without first informing him of his target status."  Id. at 190 n.6; United States v. Smith, 659 F. App'x 908, 914 (9th Cir. 2016) ("Even assuming that he was a target at that time, there was no due process violation because [defendant] was advised of his Fifth Amendment rights.").  The Justice Manual – which "provides internal DOJ guidance" and "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law" – makes this clear.  (See Justice Manual, § 1-1.200)[2]; see United States v. Olivieri, 740 F. Supp. 2d 423, 424 (S.D.N.Y. 2010) ("The law places no generalized duty on the Government to inform individuals who are being investigated, interviewed, or deposed that they are a target or subject of a criminal investigation.  In the instant case, the Government violation [defendant] alleges is that of a Department of Justice policy and not one based on the United States Constitution or other federal law.") (internal citation omitted).  It is well established that violations of internal governmental policies (which did not occur here) do not violate a defendant's

---

[2] Section 9-11.151 of the Justice Manual requires prosecutors to advise grand jury witnesses of their rights if they are either a "target" or a "subject" of the grand jury investigation.  (Justice Manual, § 9-11.151, available at https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.151.)  The Justice Manual defines a "target" as "a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant."

due process rights or establish a basis to exclude reliable evidence.  See United States v. Ash, 464 F. Supp. 3d 621, 632 (S.D.N.Y. 2020) (rejecting motion to suppress defendant's statements to agents where defendant claimed agents should have informed her she was a target within the meaning of the Justice Manual; "Failure to adhere to this DOJ policy does not rise to the level of governmental misconduct that is so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction.") (citation omitted).

An argument that the defendant was misled by the government fares no better for the same reasons when the statement was still voluntary.  In United States v. Okwumabua, 828 F.2d 950 (2d Cir. 1987), the district court agreed with defendant's claim that government deception induced a false statement and suppressed his statements.  But, the Second Circuit reversed, explaining:

> Defendant . . . argues that he would have exercised his fifth amendment right to remain silent had he not been victimized by agency deception . . . . In our view, [*Defendant]'s will was not overborne and his capacity for self-determination was not critically impaired by the agent's [deception*].  The totality of the circumstances discloses that, despite the agent's silence about his identity, [*defendant's] statements were the product of his essentially free and unconstrained choice*.  Accordingly, we conclude that [defendant's] statements were made voluntarily and should not have been suppressed.

Okwumabua, 828 F.2d at 954 (cleaned up) (emphasis added).

Moreover, the Supreme Court has long recognized that – even where the government procures a defendant's statements improperly – that defendant is not thereby entitled to commit perjury or to make false statements with impunity.  See United States v. Wong, 431 U.S. 174, 180 (1977) ("[P]erjury is not a permissible way of objecting to the Government's questions. . . .  Indeed, even if the Government could, on pain of criminal sanctions, compel an answer to its incriminating questions, a citizen is not at liberty to answer falsely."); Bryson v. United States, 396 U.S. 64, 72, 90 (1969) (rejecting challenge to false statement prosecution; "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked . . . .  A citizen may decline to answer the

question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood."); see Olivieri, 740 F. Supp. 2d at 424 ("[E]ven if an individual's perjured testimony is improperly procured because of government misconduct, that testimony may still be used to prosecute that defendant for perjury.")

## IV.   ARGUMENT

### A.   <u>AUSA Jenkins' Representation Before the July 2019 Interview That Defendant Was a Subject Was Accurate and Not Misleading and, In Any Event, Is Not Grounds for Suppression</u>

