John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile:  (949) 369-3701

*Attorneys for Defendant*
*Hon. Jeffrey Lane Fortenberry*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>    *Defendant.* | Case No. 2:21-cr-491-SB<br>Hon. Stanley Blumenfeld, Jr.<br><br>**HON. JEFFREY LANE FORTENBERRY'S *REDACTED* REPLY TO THE GOVERNMENT'S OPPOSITION TO HIS MOTION TO SUPPRESS STATEMENTS**<br><br>Hearing Date: Jan. 11, 2022<br>Hearing Time: 8:00 a.m.<br>Time Estimate: One hour<br><br>Indictment: Oct. 19, 2021<br>Pretrial Conference: Feb. 8, 2022<br>Trial: Feb. 15, 2022<br>Last Day: Mar. 2, 2022 |

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................... 1

II.  ARGUMENT ....................................................................................... 3

    A.   The government's "RELEVANT LAW" section III.A is an attack on a straw man; this is not about a general duty to warn targets, but rather the government's false and misleading responses to questions from defense counsel regarding Fortenberry's status. ..................... 3

    B.   Owing Fortenberry and his counsel a duty of good faith and fair dealing, the government could decline to answer Mr. Gowdy, but could not obtain admissible statements through false or misleading representations. ........................................................................... 4

    C.   The government's representations to defense counsel before and during the July 17, 2019, interview in Washington, D.C., were indeed false and misleading. ......................................................... 7

        1.   The government's characterizations of what it calls Fortenberry's "perilous situation" before the Washington, D.C., interview reveal that the government considered him a target. ......................................................................... 7

        2.   The government's approach to investigating Fortenberry likewise reveals he was a target well before the Washington, D.C., interview. ................................................................. 8

        3.   AUSA Jenkins has failed to testify in support of the government's equivocal suggestion that his view of the evidence differed from that of his lead FBI case agent. ................ 11

        4.   ██████████████████████████████████████████ ....... 13

        5.   The denial of a "bullshit 1001" compounded Gowdy's palpable misunderstanding. .......................................... 14

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

D.    The government fails in its attempt to counter Fortenberry's evidence of reliance and inducement. ............................................. 16

III.    CONCLUSION.................................................................................. 17

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Giglio v. United States*,
    405 U.S. 150 (1972)........................................................................ 13

*Morrow v. Super. Ct.*,
    36 Cal. Rptr. 2d 210 (Cal. Ct. App. 1994) .................................. 15

*Santobello v. New York*,
    404 U.S. 257 (1971)......................................................................... 6

*Thomas v. Westbrooks*,
    849 F.3d 659 (6th Cir. 2017) ...................................................... 13

*Travelers Indem. Co. v. Holman*,
    330 F.2d 142 (5th Cir. 1964) ........................................................ 5

*United States v. Bryan*,
    868 F.2d 1032 (9th Cir. 1989) .................................................... 13

*United States v. Carrillo*,
    709 F.2d 35 (9th Cir. 1983) ...................................................... 4, 6

*United States v. Clark*,
    218 F.3d 1092 (9th Cir. 2000) ...................................................... 6

*United States v. Farmer*,
    543 F.3d 363 (7th Cir. 2008) ........................................................ 6

*United States v. Henry*,
    758 F.3d 427 (D.C. Cir. 2014) ...................................................... 6

*United States v. Hudson*,
    609 F.2d 1326 (9th Cir. 1979) .............................................. 2, 6, 15

**Statutes**

18 U.S.C. § 1001 ........................................................................... 3, 5, 15
Cal. Bus. & Prof. Code § 6106 ............................................................ 15

**Other Authorities**

*Beyond Reliance: Promissory Estoppel, Contract Formalities, and Misrepresentations*,
    15 Hofstra L. Rev. 443 (1987).................................................... 6

Restatement (Second) of Agency § 272 (1958)................................ 16
Restatement (Second) of Contracts § 153 (1981)........................... 21
Restatement (Second) of Contracts § 201(2)(b) (1981) ................ 20
Restatement (Third) Of Agency § 5.03 (2006)................................ 17

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

# I.      INTRODUCTION

AUSA Mack Jenkins induced nine-term Congressman Jeffrey Fortenberry to speak to him and his prosecution team by representing to Fortenberry's counsel, Trey Gowdy, that Fortenberry was not an investigation target, meaning the government did not regard him as a "putative defendant." As Mr. Gowdy declares, he and Congressman Fortenberry took the government at its word. Later, when the government's questioning began to shake Mr. Gowdy's confidence in this, Mr. Gowdy even sought—and received—reassurance indicating that AUSA Jenkins's prior word on the matter was still good.

