John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone: (949) 369-3700
Facsimile:  (949) 369-3701

*Attorneys for Defendant*
*Hon. Jeffrey Lane Fortenberry*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-491-SB |
| *Plaintiff,* | Hon. Stanley Blumenfeld, Jr. |
| v. | **HON. JEFFREY LANE FORTENBERRY'S POST-ARGUMENT BRIEF RE MOTION TO SUPPRESS STATEMENTS** |
| JEFFREY FORTENBERRY, | |
| *Defendant.* | |
| | Hearing Date: Jan. 11, 2022 |
| | Indictment: Oct. 19, 2021 |
| | Pretrial Conference: Feb. 8, 2022 |
| | Trial: Feb. 15, 2022 |
| | Last Day: Mar. 2, 2022 |

# TABLE OF CONTENTS

1.  Prosecutorial misrepresentations to defense counsel in the cooperation context differ fundamentally from *police* deceit occurring *outside of a contractual setting*............................................................... 2

2.  Again the government attacks "straw man" positions that Congressman Fortenberry does not hold.......................................................... 3

3.  There is no reasonable dispute that during Congressman Fortenberry's cooperation through counsel, AUSA Jenkins held the beliefs of him that make someone, by definition, a "target."........................ 4

4.  Detrimental and reasonable reliance is clear.................................................... 8

5.  The government explicitly and implicitly made "promises" for purposes of promissory estoppel. ....................................................... 8

6.  Suppression is the necessary promissory-estoppel remedy on these facts............................................................................................................ 12

7.  In the alternative to promissory estoppel, suppression is required under the doctrines of fraudulent inducement or equitable estoppel. ........... 13

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Berger v. United States*,
    295 U.S. 78 (1935) ................................................................................................. 17

*Bustamante v. Intuit, Inc.*,
    45 Cal. Rptr. 3d 692 (Cal. Ct. App. 2006) ........................................................... 8

*Connick v. Thompson*,
    563 U.S. 51 (2011) ................................................................................................... 3

*Gee v. Timineri*,
    56 Cal. Rptr. 211 (Cal. Ct. App. 1967) ............................................................... 15

*Giglio v. United States*,
    405 U.S. 150 (1972) ................................................................................................. 3

*Hernandez v. Lopez*,
    103 Cal. Rptr. 3d 376 (Cal. Ct. App. 2009), as modified ............................. 12, 13

*Heyer Prod. Co. v. United States*,
    140 F. Supp. 409 (Ct. Cl. 1956) ......................................................................... 12

*Illinois v. Perkins*,
    496 U.S. 292 (1990) ................................................................................................. 2

*Imbler v. Pachtman*,
    424 U.S. 409 ............................................................................................................. 3

*Johnson v. Lumpkin*,
    769 F.2d 630 (9th Cir. 1985) ............................................................................... 12

*Kajima/Ray Wilson v. Los Angeles Cty. Metro. Transp. Auth.*,
    23 Cal. 4th 305 (2000) .......................................................................................... 12

*Moran v. Burbine*,
    475 U.S. 412 (1986) ................................................................................................. 2

*Morrow v. Super. Ct.*,
    36 Cal. Rptr. 2d 210 (Cal. Ct. App. 1994), as modified ................................... 18

*Pauly v. U.S. Dep't of Agric.*,
    348 F.3d 1143 (9th Cir. 2003) ............................................................................. 17

*Santobello v. New York*,
    404 U.S. 257 (1971) .............................................................................................. 12

*Travelers Indemnity Co. v. Holman*,
    330 F.2d 142 (5th Cir. 1964) ............................................................................. 9, 10

HON. FORTENBERRY'S POST-ARGUMENT SUPPLEMENTAL BRIEF
RE MOTION TO SUPPRESS STATEMENTS

**TABLE OF AUTHORITIES (cont.)**

*United States v. Carrillo*,
709 F.2d 35 (9th Cir. 1983) ............................................................................... 9

*United States v. Gamboa-Cardenas*,
508 F.3d 491 (9th Cir. 2007) ............................................................... 16, 17, 18

*United States v. Hemmen*,
51 F.3d 883 (9th Cir. 1995) ............................................................................ 16

*United States v. Hudson*,
609 F.2d 1326 (9th Cir. 1976) .................................................................. 4, 13, 17

*United States v. Washington*,
431 U.S. 181 (1977)........................................................................................ 5

*United States v. Wong*,
431 U.S. 174 (1977)........................................................................................ 5

*US Ecology, Inc. v. State*,
28 Cal. Rptr. 3d 894 (Cal. Ct. App. 2005)............................................... 12, 14

*W. Pac. Elec. Co. v. Dragados/Flatiron*,
534 F. Supp. 3d 1209 (E.D. Cal. 2021) ......................................................... 15

