TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-3289
    Facsimile:    (213) 894-0141
    E-mail:    mack.jenkins@usdoj.gov
        jamari.buxton@usdoj.gov
        susan.har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JEFFREY FORTENBERRY,<br><br>        Defendant. | No. 2:21-cr-00491-SB<br><br>GOVERNMENT'S OPPOSITION TO MOTION TO TRANSFER VENUE; ATTACHMENT A; EXS. A-D<br><br>Hearing Date:    2/8/2022<br>Hearing Time:    8:00 a.m.<br><br>Indictment: 10/19/2021<br>Pretrial Conference: 2/8/2022 at 8:00 a.m.<br>Trial: 2/15/2022 at 8:00 a.m.<br>Last Day: 3/2/2022 |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby files its opposition to defendant JEFFREY FORTENBERRY's ("defendant") motion to transfer venue.

This opposition is based upon the attached memorandum of points and authorities, Attachment A, the supporting exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: February 1, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

SUSAN S. HAR
MACK E. JENKINS
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1

**TABLE OF CONTENTS**

2

DESCRIPTION                                                                                    PAGE

3

4

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I.      INTRODUCTION ........................................................................................... 1

II.     RELEVANT FACTS ....................................................................................... 2

        A.      The Charges and Defendant's Initial Appearance ......................... 2

        B.      The Court Has Overseen Extensive Litigation in this Matter ....................... 2

III.    LEGAL STANDARD ...................................................................................... 4

IV.     ARGUMENT .................................................................................................. 6

        A.      The Specific Platt Factors Disfavor Transfer ................................. 6

                1.      Location of Defendant Slightly Favors Transfer ................. 6

                2.      Location of Possible Witnesses Strongly Disfavors Transfer ........... 8

                3.      Location of Events Strongly Disfavors Transfer ............... 11

                4.      Location of Documentary Evidence Slightly Disfavors
                        Transfer ................................................................................. 12

                5.      Disruption of Defendant's Business Is Neutral ............... 12

                6.      Expense to the Parties Strongly Disfavors Transfer ......... 14

                7.      Location of Counsel Strongly Disfavors Transfer ............ 15

                8.      Relative Accessibility of Place of Trial Slightly Disfavors
                        Transfer ................................................................................. 16

                9.      Docket Conditions May Favor Transfer But Is of Minimal
                        Significance ........................................................................... 17

        B.      The Interest of Justice Strongly Disfavors Transfer ................... 18

                1.      Judicial Resources Strongly Disfavor Transfer ............... 19

                2.      Preventing Forum Shopping Strongly Disfavors Transfer ........... 20

                3.      The CDCA Suspension of Jury Trials Is an Uncertain Factor ......... 21

V.      CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

DESCRIPTION                                                                                    PAGE

Cases

Allen v. Scribner,
  812 F.2d 426 (9th Cir.) ................................................................................. 19

Brogan v. United States,
  522 U.S. 398 (1998) ................................................................................... 11

Jones v. Gasch,
  404 F.2d 1231 (D.C. Cir. 1967) ........................................................ 4, 6, 10, 11

Lindberg v. United States,
  363 F.2d 438 (9th Cir. 1966) .................................................................... 4, 9

McCarthy v. Pelosi,
  2022 WL 199381 (U.S. Jan. 24, 2022) ........................................................ 14

Platt v. Minnesota Min. & Mfg. Co.,
  376 U.S. 240 (1964) ............................................................... 1, 5, 6, 18

U.S.A. v. Kloehn,
  2011 WL 13308094 n.1 (C.D. Cal. Apr. 11, 2011) .................................... 13, 19

United States. v. Van Allen,
  28 F.R.D. 329 (S.D.N.Y. 1961) .................................................................. 12

United States v. Acuna,
  2008 WL 1722129 (D. Haw. Apr. 14, 2008) .................................................. 8

United States v. Aronoff,
  463 F. Supp. 454 (S.D.N.Y. 1978) ............................................................... 4

United States v. Bagnell,
  679 F.2d 826 (11th Cir. 1982) ..................................................................... 6

United States v. Balsiger,
  644 F. Supp. 2d 1101 (E.D. Wis. 2009) ....................................................... 19

United States v. Bistline,
  665 F.3d 758 (6th Cir. 2012) ...................................................................... 24

United States v. Bitner,
  369 F. App'x 820 (9th Cir. 2010) .................................................................. 5

United States v. Bowdoin,
  770 F. Supp. 2d 133 (D.D.C. 2011) ..................................................... 5, 7, 18, 25

United States v. Carey,
  152 F. Supp. 2d 415 (S.D.N.Y. 2001) .......................................................... 12

United States v. Cohen,
  35 F.R.D. 227 (N.D. Cal. 1964) ............................................................. 8, 25

United States v. Estrada,
  880 F. Supp. 2d 478 (S.D.N.Y. 2012) ..................................................... 7, 12, 14, 17

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                     PAGE

United States v. Haig,
  2018 WL 8646839, at *7 (D. Nev. Oct. 10, 2018)...................................16
United States v. Haley,
  504 F. Supp. 1124 (E.D. Pa. 1981).......................................6, 9, 10
United States v. Hunter,
  672 F.2d 815 (10th Cir. 1982)..........................................11
United States v. Jamal,
  246 F. App'x 351 (6th Cir. 2007).......................................20
United States v. Jones,
  43 F.R.D. 511 (D.D.C 1967).............................................4, 15
United States v. Jordan,
  223 F.3d 676 (7th Cir. 2000)...........................................1, 20
United States v. Lupton,
  620 F.3d 790 (7th Cir. 2010)...........................................11
United States v. Menendez,
  109 F. Supp. 3d 720 (D.N.J. 2015)......................................10, 17
United States v. Napoli,
  2011 WL 1303571 (N.D. Cal. Apr. 5, 2011)...............................7, 16
United States v. Prosperi,
  686 F.3d 32 (1st Cir. 2012) ...........................................24
United States v. Robinson,
  2010 WL 3087446 (D. N. Mar. I. July 29, 2010)..........................16, 17
United States v. Rodriguez,
  2018 WL 2126429 (W.D.N.Y. May 9, 2018) ................................5
United States v. Sherwood,
  98 F.3d 402 (9th Cir. 1996)............................................5
United States v. Spy Factory, Inc.,
  951 F. Supp. 450 (S.D.N.Y. 1997).......................................23
United States v. Stefonek,
  179 F.3d 1030 (7th Cir. 1999)..........................................2, 3
United States v. Stein,
  429 F. Supp. 2d 633 (S.D.N.Y. 2006)....................................13, 17
United States v. Testa,
  548 F.2d 847 (9th Cir. 1977)...........................................6, 8
United States v. Treadwell,
  593 F.3d 990 (9th Cir. 2010)...........................................2
United States v. U.S. Steel Corp.,
  233 F. Supp. 154 (S.D.N.Y. 1964).......................................6, 7

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                                                <u>PAGE</u>

<u>United States v. Ward</u>,
   878 F.2d 387 (9th Cir. 1989) ........................................................................ 19

<u>United States v. Young</u>,
   2012 WL 5397185 (D. Utah Nov. 5, 2012) .................................................... 5

<u>United States v. Zylstra</u>,
   713 F.2d 1332 (7th Cir. 1983) ...................................................................... 19

Statutes

18 U.S.C. § 3161(h)(7)(C) .............................................................................. 17

Rules

Fed. R. Crim. P. 21(b) ...........................................................................4, 5, 8, 18

iv

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3        Since the inception of this case, defendant has sought to avoid a trial in the same

4   district that was home to an ongoing criminal investigation that he sought to obstruct—

5   and the district where a federal Grand Jury returned the Indictment and in which venue is

6   proper for all three counts.  Defendant has openly complained about the prospect of

7   "fac[ing] a jury of Californians."  (Dkt. No. 14 at 2.)  And throughout this litigation,

8   defendant has continuously and baselessly argued that this prosecution was a political

9   one, including most recently his assertion that: "This is a politically charged case

10  involving allegations of false statements by a Republican United States Representative

11  from Nebraska in a heavily Democratic judicial district that is far from his home."[1]

12       But "[v]enue is not the defendant's choice to be determined on the basis of where

13  he believes a jury might be more sympathetic to his political views."  United States v.

