TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-3289
    Facsimile:    (213) 894-0141
    E-mail:    mack.jenkins@usdoj.gov
                jamari.buxton@usdoj.gov
                susan.har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00491-SB |
|---|---|
| Plaintiff, | JOINT MOTION *IN LIMINE* NO. 3: GOVERNMENT'S MOTION TO ADMIT EVIDENCE OF DEFENDANT'S MOTIVE; DECLARATION OF MACK E. JENKINS; EXHIBITS A-C |
| v. | |
| JEFFREY FORTENBERRY, | |
| Defendant. | Hearing Date:    2/8/2022<br>Hearing Time:    8:00 a.m. |
| | Indictment: 10/19/2021<br>Pretrial Conference: 2/8/2022 at 8:00 a.m.<br>Trial: 2/15/2022 at 8:00 a.m.<br>Last Day: 3/2/2022 |

Plaintiff United States of America, by and through its counsel of record, the

United States Attorney for the Central District of California and Assistant United States

Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, and defendant

1

JEFRREY FORTENBERRY ("defendant"), by and through his counsel of record, John Littrell and Ryan Fraser, hereby file their joint Motion in Limine No. 3 regarding the government's motion to admit evidence of one of defendant's motives, namely, his motive to conceal that he received money from Gilbert Chagoury to avoid negative publicity that he received Chagoury's financial support.

**The government will move to admit evidence of one of defendant's motives to commit the charged crimes; specifically, that defendant willfully concealed and falsified information that his campaign received funds from Gilbert Chagoury because of the political and reputational harm that public association with Chagoury and his financial support would cause.**

Defendant opposes the motion.

Dated: February 3, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____
MACK E. JENKINS
SUSAN S. HAR
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Dated: January 31, 2022

     /s/ per email authorization
JOHN LITTRELL
RYAN FRASER

Attorneys for Defendant
JEFRREY FORTENBERRY

2

**GOVERNMENT'S MOTION**

## I.      INTRODUCTION

An important aspect of the government's case-in-chief at trial to prove the charged offenses in this case[1] will be to present evidence explaining to the jury <u>why</u> defendant—a nine-time elected Congressman sworn to uphold the law—would choose to repeatedly lie to federal investigators about his knowledge of having received $30,000 of Nigerian billionaire Gilbert Chagoury's money through conduits.  The government must also prove willfulness as an element and demonstrate that defendant's indisputably false statements were not borne out of an inadvertent mistake or a failed memory.

Accordingly, the government seeks to admit for a non-hearsay purpose highly probative and relevant evidence showing (1) widespread reporting of Gilbert Chagoury's association with an international criminal entity—that is, as an alleged financier of a terrorist group in the Middle East—and that, due to this public reputation, his (legal) financial support of another politician's foundation (Hilary Clinton) generated significant media controversy that threatened her 2016 presidential campaign, and (2) that defendant sought to protect his political prospects and reputation by avoiding a similar controversy. Such evidence will be helpful for the jury, as it is both "necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime," <u>United States v. Dorsey</u>, 677 F.3d 944, 951 (9th Cir. 2012), and to "put [defendant's] illegal conduct into context," <u>United States v. Daly</u>, 974 F.2d 1215, 1217 (9th Cir. 1992).  Specifically, the jury could reasonably conclude that defendant willfully concealed from, and falsified material facts to, federal investigators to avoid public scandal that he not only received illegal contributions but that the source of the donations was a person widely reported to be a supporter of terrorism.

Any Rule 403 concerns can be resolved by sanitizing and limiting the scope of the reporting information regarding Chagoury's links to terrorism and placements on the

---

[1] Defendant is charged with a scheme to falsify and conceal material facts, in violation of 18 U.S.C. § 1001(a)(1) (Count One), and making materially false statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts Two and Three).

"No Fly List" and U.S. Anti-Terror Watch List.  In an abundance of caution, the government will self-sanitize the public reporting information on Chagoury at the relevant time period and only generally describe such widespread reporting as Chagoury's negative public association with an "international criminal entity" or language to that effect.  The government will also make clear that Chagoury has not been charged with any terrorism-related offenses and was later removed from the "No Fly List."

## II.    RELEVANT FACTS

From the inception of the government's federal investigation, Gilbert Chagoury has been one of the key subjects for the suspected FECA violations and other violations of federal law.