Defendant contends that, before the July 2019 Interview, AUSA Jenkins falsely represented to Mr. Gowdy that defendant was a subject of the investigation instead of a target. (Mot. at 4-6.)  But defendant was not a target at that stage, and a contrary argument is belied by the plain language of the Justice Manual, the circumstances surrounding the investigation ahead of the interview, and common sense.  Moreover, even if defendant had been a target at the time of his second voluntary interview, failing to warn him as such, or advising him that he was a subject of the investigation, does not violate any right.  See Washington, 431 U.S. at 190 n.6; Smith, 659 F. App'x at 914; United States v. Goodwin, 57 F.3d 815, 818 (9th Cir. 1995) ("[T]he failure of the AUSA to comply with internal department policy does not, without more, establish a deprivation of [defendant's] constitutional rights.  [T]he [Justice] Manual is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal.") (citation and quotations omitted).  Further, unlike many of the cases where this claim is raised, AUSA Jenkins' <u>did</u> represent that defendant was a subject within the meaning of DOJ's internal Justice Manual – <u>i.e.</u>, "a person whose conduct [was] within the scope of the grand jury's investigation," which was an accurate description of defendant's status in the CDCA Investigation into Federal Election Campaign Act ("FECA") and foreign influence violations (the "Federal Investigation") before his <u>voluntary</u> July 2019 Interview.  Although the government had reason to believe defendant had not provided accurate or complete information during a voluntary March 2019 Interview about topics related to

the Federal Investigation, which heightened its concerns about defendant's participation in Chagoury and Baaklini's FECA schemes, defendant was plainly not a target, or "a putative defendant," for his conduct with respect to those schemes following the March 2019 Interview.

Given that the government's investigation was still ongoing and that <u>defendant had contacted the government</u> to discuss how defendant could provide "<u>additional information</u>"[3] to federal authorities, this interview could have shed additional light on defendant's knowledge, conduct, and intent during the March 2019 interview. Put another way, defendant could have simply come clean about the information discussed during the June 2018 call with Individual H. Such "additional information" would have not incriminated him in the FECA investigation and would have likely rendered any false statement prosecution based on the first interview alone unnecessary.

AUSA Jenkins' alleged statement that defendant was a subject "trending towards a witness" also does not change this analysis, as it still clearly communicated that defendant was then a subject of the Federal Investigation and thus had potential criminal liability. Moreover, it cannot be credibly argued that alerting someone – in an apparently single brief telephone communication that was documented nowhere and never spoke of again – that they were presently the subject of an investigation but had a pathway to a lesser status could cause that subject's will to become "overborne." <u>See Okwumabua</u>, 828 F.2d at 54 (reversing the district court's suppression of statements after finding that the government's tactics did not amount to the defendant's will becoming "overborne"). For that matter, even when a person is wrongly advised that they are purely a witness (which defendant agrees never occurred here) does not provide immunity for defendant's lies – in a voluntary or even compelled interview. <u>Wong</u>, 431 U.S. at 180; <u>Bryson</u>, 396 U.S. at 72, 90. This is because government action that is

---

[3] Defendant advised federal investigators that, after talking with Mr. Gowdy, he wanted a second interview to provide "additional information" to the government. (Ex. B at 41:25-35).

merely "incorrect or ill-advised" does not violate due process. <u>Bishop v. Wood</u>, 426 U.S. 341, 350 (1976). That an FBI agent participating in the investigation may have contemplated various potential charges against defendant in an internal FBI approval memo—and discussed why defendant was a "subject" (not target)—does not alter the AUSA's identification of defendant as a subject.[4]

Though Section 9-11.151 of the Justice Manual applies on its face only to grand jury witnesses, defense counsel will often ask – and federal prosecutors will sometimes volunteer – a person's status even if they are not scheduled to testify before the grand jury. Critically, a person's status as a target, subject, or witness is subjective and not set in stone. To the contrary, just as investigations evolve as the government develops additional evidence, so too can a person's status change from one point to another.

Contrary to defendant's assertion, defendant was clearly a subject within the meaning of the Justice Manual when Mr. Gowdy called AUSA Jenkins to inquire about the Federal Investigation and offered that defendant could help federal authorities. At the time, the government was continuing to investigate, among other things, if and when defendant knew about any illegal foreign or conduit contributions to his campaign at the 2016 Fundraiser, and if and when defendant had any direct or indirect communication with Chagoury or Baaklini, two of the main subjects of the investigation, about the contributions his campaign received. And while the prosecutors handling the investigation – whose judgment dictated whether defendant was a target – had reason to believe that defendant had not been forthcoming during the March 2019 Interview, one could theorize various reasons – some dubious, some less so – defendant might have initially given federal agents inaccurate information.