But, at this point, the discovery, the allegations of the Indictment, and the government's own briefing in this litigation strongly support the inference that Jenkins's representation that the government lacked intent to charge Congressman Fortenberry was false. Now that the issue has sharpened into a motion to suppress, AUSA Jenkins and the government have concluded that he is unable to testify in support of his representations to Gowdy. Against Mr. Gowdy's declaration, the government in fact submits no countervailing testimony at all.

Instead, the government attempts to resist suppression by adopting the untenably inconsistent position that—while the government regarded Congressman Fortenberry as having "dug himself a medium-sized hole" in a recorded interview, resulting in a "perilous situation," he was nevertheless *not* a target.  Opp'n to Mot. to Suppress Statements at 1. This patently flies in the face of the government's own definition of what a "target" is. *See Justice Manual* § 9-11.151. Precisely because the government viewed Fortenberry's situation as "perilous," and precisely because the government regarded Fortenberry as having demonstrably lied on tape, he was absolutely a target at the time when Jenkins said he was not. ████████████████████████████████████████

████████████████████████████████████████

████████████████████

After Gowdy and Jenkins's initial exchange regarding Fortenberry's status in the investigation, the government perpetuated the initial misleading impression by *reassuring*

Fortenberry's counsel that the Washington, D.C., interview was no "bullshit 1001 case," despite the government's accusatory questioning. This dispelled Gowdy's nascent concern that the government's view of Fortenberry's nontarget status had changed before or during the interview. And next, the government exploited the advantage of Gowdy and Fortenberry's misunderstanding even more, by *continuing to accept cooperation information* from them even after the Washington, D.C., interview that serves as the basis for Count Three of the Indictment, still without notifying Gowdy that Fortenberry had become a target.

Contrary to the government's opposition brief, it is plain that Gowdy and Fortenberry relied on Jenkins's representations. *See* Declaration of Trey Gowdy at ¶¶ 11–14. The fact that Fortenberry wanted to help the government is no answer for the government on this point, given Gowdy's undisputed declaration that knowing Fortenberry's status was "imperative" and "there would not have been a subsequent interview" had Jenkins admitted Fortenberry was a target. *See id.* Moreover, Gowdy and Fortenberry were objectively reasonable for relying on Jenkins's word. Federal prosecutors' assurances are supposed to be reliable. *See United States v. Hudson*, 609 F.2d 1326, 1328 (9th Cir. 1979) ("The federal courts have long been cognizant of the responsibility of federal prosecutors meticulously to fulfill their promises."). If they could not be relied upon, pre-indictment cooperation through counsel could virtually never happen, because it would simply pose too much danger to the citizen. Any of the government's questions could then be a trap.

For all these reasons, under the circumstances of this case, suppression would be no windfall; it is the only way to approximate treating Fortenberry as courts would treat a victim of analogous (even negligent) misrepresentations in a commercial setting. Though damage has already been done, Fortenberry at least should not continue to face the possibility that the government could use statements to convict him that it obtained from him by denying falsely that the government was already planning to charge him.

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

## II.    ARGUMENT

### A.    The government's "RELEVANT LAW" section III.A is an attack on a straw man; this is not about a general duty to warn targets, but rather the government's false and misleading responses to questions from defense counsel regarding Fortenberry's status.

As noted above and set forth in the opening brief, Fortenberry moves to suppress his statements on the ground that, in making them, he was relying on the government's materially false representations, given in response to inquiries by his counsel, that it (a) did not consider him a target after the Nebraska interview but before the Washington, D.C., interview; and (b), the Washington, D.C., interview, was not a "bullshit 1001"; *i.e.*, the interview was not designed to generate charges under 18 U.S.C. § 1001. *See, e.g.*, Mem. of P. & A. Re Mot. to Suppress Statements ("Motion"), Dkt. No. 35,  at 8 (page numbering of the brief),[1] 12 of 16 (CM/ECF page numbering) ("Here, the Court should hold the government to the necessary implications of its representations that Congressman Fortenberry was not a target after the Nebraska interview and that the Washington, D.C., interview was not 'some bullshit 1001 case' by suppressing the statements he made in reliance on the government's misrepresentations.").