*West v. JPMorgan Chase Bank, N.A.*,
154 Cal. Rptr. 3d 285 (Cal. Ct. App. 2013) .................................................... 8

*Young v. Flickinger*,
242 P. 516 (Cal. Ct. App. 1925) .................................................................... 15


**Statutes**

18 U.S.C. § 1001 ................................................................................. 4, 5, 14, 18

Cal. Civil Code § 1572.............................................................................. 15, 16

Cal. Civil Code § 1710.................................................................................... 14

Cal. Civil Code § 1689(b)(1) ......................................................................... 15


**Secondary Sources**

*Beyond Reliance: Promissory Estoppel, Contract Formalities, and Misrepresentations*,
15 Hofstra L. Rev. 443 (1987)......................................................... 9, 10, 11

Restatement (Third) Of Agency § 5.03 (2006)……………………………………6

Congressman Fortenberry submits this supplemental brief to address further the below questions and issues developed at the January 11, 2022, oral argument on his November 30, 2021, motion to suppress statements. On January 18, 2022, in advance of this filing, defense counsel met and conferred with the government by email and phone. The government objects to the filing of this supplemental brief, stating:

> these are arguments that could have been made in connection with the original motion.  We also think it makes sense to see what the Court's order is first before we take a position as to whether the issues you wish to now raise in the supplemental have been exhausted; whether there are grounds for a reconsideration motion; or whether a new motion would be appropriate.

The government also states:

> The government objects to defendant filing a supplemental post-argument brief so that it can can raise new and alternative theories in support of its motion to suppress statements.  Defendant had a full opportunity to brief and argue all relevant issues and theories in support of its motion and offers no legitimate grounds to submit additional briefing.  In any event, the government maintains that the defense's new and alternative theories of suppression are meritless because, among other reasons, the government neither misrepresented any information to the defense nor did it intend, or was it reasonable for the defense to believe the government intended, that defendant act on any alleged misrepresentation.

In response to those objections, the defense submits that the admissibility of the statements at issue implicates important issues, some novel, which deserve thorough consideration before any ruling. The defense therefore respectfully asks the Court to consider this brief and does not object to allowing the government a reasonable time to respond in writing if it requests such an opportunity.

\\\
\\\
\\\
\\\
\\\

HON. FORTENBERRY'S POST-ARGUMENT SUPPLEMENTAL BRIEF
RE MOTION TO SUPPRESS STATEMENTS

**1.   Prosecutorial misrepresentations to defense counsel in the cooperation context differ fundamentally from *police* deceit occurring *outside of a contractual setting*.**

At oral argument, the Court queried why it should be, on the one hand, that police can obtain an admissible confession through either (1) dishonesty and obstruction that prevent defense counsel from even reaching a client who is in custody, *see Moran v. Burbine*, 475 U.S. 412 (1986), or (2) the deceit of an undercover officer posing as an inmate, as in *Illinois v. Perkins*, 496 U.S. 292 (1990), but, on the other, statements given in reliance on a prosecutor's false promises or misrepresentations to defense counsel in a pre-indictment investigation should not be admissible.

*Moran* and *Perkins* are not in conflict with Fortenberry's argument; they are inapposite. Neither involved a contractual setting. It is critical here that Mack Jenkins's false promises or misrepresentations occurred in that context—*i.e.*, in discussing with defense counsel the possibility of, and parameters for, a possible future meeting between the Congressman and the prosecution team, which Congressman Fortenberry had no legal duty to attend. The contractual nature of cooperation means that contract principles, including promissory estoppel and the duty of good faith and fair dealing, apply here.

The case at bar further departs materially from *Moran* and *Perkins* in that here, the false promises or misrepresentations came from the prosecutor himself. Courts have declined to exclude evidence obtained from various particular deceitful *police* practices, but the government identifies no such history when it comes to *prosecutorial* deceit, and counsel for Fortenberry knows of none. *See also, e.g.*, Am. Bar Ass'n ("ABA") *Crim. Justice Standards for the Prosecution Function* (4th ed. 2017),  Standard 3-1.4, *The Prosecutor's Heightened Duty of Candor*, subpara. (b), ("The prosecutor should not make a statement of fact or law, or offer evidence, that the prosecutor does not reasonably believe to be true, to a . . . lawyer, witness, or third party, except for lawfully authorized investigative purposes. In addition, while seeking to accommodate legitimate confidentiality, safety or security concerns, a prosecutor should correct a prosecutor's

HON. FORTENBERRY'S POST-ARGUMENT SUPPLEMENTAL BRIEF
RE MOTION TO SUPPRESS STATEMENTS

representation of material fact or law that the prosecutor reasonably believes is, or later learns was, false.").[1]