14  Jordan, 223 F.3d 676, 686 (7th Cir. 2000).  Defendant's motion to transfer venue to

15  Nebraska should fail because he has not demonstrated that a trial in this district is so

16  unduly burdensome and that a transfer is in the interest of justice.  (See Dkt. No. 89

17  ("Mot.").)  Instead, defendant mis-analyzes the factors under Platt v. Minnesota Min. &

18  Mfg. Co., 376 U.S. 240 (1964), while also relying on unsupported generalizations to

19  obtain his results-oriented goal: to forum shop away from a district that he perceives is

20  "heavily Democratic," which he improperly equates to bias against him.

21       In addition, consistent with other arguments made by defendant in his litigation,

22  he presumes that his privilege and status as a U.S. Congressman entitle him to special

23  treatment to move his trial, as it so happens, to a location with a perceived friendly jury

24  pool where he serves as an elected politician and where he has been riding a self-

25  generated wave of local news coverage promoting his defense.  But defendant's logic

26  endorses a two-tier system of justice that treats criminal defendants who maintain a

27

28       [1] Defendant makes this claim in his forthcoming joint motion in limine for
attorney-conducted voir dire.  (JMIL No. 9 at 1.)

position of power better or more leniently than those who do not.  This harms, not advances, the interest of justice.  Cf. United States v. Treadwell, 593 F.3d 990, 1012–13 (9th Cir. 2010) (overruled on other grounds) (noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses[.]); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (white-collar criminals are "not to be treated more leniently than members of the 'criminal class'").  The motion should be denied.

## II.    RELEVANT FACTS

### A.    The Charges and Defendant's Initial Appearance

A Central District of California ("CDCA") grand jury returned the Indictment against defendant on October 19, 2021.  (Dkt. No. 1.)  The Indictment charges three counts based on defendant's conduct in violation of 18 U.S.C. § 1001—namely, defendant's scheme to falsify and conceal material facts from, and making materially false statements to, federal investigators in this district conducting a Federal Election Campaign Act and foreign influence investigation (the "CDCA Investigation").  (Id.)

On October 20, 2021, after the government agreed defendant could appear via summons (instead of arresting him in Nebraska or requiring he self surrender in the CDCA), he made his (virtual) initial appearance in the CDCA, during which the government provided in open court the names of its witnesses.  (Dkt. No. 6.)  During that hearing, defense counsel John Littrell announced to the court that he intended to move at the "first opportunity" for discretionary transfer under Rule 21.

### B.    The Court Has Overseen Extensive Litigation in this Matter

On November 2, 2021, defendant filed a motion to dismiss the case for lack of venue; he did not argue for discretionary transfer in the alternative.  (Dkt. No. 14.)  On November 9, defendant filed four more pre-trial motions: three to dismiss and one to disqualify an AUSA.  (Dkt. Nos. 17, 19, 20, 21.)  The Court heard all five motions on December 13, 2021.  (Dkt. No. 67.)  On December 29, 2021, the Court issued a 17-page Order denying all five motions.  (Dkt. No. 59.)

On November 29 and 30, 2021, defendant filed two more motions: one to compel discovery and another to suppress statements.  (Dkt. Nos. 30, 35.)  On January 11, 2022, the Court heard argument on these two motions and took them under submission; defendant did not appear in person or remotely, despite having the option to do so.  (Dkt. No. 70, 71.)  As of the date of this opposition, ruling on those motions is pending.

One week after the January 11 hearing, defendant, apparently concerned that the oral argument indicated the Court would deny his motion to suppress, filed a 17-page "post-argument supplemental brief" for the originally filed motion to suppress, along with a 10-page second motion to suppress statements based on, among other thing, "the grounds previously argued and briefed."  (Dkt. Nos. 79, 80.)  The government moved to strike the supplemental brief or, alternatively, for leave to file a (consolidated) opposition.  (Dkt. No. 82.)  On January 21, 2022, the Court vacated the hearing on defendant's so-called "second motion to suppress" but noted it would set one at a later date if a hearing was necessary.  (Dkt. No. 83.)  The Court did not require the government to file a response to either filing.  (Id.)

On January 19, 2022, the Chief Judge for CDCA issued an order announcing a temporary suspension of jury trials through February 28, 2022.[2]  Thereafter—and after this Court denied five of defendant's substantive motions and expended considerable judicial resources to review the parties' motions, conduct extensive hearings, and develop a meaningful familiarity with the facts and law (and other unique factors) of this case—defendant filed the instant motion.

Specifically, on January 24, 2022, defendant filed a motion to transfer venue to the District of Nebraska under Rule 21(b).  (Dkt. No. 87.)  One day later, defendant filed an amended motion.  (Dkt. No. 89.)  That same day, the Court conducted a status conference.  (See Dkt. No. 90.)  Defendant did not appear in person or remotely, despite

---

[2] https://www.cacd.uscourts.gov/sites/default/files/general-orders/Order_22-002.pdf.  This order extended a prior January 3, 2022 order suspending jury trials through January 24, 2022.  https://www.cacd.uscourts.gov/sites/default/files/general-orders/Order_22-001.pdf

having the option to do so.  (Dkt. Nos. 86, 90.)  The parties discussed among other things, the trial date in this matter, in light of the latest order by the Chief Judge.  The Court ordered the government to file a proposed order justifying excludable time under the Speedy Trial Act for a trial date after February 15, 2022.  (See Dkt. No. 90.)  The parties also advised the Court that they would be filing joint motions in limine, to be heard on February 8, 2022.  Finally, upon the defense's request, the Court waived defendant's presence for the next hearing on February 8.

As of the date of this opposition, the parties have internally exchanged a total of nine motions in limine and oppositions, which are expected to be filed on February 3, 2022.  Also pending before the Court is the government's ex parte application to continue the trial date to March 15, 2022.  (Dkt. No. 93.)