Gilbert Chagoury is a person of international public reputation, given his status as a Nigerian billionaire businessperson with well-known diplomatic and philanthropic activities.  Since at least 2010, there has been public reporting regarding Gilbert Chagoury and his alleged ties to terrorism, which have in turn plagued American politicians associated with Chagoury.  For example, that year, the Enterprise Report published an Internet article titled "Exclusive: Cocktails in LA with a Terrorist?  Obama DOT Cabinet Official LaHood Rubs Elbows with Jetsetting Federal Terror Watch Listee Gilbert Chagoury." (See Ex. A.)  The article described how Ray LaHood, the then-U.S. Secretary for Transportation and former longtime Republican Congressman, had attended a cocktail party at the home of Chagoury.  The article went on to describe Chagoury's alleged tied to terrorism and implicitly attacked LaHood—not for any financial contributions that he received from Chagoury—but simply for "rubbing elbows" with such an individual.[2]  That same year, there was public reporting that

---

[2] LaHood, received money from Chagoury that was, like here,  facilitated by Toufic Baaklini, but LaHood's was in the form of an informal but legal private "loan," LaHood went one to resolve his case with the government and admitted in his factual basis that he did not disclose this information on his required filings "because he did not want to be publicly associated with Chagoury who, in 2009, was reported to have been on the U.S. "No Fly List.'"  See https://www.justice.gov/usao-cdca/press-release/file/1382091/download.

1   Chagoury had been added to a "No-Fly List," again based on similar allegations of

2   associations with terrorism.  (See, e.g., Ex. B (ABC News Article).)

3        In 2015 and 2016, reporting in this same vein regarding Chagoury intensified and

4   became more widespread, in particular, focused on then-presidential candidate Hillary

5   Clinton due to her and her foundation's connection to Chagoury.  Major news outlets

6   including the New York Times, the Los Angeles Times, the New York Post, Judicial

7   Watch, the Washington Examiner, Breitbart, and others, all published articles

8   scrutinizing Clinton and her connections to a "top Clinton Foundation donor" with

9   alleged ties to terrorism and who had been placed on the U.S. Anti-Terror Watch List.

10  (Ex. C.)  This media scrutiny took place even though the financial support from this

11  foreign national to the Clinton Foundation (a non-profit organization) was legal (absent

12  any evidence of a quid pro quo).

13       During trial, the government will also present evidence that establishes or, at

14  minimum, provides the reasonable inference that defendant was likely well-aware of

15  Chagoury and his public reputation.  Defendant was not just a career politician who must

16  have followed the stream of news about the political damage caused to a prominent

17  Democratic politician and presidential candidate due to Chagoury's reputation during the

18  hotly contested 2016 U.S. federal presidential election.  Defendant had personally met

19  with Chagoury multiple times, including at a private dinner in Paris.  Chagoury was also

20  a supporter and important financial contributor for In Defense of Christians ("IDC"), an

21  organization with which defendant closely worked and found supporters for his

22  legislative agenda.  IDC's President and Founder was Toufic Baaklini, defendant's close

23  political ally and personal friend who arranged the 2016 Los Angeles fundraiser for

24  defendant.  Baaklini also facilitated defendant's interactions with Chagoury, and

25  defendant would ask Baaklini about Chagoury or ask Baaklini to pass on his regards to

26  Chagoury.  Moreover, although defendant admitted in his second interview that he knew

27  Chagoury "ha[d] an international reputation" and was "a friend of Bill Clinton's," there

28  is evidence that defendant actively tried to hide or minimize his association and

knowledge of Chagoury to federal investigators—both during his two interviews and by not amending his FEC filings.  To correct his FEC filings, which are public, defendant would have had to specify that he received illegal contributions from Chagoury—an admission that would have almost necessarily engendered public scandal and damage to defendant's political image and potentially his re-election efforts.

Based on these facts, a jury could more than reasonably conclude that defendant knew of Chagoury's negative public reputation and chose to commit the charged crimes, at least in part, in order to avoid the types of attacks in the media that had recently significantly plagued a high-profile politician who ultimately lost her election.