Similarly, there are credible reasons why, at that time, the government did not feel it could prove defendant's guilt of making a material false statement beyond a reasonable doubt and thus why he was not then a "putative defendant." For example, the

---

[4] This is corroborated by the fact that defendant was never charged with either of the initial two offenses mentioned in that FBI internal communication.

government must prove that defendant's conduct was willful, that is, his false statements were not due to inadvertence, poor questioning, faulty memory, etc.[5]  One could likewise view a U.S. Congressperson retaining criminal counsel after an initial interview with the FBI and IRS and then seeking a second interview as a sign he sought to clarify, retract, and/or expand on his previous statements to federal agents.  This would naturally influence prosecutors' view of defendant's role, if any, in the conduct being investigated and their ultimate decision whether to charge defendant with any federal crimes, including making false statements in the prior interview.[6]  Under these circumstances, AUSA Jenkins' representation to Mr. Gowdy that defendant was a subject (not a target) of the investigation was accurate and not misleading.

Defendant focuses heavily on the AUSA's alleged caveated statement to Mr. Gowdy that defendant, although currently a subject, was "trending toward a witness." But defendant overstates how this apparently once uttered statement could have meaningfully changed the calculus here.  Here, defendant was a potential interviewee who had essentially two choices: (1) come in and tell the truth or (2) leave his knowingly problematic first statement for investigators to make their determinations as to his role in the Federal Investigation and hope for the best.  By its very terms, a subject trending toward a witness is, at bottom, a subject— a person whose conduct is within the scope of the grand jury's investigation.  And while a foreseeable scenario might be that prosecutors recharacterize defendant as a mere witness at a subsequent stage – for example, _if_ defendant provided truthful and fulsome responses during the July 2019 Interview and explained why his initial statements were inaccurate – the complete phrase necessarily identifies what defendant was (a subject) and what he was not (a witness).

_____

[5] Indeed, current defense counsel has repeatedly maintained that defendant has retained and will call a memory expert at trial who will assert that defendant could have forgotten all he knew about receiving illegal foreign and conduit contributions as discussed in the call with Individual H.

[6] Nor, for that matter, was defendant "a putative defendant" with respect to any other potential federal charges as of the July 2019 Interview.  Quite the opposite— the government ultimately did not charge defendant with facilitating any illegal campaign contributions or related crimes.

11

Moreover, it made clear that defendant remained a subject unless and until prosecutors informed him his status had so changed.  Indeed, if prosecutors sought to mislead and induce defendant to attend the follow up interview he himself was requesting, they could have simply described defendant's status as a "witness"; and they could have done so multiple times, in multiple conversations, in email, and during the interview itself. None of that occurred.

AUSA Jenkins instead told Mr. Gowdy that defendant was a subject trending toward a witness in the Federal Investigation focused on Chagoury's FECA schemes, and it is reasonable to expect that Mr. Gowdy, an experienced former federal prosecutor, appreciated that important distinction and advised his client accordingly.  That Mr. Gowdy, according to his own declaration, never sought further clarification of defendant's subject status before or during the July 2019 Interview, never asked what, if any, impact the phrase "trending toward witness" had in the government's mind supports the government's view.  Further, the fact that there were was no written correspondence discussing it or even confirming it, despite the numerous other emails conversations between Mr. Gowdy and the prosecutors immediately before and after the interview further corroborates the point.  The fact that it was never discussed during the more than one-hour interview with Mr. Gowdy and defendant, also supports the government's view.  There was no confusion on this point.

 This lack of evidence of this discussion makes sense because it was not the driving factor in defendant's decision and request to be interviewed a second time.  This point is driven further home when it is taken in the context of AUSA Jenkins's email to Mr. Gowdy that references the prior discussion.  (See Ex. A. at 1.)  And, again, while there is no reference to defendant being a witness or any promises or suggestions of the same, there is the list of topics, a discussion of which began with the prior interview. Given that Mr. Gowdy concedes that he was advised that his client was a subject – after defendant participated in a voluntary interview with the FBI – and the first topic

referenced for his client-subject was the prior FBI interview[7], common sense would dictate that defendant's prior interview had problems.  See Ash, 464 F. Supp. 3d at 632 ("given the fact [of defendant's occupation and], had several contacts with the government about the [Federal] investigation, and had even been advised by the AUSA to retain counsel.  She could have been under no illusion that she was not at some risk of criminal exposure.")  But, of course, defendant was already well aware of that problem; it is what drove him to seek out the second interview seeking to salvage the damage he had done in his first one.  That he failed to do so—and in fact chose to further his lies— is the result of defendant's choices, not the government's, and not Mr. Gowdy's.