As against that argument, the government's proposition of ostensibly "RELEVANT LAW" that "There Is No Duty to Warn of Target Status and Failures to Warn Do Not Immunize False Statement Crimes" is nonresponsive. Fortenberry is not invoking a supposed general duty to warn. Rather, Fortenberry is relying on his fundamental right not to be placed in a worse position for relying on the misleading representations of a federal prosecutor in response to his attorney's questions as Fortenberry and the attorney weighed the prospect of further cooperation. Thus, section III.A. of the government's opposition

---

[1] For brevity, all subsequent citations to filings docketed in this case refer exclusively to the page numbers found at the bottom of the pages, rather than the page numbers automatically generated at the top of each page by the CM/ECF system.

attacks a "straw man" in place of Fortenberry's actual argument.[2]

The cases cited by the government in section III.A. of the opposition brief, likewise, are simply not responsive to Congressman Fortenberry's motion. In *none* of them did the defendant or defense counsel seek information from the government regarding the government's charging intent before deciding to speak, and then rely on misinformation in giving statements the defendant moved to suppress on those grounds. Moreover, the government's cases addressing suppression arguments were decided as a question of whether the defendant's statements were compelled or involuntary under the Fifth Amendment.

That is not Fortenberry's argument, either. Rather, Congressman Fortenberry's motion seeks to enforce his due process rights and the contract principles applicable to cooperation between citizens and a federal criminal investigation. *See, e.g.*, Motion at 7–8. His argument is that when he (or any other citizen) *asks the government a question* so that he can make a fair and prudent choice about whether and how to cooperate, the government may not induce him to speak with an affirmative misrepresentation indicating lack of intent to charge him, and then use the resulting statements, as well as those previously in the government's possession, to attempt to convict him of a crime.

### B. Owing Fortenberry and his counsel a duty of good faith and fair dealing, the government could decline to answer Mr. Gowdy, but could not obtain admissible statements through false or misleading representations.

In obtaining cooperation from criminal defendants, the government must adhere *at least* to the general duties of contracting parties that apply outside the criminal-justice context. *See, e.g.*, *United States v. Carrillo*, 709 F.2d 35, 36–37, 36 n.1 (9th Cir. 1983) ("an agreement to cooperate may be analyzed in terms of contract law standards"). By the doctrine of promissory estoppel, these duties protect contracting parties from being left in a worse position as a result of relying reasonably and detrimentally on their counterparty's

---

[2] In another "straw man" attack, the government argues there is not a "false statements trap defense." That issue is simply not presented by the motion before the Court.

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

assurances that are regarded as part of a larger complex set of transactions. *See, e.g.*, Randy E. Barnett & Mary E. Becker, *Beyond Reliance: Promissory Estoppel, Contract Formalities, and Misrepresentations*, 15 Hofstra L. Rev. 443, 462–67 (1987) (explaining this principle with detailed analysis of state decisions). Thus, for example, where the status of contracting parties is obscure—such as in a complex insurance arrangement, which, in this respect, is not unlike the context of an evolving and secretive criminal investigation— and one party seeks clarification of the other's intentions, promissory estoppel will be used to enforce any such clarifying assurance. *See id.* at 463–64 (discussing the application of promissory estoppel in *Travelers Indem. Co. v. Holman*, 330 F.2d 142, 151–52 (5th Cir. 1964), as an example case).

The same notions of fairness apply with equal or greater force in the context of cooperation discussions between prosecutor and defense counsel. So here, when Jenkins advised Gowdy that Fortenberry was not a target, Jenkins knew or should have known that a reasonable party in Gowdy and Fortenberry's position would understand this to mean Jenkins did not then possess a recording of statements by Fortenberry that the government believed were provable lies. To be even more blunt, Jenkins knew or should have known that Gowdy and Fortenberry would understand the assurance to mean the government did not regard Fortenberry as having already "dug" himself into "peril[]"—or a "hole" of any size—as a result of, in the government's view, "provid[ing] incomplete and inaccurate information." Opp'n to Motion, Dkt. No. 47, at 1.

Though the government contends that its § 1001 warnings at the outset of the Washington, D.C., interview negate any otherwise binding effect of Jenkins's assurance that Fortenberry was not a target, this overlooks the fact that the misrepresentation took away the element of free, undistorted choice that is supposed to inhere in fair contracting. Regardless of § 1001 warnings, no one would have agreed to cooperate on the terms that the government retrospectively seeks to impose on the Washington, D.C., interview. As noted above, and regardless of AUSA Jenkins's emailed topics for discussion, Gowdy and Fortenberry had no way to know of Jenkins's plan to test precisely Fortenberry's

recollection of the call from Individual H nine months earlier against a *secret recording*, the very existence of which undermined Jenkins's promise that Fortenberry was not a target. Under the circumstances, only the government could have provided Gowdy and Fortenberry the information that Gowdy had *conveyed to the government* was necessary for Fortenberry to decide whether to cooperate further—*i.e.*, whether Fortenberry was, in fact, a target—but the government withheld it instead. Whatever this is, it isn't "good faith and fair dealing," though all contracting parties—federal prosecutors included—owe as much to their counterparties. *See United States v. Henry*, 758 F.3d 427, 431 (D.C. Cir. 2014) (acknowledging prosecutors owe this duty); *cf. also Santobello v. New York*, 404 U.S. 257, 261 (1971) (observing that myriad aims of the criminal-justice system "presuppose fairness in securing agreement between an accused and a prosecutor").