### 2. Again the government attacks "straw man" positions that Congressman Fortenberry does not hold.

The government orally argued to the Court:

> If you sort of zoom out, your Honor, effectively what the defendant is saying is that anytime a prosecutor makes a representation, whatever that is, it creates a contractual obligation for the Government to honor that designation, regardless of what the investigation uncovers, and that simply is not the case. That's not how investigations work. During the course of investigation, the prosecution develops information about what certain people did and didn't do, and if a person's status was set in stone, like, the second it came out of a prosecutor's lips, it would effectively undermine the entire ability of the Government to investigate crimes. The flip side of that is, it would produce the absurd result of giving the defendant carte blanche to lie with impunity simply because at one point in time a prosecutor said, you are either a subject or a witness, and that certainly can't be the outcome.

Oral Argument Transcript ("Tr.") at 55:2–17.

Recalling the government's prior false casting of Fortenberry's suppression argument as a claim of involuntariness or a general prosecutorial duty to warn of target status—*see* Opp'n at 6–8; Reply at 3–4—at oral argument again, the government attacked a straw man. The government's description above neither actually nor "effectively"

---

[1] Though this Standard contains an exception for "lawfully authorized investigative purposes," defense counsel is not aware of a recognized legal authorization for prosecutors to mislead defense attorneys in their consideration of cooperation by a client.

While not law, the ABA Standards are an important guidepost because they have repeatedly shaped the Supreme Court's analysis of prosecutors' duties. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 66 (2011) (citing ABA Model R. Prof'l Conduct 3.8(d) (1984)); *Imbler v. Pachtman*, 424 U.S. 409, 426–27 n.24–25 (1976) (citing ABA Project on Standards for Criminal Justice, Prosecution and Defense Function §§ 3.9(c), 3.11 (Approved Draft 1971)); *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (citing ABA, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a)).

portrays Fortenberry's argument.

Fortenberry's position is most definitely not that the government may never change its mind as it receives new information. Rather, Fortenberry's position is that the government may not obtain admissible evidence from a defendant's cooperation that the government induced by an explicit or implied promise or representation that was false *when made*. This is not about the government changing its mind, but rather holding the government accountable for its promises and representations as of the time they are made—if, but only if, as here, the promises or representations induced significant detrimental reliance by the defendant.

Here it is obvious that Count 2 is based primarily on evidence—*i.e.*, recordings and observations of statements made both to and by Fortenberry—that the government already had when Jenkins told Fortenberry's attorney that Fortenberry was not a target and "trending" in the opposite direction. Count 3 is based entirely on Fortenberry's statements made in reliance on that misrepresentation and the false implied promise that the government did not believe it already had "substantial evidence" of a false statement by Fortenberry in the Nebraska interview. So, if federal prosecutors must "meticulously fulfill" their promises—and they must, pursuant to *United States v. Hudson*, 609 F.2d 1326, 1328 (9th Cir. 1976), and related binding cases—then all these statements by Fortenberry should be suppressed. Such a ruling leaves the government ample room to change its mind because it binds the government to its promises and representations only as of the time the government makes them and only to the extent the government thereby induces significant, reasonable detrimental reliance from the defendant.

### 3. There is no reasonable dispute that during Congressman Fortenberry's cooperation through counsel, AUSA Jenkins held the beliefs of him that make someone, by definition, a "target."

The government has submitted no declaration or other evidence to refute the strong inference that, by the time of the July 2019 Washington interview, Mack Jenkins believed he had "substantial evidence" of a violation of 18 U.S.C. § 1001 by Congressman Fortenberry and so considered him, if not a definite defendant, at least a "putative" one—

4

someone who had "dug himself a medium-sized hole" and found himself in a "perilous situation." *Justice Manual* § 9-11.151 (defining "target"); Opp'n at 1 (government's characterization of Fortenberry's situation after the Nebraska interview and before the Washington interview).

Nevertheless, the government appears to argue that inducing cooperation through false explicit and implied promises and representations could never prevent it from obtaining statements that it wants to use to establish a violation of 18 U.S.C. § 1001. *See* Tr. 54:24–55:1 ("Every single day prosecutors across the street and all across the country make representations similar to the one that the Government did in this case."), 55:22–56:9 (responding to the Court's question by positing that there is no suppression remedy for statements induced by prosecutorial deceit or false promises if the government contends they are false statements). Contrary to the government's claim, the government did not cite a case supporting this position in its brief or at oral argument. *United States v. Wong*, 431 U.S. 174, 177–80 (1977), and *United States v. Washington*, 431 U.S. 181, 189–90 (1977), for instance, cited by the government in its brief, were not cases in which a prosecutor induced cooperation through false promises and misrepresentations. Making its distinguishability even clearer, *Washington* notes specifically that there was "no evidence of any governmental misconduct which undermined the fairness of the proceedings" in that case. 431 U.S. at 190 n.6.  Similarly, the government's cases under the heading "There Is No False Statements Trap Defense," *see* Opp'n at 20–21, have no bearing on the motion at hand because none of those cases involved prosecutorial false promises or deceit in the context of cooperation through counsel. The government's cases do not support its claim that it can make false promises or representations to counsel to obtain admissible statements from a cooperating person so long as the government ultimately charges the person only under § 1001.