## III.   LEGAL STANDARD

"Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."[3]  Fed. R. Crim. P. 21(b).  Defendant has the burden to "support his motion with a showing of specific circumstances from which the district court could conclude that the proceeding should be transferred in the interests of justice."  Lindberg v. United States, 363 F.2d 438, 438 (9th Cir. 1966); see also Jones, 43 F.R.D. at 514 (defendant must demonstrate "the prosecution in the district where the indictment was properly returned will result in a

_____

[3] Prior to 1966, Rule 21(b) permitted transfer only for offenses committed in more than one district to another district where venue properly lied and when it was "in the interest of justice."  The Rule was amended thereafter to eliminate the venue precondition, but "it did not otherwise create an essentially new yardstick by which requests for removal are to be judged.  No major enlargement of authority to transfer flows from the present specification of 'the convenience of parties and witnesses,' for that was an important factor in ascertaining 'the interest of justice' under the original rule."  Jones v. Gasch, 404 F.2d 1231, 1237 (D.C. Cir. 1967); United States v. Jones, 43 F.R.D. 511, 513 (D.D.C 1967) ("[T]he 'interest of justice' standard which is incorporated in both the old and the new rule has not been changed.").  Likewise, although Platt was decided under the former Rule 21(b), and involved a corporate defendant, many courts have continued to analyze the factors articulated in Platt under the amended rule and with individual defendants.  See United States v. Aronoff, 463 F. Supp. 454, 458 (S.D.N.Y. 1978).

4

1    substantial balance of inconvenience to himself"; venue transfer should be granted "only

2    rarely and for good cause"); United States v. Young, No. 2:12-CR-502, 2012 WL

3    5397185, at *1 (D. Utah Nov. 5, 2012) (defendants who seek change of venue have a

4    "formidable burden").  There is a relative scarcity of circuit authority, as compared to

5    district court decisions, analyzing the relevant Platt factors.

6         The district court has very broad discretion to determine the propriety of a transfer

7    under Rule 21(b).  See United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  In

8    evaluating a Rule 21(b) motion to transfer venue, courts evaluate ten factors:

9    "(1) location of [] defendant; (2) location of possible witnesses; (3) location of events

10   likely to be in issue; (4) location of documents and records likely to be involved; (5)

11   disruption of defendant's business unless the case is transferred; (6) expense to the

12   parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket

13   condition of each district or division involved; and (10) any other special elements which

14   might affect the transfer."  Platt, 376 U.S. at 243–44.  "No one of the Platt considerations

15   is dispositive, and it remains for the court to try to strike a balance and determine which

16   factors are of greatest importance."  United States v. Bowdoin, 770 F. Supp. 2d 133, 137

17   (D.D.C. 2011) (citations omitted).  So long as the district court applies the appropriate

18   criteria as set forth in Platt, and does not rely on any improper factors, that determination

19   will not be disturbed.  United States v. Bitner, 369 F. App'x 820, 821 (9th Cir. 2010) ("It

20   is not our function to reweigh the factors once we are satisfied that the district court

21   applied the appropriate criteria [under Platt].")

22        According to various district courts, "[t]here is a general presumption that a

23   criminal prosecution should be retained in the original district."  Bowdoin, 770 F. Supp.

24   2d at 138 (citations omitted); United States v. Rodriguez, 2018 WL 2126429, at *3

25   (W.D.N.Y. May 9, 2018) (agreeing with general rule based on persuasive authority;

26   collecting cases).  "To warrant a transfer from the district where an indictment was

27   properly returned, it should appear that a trial there would be so unduly burdensome that

28   fairness requires the transfer to another district of proper venue where a trial would be

5

1   less burdensome; and, necessarily, any such determination <u>must take into account any</u>

2   <u>countervailing considerations which may militate against removal</u>."  United States v.

3   U.S. Steel Corp., 233 F. Supp. 154, 157 (S.D.N.Y. 1964) (emphasis added); <u>see also</u>

4   United States v. Testa, 548 F.2d 847, 857 (9th Cir. 1977) (recognizing that "some degree

5   of inconvenience [to the defense] is inevitable, and that the government's inconvenience

6   must be considered as well" (citing Gasch, 404 F.2d at 1243)).

7   **IV.    ARGUMENT**

8       **A.    The Specific <u>Platt</u> Factors <u>Disfavor</u> Transfer**

9       Defendant has not met his burden to show affirmatively and specifically that it

10  would be more convenient for the parties and witnesses, and that it would be in the

11  interest of justice, to transfer this case to Nebraska.  Much of defendant's analysis of the

12  factors is perfunctory, illogical, or unsupported by the requisite showing defendant must

13  make so that the Court can be "well informed" in evaluating the motion.  United States

14  v. Haley, 504 F. Supp. 1124, 1126 (E.D. Pa. 1981).  And although it is defendant's

15  burden, the government sets forth why on balance the <u>Platt</u> factors weigh strongly in

16  favor of retaining this CDCA case here: both because it would be comparatively

17  convenient to the parties and witnesses and best serve the interest of justice.

18          1.    Location of Defendant Slightly Favors Transfer

19      "A criminal defendant has no right to be tried in place of his domicile, and the

20  defendant's concerns about the expense and inconvenience of being tried away from

21  home are ordinarily of little relevance to a motion for a change of venue."  United States

22  v. Bagnell, 679 F.2d 826, 832 (11th Cir. 1982).  The location of the defendant's home

23  does not have "independent significance in determining whether transfer to that district

24  would be in the interest of justice, although it may be considered with reference to such

25  factors as the convenience of records, officers, personnel and counsel."  Platt, 376 U.S.

26  at 246; Gasch, 404 F.2d at 1240 ("Defendant's residence . . . derives significance solely

27  from its relationship to the convenience of witnesses, records, and counsel.).

28

Defendant's status as a resident of Nebraska should be given little weight.  See Bowdoin, 770 F. Supp. 2d at 137 ("[I]t remains for the court to . . . determine which factors are of greatest importance.").  Every prosecution, regardless of its location, "imposes burdens upon a defendant and brings in its wake dislocation from normal occupational and personal activities." U.S. Steel Corp., 233 F. Supp. at 157.  In today's era, those ordinary burdens associated with being a criminal defendant have been mitigated, given the "efficiency of modern air transportation," United States v. Estrada, 880 F. Supp. 2d 478, 485 (S.D.N.Y. 2012), and even in view of the ongoing COVID-19 pandemic, which has had the effect of largely substituting, or at least permitting, remote interactions for in-person ones for defendants who want to participate.

Notwithstanding that defendant directed his false statements at federal investigative efforts in this district; a grand jury returned an indictment in this district; and venue is proper in this district, (see Dkt. No. 59 at 9-10), defendant has not once actually been required to travel to the CDCA as a result of this prosecution.  At defense request, his initial appearance took place by video teleconference with defendant in Nebraska.  At defense request, the government facilitated for defendant to be processed by the U.S. Marshals in Nebraska.  At defense request, this Court has waived defendant's presence at all court hearings, and additionally provided him the option of appearing remotely by video teleconference (which defendant has repeatedly declined), thereby substantially mitigating defendant's burden of being prosecuted in CDCA.  (See Dkt. Nos. 43, 70, 86, 90); United States v. Napoli, No. C 10-00642 CRB, 2011 WL 1303571, at *1 (N.D. Cal. Apr. 5, 2011) ("[B]ecause the Court has waived [defendant's] presence at all non-essential court appearances, the time and financial burden on him has been mitigated.").  The government has not objected to any of these defense requests aimed at facilitating his convenience and minimizing disruption for him.  Moreover, the parties estimate that the trial of this matter will last a few days—not months or even weeks.  In sum, defendant's location weighs only slightly in favor of transfer.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.    Location of Possible Witnesses Strongly Disfavors Transfer

Although defendant correctly lays out the government's current anticipated witness list, his logic regarding the "convenience" of a transfer is seriously flawed.  (See Mot. at 6.)  At present, the government expects to call seven witnesses in its case-in-chief—three are in this district, three are in the Washington D.C. area, and one spends time across this district and two other locations.  None are in Nebraska.  Should the case remain here, that means three (and possibly four) of the government witnesses will need to travel to Los Angeles.  Should this case be transferred to Nebraska, that means all seven government witnesses will need to travel out of state.