## III.   ARGUMENT

Even when, like here, motive is not an element of the charged crime that must be proven, "it is far from irrelevant.  Motive is evidence of the commission of any crime." United States v. Bradshaw, 690 F.2d 704, 708 (9th Cir. 1982).  Moreover, circumstantial evidence may be admitted to establish intent to make a false statement.  United States v. Selby, 557 F.3d 968, 978 (9th Cir. 2009) ("As we have noted in other criminal fraud contexts, '[i]t is settled law that intent to defraud may be established by circumstantial evidence[.]'"); United States v. Rogers, 321 F.3d 1226, 1230 (9th Cir. 2003) (same); see also United States v. Bucher, 375 F.3d 929, 934 (9th Cir. 2004) ("Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances.").

Evidence of the public negative reporting regarding Chagoury (and the adverse publicity that plagued American politicians affiliated with Chagoury) is highly relevant to establish defendant's motive to commit the charged offenses; that is, it has the tendency to make more probable that defendant, in fact, willfully denied knowledge of having received illegal contributions from Chagoury to avoid similar negative press and political attention and controversy.[3]  The widespread reporting concerns the key subject

---

[3] It is also relevant that some of this public reporting also suggested that Chagoury's *legal* financial support to the Clintons was owed to some underlying corrupt relationship.  Such a suggestion would also be, and in fact was, a relevant inquiry of Fortenberry's *illegal* financial relationship with Chagoury and thus likely only exacerbated his motive to conceal it.

1  of the federal investigation who was the illegal source of the campaign contributions that

2  defendant received—and from whom defendant falsely denied having knowledge of

3  receiving money.  (See Indictment ¶¶ 18-19.)  The purpose for which the government

4  seeks to introduce this information regarding Chagoury's public reputation is permissible

5  and will be deliberately narrowly tailored.  Importantly, the government does not seek to

6  introduce this information for the truth of any such reporting, i.e., that Chagoury was, in

7  fact, associated with terrorism.[4]  Rather, the government seeks to introduce this

8  information for the non-hearsay purposes of (1) establishing what was in the public

9  realm and within defendant's specific political orbit concerning individuals and causes

10  close to him, and (2) defendant's state of mind.  See Fed. R. Evid. 801(c) (hearsay is

11  only statements offered "to prove the truth of the matter asserted in the statement").

12  Indeed, this information could even be presented to the jury by way of judicial notice.

13  "Courts may take judicial notice of publications introduced to indicate what was in the

14  public realm at the time, not whether the contents of those articles were in fact true."

15  Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir.

16  2010).  This is precisely the same purpose for which the government seeks to introduce

17  this evidence.

18       The high probative value of this information is not outweighed by 403 concerns,

19  especially as mitigated by the government.  In particular, the government will self-

20  sanitize this evidence by not explicitly referencing "terrorism," the "No-Fly List," or the

21  U.S. Anti-Terror Watch List.  Rather, the government will introduce only evidence that

22  there was widespread reporting of Chagoury's association with an "international

23  criminal entity" (or other comparable language that the Court deems appropriate) and

24  that this public reputation had recently tainted other American politicians associated with

25  Chagoury.  The government can also propose additional limiting instructions as needed

26  to cabin the permissible purposes for which the jury is to consider this significantly

27  relevant evidence.

28

---

[4] As set forth above, the government will elicit agent testimony that Chagoury has not been charged with such offenses.

5

**DEFENDANT'S OPPOSITION**

The government's "motive" exhibits are inadmissible under Federal Rules of Evidence ("FRE") 401–404 and 801–802. They lack any foundation for their ostensible non-hearsay purpose because they have no tendency to show any effect on the ostensible "listener," Congressman Fortenberry. *Cf.* Motion at 5 ("the government seeks to introduce this information for the non-hearsay purposes of (1) establishing what was in the public realm and within defendant's specific political orbit concerning individuals and causes close to him, and (2) defendant's state of mind"). So they are irrelevant and hearsay. And they create unfair prejudice, necessitate a mini-trial, and waste time. The Court should exclude them.

## 1.  Proposed government exhibits at issue

Proposed government Exhibit A is an article dated March 26, 2010, apparently published by "The Enterprise Report," discussing an apparent meeting between former Secretary of Transportation Ray LaHood and Gilbert Chagoury and Chagoury's alleged ties to terrorism. The government provides no information concerning the readership of "The Enterprise Report" and identifies no evidence that Congressman Fortenberry ever saw or heard about Exhibit A.