The fact that an FBI agent discussed plans to pursue potential charges against defendant in a document seeking authorization for the March 2019 Interview also did not transform defendant from a subject to a target.  (See Mot. at 4.)  First, the agent who authored the document explained that defendant, at the time, "[was] a subject of the investigation."  (Mot., Ex. B at JF00002484) (emphasis added.)  Second, though the document states that agents will "seek to indict" defendant with misprision of a felony and conduit contribution charges in the future, (id. at JF00002486), those charges never materialized, fatally undermining defendant's assertion that he was a putative defendant with respect to those offenses.  Third, while the document states that defendant "will be charged if case agents determine from the [March 2019] interview that defendant . . . is making false statements," (id.), such charging decisions rested solely with prosecutors and not the agents and was contingent on obtaining additional evidence.  (See Justice Manual, § 9-11.151) (defining a target as a person "who, in the judgment of the prosecutor, is a putative defendant") (emphasis added.)  Likewise, though the document indicates that AUSA Jenkins was notified of and concurred with the agents' plan to *interview* defendant, it does not say – let alone suggest – that AUSA Jenkins (or any other prosecutor) shared with the agents' views about *charging* defendant with

---

[7] Ex. A at 1.

13

misprision or conduit crimes or otherwise approved of or even saw that internal FBI document.

In sum, AUSA Jenkins's advisement to Mr. Gowdy, which included that defendant was, at bottom, a subject of the Federal Investigation ahead of his voluntary July 2019 Interview, which he sought out, particularly when combined with the other written and recorded communications, show that neither Mr. Gowdy nor defendant was improperly misled or induced to make any statements at his second interview. Moreover, defendant's will was not overborne sufficient to transform his voluntary interview into one that violated his due process rights or that should permit him to lie with impunity to federal investigators. See Washington, 431 U.S. at 188.

**B.   AUSA Jenkins Correctly Confirmed During the July 2019 Interview That the Government's Investigation Was Legitimate**

Defendant's allegation that AUSA Jenkins misled Mr. Gowdy when he confirmed during a break at the July 2019 Interview that the government's investigation was not "some bullshit 1001 case" is spurious. (Mot. at 6-7.)  The record of this investigation has since conclusively established the accuracy of AUSA Jenkins' assurance.

The government was in the midst of investigating if and when defendant knew that his campaign had received illegal foreign and conduit contributions, including from a billionaire foreign national with interests affecting the U.S., and whether defendant had played any role in facilitating those illicit payments, concealing them, or was asked to take any action as a result of them.  Considering that two of these sources, Gilbert Chagoury and Tofuic Baaklini, were friends and associates of defendant and that they later admitted their central roles in the scheme (along with two others), the government maintains the Federal Investigation was and is legitimate.  In addition, the government has similarly not wavered on its view that defendant repeatedly and demonstrably lying to investigators about his knowledge of those events, as established in the recordings, violates federal law and is, therefore, a serious matter.  It was not as though defendant had been untruthful or given inaccurate information about some ancillary, unimportant

14

fact – for example, his date of birth or what clothes he wore on a particular day.  It was not even as if the government's proof of falsity was based on weak speculative or hearsay evidence (as opposed to crystal clear recordings of defendant eagerly discussing the very things he later lied about).  Mr. Gowdy's pejorative and self-serving view of the government's case cannot alter those facts.  More relevant to defendant's motion, it cannot shield defendant from his own voluntary statements.[8]

C.   **The Government Neither Induced Defendant to Participate in the July 2019 Interview Nor Misled Him About the Nature of the Interview**

Putting aside AUSA Jenkins' accurate representations regarding defendant's status ahead of the July 2019 Interview and the merits of the investigation during a break in that interview, additional factors make clear that the government did not mislead or trick defendant into sitting with the government.