On these facts, mere contract-based rights should be enough for Fortenberry to be entitled to relief, but, as a criminal defendant, Fortenberry has additional constitutional rights. *See Carrillo*, 709 F.2d at 36 n.1; *United States v. Farmer*, 543 F.3d 363, 374 (7th Cir. 2008) (supplementing ordinary contract principles with the concern that the bargaining process not violate the defendant's rights to fundamental fairness). Thus:

> [Contract rules] have to be applied to plea agreements with two things in mind which may require their tempering in particular cases. First, the defendant's underlying "contract" right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law. Second, with respect to federal prosecutions, the courts' concerns run even wider than protection of the defendant's individual constitutional rights—to concerns for the "honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government."

*United States v. Clark*, 218 F.3d 1092, 1095 (9th Cir. 2000) (alteration omitted) (quoting 5 Wayne R. Lafave, Jerold H. Israel & Nancy J. King, *Criminal Procedure*, § 21.2(d), at 57 (2d ed. 1999)). For these reasons, federal prosecutors must "meticulously fulfill their promises." *Hudson*, 609 F.2d at 1328; *see also* Motion at 7–8.

At a minimum, therefore, the government could not mislead Fortenberry or his counsel or exploit their palpable misunderstanding of the government's charging intent, and then violate that understanding. Unfortunately, however, that is what happened.

### C. The government's representations to defense counsel before and during the July 17, 2019, interview in Washington, D.C., were indeed false and misleading.

Again, in overview, Gowdy asked Jenkins whether Fortenberry was a target and Jenkins told Gowdy that Fortenberry was not; he was a mere subject and even "trending" in the opposite direction, away from being a target.[3] The government's defense of this representation by Jenkins is now to claim that it was true. In other words, the government claims that it actually did not regard Fortenberry as a target, and even saw him becoming less and less so. But the record belies the government's self-serving post-hoc contention.

#### 1. The government's characterizations of what it calls Fortenberry's "perilous situation" before the Washington, D.C., interview reveal that the government considered him a target.

Here is how the government summarized its investigation in the first paragraph of its briefing in this case:

> Defendant . . . repeatedly lied in recorded statements to Los Angeles federal investigators conducting a criminal inquiry into illegal foreign and conduit contributions after the evidence led them literally to defendant's doorstep. Defendant was a *subject of the investigation because he received illegal foreign contributions from Nigerian billionaire Gilbert Chagoury*, as part of Chagoury's scheme to influence U.S. politicians. It is undisputed that defendant's campaign received the illicit money. It is undisputed that defendant's statements to investigators regarding this topic were false. It cannot be credibly disputed that such statements were material—indeed, they went to the heart of the investigation and were intended by defendant to minimize his knowledge of any wrongdoing and his campaign's acceptance of illegal foreign funds. When confronted, defendant, *realizing the peril of his situation* but *failing to realize the strength of the*

---

[3] "A 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *Justice Manual* § 9-11.151.

1
2

> *government's evidence*, elected to eschew his oath and instead began his ill-
> fated campaign of concealment and lies.

3   Opp'n to Mot. to Dismiss for Lack of Venue, Dkt. No. 18, at 1 (emphasis added). As the

4   government similarly tells the story in opposing the motion to suppress, *in the government's*

5   *assessment*, Fortenberry had "dug himself a medium-sized hole" in the recorded interview

6   in Nebraska, resulting in a "perilous situation." Opp'n to Mot. to Suppress Statements at 1.

7   These vividly recounted government perspectives tell the Court everything it needs to know

8   to determine whether the representation that Fortenberry was not a target (though at the

9   bottom of a "perilous" self-dug "hole") was fair and accurate.