And again, there should be no mistaking that the government in fact made misrepresentations and false promises. As explained previously, Exhibit B memorializes Jenkins's supervisory participation in approving the request for the Nebraska interview.

The intent to charge Fortenberry with crimes is contained within the section entitled "Reason(s) for the interview and the general subject matter of the interview." The notion that Jenkins would have approved surreptitiously recording a sitting member of Congress in the Congressman's own home without a thorough explanation from the requesting agent of the reasons for doing so is implausible. And indeed, there is *zero evidence* in the record tending to show that Jenkins did not share his agent's intent to charge as part of the basis for the interview. So there is no reasonable way for the Court to avoid finding that Jenkins in fact subjectively shared the FBI's intent. *See also* Restatement (Third) Of Agency § 5.03 (2006) (explaining that, with inapplicable exceptions, "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal"); Cal. R. Prof'l Conduct 3.8 cmt. 6 (stating that "[p]rosecutors have a duty to supervise the work of subordinate . . . nonlawyer employees or agents").

Moreover, Motion Exhibit B *predates* the Nebraska interview. The government's position is that Fortenberry's situation became *more* "perilous" in that interview. Opp'n at 1. So, it would be entirely contrary to the facts of this record to infer that Jenkins had *less* of a plan to charge or less of a belief of possessing "substantial evidence" after the Nebraska interview than he had before it.

There is also Motion Exhibit C, showing that the FBI specifically referred Mr. Gowdy to Mr. Jenkins to answer Mr. Gowdy's question regarding Fortenberry's status as a target, subject, or witness. It would be unreasonable to conclude, without any evidence from the government on the matter, that, when the FBI made this referral, the FBI failed to confer with Jenkins regarding the intent to pursue charges. Equally unreasonable and unsupported by any evidence would be the idea that they did confer, but Jenkins rejected the FBI's written intent to pursue charges.

Additionally, even indulging the off chance that Jenkins's representation of Fortenberry's status was consistent with Jenkins's own actual impressions and knowledge

*at the time of Jenkins's statement to Gowdy on the matter*, and the extremely off chance that the representation was still true three months later when the Washington interview took place, it is inconceivable that Jenkins believed he lacked "substantial evidence" and did not regard Fortenberry as a "putative" defendant until approximately January 2020, when he apparently acknowledged such views to Gowdy for the first time. *See* Exh. C to Opp'n to Motion, CM/ECF doc. no. 47-3 (Jenkins email to Gowdy reporting that "[c]onsistent with our last call, we remain actively investigating whether your client provided willfully false statements to the FBI and/or to the USAO/FBI during his two interviews" and *notifying* Gowdy—apparently for the first time—of the government's position that it "ha[d] evidence [(still not identifying the recording of the June 4, 2018, call from Individual H (*see* Indictment ¶¶ 14–15, 19.b.i, iii, 21))] that is inconsistent with the version of events your client provided to the FBI/USAO, specifically regarding events surrounding the LA fundraiser, the content of his later phone call with [redacted]" and other matters).

This delay is significant because Jenkins continued accepting cooperation from Fortenberry that was premised on non-target status well *after* Fortenberry's Washington interview—for example, when Fortenberry waived attorney-client privilege to permit the government to interview his election-law attorney in August 2019. *See* Gowdy Decl. ¶ 21 (noting that Fortenberry continued to "view[] himself as a witness" after the Washington interview); Exh. B to Opp'n to Motion, CM/ECF doc. no. 47-2 at 49 of 84 (discussing privilege waiver, which occurred through August 2019 FBI interview of the election-law attorney); Exh. C to Opp'n to Motion, CM/ECF doc. no. 47-3 (Gowdy email to Jenkins noting Fortenberry "provided information" in July 2019 "and thereafter"). On this record, devoid of any contrary declaration from AUSA Jenkins, there is no real dispute that Jenkins created and deliberately failed to correct Gowdy and Fortenberry's misunderstanding of Fortenberry's status in the investigation even as Fortenberry cooperated over an extended period of time while relying on that misunderstanding.