Defendant dismisses out of hand the government agents because their "job requires travel." (Mot. at 6.)  This is nonsense.  In the context of a Rule 21(b) motion, the government's convenience must be considered.  Testa, 548 F.2d at 857.  By defendant's logic, convenience to the witnesses would count for nothing at all because all subpoenaed witnesses are "required" to appear for a criminal trial.  Whether a witness is required to appear for a criminal trial due to their job or a subpoena (or both) should not affect the convenience calculus because all of it comes with the financial, opportunity, and physical cost of travel.  Furthermore, the witnesses in the Los Angeles area are the main witnesses who the government expects will spend the most time on direct and cross examination, including the case agent who will need to be present for the entirety of the trial.  See United States v. Cohen, 35 F.R.D. 227, 232 (N.D. Cal. 1964) (noting that the "main government witnesses" were in the original district); see also United States v. Acuna, 2008 WL 1722129, at *4 (D. Haw. Apr. 14, 2008) (denying defendants' motions for change of venue where the "majority of the Government's substantive witnesses are located in the [original district]").

With respect to defendant's tentative witness list, defendant has not met his burden to demonstrate these are bona fide necessary witnesses, and there is ample reason

8

for skepticism.[4]  A defendant must support his Rule 21(b) motion "with a showing of specific circumstances"; as it relates to purported defense witnesses, defendant must not only name the witnesses but also disclose "the nature of their expected testimony." Lindberg, 363 F.2d at 438–39.  Given the strong incentive for a defendant seeking to escape a venue he perceives as insufficiently friendly to manipulate this factor by conjuring up witnesses, this factor necessitates particularly close analysis.  The court "must be well informed" to exercise its sound discretion in deciding the motion and can "make an informed decision regarding the necessity of those defense witnesses who would be inconvenienced or unable to attend trial absent transfer" only with "concrete demonstrations" of the proposed testimony and not just "naked allegation[s] that witnesses will be inconvenienced by trial in a distant forum."  Haley, 504 F. Supp. at 1126 (citations omitted) (emphasis added).

Tellingly, defendant does not provide the Court *any* information regarding the nature of the expected testimony for his four purported witnesses in Nebraska and why they are essential, or even relevant, to his defense or what admissible evidence they might offer.  For one, he improperly double counts himself both as a witness and under the first Platt factor (defendant's location).  As for the remaining Nebraska witnesses, the government heard most of their names[5] for the first time from defense counsel the day after defendant filed his original motion.  Despite repeated requests for reciprocal discovery, defense counsel has provided no witness statements, and the relevance of these witnesses is specious.  What testimony can two Lincoln police officials provide that is legally relevant and not cumulative, particularly when the entire Lincoln interview with defendant was both video and audio recorded?  Likewise, what is the relevance of

---

[4] In support of the view that these witnesses appear to be more of an afterthought, defendant inexplicably filed his original motion without reference to any of them.  (Dkt. No. 87.)  One day later, defendant filed the amended motion, newly identifying four defense witnesses, plus defendant, in Nebraska.  (Mot. at 6.)

[5] According to Mr. Littrell, Jeffrey Bleimeister and Michael Schmidt are officials with the Lincoln Police Department and Nibras Bisetkey is a former extern who purportedly worked on the 2016 Los Angeles Fundraiser.

an extern who did not attend or organize the 2016 Los Angeles Fundraiser, was not on any of the key communications, but allegedly "worked on" the fundraiser in some non-descript way?  The superfluousness of such testimony is further established by the fact that defendant's central fundraiser (Kendrick) and the two key witnesses behind the 2016 Fundraiser (Baaklini and Individual H) will already be testifying.  It is defendant's burden to provide these explanations, and he has failed to do so, despite having two opportunities to do it.  Further, because of his failure to "disclose the nature of their expected testimony" to the Court or "provide an adequate basis to enable the Court to determine whether these individuals may even be properly classified as 'witnesses,'" the government presumes that defendant seeks to call his wife, Celeste Fortenberry, as a character witness, which will necessarily be limited, assuming it is admissible.  See Gasch, 404 F.2d at 1239 (district court did not abuse discretion when he did not credit defense affidavit designating 69 witnesses, when defendant did not otherwise "disclose the nature of their expected testimony" or "provide an adequate basis to enable the Court to determine whether these individuals may even be properly classified as 'witnesses'"; court expressed doubt that the witnesses "will all be necessary" and noted it may exercise discretion to "reasonably limit their number").[6]

The point is that defendant has not even attempted to provide the required "concrete demonstrations" of the proposed testimony or explain why these defense witnesses would be so inconvenienced or "unable to attend trial absent transfer."  Haley, 504 F. Supp. at 1126.  Naked and belated assertions, particularly in the absence of evidence that "denying transfer threatened to frustrate a defendant's trial presentation," do not support transfer.  United States v. Menendez, 109 F. Supp. 3d 720, 728 (D.N.J. 2015) (collecting cases).  Notably, the only witness that defendant has consistently identified and for whom defendant has proffered relevant testimony is Dr. Alan Castel, who defendant noticed as a memory expert.  He is in the CDCA.

---

[6] Indeed, defendant's "tentative" witness list has already changed.  After reviewing the government's Motion in Limine seeking to exclude him, the defense withdrew its plans to call Florida-based witness Jeffrey Danik.  (See Mot. at 6.)

This factor strongly disfavors transfer.

### 3. Location of Events Strongly Disfavors Transfer

Criminal actions should normally be prosecuted "in (the) district in which the offense was committed." United States v. Hunter, 672 F.2d 815, 816 (10th Cir. 1982) (citing Fed. R. Crim. P. 18).

In addressing this factor, defendant rehashes facts from his failed motion to dismiss for lack of venue—namely, that the interviews took place in Nebraska and Washington D.C.—and makes the conclusory claim that this favors transfer. (Mot. at 7.) But all of the Platt factors are to be evaluated with an eye towards whether transfer is in the interest of justice, see Gasch, 404 F.2d at 1237, and there are strong federal interests as contemplated by both section 1001 and the attendant venue laws to hold defendant accountable here, where he attempted to obstruct a significant, ongoing federal investigation. See Brogan v. United States, 522 U.S. 398, 403 (1998) (section 1001 reflects "the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described") (emphasis added). As this Court previously explained: "[A]n exclusive focus on the location where the false statement was made without regard to where it was directed gives short shrift to the prohibited conduct as contemplated by the statute: . . . . When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001." (Dkt. No. 59 at 8 (quoting United States v. Lupton, 620 F.3d 790, 806–07 (7th Cir. 2010).)