Proposed government Exhibit B appears to be a May 21, 2010, story that apparently appeared on abcnews.go.com titled "US Apologizes to Billionaire Added to the No-fly List," which references similar alleged ties between Chagoury and terrorism. The government likewise identifies no evidence that Congressman Fortenberry ever saw or heard about Exhibit B.

Proposed government Exhibit C, labeled "Other Articles," is a mishmash of ten more articles about Gilbert Chagoury from various news outlets—nypost.com, latimes.com, washingtonexaminer.com, judicialwatch.org, Breitbart.com, and nytimes.com, and theepochtimes.com, dating from 2015 and 2016—linking Chagoury to alleged "corruption" and a terrorism-based "no fly" list.  The government deems it significant that these articles discussed Chagoury's "legal" support of the Clinton

1  Foundation. *See* Motion at 3 (original emphasis). As with Exhibits A and B, however, the

2  government identifies no particular evidence that Congressman Fortenberry ever saw or

3  heard about any of the articles in Exhibit C, either, but promises that "[d]uring trial, the

4  government will . . . present evidence that establishes or, at minimum, provides the

5  reasonable inference that defendant was likely well-aware of Chagoury and his public

6  reputation." *Id.* The government's anticipated evidence of notice apparently amounts to

7  the fact that Fortenberry was a politician (and so, followed the news generally), and

8  Fortenberry knew Chagoury had an "international reputation" and was "a friend of Bill

9  Clinton's." *Id.*

10   **2. The government's exhibits are irrelevant and hearsay because there is no
11       evidence Fortenberry read or was aware of any of the government's
12       exhibits, and, in any event, Fortenberry disclosed in both government
13       interviews that he had heard insinuations implying that his campaign may
         have received funds originating from Chagoury.**

14      The government posits in its Motion that Congressman Fortenberry committed the

15  offenses charged "because of the political and reputational harm that public association

16  with Chagoury and his financial support would cause." The government says its articles

17  would show that harm. *See id.* at 3–4.

18      The government's argument that the news articles come in for their effect on the

19  listener, rather than the truth of the matters asserted in the articles, fails for a simple reason:

20  there is no evidence that Fortenberry received any of these inflammatory articles. *See* FRE

21  104(b). Moreover, the articles contain multiple levels of hearsay and the government does

22  not identify an exception or non-hearsay purpose for each level of hearsay. Therefore, the

23  articles are inadmissible under the rule against hearsay.

24      In any event, the government's "motive" evidence has no "tendency to make a fact

25  of consequence more or less probable," FRE 401, because the event they are ostensibly

26  being offered to explain didn't happen. That is, even if Fortenberry had received, read, and

27  remembered all the articles, they still would not support the government's motive

28  inference because Fortenberry in fact substantially did recount to the government the

1   Chagoury-related information that he received through insinuation in Individual H's June

2   4, 2018, call. In particular, in Fortenberry's first interview, the FBI agent asked him

3   whether Chagoury "directed or gave anybody money to give to [Fortenberry's] campaign

4   or any other campaign." Referring to the June 4, 2018, call from Individual H, Fortenberry

5   responded: "There was a comment made that we would have to ask Gilbert along the way,

6   but I don't know what that exactly meant." Similarly, in Fortenberry's second government

7   interview, he disclosed that Individual H told him in 2018 that the amounts that could be

8   raised at a future fundraiser "wouldn't be as large because Gilbert [wouldn't] be involved."

9   Fortenberry further shared that this comment was "discomforting" and "caused

10  [Fortenberry] concern" that Chagoury may have had a role in the previous fundraiser.

11  These voluntary disclosures are incompatible with the government's urged inference that

12  the articles scared Fortenberry into silence for fear of "public scandal and damage to [his]

13  political image," Mot. at 4, and make it impossible to infer rationally that Fortenberry

14  (1) saw the government's articles and (2) thus became motivated to lie about Chagoury.