Defendant concedes, for example, it was Mr. Gowdy who contacted the government to discuss the investigation and the prospect of defendant meeting with the government.  (See Mot. at 4-5) ("Gowdy contacted the FBI to discuss the possibility of providing the government further assistance and was referred to AUSA Jenkins . . .  He and AUSA Jenkins discussed the general nature of the government's inquiry and the prospect of further cooperation by [defendant].")  By his own admission, defendant claims he "was keenly interested in sharing information with federal authorities" and "wanted to assist in the investigation."  (Mot., Ex. A ¶ 11.)  Taking Mr. Gowdy and defendant at their word, defendant was independently motivated to participate in another interview with the government.  And "[i]nculpatory statements are not involuntary when

---

[8]  Defendant suggests that AUSA Jenkins could have asked Mr. Gowdy to clarify what Mr. Gowdy meant by "some bullshit 1001 case" if he and Mr. Gowdy did not assign the same meaning to the phrase, (id. at 6), but placing this burden of clarification on the AUSA makes no sense.  Rather, had Mr. Gowdy, an experienced attorney, intended to seriously ask a more illuminating or substantive question, he was armed with both the ability and the topics.  Mr. Gowdy instead asked AUSA Jenkins whether the government was investigating "some bullshit 1001 case," and he got a direct, accurate response in return and apparently never felt it worth revisiting again.

15

they result from a desire to cooperate." See Ash, 464 F. Supp. 3d at 629 (Ash, a sitting judge charged with false statements, argued that the two voluntary interviews conducted while she allegedly was an unknowing "target" of the government's investigation constituted "outrageous" government misconduct.  The district court found that argument "unpersuasive, especially when taken in the full factual context," which included the judge's position, experience, and interactions with the government).  This affirmative contact with the government and expressed desire to "help" its investigation is completely inconsistent with defendant's claim of inducement.

Mr. Gowdy's declaration fails to disclose that, ahead of the July 2019 interview, the government, although under no obligation to do so, identified the specific topics it planned to cover during defendant's requested meeting.  Notably, the very first topic enumerated by AUSA Jenkins was defendant's "prior interview with the FBI at his home[.]" (Ex. A at 1.)  The email to Mr. Gowdy also specifically referenced "conversations [defendant] had regarding donations to his campaign with or regarding [Individual H], Baaklini, and Chagoury." (Id.)  Indeed, that was the sum of the topics provided.  This explicit notice of the topics – topics which were ultimately the focus of the interview – demonstrates that the government had no intention of misleading or inducing defendant to make false statements during the July 2019 Interview, or of ambushing defendant with questions he had no way of foreseeing.  The belated claim that both Mr. Gowdy, an experienced attorney, and defendant, a career politician, were nevertheless somehow tricked regarding the nature of the interview that followed that exact preview provided by the government is unconvincing.

Defendant additionally suggests that the government misled defendant by not informing Mr. Gowdy that agents had recorded the 2018 call between Individual H and defendant or the March 2019 Interview.  (See Mot. at 5.)  This makes no sense. Determining the nature and scope of a person's involvement in conduct being investigated and assessing that person's credibility are among the core purposes of conducting an investigatory interview.  If the government were required to disclose

everything it had learned during the course of an investigation before interviewing a person – thus permitting the person to tailor their responses as they see fit – those objectives would be all but impossible and the government's truth-seeking function would be thwarted.  Not surprisingly, defendant cites no authority obligating the government to alert the people it interviews about the various details of its investigation. Defendant's argument here reflects an undercurrent of several aspects of his litigation – that because he is an elected official he should be provided more favorable treatment than other defendants or subjects of investigations.   Our Constitution says otherwise. "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law[.]"  Butz v. Economou, 438 U.S. 478, 505 (1978); see also United States v. Lee, 106 U.S. 196, 220 (1882) ("All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.").