10              **2.      The government's approach to investigating Fortenberry likewise**
11                      **reveals he was a target well before the Washington, D.C.,**
                        **interview.**

12          Consider also the steps and methods used by the government to investigate

13   Fortenberry. After identifying him as a "subject" for the fact that his campaign received

14   contributions from Chagoury, but understanding that there was still no evidence Fortenberry

15   knew those donations had a foreign source at the time, the government directed Individual

16   H to place a secretly recorded call to Fortenberry to *tell* him that his campaign had received

17   funds in a particular amount, channeled through particular persons. The result was the

18   government's possession of a secretly recorded call in which its informant told Fortenberry

19   the money Fortenberry's campaign received "probably" had come from Chagoury. *See*

20   Indictment ¶¶ 14–15.

21          The government argues that Fortenberry heard, understood, and quickly adopted as

22   fact the news from Individual H, but nevertheless brushed it aside in requesting an

23   additional fundraiser, which the government treated as significantly incriminating in

24   opposing the motion to dismiss for lack of venue. There, the government emphasized its

25   allegation that Fortenberry—

26

27              did not express surprise or concern or seek clarification about Individual H's
28              admissions that illegal foreign cash had been funneled to his campaign.
               Instead, defendant simply continued to push for the second fundraiser,

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

explaining that he hoped to "have some continuation of the fine generosity" that he had received from the first (illicitly funded) fundraiser and offering to speak with his friend Baaklini—a key facilitator of the illegal contributions to defendant's campaign—to see if he could again "help" with the fundraiser.

Opp'n to Mot. to Dismiss for Lack of Venue at 6.

The government even regards Fortenberry's failure, following the Individual H call, to amend his Federal Election Commission ("FEC") reports as a criminal violation of § 1001. *See id.* at 7; Opp'n to Mot. to Dismiss Count One as Multiplicitous at 10 (relying on Indictment's allegations of failure to amend FEC reports). The Indictment alleges:

> Despite being told by Individual H about the illegal donations, defendant FORTENBERRY did not file an amended report with the FEC regarding the 2016 Fundraiser. Defendant FORTENBERRY also did not return or otherwise try to disgorge the contributions from the 2016 Fundraiser after learning on the 2018 Call with Individual H that they were illegal contributions. Rather, *it was not until after the FBI and USAO interviewed him in July 2019* that defendant FORTENBERRY disgorged the contributions.

Indictment ¶ 16 (emphasis added). The government claims further still that, by the time of the Washington, D.C., interview at the latest, Fortenberry actually *knew* his campaign had received illegal contributions. *Id.* at ¶ 19.c.

This viewpoint, embodied in the Indictment and the government's briefing, did not arise later. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

That is why the Nebraska interview was conducted in the manner that it was. Agent Carter secretly recorded Congressman Fortenberry during a visit to Fortenberry's home on a weekend night without advance notice, and grilled him concerning his knowledge of possible illegal donations to his campaign, including the purported facts stated or insinuated by Individual H in his recorded call to Fortenberry nine months before. *See, e.g.*, Indictment at ¶ 20.a., c. Indeed, again as the government claimed in opposing the motion to dismiss for lack of venue, in the Nebraska interview—

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

[t]he . . . agents' questions focused on the CDCA Subjects and [Fortenberry's] 2016 fundraiser in Los Angeles. Defendant repeatedly denied knowing about any illegal conduit contributions to his campaign, *including after being specifically asked about Individual H and Baaklini*. (Indictment ¶ 19(a)(i), ¶ 20.) He denied receiving money from Chagoury. (Id. ¶ 19(a)(iii).) Defendant also falsely stated that "the only people [he] received money for are on the financial disclosure." (Id. ¶ 19(a)(ii), ¶ 20(b)-(c).)

Opp'n to Mot. to Dismiss for Lack of Venue at 7–8 (emphasis added).

It was with these two recordings in hand, and ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ ; that Jenkins told Gowdy that Fortenberry was not a target but a subject "trending toward" a witness. Gowdy Decl. at ¶ 12.

To be sure, "target" status is defined as a subjective concept, but that does not make representations about it meaningless. By definition, even a merely "putative" defendant *is* a "target"; it is not required that the prosecutor have made a final decision to charge. *Justice Manual* § 9-11.151. And, contrary to the government's brief,[4] neither is proof by a preponderance of evidence or anything close to proof beyond reasonable doubt required to be a "target." *Id.* Being a target requires only that the government have what it considers "substantial evidence." *Id.* Again, in the face of this definition, the government's posture that the government considered Fortenberry at once in "peril[]"—at the bottom of a self-dug "medium-sized hole"—and yet *not a target* is a painful contortion. The Court should reject it.