### 4. Detrimental and reasonable reliance is clear.

Nor is there any real dispute that Fortenberry and his counsel relied detrimentally upon Jenkins's misrepresentation of Fortenberry's status. Though the government makes much of Fortenberry's desire to assist the government, which he did have, that does not mean the non-target assurance was not essential or not relied upon. Mr. Gowdy's declaration is undisputed on the fact that he "relied on AUSA Jenkins' representations to [him] and Congressman Fortenberry relied on [Gowdy's] representations of that conversation with AUSA Jenkins. [Gowdy] specifically told Congressman Fortenberry" what Jenkins had told Gowdy about the government's view of Fortenberry in their investigation. Gowdy Decl. ¶ 12; *see also id.* at ¶ 14 ("If I had known AUSA Jenkins thought Mr. Fortenberry made a false statement to an FBI agent during the initial field interview in Nebraska, there would not have been a second interview."), ¶ 20 ("Had I known the government believed Congressman Fortenberry lied during either interview, I would never have advised the waiver of [the attorney-client] privilege" to enable the government to interview Fortenberry's election-law lawyer.).

### 5. The government explicitly and implicitly made "promises" for purposes of promissory estoppel.

The government has also claimed that Jenkins's representations cannot give rise to promissory estoppel because they expressed a tentative viewpoint. But, "[f]or a promise to be enforceable, it need only be 'definite enough that a court can determine the scope of the duty,'" *West v. JPMorgan Chase Bank, N.A.*, 154 Cal. Rptr. 3d 285, 303 (Cal. Ct. App. 2013) (quoting *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 699 (Cal. Ct. App. 2006)), and the "intention of the parties in material particulars." *Bustamante*, 45 Cal. Rptr. 3d at 699.

An investigation-status representation framed in terms of "target," "subject," or "witness" meets this standard. "[T]arget" has a specific definition that is widely understood and relied upon by defense counsel in advising unindicted clients. *Justice Manual* § 9-11.151; *see also* Gowdy Decl. ¶ 10 ("The term 'target' is a universally

understood and consequential term among federal criminal practitioners."), ¶ 11 ("It was imperative for me to know whether Mr. Fortenberry was a target, subject, or witness in this investigation, so I could advise Mr. Fortenberry about the risks and benefits of cooperating further . . . ."). It means "putative defendant." *Justice Manual* § 9-11.151; Gowdy Decl. ¶ 10.

So, the representation that the government did not consider Fortenberry a target, in response to Gowdy's question in considering a future cooperation meeting, created a duty on the government's part that its representation was accurate when made and that the government did not *then*, or during the subsequent period of cooperation to which the representation was patently material, intend to pursue criminal charges against him. It also includes the implication that the government did not contemporaneously possess what it believed to be "substantial evidence" of any crime by Fortenberry. Here, as detailed above, it is clear that the government believed contemporaneously that it had such evidence and that the government considered Fortenberry—mired as they saw him in a "medium-sized hole" and "perilous situation" between the Nebraska and Washington interviews and as having "lied—more times and more unequivocally," leaving him in "a deeper hole" after the Washington interview, *see* Opp'n at 1—at least "putative[ly]" a defendant.

While it appears there is no federal appellate (or district-court) decision on whether representations of non-target status are "promises" for promissory estoppel, that does not leave the Court entirely in a vacuum of precedent. After all, we know that representations concerning target status in the cooperation context take place within a complex contractual relationship, because cooperation is essentially contractual. *See, e.g.*, *United States v. Carrillo*, 709 F.2d 35, 36 (9th Cir. 1983) ("[A]n agreement to cooperate may be analyzed in terms of contract law standards.").

And a leading promissory-estoppel case shows that status representations in complex contractual relationships are enforceable promises if detrimentally relied upon. In *Travelers Indemnity Co. v. Holman*, 330 F.2d 142, 151 (5th Cir. 1964), expounded

upon in Barnett & Becker's *Beyond Reliance: Promissory Estoppel, Contract Formalities, and Misrepresentations*, 15 Hofstra L. Rev. 443, 463–64 (1987), as noted in Fortenberry's Reply brief at page 5, an insurer's status representation regarding the insured's coverage for particular property bound the insurer under promissory estoppel because the insurer knew the representation would induce detrimental reliance by the insured, which did occur.

Just like an opinion about "target" status from a prosecutor who is leading an investigation, the insurer's coverage-status representation was an opinion from the authority on the matter. The insured was right to ask the insurer, *Holman* reasoned, precisely because the insurer's view was going to be authoritative, absent litigation. 330 F.2d at 151; *see also Beyond Reliance*, 15 Hofstra L. Rev. at 463–64 (discussing *Holman*). Here, similarly, Mr. Gowdy was right to ask Mr. Jenkins about Fortenberry's status because of Jenkins's authority in the investigation. Moreover, the FBI referred Gowdy to Jenkins to answer *that question*. *See* Exh. C to Motion. Jenkins's view—as the lead prosecutor of the investigation—was likely to determine the ultimate charging decision. Therefore, Jenkins's "target" view is distinguishable from opinions regarding events beyond the control of the speaker, which do not necessarily give rise to promissory estoppel.