Defendant's charged criminal conduct was aimed at perverting authorized government functioning in CDCA and obstructing the CDCA Investigation that focused on criminal conduct that benefitted defendant's campaign and occurred here.[7] "Trial

---

[7] Although the amended rule permits a transfer to any venue, it is worth noting that Count Three of the Indictment (arising from defendant's false statements during an interview in Washington D.C.) is not properly venued in Nebraska, even under defendant's incorrect theory of venue.

should be had at the place where the primary evils are alleged to have occurred." <u>United States. v. Van Allen</u>, 28 F.R.D. 329, 340 (S.D.N.Y. 1961).  That place is the CDCA: the heart of the harm of defendant's conduct.  <u>See also</u> <u>United States v. Carey</u>, 152 F. Supp. 2d 415, 422 (S.D.N.Y. 2001) (although "some of the [false] statements may have occurred elsewhere, the heart of the events at issue lies . . . in this district").

### 4.    Location of Documentary Evidence Slightly Disfavors Transfer

Consistent with the fact that the federal investigation took place in this district for over six years, all documentary evidence is in CDCA.  Again, "given the conveniences of modern transportation and communication, the location of the documents is a minor concern, but it is one that favors [the original district]." <u>Estrada</u>, 880 F. Supp. 2d at 484.

Defendant misleadingly claims that the protective order in this case means counsel must travel to Nebraska or Washington D.C. "to review documents with the Congressman and prepare for trial." (Mot. at 7.)  However, as even defendant dismissively admits in a footnote, the government has permitted the defense to review protected documents through videoconferencing software—which is presumably how defendant and counsel like many other busy professionals have largely interacted during the pendency of this litigation during the pandemic.  (<u>Id.</u>)  Mr. Littrell even made a statement to the media that the protective order was "not an unusual step at all" and that "[t]he protective order does not limit the Congressman's access to information, <u>and it will not inhibit our ability to defend this case</u>."[8]  Given the volume, breadth, and frequency of pre-trial motions that the defense has filed in this matter, Mr. Littrell's statement appears to have been true.

This factor slightly disfavors transfer or, at minimum, does not support transfer.

### 5.    Disruption of Defendant's Business Is Neutral

The analysis of disruption to defendant's business compares the delta in that disruption caused by a trial in this district, as opposed to in Nebraska.  "[E]very life is

---

[8] https://nebraskapublicmedia.org/en/news/news-articles/protective-order-filed-in-congressman-fortenberrys-federal-indictment-case/

significantly disrupted during a trial wherever it is held.  Besides the need to be in court every day, the evenings and weekends are usually consumed analyzing the evidence that has been admitted and preparing for the remainder of trial." <u>United States v. Stein</u>, 429 F. Supp. 2d 633, 645 (S.D.N.Y. 2006) (citation omitted); <u>U.S.A. v. Kloehn</u>, 2011 WL 13308094, at *1 n.1 (C.D. Cal. Apr. 11, 2011) ("Whether the trial takes place here or in Las Vegas, Defendant will be in court for much of the day during the trial and unable to take part in operation of the businesses.  The question is only whether the lack of his physical availability outside of court hours will harm his businesses . . . [during] trial.").

For most defendants, a criminal trial is all-consuming.  There can be little doubt that this defendant will be fully involved with his trial, even outside of court hours.  This factor carries particularly little weight here because the trial is estimated to last a few days—a shorter time than most vacations.  It is not credible to argue that all manner of defendant's business in his district will come to a screeching halt due to his <u>physical</u> absence outside Nebraska for a few days.

Defendant makes the conclusory assertion that transfer would "greatly reduce" disruption but does not explain what added disruption a trial in <u>this</u> district would cause and how that disruption would meaningfully be mitigated by defendant's limited physical presence outside of trial preparation and court hours if the trial proceeded in Nebraska.  Defendant references the scheduled votes in the House of Representatives, attributing them to his absence for the pretrial hearings in this case.  (Mot. at 8.)  But there is no reason why defendant could not participate in any scheduled votes in Washington D.C. that might take place during this short trial (which he physically could not attend during a trial in <u>Nebraska</u> anyway).   On May 15, 2020, the House of Representatives authorized remote voting by proxy, and the covered period for that resolution has been extended through the present.[9]  Indeed, defendant availed himself of

---

[9] Nichols, Hans, *Nearly 4 in 10 House members to vote remotely as Omicron surges*, Axios (Jan. 11, 2022), <u>https://www.axios.com/house-proxy-voting-4f7615ee-e027-4bfb-bb2a-1464807760b4.html</u>; <u>see also</u>

*(footnote cont'd on next page)*

1  this option, when he issued a letter to the House on January 19 <u>to designate a proxy on</u>
2  <u>his behalf to cast his vote</u> "due to the ongoing public health emergency."  (Ex. D.)

3      Because any alleged difference in the disruption to defendant's business in a trial
4  here versus in Nebraska is negligible, this factor is neutral and thus does not support
5  defendant's motion.

6        6.    <u>Expense to the Parties Strongly Disfavors Transfer</u>

7      A trial in Nebraska will be far more expensive for the government and likely more
8  expensive for defendant.  For the government's part, a trial in Nebraska would be
9  exceedingly expensive.  Instead of covering the costs for three witnesses (each of whom
10 are expected to testify for less than one day) to fly to Los Angeles, the government
11 would still need to cover those same witnesses' travel (now to Nebraska), <u>in addition to</u>
12 the costs of travel and housing for <u>eight more</u> individuals: another civilian witness; three
13 agents (including at least one case agent who must be present for the entire trial); three
14 AUSAs (for the entirety of the trial), and possibly government support staff.  Whatever
15 minimal savings there may be in hotel fees or incidentals in Nebraska falls far short of
16 offsetting the costs of travel and housing for eight additional people.

17     Defendant does not even argue that a trial in this district as compared to Nebraska
18 would be prohibitively, or materially more, expensive to him.  <u>See</u> <u>Estrada</u>, 880 F. Supp.
19 2d at 484 ("In the absence of evidence of a material difference in total travel costs or,
20 more importantly, evidence that [the defendant] cannot afford to bear those costs, this
21 factor does not favor transfer.").  And it is reasonable to conclude that a trial in Nebraska
22 would be <u>more</u> expensive for defendant.  A trial in that district would mean, absent
23 replacing his current defense team with local Nebraska counsel, the defense would have
24 to now pay for the cost of both counsel (plus presumably their paralegal who regularly
25 attends hearings) to travel, stay, and work in some office space in a remote location

26

27 https://www.nytimes.com/2020/05/15/us/politics/remote-voting-house-coronavirus.html.
   The Supreme Court recently declined to review the District of Columbia Circuit decision
28 dismissing a lawsuit challenging the constitutionality of the Resolution.  <u>McCarthy v.</u>
   <u>Pelosi</u>, No. 21-395, 2022 WL 199381, at *1 (U.S. Jan. 24, 2022).

1   without the on-site support and resources of their Southern California law firm.

2   Defendant's costs would be further increased should Dr. Castel (based in Los Angeles)

3   be permitted to testify.  Even assuming defendant's other "tentative" witnesses based in

4   Nebraska had admissible and relevant testimony (a dubious assumption), the costs of

5   flying such witnesses out to this district for their short testimonies would be offset by the

6   savings in trying a case where defendant's entire defense team resides.