15

16      **3. The Chagoury "motive" evidence is inadmissible under FRE 403 because
        the dangers of issue confusion, unfair prejudice, wasting time, and inviting
        a mini-trial substantially outweigh the nonexistent or minimal probative
        value.**

17

18

19  The government's proposed exhibits will distract jurors from the issues properly

20  before them because of the sensationalistic nature of the articles at issue, which will

21  necessitate a mini-trial on who Gilbert Chagoury is and his donations to the Clinton

22  Foundation, his links to the Vatican, and his supposed links to terrorism. For example, the

23  articles' mention of Chagoury's Catholic beliefs and support of the Vatican also create

24  unfair prejudice to Fortenberry because the trial will inevitably reveal that Fortenberry is

25  Catholic and received honors from the Vatican around the time of the 2016 fundraiser,

26  suggesting improperly that Fortenberry is more likely to be guilty because of his religion.

27  *Cf. United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015) ("Evidence is unfairly

28  prejudicial if it makes a conviction more likely because it provokes an emotional response

    in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant

1  wholly apart from its judgment as to his guilt or innocence of the crime charged."). These

2  403 dangers substantially outweigh the minimal probative value regarding "motive."

3       Important in this analysis is the fact that the government has obvious alternative

4  evidence of an apparent motive that has no significant tendency to raise problems under

5  FRE 403. *See Old Chief v. United States*, 519 U.S. 172, 183–85 (1997) (calling for

6  discounting the probative value of evidence objected to under FRE in light of the

7  availability of "less risky alternative proof going to the same point"). In particular, the

8  government can, and no doubt will, argue that Fortenberry made incorrect statements

9  because the possibility that his campaign received foreign or conduit contributions would

10  have placed him and his campaign in an unfavorable light, regardless of the identity of

11  Chagoury and the various prejudicial allegations related to him circulating in news media.

12       The government fails to show a relevant and non-prejudicial means of presenting

13  the Chagoury exhibits because, though the government promises to "self-sanitize" the

14  evidence, it has failed to demonstrate how it would do so. This "offer" therefore cannot

15  support granting the motion *in limine*.

16                      \*      \*      \*

17       The Court should exclude this inflammatory, irrelevant evidence.

18

19

20

21

22

23

24

25

26

27

28

4

# GOVERNMENT'S REPLY

## A.    Defendant's Opposition Opposes the Wrong Evidence

Defendant misapprehends the government's motion.  Defendant's opposition's ("Opp.") conclusion confirms as much when he states: "The government . . .  has failed to demonstrate how it would [self-sanitize the motive evidence]."  (Opp. at 4.)  In fact, the government explicitly stated it would limit presentation of defendant's motive as follows:

> **[O]nly generally describe such widespread reporting as Chagoury's negative public association with an "international criminal entity" or language to that effect**. . . .
>
> **[T]he government will self-sanitize this evidence by not explicitly referencing "terrorism," the "No-Fly List," or the U.S. Anti-Terror Watch List**.  Rather, the government **will introduce only evidence that there was widespread reporting of Chagoury's association with an "international criminal entity"** (or other comparable language that the Court deems appropriate) and that this public reputation had recently tainted other American politicians associated with Chagoury.

(Mot. at 2, 5 (emphasis added).) [1]  The government also offered to devise an appropriate "limiting instruction."  (Id. at 5.)

To further clarify, that means the government is <u>not</u> intending to seek to admit <u>any</u> of the exhibits defendant spends almost his entire Opposition challenging.[2]  The example exhibits are attached to provide the Court credible evidence for the motive and support the foundation for the government's sanitized motive argument; they are not intended as exhibits for the government's case-in-chief.

## B.    The Self-Sanitized Presentation Presents No 403 Concerns

The Ninth Circuit has made clear that "[Rule] 403 favors admissibility," <u>United States v. Hankey</u>, 203 F.3d 1160, 1172 (9th Cir. 2000), and that excluding evidence

---

[1] The testimony will be presented through a competent witness such as an agent or Individual H.

[2] The government's self-sanitizing is in the abundance of caution and for efficiency, but maintains the articles themselves (or at least excerpts therefrom) would be relevant, not unduly prejudicial, and non-hearsay evidence admissible at trial. Accordingly, the government reserves the right to seek to introduce such articles on cross-examination and in rebuttal should defendant open the door.