This claim is rendered further disingenuous again in the context of AUSA Jenkins' email communication with Mr. Gowdy in advance of the interview.  (See Ex. A.)  There, Mr. Gowdy asked for an advanced preview of any evidence and AUSA Jenkins stated they did not intend to share any such information in advance.  (See id.)  Mr. Gowdy did not protest to the government's response, of course, because he full well knew he was "not entitled" to such advance preview of the evidence.  (See id.) Indeed, Mr. Gowdy later confirmed that exact sentiment to AUSA Jenkins after being advised that defendant was being investigated for false statements and that the government had evidence that he lied.  (See Ex. C.)  Again, Mr. Gowdy did not protest or make any claims of surprise or being misled.  These email communications undermine defendant's narrative here.

Defendant now claims he would not have participated in the July 2019 interview had he known he had potential criminal exposure (Mot. at 5-6); but this, ignores the fact that he was made aware he had criminal exposure because he concedes he was advised that he was a subject and that the government could have simply issued him a grand jury subpoena to compel his testimony.  In such a scenario, the government would have

posed the same exact questions to him, but this time under oath, in the Central District of California, without his attorney present – a scenario far less favorable to defendant than the one he orchestrated to occur at Mr. Gowdy's then law firm.

In sum, the government had no reason to induce or trick defendant into participating in the July 2019 Interview that he sought out and that he needed in order to help himself.

### D. AUSA Jenkins Neither Made Nor Broke Any Promises to Defendant, Thus Invalidating Defendant's Due Process and Contract-Based Arguments

"As a general rule, fundamental fairness requires that promises made during plea-bargaining and analogous contexts be respected" so long the government agent was authorized to make the promise, and the defendant relied on the promise to his detriment. Johnson v. Lumpkin, 769 F.2d 630, 633 (9th Cir.1985); United States v. Hudson, 609 F.2d 1326, 1329 (9th Cir.1979). Conversely, and logically, there is no due process violation where – as here – the government has made no promises at all to a defendant. See Morgan v. Gonzales, 495 F.3d 1084, 1091 (9th Cir. 2007) ("Because Morgan has not alleged that an actual promise was made, he has not stated a colorable claim that his due process rights were violated . . . . That Morgan believed he would be allowed to remain in the United States indefinitely is not the same as being explicitly promised as much by an authorized agent of the U.S. government. Nor is there any external evidence of a promise.")

AUSA Jenkins' representation to Gowdy ahead of the July 2019 Interview that defendant was a subject of the investigation was not a promise of any particular protection or result. Defendant does not allege – nor can he – that AUSA Jenkins promised defendant he had no criminal exposure or that the government would not charge defendant with any crimes. To the contrary, AUSA Jenkins explicitly warned defendant that "lying to the FBI or Federal Government is a Federal crime." (Ex. B at 2: 28-29) Moreover, it is also undisputed that defendant was not charged for any

18

affirmative *admissions* he made during the July 2019 interview or related to his violation of FECA laws; defendant was charged for his lies.

As discussed above, AUSA Jenkins simply made an accurate statement regarding defendant's status at that moment in time. That representation conferred no benefit upon defendant and did not immunize him from being charged in connection with the March 2019 Interview, the July 2019 Interview, or with any other act or event. If that were the case, any person a prosecutor initially deemed either a subject or a witness would be forever immune from prosecution based on their past and ongoing conduct, regardless of what an investigation subsequently revealed, regardless of how often they lied. This outcome, of course, would be illogical.

Because AUSA Jenkins neither made nor broke any promises to defendant, the cases defendant cites have no bearing here. See United States v. Carrillo, 709 F.2d 35, 37 (9th Cir. 1983) (upholding dismissal of indictment where government agreed to refrain from prosecuting defendant in exchange for his cooperation in a subsequent investigation and court found that defendant met those obligations); United States v. Dudden, 65 F.3d 1461, 1469 (9th Cir. 1995) (remanding case for evidentiary hearing to determine whether government made direct or derivative use of defendant's statements in its investigation and prosecution of her where agents told defendant "whatever information [she] provided, [she] would not be prosecuted for"); Santobello v. New York, 404 U.S. 257, 262-63 (1971) (remanding case for re-sentencing or other relief where defendant negotiated for a particular plea on condition that no sentence recommendation would be made by the prosecutor and the state breached that agreement); United States v. Moore, No. 2:16-CR-00090-JAM, 2016 WL 5340649, at *3 (E.D. Cal. Sept. 23, 2016) (dismissing indictment where government "unequivocally and unconditionally told [defendant's] attorney that the federal charge against his client would be dismissed" and later "refus[ed] to . . . honor its promise to [defendant].")