---

[4] *See* Opp'n to Motion to Suppress Statements at 10 (arguing—as if ignorant of the *Justice Manual*'s "substantial evidence" standard for being a target—that Fortenberry was not a "putative defendant" because "the government did not feel it could prove defendant's guilt of making a material false statement *beyond a reasonable doubt*" (emphasis added)).

1

2

      **3.**     **AUSA Jenkins has failed to testify in support of the government's equivocal suggestion that his view of the evidence differed from that of his lead FBI case agent.**

3

      For the reasons above, the government's assertion that Fortenberry "was plainly not

4

a target" even after the Nebraska interview is incredible. Opp'n to Mot. to Suppress

5

Statements at 9. It is all the more so for the government's conspicuous failure to submit any

6

declaration from AUSA Jenkins about how he actually viewed the evidence at that time of

7

his communications with Mr. Gowdy.

8

      This is both substantively and procedurally problematic for the government. It is

9

*substantively* problematic because, as the government admits, "target" status is subjective

10

and in the mind of the prosecutor. *Id.* at 10. Here, the existing evidence, which includes, but

11

is not limited to Exhibit B to the motion to suppress statements, shows that Fortenberry was,

12

in fact, a target. The government has offered no countervailing evidence.

13

      And it is *procedurally* problematic because the government's opposition filing was

14

its opportunity to submit any such evidence. *See* Local Rule 7-9 (requiring filing and serving

15

"the evidence upon which the opposing party will rely in opposition to [a] motion" with the

16

opposition brief); Local Crim. Rule 57-1 ("When applicable directly or by analogy, the

17

Local Rules of the Central District of California shall govern the conduct of criminal

18

proceedings before the District Court, unless otherwise specified.").

19

20

21

22

23

24

25

      In any event, given Jenkins's leadership of, and

26

close collaboration with, the FBI on the investigation at issue, his declaration would have

27

faced an uphill battle to persuade

28

Moreover, regardless of what Jenkins intended when he first spoke to Gowdy, it is readily apparent that, by the time of the Washington, D.C., interview, he was prepared to lay the groundwork for a false-statement charge, which is consistent with ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ target treatment. Indeed, without disclosing to Fortenberry his recordings or offering anything for Fortenberry to review in advance, *see* Ex. B to Opp'n to Mot. to Suppress Statements, AUSA Jenkins quizzed the Congressman on the exact contents of the 2018 call from Individual H that Jenkins had personally approved or requested by the FBI. That is a "gotcha" tactic that results only from design and preparation.[5]

---

[5] Even without a declaration from AUSA Jenkins, the government alludes to the idea that a change of heart by Jenkins after the initial contact with Gowdy or the possibility of such a change later could save the government from having made a material misrepresentation. *See* Opp'n to Mot. to Suppress Statements at 10–12 ("defendant remained a subject unless and until prosecutors informed him his status had . . . changed"). But, for months after the Washington, D.C., interview, during which the government accepted further post-interview cooperation from Fortenberry, the government provided no update. *See* Ex. C to Opp'n to Mot. Suppress Statements (Jan. 18, 2020, email from AUSA Jenkins, which the government's brief references on page 17 as the time when Gowdy was "advised that defendant was being investigated for false statements and that the government had evidence that he lied").

If Jenkins's assessment of Fortenberry's status changed after he told Gowdy that Fortenberry was not a target but a subject "trending" toward witness, then Gowdy had reason to expect Jenkins would update him accordingly, as called for by ABA Standards. *See* ABA Standards for Criminal Justice: Prosecutorial Investigations, Standard 1.4(b) on "Victims, Potential Witnesses, and Targets During the Investigative Process" (approved Feb. 2008) ("Upon request and if known, the prosecutor should inform a person or the person's counsel, whether the person is considered to be a target, subject, witness or victim, *including whether their status has changed*, unless doing so would compromise a continuing investigation." (Emphasis added.)). Moreover, Fortenberry was, of course, a represented party, and California ethics rules would prohibit attorney contact with a represented party induced by a misrepresentation to the represented party's counsel, *cf.* Cal. R. Prof'l Conduct 4.2(a), a duty which the ABA further applies to prosecutors when they are conducting investigations before the filing of charges. *See* Standard 1.4(f) ("The prosecutor should comply with applicable rules and case law that may restrict communications with persons represented by counsel.").