Although of course insurance is not the same as a criminal investigation, the characteristics of these respective contexts that are relevant to promissory estoppel are shared—*i.e.*, an ongoing, complex relationship; asymmetric information between the parties; and authority of the speaking party concerning the subject of the representation. *Beyond Reliance* focuses on the importance of these circumstances for promissory estoppel:

> [T]he provisions on coverage in the Holman policy were "obscure" and "contradictory." Even attorneys often cannot understand insurance policies. When such a contract has been drafted by one of the parties, it is likely to be the understanding of the non-drafting party, as well as the expectation of the drafting party, that the latter's descriptions of what has been purchased will be authoritative. Thus, the court used promissory estoppel to enforce an

> implicit term in the original contract: that the insured can regard the insurer's descriptions of the policy as authoritative.

15 Hofstra L. Rev. at 464.

Again, much as "even attorneys often cannot understand insurance policies," *id.*, in the pre-indictment investigation context, defense attorneys often have no means of assessing reliably their clients' status without asking the prosecutor. When the parameters for cooperation are being discussed, defense counsel have reason to expect the prosecutor can provide an authoritative representation regarding target status. Here, that was especially true because (1) it was obvious that Jenkins was leading the investigation and the FBI referred Gowdy to him to answer the status question, *see* Exh. C to Motion; and (2) Jenkins expressed no doubt or need to defer to anyone else in representing that Fortenberry was *not* a target—even stating that Fortenberry was "trending" in the opposite direction, toward witness status. Because Jenkins's words were definite, material representations of intent likely to induce reliance, they were "promises" for purposes of promissory estoppel.

Jenkins also made *implied* promises that support promissory estoppel. First, his statements to Gowdy during the interim period between the Nebraska and Washington interviews implied that the government did not regard Fortenberry as having committed a crime during the Nebraska interview. *See also* Motion at 8–9 ("Given that the Nebraska interview had already taken place, with AUSA Jenkins's approval and upon his instruction, this representation necessarily implied that the government was not planning to charge Congressman Fortenberry with any crime based on the Nebraska interview. In fact, the opposite was true."). Similarly, Jenkins promised by implication that he did not intend to use his then-existing evidence of the Nebraska interview as the primary basis for a criminal charge, which is exactly what he did. *See* Indictment Count 2. Similarly, to fail to correct the not-a-target representation after the Washington interview while seeking and obtaining further cooperation, such as Fortenberry's waiver of the attorney-client privilege for the government's follow-up interview of Fortenberry's election-law lawyer, implies

11

that the recording of the Washington interview was not "substantial evidence" of a crime sufficient to make Fortenberry a "putative defendant," either. But Fortenberry now stands charged with the Washington interview as a standalone violation of § 1001, as well. *See* Indictment Count 3.

The government must be held to its implied promises as well as its explicit ones. *See, e.g.*, *Kajima/Ray Wilson v. Los Angeles Cty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 319 n.6 (2000) (acknowledging implied promises as basis for promissory-estoppel recovery against the government); *Heyer Prod. Co. v. United States*, 140 F. Supp. 409, 412–14 (Ct. Cl. 1956) (allowing recovery for bid-preparation expenses where government's implied promise to consider bids in good faith was fraudulent).

"[F]undamental fairness requires that promises made during plea-bargaining *and analogous contexts* must be respected." *Johnson v. Lumpkin*, 769 F.2d 630, 633 (9th Cir. 1985) (emphasis added) (citing *Santobello v. New York*, 404 U.S. 257, 262–63 (1971)). Cooperation is clearly such an "analogous context" because *Johnson v. Lumpkin* was a cooperation case. There, the Ninth Circuit indicated that estoppel would have bound the government if the promising agent had been authorized to make the promise at issue and the defendant relied on it detrimentally, 769 F.2d at 633—two conditions that are clearly satisfied here.

### 6.   Suppression is the necessary promissory-estoppel remedy on these facts.

"[P]romissory estoppel claims are aimed solely at allowing recovery in equity where a contractual claim fails for a lack of consideration, and in all other respects the claim is akin to one for breach of contract." *US Ecology, Inc. v. State*, 28 Cal. Rptr. 3d 894, 907 (Cal. Ct. App. 2005). Such a remedy may be based on restitution and unjust-enrichment principles, which call for returning to the party deceived by an unfulfilled or false promise what they gave up in reliance thereon. *Cf., e.g.*, *Hernandez v. Lopez*, 103 Cal. Rptr. 3d 376, 380–81 (Cal. Ct. App. 2009), as modified (Dec. 28, 2009).