7          This factor strongly disfavors transfer.

8                  7.   Location of Counsel Strongly Disfavors Transfer

9          Counsel for the government consists of three AUSAs, all of whom reside and

10  work in this district.  If this case were transferred to Nebraska, this would require three

11  AUSAs to travel back and forth for pre-trial hearings, of which there will certainly be

12  multiple, given the amount of pending pre-trial litigation.  This is in addition to the

13  inconvenience of traveling to and staying in a faraway district, reasonably in advance of

14  and during the entire trial.  Government support staff, which at a minimum includes a

15  legal assistant and a paralegal, reside and work here and have performed work for this

16  case, are familiar with it, and will be needed to prepare this case for trial; if this case is

17  transferred, government counsel would either need to make arrangements for a staff

18  member, or go without.  In short, transferring the case to Nebraska would be a

19  tremendous burden on government counsel.

20         Counsel for defendant (and their support staff and offices) are also located here.

21  Defense counsel minimizes his own inconvenience and contends that they must spend

22  time in Nebraska to "advise the Congressman and prepare for trial," in any event.  (Mot.

23  at 8.)  But having the trial in this district—and having defendant travel here for the

24  trial—is far more convenient to counsel (which is what this factor measures) than having

25  the entire defense legal team travel to, and stay and work in, Nebraska.  See Jones, 43

26  F.R.D. at 514 (where "defendant is the only party to this litigation who resides in [the

27  other district]" and both government and defense counsel are residents of the original

28  district, the original district "clearly provides the most convenient trial forum as far as all

1   parties and counsel are concerned"); see also United States v. Haig, No.

2   218CR256JCMVCF, 2018 WL 8646839, at *7 (D. Nev. Oct. 10, 2018) (factor weighs

3   against transfer "because both parties have counsel located in the [original district]").

4          By all measures, the location of all counsel weighs strongly against transfer.

5          8.     Relative Accessibility of Place of Trial Slightly Disfavors Transfer

6          There can be no question that the CDCA is a far more accessible location than

7   Nebraska.  The greater Los Angeles Area is the second largest urban region area in the

8   United States and is served by five major airports: Los Angeles International Airport

9   (LAX), John Wayne Airport,  Hollywood Burbank Airport, Ontario International

10  Airport, Long Beach Airport, and San Bernardino International Airport.[10]  LAX alone is

11  serviced by over 50 airlines, including every major airline in the United States.[11]

12  Nebraska, on the other hand, has one major airport in Omaha (OMA), as well as an

13  airport in Lincoln (LNK).  Seven airlines service OMA (although only four seem to have

14  regular flights), two of which also service LNK.[12]  Direct flights between the Los

15  Angeles or Washington D.C. areas and OMA are rare; a Google search across various

16  dates in the next two months shows that almost all such flights have at least one

17  connection (in either direction).  There do not appear to be any direct flights between the

18  Los Angeles area or Washington D.C. and LNK.  By contrast, there is no shortage of

19  direct flights between Washington D.C. and Los Angeles.[13]  These facts alone show that

20  CDCA is a more accessible location than Nebraska by far.  Cf. United States v.

21  Robinson, 2010 WL 3087446, at *7 (D. N. Mar. I. July 29, 2010) (emphasizing the ease

22  of accessing Washington D.C., which has three major airports, compared to the Northern

23  Mariana Islands).

24

25          [10] https://en.wikipedia.org/wiki/List_of_airports_in_the_Los_Angeles_area

26          [11] https://www.flylax.com/lax-airline-list

27          [12] https://www.flyoma.com/flight-information/airline-information/;
    https://lincolnairport.com/flights-airlines/air-traffic-map/

28          [13] As a result, although the geographic distance between Washington D.C. and Los
    Angeles is greater than that between D.C. and Nebraska, the flight times are comparable.

16

In addressing this factor, defendant again double counts himself to say that Nebraska is a more accessible location than Los Angeles to him.  (Mot. at 9.)  That's not what this factor accounts for.  It specifically measures the accessibility of the trial location itself.  And while Nebraska can be accessed, it cannot be said to be more or even as accessible as the CDCA.  Cf. Estrada, 880 F. Supp. 2d at 485 (where "parties agree that New York is as accessible a city as Los Angeles[, t]his factor does not favor transfer").  Accordingly, this factor slightly disfavors transfer.

9.  Docket Conditions May Favor Transfer But Is of Minimal Significance

The ninth factor is the docket conditions in the original district versus the proposed transferee district.  Since the adoption of the Speedy Trial Act of 1974, several courts have found the relative conditions of the courts' dockets to be "of minimal significance."  Robinson, 2010 WL 3087446, at *7 (collecting cases); see also 18 U.S.C. § 3161(h)(7)(C) (trial continuance due to "general congestion of the court's calendar" not permitted).  To the extent this factor carries any import, it lies in the delay of trial or lack of judicial attention to one's case caused by the congested docket conditions of one district that would be mitigated by trying the case in another, less congested district.  See Menendez, 109 F. Supp. 3d at 732 ("While the median time from filing to disposition of criminal cases is comparable between the District of New Jersey and the District of Columbia, this comparison ignores the reality that this Court is ready to conduct trial as soon as possible."); Stein, 429 F. Supp. 2d at 645 (docket conditions irrelevant given that the court already scheduled trial, "ensuring that defendants will receive ample attention regardless of docket conditions").

It is widely understood that, as a general matter, the judges in the CDCA are amongst the busiest in the nation, and the government does not dispute that CDCA courts have full dockets.  Nevertheless, this Court has efficiently and substantively presided over the extensive pre-trial litigation in this case and gained a deep understanding of the applicable facts and law.  Defendant does not and cannot complain

17

of any lack of attention as a result of the Court's other matters.  Moreover, it is not the docket conditions of this district, or even of this Court, that may cause a delay in defendant's trial date, which was set for February 15, 2022.  Rather, it is the CDCA's temporary suspension of jury trials through February 28, 2022 (assuming suspension is not lifted earlier).  That factor is set forth independently as one of defendant's "special factors" and should be addressed therein, not duplicated here.  Because "docket conditions" do not drive a lack of judicial resources expended towards this case or any delay in the trial, this factor should be afforded only minimal weight.

Analyzing all the above-referenced factors together, a trial in Nebraska would be more inconvenient to the witnesses and all counsel, more expensive, less accessible, and would do little to mitigate the ordinary disruptions caused by a criminal trial.  (See Att. A.)  Defendant's "bald assertions of witness expense and inconvenience fail to counter the presumption that a criminal prosecution should be retained in the district where the indictment was returned" and where a trial would be altogether more convenient.  Bowdoin, 770 F. Supp. 2d at 139-140.

## B.   The Interest of Justice Strongly Disfavors Transfer

As noted, a Rule 21(b) motion may be granted only for convenience "*and* in the interest of justice."  Fed. R. Crim. P. 21(b) (emphasis added).  As a catchall, the district court is to consider "any other special elements."  Platt, 376 U.S. at 244.