1    under Rule 403 is an "extraordinary remedy to be used sparingly because it permits the

2    trial court to exclude otherwise relevant evidence." United States v. Patterson, 819 F.2d

3    1495, 1504 (9th Cir. 1987) (cleaned up).  As the Ninth Circuit explained in a case

4    admitting evidence of the defendant's and a witness's unfavorable connection to a

5    criminal organization:

6         Relevant evidence is inherently prejudicial; but it is only unfair prejudice,
          substantially outweighing probative value, which permits exclusion of
7         relevant matter under Rule 403.  *Unless trials are to be conducted as
          scenarios, or unreal facts tailored and sanitized for the occasion, the
8         application of Rule 403 must be cautious and sparing*.  Its major function
          is limited to excluding matter of scant or cumulative probative force,
9         dragged in by the heels for the sake of its prejudicial effect.

10   Hankey, 203 F.3d at 1172 (cleaned up) (emphasis added).  Further, Rule 403 does not

11   require that a trial be "scrub[bed] . . . clean of all evidence that may have an emotional

12   impact." United States v. Ganoe, 538 F.3d 1117, 1124 (9th Cir. 2008) (cleaned up).

13        Any marginal additional prejudice defendant's Chagoury-specific motive could

14   create would not substantially outweigh its probative value.  As described above,

15   defendant's motive to avoid public financial ties to Chagoury is directly illustrative of

16   his intent to mislead, conceal, and lie about his knowledge that Chagoury sourced illegal

17   donations to defendant at a time that significantly overlapped with the time period within

18   which the negative Chagoury reporting was reaching its peak (2015-16).  (Ex. C.)

19   Chagoury's significantly negative public reputation is not being "dragged in by the heels

20   for the sake of its prejudicial effect," Hankey, 203 F.3d at 1172; it is offered to help

21   explain why defendant committed these crimes and, in any event, will be sanitized.

22        **C.     There Is Proper Foundation for This Motive Argument**

23        Defendant also argues that the government's motive argument lacks foundation.

24   (Opp. at 1-2.)  According to defendant, the only sufficient basis for notice would be for

25   the government to show direct evidence that defendant read the referenced articles.

26   Defendant's argument requires that no rational juror could infer that a career politician

27   committed to his re-election and who served on a Foreign Operations appropriations

28

2

1    subcommittee[3] read the New York Times, the Los Angeles Times, the New York Post,

2    Judicial Watch, the Washington Examiner, Breitbart or any other number of publications

3    during a time when he was running for re-election and when each of those outlets

4    reported on an internationally prominent associate and deep supporter of one of

5    defendant's central political/religious causes during an election year and where such

6    articles impacted the election for the highest office in the land.  Factually, defendant's

7    argument that he was *completely unaware* of Chagoury's international reputation is

8    implausible and inconsistent with his recorded second interview.[4]

9        Legally, this argument goes to weight not admissibility, and defendant can make

10   this same lack of notice argument to the jury.  However, particularly given the sanitized

11   version the government will ask the jury to consider, defendant's dubious foundation

12   argument is not a basis to exclude it from the jury's consideration.

13       **D.     Whether Defendant Committed the Charged Crimes Is a Jury Question**

14       Count One alleges that defendant sought to conceal from federal investigators,

15   *inter alia*, that "Chagoury was the source of $30,000" in illegal contributions he received

16   at the 2016 fundraiser.  (Indictment ¶ 18(e).)  In seeking to prevent the government from

17   admitting circumstantial evidence of why defendant would commit this crime, defendant

18   essentially argues that defendant did not commit this crime.  (Opp. at 2) ("[T[he event

19   [concealing the Chagoury connection] . . . didn't happen . . . . because Fortenberry in fact

20   substantially did recount to the government the Chagoury-related information[.]").

21   Whether defendant concealed, misled, or lied about the "Chagoury-related information"

22   is precisely a question the jury will be asked to decide.  And the jury should do so armed

23   with <u>all</u> relevant and probative evidence – direct and circumstantial – that is not

24   substantially unduly prejudicial; the (sanitized) motive evidence is just that and it should

25   be admitted.  See <u>Patterson</u>, 819 F.2d at 1504.

26

27       [3] https://fortenberry.house.gov/biography/committees

28       [4] Defendant stated he knew, in 2014, that Chagoury had "an international
     reputation," was a "friend of Bill Clinton's," and <u>admitted</u> he "researched more" about
     Chagoury before the July 2019 interview.