Because the government made no promise, defendant's assertion that he reasonably relied on the government's assurances, which were likely to induce and in

fact induced defendant's detrimental reliance by participating the July 2019 Interview, is also meritless.  (See Mot. at 9-11.)  In any event, defendant's assertion that he was induced to participate in the July 2019 Interview and to make false statements is belied by myriad factors, as discussed above.

### E.   There Is No False Statements Trap Defense

Defendant's motion essentially suggests that the government set him up to lie and that was inherently improper.  The Ninth Circuit rejects this theory.   More specifically, the subtext in defendant's motion appears to be that the government created a "false statements trap" akin to a "perjury trap" ahead of the July 2019 Interview.  As an initial matter, there is no such thing as a "false statements trap."  Additionally, this was plainly not a perjury trap.  "A perjury trap is created when the government calls a witness *before the grand jury* for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury."  United States v. Chen, 933 F.2d 793, 796 (9th Cir. 1991) (emphasis added).  While the Ninth Circuit has never recognized the "perjury trap" doctrine, see id. at 797, it has recognized that the doctrine is inapplicable when testimony is elicited before a grand jury that (1) is attempting to obtain useful information in furtherance of its investigation; or (2) is conducting a legitimate investigation into crimes within its jurisdiction.  See id.  The Ninth Circuit's holding in Chen is instructive:

> Chen also contends that his perjury prosecution was improper because the government anticipated he would commit perjury in testifying before the grand jury because he had lied to the government investigators in the informal interviews. We reject this argument. Here, *while the government may have anticipated Chen would give false testimony before the grand jury, it is also apparent the government recognized that [Chen] ... might provide information about the pending investigation.*  Indeed, the *government had reason to expect that Chen would testify truthfully* once placed in the solemn atmosphere of the grand jury room.

933 F.2d at 797 (cleaned up) (emphasis added).  Defendant's analogous argument here is even weaker than the one the Ninth Circuit rejected in Chen because (a) defendant's second interview was not compelled or before the grand jury and (b) defendant himself sought out the interview and stated he had "additional information" to provide on the

relevant topics; thus it was more than reasonable for the government to have "reason to expect that defendant would testify truthfully."

As discussed in detail above, at the time of the July 2019 Interview, the government was investigating, among other topics, if and when defendant knew that his campaign had received illegal foreign and conduit contributions, and whether defendant had played a role in facilitating those illicit payments. The questions the government posed to defendant during the July 2019 Interview related to defendant's knowledge of the illegal payments and conversations he with Individual H, Baaklini, and others about campaign contributions, which necessarily "further[ed] . . . its investigation." See id. The government's investigation was likewise legitimate and ultimately revealed that defendant's campaign had, in fact, received illegal contributions. See id. For those reasons, even if the Ninth Circuit were to ever recognize the trap to which defendant alludes, that defense is inapplicable here. See id.; see also United States v. McKenna, 327 F.3d 830, 837-38 (9th Cir. 2003) (noting that Ninth Circuit has not recognized perjury trap as a valid defense and, in any event, explaining it did not apply where defendant was questioned in a civil proceeding and "the government did not use its investigatory powers to question McKenna before a grand jury.") United States v. Awadallah, 202 F. Supp. 2d 82, 107–08 (S.D.N.Y. 2002), rev'd, 349 F.3d 42 (2d Cir. 2003) ("Some defenses, although graced with a name, seem to be illusory. The recantation defense, for example, appears to be an illusion often asserted but never found. The same can be said of 'perjury trap.'") (collecting cases).

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's Motion to Suppress Statements.

21