12

REPLY TO OPPOSITION TO MOTION TO SUPPRESS STATEMENTS

4. ████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ As leader of
the investigation, Jenkins is legally chargeable with his agents' knowledge, intent, and
actions. *See, e.g.*, *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) ("The
prosecutor will be deemed to have knowledge of and access to anything in the possession,
custody or control of any federal agency participating in the same investigation of the
defendant."); *Thomas v. Westbrooks*, 849 F.3d 659, 667 (6th Cir. 2017) ("a prosecuting
attorney may be charged with the actual knowledge possessed by his subordinates").

This is because, as the Supreme Court has explained, "whether . . . nondisclosure [is]
a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's
office is an entity and as such it is the spokesman for the Government." *Giglio v. United
States*, 405 U.S. 150, 154 (1972). In support, *Giglio* cited the Restatement (Second) of
Agency § 272 (1958), which explained that "the liability of a principal is affected by the
knowledge of an agent concerning a matter . . . upon which it is his duty to give the principal
information."[6] Thus, any claim by the government that this principle is limited to the context
of post-indictment discovery must fail. Where the agent has knowledge in a joint
investigation with a prosecutor, the prosecutor is legally charged with that knowledge. *See
id.*

---

[6] This agency principle has not changed since *Giglio* in any respect relevant here.
*See* Restatement (Third) Of Agency § 5.03 (2006) (explaining that, with inapplicable
exceptions, "[f]or purposes of determining a principal's legal relations with a third party,
notice of a fact that an agent knows or has reason to know is imputed to the principal if
knowledge of the fact is material to the agent's duties to the principal"). Here, it is self-
evident ██████████████████████████████████████████████████████
The government provides no contrary evidence on this point, either.

### 5. The denial of a "bullshit 1001" compounded Gowdy's palpable misunderstanding.

Fortenberry's motion to suppress is based on a dynamic and evolving set of interactions between the government, on the one hand, and Fortenberry and his counsel, on the other. The government's misleading communications to Fortenberry and his counsel certainly did not end with a "single . . . telephone communication" that the government complains was "documented nowhere" (other than in the sworn declaration of a former Congressman and Assistant U.S. Attorney), but which the government does not actually contest with any countervailing declaration from Jenkins. Opp'n to Mot. to Suppress Statements at 9. AUSA Jenkins's response to Mr. Gowdy during the intermission from the Washington, D.C., interview served to further compound the misleading effect of the initial misrepresentation that Fortenberry was not a target and "trending" toward mere witness status. *See* Gowdy Decl. at ¶ 17. In light of the accusatory tone the Washington, D.C., interview had taken on and Jenkins's prior representation, Mr. Gowdy asked AUSA Jenkins if the interview was "some bullshit 1001 case." *Id.* at ¶¶ 17–18. Mr. Gowdy used that term "because [he] believed AUSA Jenkins when [Jenkins] told [Gowdy} the Congressman was a subject trending toward a witness during [their] initial call." *Id.* at ¶ 18. If Jenkins's view had somehow changed, as it appeared that it might have, Gowdy "wanted to know that immediately. [Gowdy] would not have advised Congressman Fortenberry to return to the interview room had the government not answered in the negative when [Gowdy] asked if [it] was a 'bullshit 1001 case.'" *Id.*; *cf. also* ABA Standards for Criminal Justice: Prosecutorial Investigations, Standard 1.4(b) (prosecutors' duty to update).

By the government's view, Fortenberry was only *more* likely to be charged with a false statement after apparently denying (directly before Gowdy's question of a seeming "bullshit 1001") that Individual H told him precisely what the government contends Individual H told Fortenberry. *See* Opp'n to Mot. to Suppress Statements at 14–15; Ex. C to Opp'n to Mot. to Suppress Statements at 57–58. Indeed, by the explanation of the government's brief, the government believed Fortenberry "repeatedly and demonstrably

l[ied]" in violation of federal law and not "about some ancillary, unimportant fact." Opp'n to Mot. to Suppress Statements at 14–15. Further, according to the government's view, "[i]t was not even as if the government's proof of falsity was based on weak speculative or hearsay evidence (as opposed to crystal clear recordings of defendant eagerly discussing the very things he later lied about)." *Id.* at 15.

During that first intermission in the Washington, D.C., interview, right after Fortenberry allegedly denied what the recording showed that Individual H had told him, Gowdy expressed ongoing but suddenly uncertain belief in Jenkins's prior not-a-target assurance by seeking confirmation that the interview was not "some bullshit 1001 case." *See* Gowdy Decl. at ¶¶ 16–18. As of that time, it is apparent that the government believed it had strong evidence of Fortenberry's guilt and likely considered him not merely a "putative defendant" against whom the evidence was "substantial," but a near-certain defendant against whom the government could prove a case under 18 U.S.C. § 1001 beyond reasonable doubt. *See, e.g.*, Opp'n to Mot. to Suppress Statements at 14–15.