If it is true, as the Ninth Circuit has guaranteed, that federal prosecutors must "meticulously fulfill their promises," *Hudson*, 609 F.2d at 1328, then a similar equitable

remedy must be available to Fortenberry.

Here, suppression of the Washington, D.C., interview is the only conceivable remedy to approximate the positions the parties would have had, but for the government's false or unfulfilled promises. As for the Nebraska interview, it, too, must be suppressed to fulfill and enforce the government's implied promise going into the Washington interview that evidence in its possession at the time did not constitute "substantial evidence" that the Nebraska interview entailed a false statement in violation of 18 U.S.C. § 1001. *See US Ecology*, 28 Cal. Rptr. 3d at 907 (noting that promissory estoppel is akin to breach-of-contract claim, including in the remedies available, except for the equitable nature of promissory estoppel and the replacement of the consideration requirement with the requirement of reasonable detrimental reliance). At least such evidence of the Nebraska interview must be suppressed as the government possessed before the Washington interview, because the implied promise referred to the government's then-available evidence.

### 7. In the alternative to promissory estoppel, suppression is required under the doctrines of fraudulent inducement or equitable estoppel.

For the reasons above and previously argued, Fortenberry should not be denied relief under the theory that the government's representations were not an expression of intent to act in a particular way and therefore do not support promissory estoppel.

Regardless, in the alternative, to the extent the government made only misrepresentations of fact rather than false or unfulfilled promises, then the doctrine of fraudulent inducement would still call for granting Fortenberry relief. Similarly, equitable estoppel likewise calls for relief in the alternative to promissory estoppel or fraudulent inducement.

### a. Fraudulent inducement

The Justice Manual's concrete definition of "target" status makes it a fact at any given point in time. Therefore, if other elements are satisfied, to mispresent target status negligently or intentionally constitutes "deceit" or "fraud" under California law, which are

grounds to provide the victim relief from a contract formed in reliance thereon.

In particular, "deceit" under California law includes any of the following: "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true;" Cal. Civ. Code § 1710(1); or "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;" Cal. Civ. Code § 1710(2); or "[t]he suppression of a fact, by one who . . . gives information of other facts which are likely to mislead for want of communication of that fact." Cal. Civ. Code § 1710(3). Under the principle of Civil Code § 1710(3), it is necessary to clarify misleading half-truths to avoid committing deceit. *W. Pac. Elec. Co. v. Dragados/Flatiron*, 534 F. Supp. 3d 1209, 1248 (E.D. Cal. 2021) (citations omitted).

"Fraud," a ground for contract rescission under California Civil Code § 1689(b)(1), is defined to include any of the foregoing conduct covered by Civil Code § 1710, as well as other similar conduct. *See* Cal. Civ. Code § 1572. Rescission is also available as relief for half-truth fraud. *See Dragados*, 534 F. Supp. 3d at 1248 (denying summary judgment on rescission cause of action premised on half-truth deceit).

In other words, the victim of fraud or deceit is entitled to be restored to their position before the fraudulent inducement. *Young v. Flickinger*, 242 P. 516, 517 (Cal. Ct. App. 1925) ("'[R]escission,' . . . means to restore the parties to their former position."); *see also Gee v. Timineri*, 56 Cal. Rptr. 211, 217 (Cal. Ct. App. 1967) ("The contract sued on was, it appears, either entered into as the result of a mutual mistake of fact or as the result of a fraudulent representation. Upon the showing made, defendant was entitled to ask that the contract be rescinded and the status quo *restored*, or alternatively, he could have sued for damages for fraud." (emphasis added)). Thus, in the context of pre-indictment cooperation, suppression is the closest approximation for the civil contract remedy.

Here, Jenkins committed at least half-truth fraud or deceit by advising Gowdy that Fortenberry was not a target and trending toward being a witness while Jenkins possessed recordings of the "2018 Call" from Individual H to Fortenberry and the Nebraska

14

interview. That is because the government believed those recordings were substantial evidence of violations of § 1001 that left Fortenberry in a "medium-sized hole" and "perilous situation" after the Nebraska interview. Opp'n at 1. In that context, Jenkins's representations that Fortenberry was not a target and was trending toward being a witness were not just likely, but certain, to mislead Gowdy into the following mistaken beliefs: (1) that the government did not possess such recordings; (2) that the government did not so view Fortenberry's Nebraska statements; and (3) that the government did not regard Fortenberry as a "putative defendant" on the basis of his Nebraska statements or any other evidence then in the government's possession. *See also* Motion at 8–9 ("Given that the Nebraska interview had already taken place, with AUSA Jenkins's approval and upon his instruction, this representation necessarily implied that the government was not planning to charge Congressman Fortenberry with any crime based on the Nebraska interview. In fact, the opposite was true."); Gowdy Decl. ¶ 13 ("If I had known that a recording of the call existed, I would not have agreed to have Mr. Fortenberry participate in an interview without first receiving a copy of the tape and transcript.").