A venue transfer here does not support the interest of justice.  As explained, there is a strong federal interest to prosecute this case specifically in this district, where the CDCA Investigation was pending for over six years, where defendant's campaign received the illegal contributions, and where defendant directed his falsehoods in an attempt to pervert the legitimate investigation and functioning of three governmental agencies operating in the CDCA.  Additionally, this case should proceed in this district where: (1) this Court has already expended significant judicial resources; (2) there is strong indicia that defendant is opportunistically using this motion to forum shop; (3) the prospect of proceeding to trial materially faster in Nebraska is presently unsupported by

any clear evidence; and (4) defendant's underlying arguments suggest he is seeking favored treatment because of his status as an elected official.

### 1.    Judicial Resources Strongly Disfavor Transfer

Courts routinely consider whether judicial economy would be served in transferring venue. See Allen v. Scribner, 812 F.2d 426, 436 (9th Cir.), amended, 828 F.2d 1445 (9th Cir. 1987) (district court's familiarity with the case counseled against transfer); United States v. Ward, 878 F.2d 387 (9th Cir. 1989) (district court properly analyzed Platt in concluding that "transfer was unnecessary and would be a waste of judicial resources"); United States v. Zylstra, 713 F.2d 1332, 1336 (7th Cir. 1983) ("Courts must be mindful of . . . the actual expense and waste of court time in our severely burdened and overtaxed federal judicial system."); United States v. Balsiger, 644 F. Supp. 2d 1101, 1127 (E.D. Wis. 2009) ( "To transfer this case at this time would result in additional time necessary for another judge to become as knowledgeable about the case . . . ."; Given limited judicial resources, a transfer of this case certainly would not serve the interests of justice.").

For example, in denying a motion to transfer, a court in this district explained that it was "intimately familiar with [the] file and the various issues that have and might be raised. A brief review of the docket establishes the number of legal issues that have arisen and have been ruled on by this Court." Kloehn, 2011 WL 13308094, at *2. The court added that it would "be able to handle these matters much more efficiently than would a court in Las Vegas. The Court has expended considerable resources in trying this case." Id. The same is true here. The government need not re-hash the motions reviewed (some with multiple supplemental rounds of briefing and adjacent ex parte requests); oral arguments heard; orders issued; conferences held; and independent research conducted by this Court. Moreover, there are a number of motions pending before this Court, many of which build on issues that have developed through the litigation and may impact how the trial itself should proceed. Specifically, there are the motions to compel discovery and suppress statements, for which the Court has already

1   heard oral argument, taken under submission, and undoubtedly made significant progress

2   in considering.  There is also the second motion to suppress statements, which remains

3   pending, as well as the nine joint motions in limine that are expected to be filed this

4   week.  The motions flow and evolve from past briefing and legal and factual arguments

5   and Court comments and rulings, with all of which this Court is very familiar.

6        A transfer would lead to a significant waste of judicial resources, both for this

7   Court and for the transferee court that would need to start anew and duplicate this

8   Court's substantial efforts.  This weighs strongly against transfer.

9                    2.    Preventing Forum Shopping Strongly Disfavors Transfer

10       Defendant has sought to avoid a trial in this district from the start.  But "[v]enue is

11  not the defendant's choice to be determined on the basis of where he believes a jury

12  might be more sympathetic to his political views."  Jordan, 223 F.3d at 686.  A

13  defendant does not have the right to forum shop for his criminal case.  United States v.

14  Jamal, 246 F. App'x 351, 368 (6th Cir. 2007) (transfer motion properly denied "based

15  largely on its impression that [defendant] was attempting to forum shop").

16       There are multiple indicia demonstrating that defendant seeks to improperly use

17  Rule 21(b) as a mechanism to forum shop his way out of this district and into a district

18  he thinks will be more friendly to him.  Defendant's motion to dismiss for lack of venue

19  made clear he did not want to be judged by "Californians."  (Dkt. No. 14 at 2.)

20  Defendant, through his spokesperson, has also blamed "a California prosecutor" for his

21  plight and, by contrast, believes "Nebraskans will see this case clearly for what it is."[14]

22  Defense counsel has stated that the "core defense" will be not of actual innocence but of

23  a "political prosecution," and defendant's motions have borne out this misplaced and

24  legally irrelevant theme.  (See Tr. of 12/13/21 Hr'g at 43:17-19.)  Defendant recently

25  framed the case as so: "[t]his is a politically charged case involving allegations of false

26  statements by a Republican United States Representative from Nebraska in a heavily

27  _____

28       [14] See https://www.wpxi.com/news/politics/judge-denies-
         rep/RISSKQJEYXHTFEUOWL23SCP3ZA/.
                                           20

Democratic judicial district that is far from his home," followed by a citation to Wikipedia regarding political demographics.[15]  Despite having announced at his very first appearance (armed with the government's witness list) that he would file a motion for discretionary transfer, defendant filed this motion after this Court issued adverse rulings on five of defendant's pre-trial motions (and after the temporary suspension of CDCA jury trials).[16]  Defendant's strained analysis on each of the Platt factors also supports that his true intent is to forum shop into Nebraska.[17]

The interest of justice does not condone an opportunistic motion by defendant to evade prosecution and trial in the district where he obstructed an investigation, venue properly lies, a grand jury returned an indictment, and a trial would be more convenient.

### 3.   The CDCA Suspension of Jury Trials Is an Uncertain Factor

Finally, defendant argues that CDCA's suspension of jury trials favors transfer. Defendant's argument, however, rests on a number of unsupported legal and factual assumptions, including about the predictability of the timeline of a Nebraska trial, rendering the significance of this factor neutral or unclear.  Because defendant has not met his burden as to this one non-dispositive factor, it does not support transfer.

First, defendant cites authority regarding the right to a speedy trial.  (Mot. at 11.) But the right to a speedy trial is not absolute, with the Ninth Circuit reasoning that "surely a global pandemic that has claimed more than half a million lives in this country, and nearly 60,000 in California alone, falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health."  United States v.

---

[15] See forthcoming JMIL No. 9 at 1.

[16] If trial expediency was, as defendant claims, his exclusive or primary factor, a transfer of venue is not the most logical option.  Government counsel has offered on two occasions, given the circumstances, to stipulate to a bench trial before this Court. Defense counsel has not responded to the government's most recent offer on this point.

[17] While the government firmly believes venue here is both the most convenient and in the interest of justice, defendant's arguments might have seemed more credible had he sought to transfer this case to Washington D.C. where jury trials are proceeding. See https://www.dcd.uscourts.gov/sites/dcd/files/Final_SO%2021-83_Postponement%20of%20Jury%20Trials%20Until%20January%2024%2C%202022_20211230.pdf

Olsen, 21 F.4th 1036, 1047 (9th Cir. 2022) (per curiam).  In any event, Rule 21(b) is not a mechanism to effectuate speedy trial rights and certainly not without regard to the other relevant factors—it is about the convenience to all parties and witnesses and the interest of justice as it pertains to the appropriate venue for a criminal trial.

Second, defendant's argument rests on his speculation that this case would proceed to trial materially faster in Nebraska than it would if it remained here.  But defendant fails to make a specific showing of when Nebraska might be able to conduct a trial in this matter; he only establishes that jury trials in that district, as a general matter, are ongoing as of the date of his filing.  This is a far cry from demonstrating, as he must for this factor to weigh in his favor, that it is reasonably certain this case would proceed to trial in the transferee district *materially faster*.