That is why the duty of good faith and fair dealing and Jenkins's prior course of communications with Gowdy made it imperative for Jenkins to clarify the matter then and update Gowdy on his view of Fortenberry's status in the investigation. Yet Jenkins provided no update or clarification and simply answered that a "bullshit 1001" was not what the interview was. Gowdy Decl. at ¶ 18. This understandably led Gowdy to believe that his client's status had not materially changed in the government's eyes, even though it had.

In addition to the duty of good faith and fair dealing that attached to Jenkins merely as a contracting party, California *attorneys* generally have a duty not to deceive, and *prosecutors* are supposed to be held to even higher standards. *See, e.g.*, *Morrow v. Super. Ct.*, 36 Cal. Rptr. 2d 210, 217 (Cal. Ct. App. 1994), as modified (Jan. 5, 1995); *see also Hudson*, 609 F.2d at 1328 (*federal* courts' expectations of prosecutors to "meticulously fulfill" their promises). Where does it leave criminal defense counsel or represented investigation subjects or targets if prosecutors can benefit from deceiving them?

Under the circumstances of the first intermission in the Washington, D.C., interview,

it was Jenkins's responsibility to correct Gowdy's misunderstanding because it was material and palpable from Gowdy's "bullshit 1001" question. Indeed, in interpreting contract terms to which the parties have attached different meanings, the meaning attached by one of them prevails if "that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party." Restatement (Second) of Contracts § 201(2)(b) (1981). Here, having denied to Gowdy that Fortenberry was a target and denied thereafter that the Washington, D.C., interview was for a "bullshit 1001 case," Jenkins had reason to know that Gowdy had operated and was continuing to operate on the misunderstanding that the government's contemporaneous intention was not to charge Fortenberry with crimes. Gowdy, on the other hand, having received those responses from Jenkins, did not have reason to know the government's intent to charge Fortenberry. Therefore, under contract principles, the government must suffer the consequences of failing to correct the palpable misunderstanding that it created. (For related reasons—*i.e.*, the government "had reason to know of [Gowdy and Fortenberry's] mistake[n understanding] or [the government's] fault caused th[at] mistake"—the seeming contract for cooperation between the government and Fortenberry was "voidable" by Fortenberry. *See* Restatement (Second) of Contracts § 153 (1981).)

> ### D. The government fails in its attempt to counter Fortenberry's evidence of reliance and inducement.

The government claims for the following reasons that it did not induce Fortenberry's cooperation: First, it was *Gowdy's* contact with the government that resulted in the Washington, D.C., interview; second, Fortenberry was "keenly interested" in assisting the government; third, the government informed Gowdy in advance that it would ask about the Nebraska interview and "conversations [defendant] had regarding donations to his campaign with or regarding [Individual H], Baaklini, and Chagoury"; and fourth, Gowdy was an attorney and Fortenberry was a politician. Opp'n to Mot. to Suppress Statements at 15–16.

None of these reasons is convincing. Regardless of any of these circumstances, the desire to help the government's investigation on condition of advance clarification of the government's intentions of course does not equate to a blind commitment to accept any and all risk of criminal prosecution. No evidence undermines Gowdy's declaration that Jenkins's representations—

- induced Fortenberry to interview (after the "not a target" representation);
- induced Fortenberry to *continue* to interview (after the "not a 'bullshit 1001'" representation); and
- induced Fortenberry to *continue to cooperate* after the conclusion of the Washington, D.C., interview (with no update as to Fortenberry's target status until five months later).

*See* Gowdy Decl. at ¶¶ 11–14 ("imperative" and "critical" to know Fortenberry's status; without the assurances given, the Washington, D.C., interview "would not have been"); 20–21 (post-Washington, D.C., interview follow-up cooperation efforts without an update on Fortenberry's target status until January 2020); Motion at 7 (post-Washington, D.C., interview follow-up). The government's attempts to undermine Fortenberry's evidence of inducement and reliance fail.

## III.   CONCLUSION

Fundamental fairness and contract principles call for suppressing the Nebraska and Washington, D.C., statements because that is the only way to enforce the government promises that induced Fortenberry's cooperation through counsel.


Date:  December 21, 2021          BIENERT KATZMAN
                                  LITTRELL WILLIAMS LLP


                                  By: _____
                                     John L. Littrell
                                     Ryan V. Fraser
                                     *Attorneys for Hon. Jeffrey Lane Fortenberry*