Therefore, in the alternative to promissory estoppel, the facts here present a case of fraudulent inducement under California law that would entitle Fortenberry to rescind any contract entered into in reliance on the fraud. *See* Cal. Civ. Code §§ 1572, 1689(b)(1); Opp'n at 5 (quoting Mack Jenkins referring to having a "contract[,] if you will" with Fortenberry). That is yet another reason, going hand in hand with promissory estoppel, for why suppression here is required to vindicate the citizen's right to contract-based protections in cooperation with the government.

### b.  Equitable estoppel

The related doctrine of equitable estoppel also applies to this fact pattern and should estop the government from arguing that Fortenberry committed a crime in his Nebraska interview. "To establish grounds for estoppel against the government," Fortenberry "must demonstrate that the four traditional elements of equitable estoppel are met." *United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007). Those are:

> "(1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be ignorant of the true facts, and (4) he or she must detrimentally rely on the former's conduct."

*Id.* (quoting *United States v. Hemmen*, 51 F.3d 883, 892 (9th Cir. 1995)). In addition, because Fortenberry seeks to apply equitable estoppel against *the government*, he must establish two additional factors: "([5]) 'the government has engaged in affirmative misconduct going beyond mere negligence' and ([6]) 'the government's act will cause a serious injustice and the imposition of estoppel will not unduly harm the public interest.'" *Id.* (quoting *Pauly v. U.S. Dept. of Agric.*, 348 F.3d 1143, 1149 (9th Cir. 2003) (quotation marks omitted)).

Here, all four traditional elements and the two special government factors are satisfied. First, Jenkins appears to have gone into the Washington interview knowing the true facts that he possessed recordings of the 2018 Call and the Nebraska interview and regarded those recordings as at least "substantial" evidence of a false statement. *See* Opp'n at 1 (government's characterizations of the state of the evidence after the Nebraska interview). Second, Gowdy and Fortenberry had the right to believe Jenkins intended his representations of Fortenberry's status in the investigation to be relied upon since Gowdy asked in the context of considering whether Fortenberry would cooperate further. *See* Gowdy Decl. ¶¶ 9–14. Third, Gowdy and Fortenberry did not know that the 2018 Call or Nebraska interview had been recorded or in substance what those recordings showed. *See id.* at ¶¶ 13–14. Fourth, Fortenberry clearly relied on Jenkins's representations by granting the Washington interview and waiving his attorney-client privilege. *See id.* at ¶¶ 11–14.

Fifth, it must be concluded that the government went beyond mere negligence, given that Jenkins fails to declare anything to rebut the inference raised by the record that he deliberately and materially misled Gowdy. Sixth, allowing the government to benefit from its misconduct and to act contrary to its misrepresentation causes a serious injustice because it rewards prosecutorial deceit. This would fly in the face of binding cherished

16

passages extoling and guaranteeing prosecutorial virtue. *See, e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law . . . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones."); *United States v. Hudson*, 609 F.2d 1326, 1328 (9th Cir. 1979) ("The federal courts have long been cognizant of the responsibility of federal prosecutors meticulously to fulfill their promises."); *Morrow v. Super. Ct.*, 36 Cal. Rptr. 2d 210, 217 (Cal. Ct. App. 1994), as modified (Jan. 5, 1995) ("Courts expect even higher ethical standards from prosecutors.").

Sixth, Fortenberry's remedy of suppressing the Nebraska interview will not unduly harm the public interest. The government struggles to identify how it was actually misled by Fortenberry's statements in Nebraska or Washington. Moreover, with suppression of only the Nebraska interview, the government could still pursue a conviction at trial on Count 3 and the part of Count 1 that is related to the Washington interview and the alleged FEC violation. This would leave the government ample opportunity to seek to vindicate the interests that it interprets 18 U.S.C. § 1001 to protect with regard to this investigation.

\* \* \*

The Court should grant suppression relief to hold the government to its word because Fortenberry relied on it in reasonably and detrimentally in providing the Washington interview as well as later additional cooperation.

Date: January 18, 2022

**BIENERT KATZMAN
LITTRELL WILLIAMS LLP**

By: *  /s/ Ryan V. Fraser*
    John L. Littrell
    Ryan V. Fraser
    *Attorneys for Hon. Jeffrey Lane Fortenberry*