While defendant has the burden, government counsel has obtained information from the U.S. Attorney's Office in Nebraska that calls into question how quickly defendant could proceed to trial there.  COVID-19 has also delayed trials in that district, with the Chief Judge acknowledging at the latest quarterly meeting of the judicial conference that there has been a "soft COVID pause" of trials.  As a result, the last jury trial held in that district was over four weeks ago, and the next trial is tentatively scheduled for the week of February 7.  There are three active district court judges in the transferee district—two in Omaha and one in Lincoln.  (Mot. at 9.)  The general practice is for each judge to stack multiple trial dates every week as a matter of course.  For example, for the week of February 14, the Honorable John M. Gerrard has seven cases set for trial.  (Ex. A.)  The Honorable Brian C. Buescher has 12.  (Ex. B.)  Trial prioritization typically depends on various factors, with older, in-custody cases getting priority.  In short, the Nebraska USAO could not say with certainty how quickly a judge would be able to try a newly transferred case.  This uncertainty is enhanced here, where defendant is not in custody, his case was indicted three months ago, and there has been extensive and ongoing litigation.

<u>Third</u>, any transfer to a new judge naturally results in delay.  <u>See</u> <u>United States v.</u> <u>Spy Factory, Inc.</u>, 951 F. Supp. 450, 460 (S.D.N.Y. 1997) ("[A] transfer to San Antonio will inevitably necessitate a delay in the impending trial date, if for no other reason than that the . . . local judge would have to prepare themselves for the trial of this case.").  A transferee court would need to become familiar with the law and facts of the case, review the parties' extensive past briefing and this Court's prior rulings, hear and adjudicate all outstanding pre-trial motions, and resolve trial-related matters, such as jury instructions and evidentiary issues.  On that point, there is still outstanding pre-trial work to be done in this case, irrespective of venue.  The parties' nine expected motions <u>in limine</u> are scheduled to be heard on February 8, and trial could not proceed until the parties obtained at least a tentative court ruling on those.

Even assuming one of the three judges in Nebraska immediately accepted this case, got up to speed, and accomplished all the required tasks so that the case was ready for trial by the end of February (a generous assumption in defendant's favor)—the CDCA suspension is set to be lifted by that point.  The government has filed an <u>ex parte</u> application to set the trial for March 15, 2022.  (Dkt. No. 93.)  And while there are always uncertainties—including that the CDCA suspension could be lifted early—the Court and the parties can only operate based on the information available at this time.  It presently seems reasonable that a short trial on March 15, or close to it, could be accommodated.  It makes little sense to transfer a case where defendant has not met his burden to show what the difference in time might be and particularly where it is reasonable to conclude that any difference may be minimal.

<u>Finally</u>, defendant claims that he has a special need to "quickly proceed to trial and clear his name," in light of the May 10, 2022 primary election.  (Mot. at 1.) Defendant describes the challengers he faces, both of whom have referred to the Indictment.  (Mot. at 2-4.)  In essence, defendant equates his ability to go to trial with his ability to improve his chances of retaining his congressional seat.  (<u>See</u> Mot. at 1.)  But defendant's motion suggests he is entitled to special treatment, above and beyond other

criminal defendants in this district who have been affected by the CDCA suspension, owing entirely to his status as an elected politician who runs for re-election every other year.  Put differently: the basis for his urgency to proceed to trial is predicated on his status as a congressperson.  But the United States criminal justice system does not endorse a worldview by which "criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.'" United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) (citation omitted) (disapproving of district court that emphasized collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends" as such rationale would "tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines"); cf. United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) (impermissible rationale that "white-collar offenders suffer greater reputational harm or have more to lose by conviction" than blue-collar defendants).

A pending federal criminal indictment of any nature substantially impacts defendants, their personal lives, reputations, livelihoods, and even the people within their sphere who did not play a role in the charged crime.  That disruption must be tolerated if our criminal justice system is to function, and that is no different for defendant.  This Court can and should consider defendant's specific circumstances as it relates to his job. But the nature of his job should not beget defendant greater weight or higher regard than another criminal defendant on bond with a blue-collar job who believes his odds of retaining employment would be improved the faster he went to trial.  Or another criminal defendant not in elected office who urgently wishes to go to trial to offset the reputational harm within her own circle.  Indeed, unlike most other federal pre-trial criminal defendants facing a potential prison sentence: (1) defendant is not in custody, (2) is not even under pre-trial supervision,[18] (3) continues to be gainfully employed with little disruption of his day-to-day professional activities, and (4) has used the charges in

---

[18] Upon defense request, the government also agreed that defendant could travel internationally as needed for his job, a rare concession.  (See Dkt. No. 9.)

this case to *help* himself (via campaign contributions).  (See Ex. C.)  Moreover, because amended Rule 21 permits transfer to any district (even one that is not proper), it is conceivable that all criminal defendants affected by a delayed trial date due to the CDCA suspension could move to relocate their trial to another venue that has not suspended jury trials.  Conversely, once the CDCA suspension is lifted, defendants in other districts without the precise trial date they want, and who perceive the CDCA to be a *more* friendly venue, could seek transfer here.

The upshot of all this is that on this single, non-dispositive factor, defendant has not shown that he will proceed materially faster to trial in Nebraska as compared to here, and the basis for his claimed "urgency" should not afford defendant special treatment, particularly on these facts.  Because defendant has not met his burden, the weight and significance of the CDCA jury suspension is, at best, unclear.

*     *     *

If the respective conveniences of the parties are "too evenly balanced," the government should not be denied "the right to proceed in the forum originally chosen."  Cohen, 35 F.R.D. 227, 232 (N.D. Cal. 1964).

Here, the conveniences are not merely "balanced."  The Platt factors weigh against transfer and strongly in favor of keeping this case in the CDCA.  The government submits that the factors that should be afforded the most weight here disfavor transfer, and the factors that are neutral or that tend to only slightly favor transfer are less significant, given the specific circumstances.  See Bowdoin, 770 F. Supp. 2d at 137 (district court to "strike a balance and determine which factors are of greatest importance").  Transfer should be denied.

## V.   CONCLUSION

The government respectfully requests that this Court deny defendant's motion to transfer venue to Nebraska.

**ATTACHMENT A**

| *Factor* | *Weight* | *Disfavors/Favors Transfer* |
|---|:---:|:---:|
| 1.  Location of Defendant | Low | Favors |
| 2.  Location of Witnesses | **High** | **Disfavors** |
| 3.  Location of Events in Issue | **High** | **Disfavors** |
| 4.  Location of Documents | Low | **Disfavors** |
| 5.  Disruption of Defendant's Business | Low | Neutral |
| 6.  Expense to the Parties | **High** | **Disfavors** |
| 7.  Location of Counsel | **High** | **Disfavors** |
| 8.  Accessibility of Place of Trial | **Medium** | **Disfavors** |
| 9.  Docket Condition | Low | Favors |
| 10.  Judicial Resources | **High** | **Disfavors** |
| 11.  Prevent Forum Shopping | **High** | **Disfavors** |
| 12.  CDCA Suspension of Jury Trials | **Medium** | **Presently Unclear** |