1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   MACK E. JENKINS (Cal. Bar No. 242101)
4  Assistant United States Attorney
   Chief, Public Corruption & Civil Rights Section
5  SUSAN S. HAR (Cal. Bar No. 301924)
   J. JAMARI BUXTON (Cal. Bar No. 342364)
6  Assistant United States Attorneys
   Public Corruption & Civil Rights Section
7       1500 United States Courthouse
        312 North Spring Street
8       Los Angeles, California 90012
        Telephone:    (213) 894-3289
9       Facsimile:    (213) 894-0141
        E-mail:       mack.jenkins@usdoj.gov
10                    jamari.buxton@usdoj.gov
                      susan.har@usdoj.gov
11 Attorneys for Plaintiff
   UNITED STATES OF AMERICA
12

13                  UNITED STATES DISTRICT COURT

14           FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>JEFFREY FORTENBERRY,<br><br>                    Defendant. | Case No. 2:21-cr-00491-SB<br><br><u>GOVERNMENT'S TRIAL MEMORANDUM</u><br><br>Indictment: 10/19/2021<br><br>Pretrial Conference: 3/15/2022 at 8:00 a.m.<br>Trial: 3/15/2022 at 8:00 a.m. |

22      Plaintiff United States of America, by and through its counsel of record, the

23 United States Attorney for the Central District of California and Assistant United States

24 Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby submits its trial

25 memorandum.

26 //

27 //

28

The government respectfully requests leave to file additional memoranda as may become appropriate during the course of trial.

Dated: February 15, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____

SUSAN S. HAR
MACK E. JENKINS
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

1
2
## **TABLE OF CONTENTS**
3
TRIAL MEMORANDUM................................................................................1

I.     STATUS OF THE CASE ...................................................................1

     A.    Trial Status .....................................................................1

     B.    Length of Trial and Number of Witnesses ....................................1

     C.    Motions in Limine .............................................................2

II.    THE CRIMES AND THEIR ELEMENTS ....................................................2

     A.    Count One.........................................................................2

     B.    Counts Two and Three ........................................................3

III.   DETAILED SUMMARY OF FACTS .........................................................4

     A.    Background and Overview of the Federal Investigation ...............4

     B.    Defendant and His Relationship to Baaklini ..............................6

     C.    2016: Defendant's Campaign Receives Illegal Contributions at a Fundraiser in Los Angeles.................................................7

     D.    2018: Defendant Pushes Individual H to Host Another Fundraiser in Los Angeles for Him .............................................9

     E.    March 2019: Defendant Lies to and Misleads CDCA Investigators about the Illegal Contributions He Received .................11

     F.    July 2019: Defendant Requests Another Interview with CDCA Investigators and Doubles Down on His Lies about Matters Material to the Federal Investigation .................................................12

     G.    Federal Investigation Follow-Up .........................................15

IV.   LEGAL AND EVIDENTIARY ISSUES .....................................................16

     A.    Authentication and Foundation .........................................16

     B.    Specific Evidentiary Issues ..................................................16

          1.    FEC Filings and Records ..................................16

          2.    Defendant's Legislation and Press Releases.................17

          3.    Audio/Video Recordings and Transcripts.........................18

          4.    Summary Charts.................................................20

          5.    Emails and Text Messages ..................................21

6.    Photographs ........................................................... 23

7.    News Articles regarding Gilbert Chagoury ....................... 24

C.    Lay Opinion Testimony ................................................. 25

D.    Cross-Examination of Defendant ..................................... 26

E.    Affirmative Defenses and Reciprocal Discovery .................... 26

F.    The Jury Should Have a Trial Indictment During Deliberations ............... 27

G.    The Jury Should Have an Exhibit List During Deliberations ................... 28

V.    CONCLUSION .................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

<u>Cota v. Maxwell-Jolly,</u>
  688 F. Supp. 2d 980 (N.D. Cal. 2010)................................................17

<u>Goldberg v. United States,</u>
  789 F.2d 1341 (9th Cir. 1986) ......................................................20

<u>Love v. Marriott Hotel Servs., Inc.,</u>
  2021 WL 810252 (N.D. Cal. Mar. 3, 2021) .................................17

<u>People of Territory of Guam v. Ojeda,</u>
  758 F.2d 403 (9th Cir. 1985) .......................................................23

<u>Taylor v. Illinois,</u>
  484 U.S. 400 (1988) .....................................................................27

<u>United States v. Beck,</u>
  418 F.3d 1008 (9th Cir. 2005) .....................................................24

<u>United States v. Black,</u>
  767 F.2d 1334 (9th Cir. 1985) .....................................................26

<u>United States v. Chen,</u>
  754 F.2d 817 (9th Cir. 1985) .......................................................19

<u>United States v. Chu Kong Yin,</u>
  935 F.2d 990 (9th Cir. 1991) .......................................................16

<u>United States v. Collicott,</u>
  92 F.3d 973 (9th Cir. 1996) .........................................................21

<u>United States v. Crawford,</u>
  239 F.3d 1086 (9th Cir. 2001) .....................................................25

<u>United States v. Dhinsa,</u>
  243 F.3d 635 (2d Cir. 2001) ........................................................16

<u>United States v. Fernandez,</u>
  839 F.2d 639 (9th Cir. 1988) .......................................................21

<u>United States v. Johnson,</u>
  594 F.2d 1253 (9th Cir. 1979) .....................................................20

<u>United States v. King,</u>
  472 F.2d 1 (9th Cir. 1972) ...........................................................16

<u>United States v. King,</u>
  587 F.2d 956 (9th Cir. 1978) .......................................................18

<u>United States v. May,</u>
  622 F.2d 1000 (9th Cir. 1980) .....................................................23

<u>United States v. Miranda-Uriarte,</u>
  649 F.2d 1345 (9th Cir. 1981) .....................................................26

United States v. Moran,
    759 F.2d 777 (9th Cir. 1985) ........................................................... 21
United States v. Nelson,
    285 F. App'x 491 (9th Cir. 2008) ..................................................... 25
United States v. Noushfar,
    78 F.3d 1442 (9th Cir. 1996) ........................................................... 19
United States v. Ortega,
    203 F.3d 675 (9th Cir. 2000) ...................................................... 21, 22
United States v. Pang,
    362 F.3d 1187 (9th Cir. 2004) ......................................................... 16
United States v. Pino-Noriega,
    189 F.3d 1089 (9th Cir. 1999) ......................................................... 25
United States v. Rizk,
    660 F.3d 1125 (9th Cir. 2011) .................................................... 20, 21
United States v. Safavian,
    435 F. Supp. 2d 36 (D.D.C. 2006) ................................................... 21
United States v. Scales,
    594 F.2d 558 (6th Cir. 1979) ........................................................... 20
United States v. Siddiqui,
    235 F.3d 1318 (11th Cir. 2000) ....................................................... 21
United States v. Skeet,
    665 F.2d 983 (9th Cir. 1982) ........................................................... 25
United States v. Smith,
    591 F.3d 974 (8th Cir. 2010) ........................................................... 18
United States v. Stearns,
    550 F.2d 1167 (9th Cir. 1977) ......................................................... 23
United States v. Turner,
    528 F.2d 143 (9th Cir. 1975) ........................................................... 18
United States v. White Eagle,
    721 F.3d 1108 (9th Cir. 2013) ........................................................... 3

**Statutes**

18 U.S.C. § 1001 ................................................................................ 4
18 U.S.C. § 1001(a)(1) ............................................................... 1, 2, 3
18 U.S.C. § 1001(a)(2) .................................................................. 1, 3

**Rules**

Fed. R. Crim. P. 16(b)(1) ................................................................ 27
Fed. R. Crim. P. 16(d)(2) ................................................................ 27
Fed. R. Evid. 611(b) ........................................................................ 26
Fed. R. Evid. 801(d)(2) ................................................................... 21

Fed. R. Evid. 801(d)(2)(A) ................................................................. 17, 22

Fed. R. Evid. 801(d)(2)(D) ..................................................................... 22

Fed. R. Evid. 901(a) ............................................................................... 16

Fed. R. Evid. 901(b)(1) ........................................................................... 23

Fed. R. Evid. 1002 .................................................................................. 23

Fed. R. Evid. 1006 .................................................................................. 20

**Other Authorities**

2A Fed. Jury Prac. & Instr. § 40:04 .......................................................... 3

32 McCormick on Evid. § 215 ................................................................. 23

## TRIAL MEMORANDUM

### I. STATUS OF THE CASE

#### A. Trial Status

Defendant is charged in the Indictment with the following three counts:

- Count One – Scheme to falsify or conceal material facts, in violation of 18 U.S.C. § 1001(a)(1)
- Count Two – Making a false statement to a government agency, in violation of 18 U.S.C. § 1001(a)(2)
- Count Three – Making a false statement to a government agency, in violation of 18 U.S.C. § 1001(a)(2)

Jury trial against defendant is set for March 15, 2022 at 8:30 a.m.  Defendant is on bond.

#### B. Length of Trial and Number of Witnesses

The estimated time for the government's case-in-chief (with a reasonable allotment for cross-examination) is approximately four days.  The government plans to call the following seven witnesses in its case-in-chief in the below expected order:

| Witness Name | Government Time Estimate | Defense Cross-Examination Estimate |
|---|---|---|
| (1) FBI Special Agent Todd Carter | 2.5 hours | 5.0 hours |
| (2) Toufic Baaklini | 2.5 hours | 1.25 – 2.5 hours |
| (3) Alexandra Kendrick | 1.5 hours | 0.75 – 1.5 hours |
| (4) Individual H | 3.0 hours | 1.5 – 3.0 hours |
| (5) Jessica Furst Johnson | 0.5 hours | 0.25 – 0.5 hours |
| (6) IRS-CID Special Agent James O'Leary | 1.5 hours | .75 – 1.5 hours |
| (7) FBI Special Agent Edward Choe | 3.0 hours | 1.5 – 3.0 hours |

The defense estimates that presenting its case will take two days.

**C.    Motions in Limine**

The parties have filed the following nine joint motions in limine:

1. JMIL No. 1 – Government's Motion to Exclude Improper Argument Regarding Materiality

2. JMIL No. 2 – Government's Motion to Exclude Improper Reference or Evidence Regarding Alleged Political Prosecution

3. JMIL No. 3 – Government's Motion to Admit Evidence of Defendant's Motive

4. JMIL No. 4 – Government's Motion to Exclude Dr. Alan Castel

5. JMIL No. 5 – Defendant's Motion to Exclude "Other Acts" Evidence

6. JMIL No. 6 – Defendant's Motion to Exclude Evidence of Irrelevant Texts, Phone Calls, and Emails

7. JMIL No. 7 – Defendant's Motion to Preclude Evidence or Argument that Fortenberry Had Reason Other Than the June 4, 2018 Call to Believe His 2016 Fundraiser Received Illegal Donations

8. JMIL No. 8 – Defendant's Motion to Admit His Statements

9. JMIL No. 9 – Defendant's Motion for Attorney Conducted Voir Dire

The Court took preliminary information regarding several of the nine motions during a hearing on February 11, 2022.

## II.    THE CRIMES AND THEIR ELEMENTS

**A.    Count One**

Count One charges defendant with a scheme to falsify or conceal material facts, in violation of 18 U.S.C. § 1001(a)(1).  The elements of this offense are as follows:

First, the defendant had a duty to disclose material information; a duty to disclose arises when a defendant responds to specific questions posed by a government agency on a particular topic;

Second, the defendant falsified, concealed, or covered up such a fact by trick, scheme, or device; to falsify, conceal, or cover up by a trick, scheme, or device means

any deliberate plan or course of action, or any affirmative act, or any knowing omission designed to deceive others by preventing or delaying the discovery of information;

Third, the falsified, concealed, or covered up fact was material to the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service – Criminal Investigations ("IRS-CI"), or the United States Attorney's Office ("USAO"); that is, it had a natural tendency to influence, or was capable of influencing, the decisions or activities of a government agency;

Fourth, the falsification and/or concealment was knowing and willful; that is, the defendant acted deliberately and with knowledge both of the falsification and/or concealment and that his conduct was unlawful; and

Fifth, the material fact was within the jurisdiction of the executive branch of the Government of the United States, namely, the FBI, IRS-CI, or USAO.

18 U.S.C. § 1001(a)(1); <u>United States v. White Eagle</u>, 721 F.3d 1108, 1116-17 (9th Cir. 2013); O'Malley, Grenig & Lee, 2A Fed. Jury Prac. & Instr. § 40:04 (6th ed.); Ninth Circuit Model Jury Instructions, No. 24.10 (2022 ed.) [False Statement to Government Agency].

### B.     Counts Two and Three

Counts Two and Three charge defendant with making a false statement to a government agency, in violation of 18 U.S.C. § 1001(a)(2).  The elements of this offense are as follows:

First, the defendant made a false statement;

Second, the statement was made in a matter within the jurisdiction of the FBI, IRS-CI, or the USAO;

Third, the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful; and

Fourth, the writing was material to the activities or decisions of the FBI, IRS-CI, or the USAO; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

The jury must unanimously agree as to which statement or statements were false and material.

See Ninth Circuit Model Jury Instructions, No. 24.10 (2022 ed.) [False Statement to Government Agency (18 U.S.C. § 1001)].

Although the government charged multiple false statements in Counts Two and Three, the government need only prove one false statement in each Count for defendant to be found guilty. Moreover, although a unanimity instruction is not required, in the abundance of caution the government will propose the supplemental instruction that the jury unanimously agree on which statement(s) it found were false. See id., Comment; see also Ninth Circuit Model Jury Instructions, No. 6.27 (2022 ed.) [Specific Issue Unanimity].

Defendant disagrees with the government concerning what the elements are, as reflected in the parties' prior filings and defendant's opposing proposed jury instructions and objections to proposed jury instructions.

## III.   DETAILED SUMMARY OF FACTS

The government expect that the evidence at trial will establish the following facts, among others[1]:

### A.   Background and Overview of the Federal Investigation

Under federal law, it is illegal to knowingly accept campaign contributions from foreign nationals. It is also a violation of federal law to knowingly accept campaign contributions from conduit donors. From 2015 to 2016, the contribution limit for an individual to contribute to a political candidate committee was $2,700 per election. The Federal Election Commission ("FEC") is the entity charged with ensuring transparency in federal elections by administering and enforcing federal campaign finance law. Each

---

[1] The defense respectfully declines to adopt the government's statement of facts. The defense disputes every element of every charge.

4

United States federal political campaign is required to submit regular reports to the FEC with information about donors contributing more than $50.  If a campaign receives a questionable donation, the FEC prescribes specific procedures the campaign must follow, including that the "committee must keep a written record noting the reason why a contribution may be prohibited and must include this information when reporting the receipt of the contribution."

Since 2015, the FBI, IRS-CI, and the USAO for the Central District of California ("CDCA") have been investigating illegal foreign and conduit contributions and foreign influence schemes orchestrated by Gilbert Chagoury and aided by several subjects, including Toufic Baaklini and Individual H (the "Federal Investigation").

**Gilbert Chagoury** is a Nigerian-born, billionaire businessperson of Lebanese descent.  Because he is a foreign national, Chagoury is prohibited from making contributions directly or indirectly in support of any candidate for federal elected office in the United States.  As early as 2010, Chagoury was the subject of various news articles reporting that he had ties to an international criminal entity.[2]  In 2015 and 2016, the reporting intensified and became more widespread.  In particular, the reporting focused on then-presidential candidate Hillary Clinton and her and her foundation's controversial (but legal) financial connection to Chagoury as a "top Clinton Foundation donor."

Chagoury was a key (but silent) initial financial backer for the non-profit organization In Defense of Christians ("IDC"), which was founded in 2014.

Defendant personally met with Chagoury twice.

**Toufic Baaklini** is a United States citizen of Lebanese descent.  Baaklini has consistently served as a proxy for Chagoury and has assisted him with financial and political dealings in the United States.  Baaklini is the founder of IDC and, until he resolved the criminal allegations against him in this case, served as its President.

---

[2] Specifically, Chagoury was publicly alleged to have financially supported a terrorist organization, namely, Hezbollah, and was, for a time, also on the U.S. government's "No Fly List" and "Terror Watchlist."  Chagoury was never charged with any terrorism-related offenses and was later removed from the "No Fly List."

**Individual H** is a United States citizen of Lebanese descent.  He is a Los Angeles-based physician with ties to both Chagoury and Baaklini.  Individual H has served as a board member with IDC.

Through the Federal Investigation, investigators learned that Chagoury had funneled his money to the campaigns of U.S. political candidates whom Chagoury believed would be supportive to his cause.  The Federal Investigation ultimately revealed that from 2012 to 2016, Chagoury provided approximately $180,000 in illegal political contributions to four political candidates—including defendant—with the assistance of Baaklini, Individual H, and others.  The Federal Investigation also revealed that Chagoury separately routed $50,000 to then-United States Secretary of Transportation Ray LaHood, in the form of a purported "loan" that LaHood never disclosed as required on government ethics forms.

As part of the investigation, federal investigators sought to learn whether and when any of the recipient politicians were aware of the illicit contributions to their campaigns; whether any person sought to impermissibly influence the recipient politician in exchange for the contribution; and whether any recipient politician took any official acts in connection with the illicit contributions.  In short, federal agencies were investigating whether the payments were linked to bribe attempts or bribe solicitations.

### B.    Defendant and His Relationship to Baaklini

Defendant is a U.S. Representative for Nebraska.  In 2014 and 2015, defendant led efforts to obtain the passage of two resolutions (H. Res. 683 and H. Con. Res. 75) publicly condemning the persecution of Christians and other religious minorities in the Middle East.

In 2014, Baaklini founded IDC to advocate for the protection of Christians in the Middle East.  One of the aims of IDC was to get more U.S. Congressional involvement surrounding these issues, and defendant became an important political ally for Baaklini and his organization.  As a result, defendant developed a close working relationship and friendship with Baaklini.  Defendant's communications with Baaklini starting in 2014,

including through text messages and emails, reflect this close friendship.  Through Baaklini, defendant also came to know Chagoury based on their shared commitment to IDC and the "cause," and the two personally met twice: once in Washington D.C. and once in Paris.  Defendant would periodically pass on his regards to Chagoury through Baaklini.

In late 2015, following defendant's introduction of H. Con. Res. 75, defendant asked Baaklini to assist him in identifying supporters who would contribute to his re-election campaign.  Baaklini advised defendant that he had a group of Lebanese donors in Los Angeles who wanted to support defendant, and defendant, in turn, directed his fundraising consultant, Alexandra Kendrick, to coordinate the event with Baaklini.  Around the same time, Baaklini directed Individual H to host the Los Angeles fundraiser for defendant's re-election.

### C.  2016: Defendant's Campaign Receives Illegal Contributions at a Fundraiser in Los Angeles

In 2016, Chagoury arranged to funnel $30,000 of his money to defendant's campaign through Baaklini.  Baaklini, in turned, arranged to provide that money in cash to Individual H to fund defendant's campaign.  Specifically, in January 2016, Baaklini provided $30,000 of Chagoury's money in cash to Individual H at a restaurant in Los Angeles with instructions that Individual H (1) host a fundraiser for defendant, and (2) recruit other individuals (conduits) to contribute Chagoury's money to defendant's campaign.  Individual H agreed.

In early February 2016, Baaklini introduced Kendrick to Individual H as the host of the Los Angeles fundraiser (the "2016 Fundraiser").  Through a series of emails and text messages, Kendrick and defendant's campaign team coordinated with Baaklini and Individual H to arrange the 2016 Fundraiser to take place in Los Angeles on February 20, 2016.  In the lead-up to the 2016 Fundraiser, Kendrick repeatedly emphasized to defendant the potential risk of illegal foreign and conduit contributions with this event.  Among other things, she relayed to defendant a "cautionary tale" in which she coordinated for a different client a fundraiser that similarly had ties with foreign

7

nationals from the same community.  Kendrick later learned that the contributions from that event were illegal foreign and conduit contributions.  In preparing for the 2016 Fundraiser, Kendrick's concerns were further heightened because she was never provided an RSVP list.  Despite her requests and even after enlisting defendant's assistance to procure such a list, Kendrick never received a guest list prior to the event.

Defendant flew out to Los Angeles for the 2016 Fundraiser, and Individual H picked him up from the airport.  Kendrick also traveled to Los Angeles.  The 2016 Fundraiser was co-hosted by Individual H and his family friends at the family friends' home in Los Angeles.  During the event, Kendrick insisted that the donors complete the contribution forms in person at her table, given her concerns about possible conduit contributions.  This was an unusual practice for Kendrick, and she made sure defendant was aware that she was taking these cautionary steps.

The 2016 Fundraiser raised a total of $36,000, which by all accounts was a major success for defendant.  Of that amount, approximately $30,200 was contributed by six conduits whom Individual H recruited and reimbursed with Chagoury's money.  Defendant's April 15 Quarterly FEC Report for 2016 disclosed the contributors from the 2016 Fundraiser, including the six conduits who had contributed Chagoury's money to defendant.  The FEC report did not indicate that Chagoury or Baaklini provided any contributions at the 2016 Fundraiser.

A short time after the 2016 Fundraiser, defendant saw Baaklini in Washington, D.C.  In a private conversation, defendant asked Baaklini if he thought anything was wrong with the 2016 Fundraiser.  Baaklini falsely told him no and inquired why defendant was asking.  In response, defendant noted that the money had all come from one family.  Baaklini again falsely told defendant nothing was wrong with the fundraiser.

On March 14, 2016, defendant's resolution (H. Con. Res. 75), which was favored by IDC, Chagoury, Baaklini, and Individual H, passed.

### D.      2018: Defendant Pushes Individual H to Host Another Fundraiser in Los Angeles for Him

Following the 2016 Fundraiser, and after being confronted by the FBI, Individual H began cooperating in the Federal Investigation.  The scope of the Federal Investigation included determining if and when defendant knew about the illegal funds he received from the 2016 Fundraiser and whether defendant had any communications with Chagoury or Baaklini about the funds he received from that event.

Defendant was up for re-election in November 2018.  Since the time of the 2016 Fundraiser, defendant and Individual H had maintained periodic contact, largely through text messages.  In the spring of 2018, defendant reached out to Individual H via text message, asking for a call.  On April 9, 2018, defendant called Individual H, which was surreptitiously recorded at the direction of the FBI.  After inquiring about how the "community in L.A." was doing, defendant asked Individual H if he would host another fundraising event in Los Angeles for him.  Individual H agreed to speak to one of their mutual acquaintances about it.

One week later, on April 17, defendant's staff aide, Luke Wenz, sent defendant an email stating that he would email Individual H about a possible fundraising event in California.  That same day, defendant—having already personally reached out to Individual H just one week prior—instructed Wenz not to contact Individual H.

Following up on defendant's request, on June 4, 2018, Individual H placed a call to defendant, which was surreptitiously recorded at the direction of the FBI.  During that nine-minute call, Individual H repeatedly discussed with defendant that Baaklini had given Individual H $30,000 cash to contribute to the 2016 Fundraiser, which Individual H distributed to conduit donors, and that Chagoury was probably the ultimate source of the money.

Defendant did not express surprise or concern or seek clarification about Individual H's admissions that illegal foreign cash had been funneled to his campaign by people known to him and people who sought his legislative support during the time period he received the illegal donations.  Instead, defendant continued to push for the

9

1   second fundraiser, explaining that he hoped to "have some continuation of the fine
2   generosity" that he had received from the first (illicitly funded) fundraiser.  When
3   Individual H advised defendant that the money "probably did come from Gilbert
4   Chagoury because he was so grateful for [defendant's] support [for] the cause,"
5   defendant responded with a summary of the efforts he had been making in Congress for
6   "the cause" and praised Baaklini for his respective efforts to "elevate the issue," before
7   circling back to possible dates for the fundraising event.  Defendant also offered to speak
8   with Baaklini—a key facilitator of the illegal contributions to defendant's campaign—to
9   see if he could again "help" with the fundraiser.  The call concluded with defendant
10  noting that he had told Baaklini to deliver his regards to Chagoury, who defendant
11  understood was "still in Paris."

12          Following the June 4 call with Individual H, defendant sent Baaklini a text
13  message on about June 4, 2018 asking, "Would you have some time to visit later
14  Thursday evening?"  Baaklini, who was represented by counsel at the time and aware of
15  the Federal Investigation into him and defendant, responded "sorry can not this week."

16          Following the June 4 call with Individual H, defendant reached out to an attorney
17  specializing in FEC rules, Jessica Furst Johnson.  Defendant did not advise Johnson
18  about the source of the call (the host of the 2016 Fundraiser) or the nature of Individual
19  H's statements (that Baaklini provided $30,000 of Chagoury's cash to Individual H and
20  his friends to donate to defendant).  Rather, defendant raised only an unremarkable and
21  unmemorable "concern" about something he heard.  Johnson could not get defendant to
22  provide any more details, and she concluded there was nothing more to do done about an
23  unverifiable innuendo or suspicion about a possible "bad check."

24          Following the June 4 call with Individual H, defendant did not amend his FEC
25  disclosures regarding the contributions from the 2016 Fundraiser.  Defendant also did
26  not disgorge the funds from the 2016 Fundraiser as required by the FEC and which
27  would have required him to publicly disclose that he had received, or he suspected he
28  had received, illegal conduit contributions from Chagoury.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E.    March 2019: Defendant Lies to and Misleads CDCA Investigators about the Illegal Contributions He Received

On March 23, 2019, FBI Special Agent Todd Carter and IRS-CI Special Agent James O' Leary traveled to defendant's home in Lincoln, Nebraska to see if defendant would agree to a voluntary interview as part of the Federal Investigation.  Defendant agreed, and the agents surreptitiously video and audio recorded the interview.  At defendant's request, several local Nebraska police officers were present during the entirety of the interview.

 At the start of the interview, defendant was openly hostile towards the federal investigators and directed that they listen to his grievances before he would participate in any interview.  After they did so, the federal investigators established they were from California, and they advised defendant it was a crime to lie to federal agents.  The investigators' questions focused on Chagoury, Baaklini, Individual H, IDC, and illegal campaign contributions.  Defendant repeatedly and falsely denied knowing about any illegal conduit contributions to his campaign, including after being specifically asked about Individual H and Baaklini.  Defendant denied receiving money from Chagoury.  Defendant also falsely stated that "the only people [he] received money from are on the financial disclosure."

Defendant misleadingly minimized his association with and knowledge of Individual H.  Defendant claimed that he had only a vague recollection of Individual H and stated that he "may have" donated to him.  When pressed about whether Individual H just donated or held a fundraiser, defendant equivocated, stating he would need to "double check."

The only reference defendant made to the June 4 call with Individual H was in response to questioning about whether he was aware if Chagoury ever directed or gave anybody money to give to his campaign.  Defendant vaguely stated, "there was a comment that we would have to ask Gilbert [Chagoury] along the way, but I don't know what that exactly meant."  But defendant did not provide any details about when that comment occurred or what he understood its relevance to be to the investigators' inquiry.

11

Defendant also failed to disclose his conversation with Baaklini after the 2016 Fundraiser.  Similarly, defendant failed to disclose his conversation with Johnson after the June 4 call.

At the conclusion of the interview, defendant asked the federal investigators how to get in touch if he recalled additional information, and they provided defendant with a California phone number.

### F.   July 2019: Defendant Requests Another Interview with CDCA Investigators and Doubles Down on His Lies about Matters Material to the Federal Investigation

Following the March 23 interview, defendant (through then-counsel Trey Gowdy) proactively reached out to the government and requested another interview.  At the defense's request, a second interview took place in Washington, D.C. on July 18, 2019, at Gowdy's office.  FBI Agents Carter and Edward Choe and AUSAs Mack Jenkins and Aron Ketchel were present for the interview.  At the time of the interview, defendant was still unaware that his call with Individual H had been recorded or that Individual H was cooperating with the Federal Investigation.

AUSA Jenkins repeatedly advised defendant that the interview was voluntary, that he could terminate the interview at any time, that he did not need to answer any questions, and that he could consult with his attorney whenever and as often as he wished.   Defendant was also again reminded that it was a crime to lie to the federal government.

During the approximately two-hour, consensually recorded interview, defendant admitted the following:

- Defendant is friends with Baaklini and has worked closely with him and IDC.

- Defendant understood Baaklini and Chagoury to be friends.  Through Baaklini, defendant met Chagoury twice: once in Washington D.C. in late 2014 and again in 2015 in Paris.  Defendant understood Chagoury to be a foreign national with an international reputation and a friend of the

Clintons, and defendant had researched Chagoury after the Nebraska interview.

- Defendant believed Chagoury wanted to meet him because of defendant's work on a cause Chagoury favored.

- In late 2015, defendant asked Baaklini if there were people in "this broader community" (referring to constituencies who supported the protection of Christians in the Middle East) that would financially support his re-election campaign.  It was out of that conversation that the 2016 Fundraiser arose.

- The 2016 Fundraiser was "very unique"; "substantially bigger"; and a "worthwhile" trip for defendant because of its size and success.

- Defendant correctly recalled (without having reviewed any records) that he raised between $30,000 and $40,000 at the 2016 Fundraiser.

- Defendant was very familiar with the laws prohibiting political contributions from foreign nationals and conduits and has spent "significant time" in the FEC manual.

- Defendant understood there is an obligation to return illicit campaign contributions.

- Defendant personally reviews each FEC report for his campaign two weeks before filing and intentionally reviews it himself "line by line" to make sure mistakes are not made.

Defendant made the following false and/or misleading statements:

- Defendant misleadingly claimed that everything about the 2016 Fundraiser was "standard procedure."

- Defendant misleadingly claimed that Individual H made a vague comment that the amounts at a future fundraiser wouldn't be as large because "Gilbert won't be involved," which caused defendant "concern."

13

- Defendant falsely claimed that because of his "concern" following the June 4 call with Individual H, he sent an email to his aide, Luke Wenz, not to pursue another fundraiser in Los Angeles.[3]

- Defendant misleadingly claimed that he contacted FEC attorney Johnson after the June 4 call because he was concerned and that he told her "what I told you, basically," i.e., the facts as defendant recalled them from his conversation with Individual H.

- Defendant falsely claimed that he never had any conversations with Baaklini about any concerns with the 2016 Fundraiser.

- In response to a question posed by Gowdy, defendant falsely denied being aware that any of the donations from the 2016 California "were from anyone not legally entitled to donate to [defendant]."

- In response to a question posed by Gowdy, defendant falsely denied being aware that any donations from California were illicit at the time of his call with Johnson.

- In response to a question posed by Gowdy, defendant falsely claimed he was "absolutely not" aware at any time of any illicit donations and that he was "even now" (the time of the Washington D.C. interview) not aware of any illicit donations.

- In response to a question posed by Gowdy, defendant misleadingly claimed that if he had been aware of any illicit donations, he would return the money.

- Defendant falsely claimed that he ended the conversation with Individual H after the "concerning comment" was made.

- Defendant falsely denied that Individual H told him that Toufic Baaklini had given Individual H $30,000 cash to fund the 2016 Fundraiser.

---

[3] In fact, that email is dated April 17, 2018, almost two months before the call with Individual H.

- Defendant misleadingly claimed that if Individual H had stated such facts, "that would have been horrifying."
- Defendant misleadingly claimed that he was "shocked" by what the investigators stated during the interview and falsely stated that he had no reason to believe any of the donations from the 2016 Fundraiser were illicit "up to now" (the time of the Washington D.C. interview).
- Defendant misleadingly claimed that he relied on Johnson's advice in deciding not to ask Baaklini about the comment made by Individual H.

After the interview, defendant furthered his false claim that he told his aide, Wenz, not to pursue the Los Angeles fundraiser because of defendant's "concern" by having Gowdy send to the federal investigators defendant's email exchange with Wenz.

## G.   Federal Investigation Follow-Up

As a result of defendant's false and misleading statements during his two interviews, federal investigators took the following steps in connection with the Federal Investigation, among others:

- Interview Jessica Furst Johnson
- Interview defendant's Chief of Staff, Reyn Archer
- Interview Luke Wenz
- Interview Alexandra Kendrick
- Interview Toufic Baaklini
- Request and review documents, communications, and phone from Baaklini
- Interview Gilbert Chagoury
- Obtain and review cell-site data for Baaklini and defendant's phones
- Interview Andrew Doran

## IV.   LEGAL AND EVIDENTIARY ISSUES[4]

### A.   Authentication and Foundation

Rule 901(a) simply requires that a proponent of evidence make a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); <u>United States v. Chu Kong Yin</u>, 935 F.2d 990, 996 (9th Cir. 1991) (government need make only a prima facie showing of authenticity or identification).

This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  <u>United States v. Dhinsa</u>, 243 F.3d 635, 658-59 (2d Cir. 2001) (citations omitted).  The proponent of evidence need not establish a proper foundation through personal knowledge; a proper foundation "can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902."  <u>United States v. Pang</u>, 362 F.3d 1187, 1193 (9th Cir. 2004) (citation omitted). The authenticity of proposed exhibits may also be proven by circumstantial evidence. <u>See</u> <u>United States v. King</u>, 472 F.2d 1, 8-11 (9th Cir. 1972).

Once a prima facie showing of authenticity has been made, the credibility or probative force of the evidence offered is ultimately an issue for the trier of fact.  <u>Chu Kong Yin</u>, 935 F.2d at 996.

### B.   Specific Evidentiary Issues

#### 1.   <u>FEC Filings and Records</u>

The government will seek to introduce relevant FEC Form 3 filings for defendant's campaign.  In particular, the government will seek to introduce the April 15 Quarterly Report for 2016 in which the conduit donors from the 2016 Fundraiser are

---

[4] Defendant states his position as follows: Major outstanding legal and evidentiary issues include AUSA Jenkins's participation in the trial as an advocate, the defense's right to call him to testify, and other matters raised in the pending motions *in limine* and conflicting jury instructions.  The jury should not receive the indictment or a "sanitized" version of the indictment.  The defense will meet and confer regarding the possibility of an exhibit list for the jury.  The defense will object to sending copies of any recordings in this case back to the jury during deliberations.  <u>See</u> <u>United States v. Felix-Rodriguez</u>, 22 F.3d 964, 967 (9th Cir. 1994).

identified.  The government may also introduce certain of defendant's other amended FEC filings, which will show defendant made other amendments to his FEC reports, but not to the April 15 Quarterly Report for 2016.  The government will also seek to introduce various printouts from the FEC.gov website explaining the rules regarding who can and cannot contribute, contribution limits, instructions on when a reporting form must be amended, and instructions for a committee that discovers that is received a contribution that is prohibited.

All of these documents are publicly available on the FEC government website (www.fec.gov), a source whose accuracy cannot reasonably be questioned.  See Fed. R. Evid. 201.  The Court may even take judicial notice of these records because they are "official government record[s] from a government website."  See Love v. Marriott Hotel Servs., Inc., 2021 WL 810252, at *4 (N.D. Cal. Mar. 3, 2021) (citing Cota v. Maxwell-Jolly, 688 F. Supp. 2d 980, 998 (N.D. Cal. 2010)).  One of the case agents who accessed and reviewed these records from the FEC website will authenticate their source and explain their relevance to the Federal Investigation.

2.     Defendant's Legislation and Press Releases

The government will introduce evidence of specific legislative actions taken by defendant and the timing of those acts in relation to the 2016 Fundraiser.  This evidence is relevant to show defendant's official work on a political/religious cause shared by Chagoury, Baaklini, and Individual H and reflects a subject of interest to the Federal Investigation.

Defendant's legislative activity is public information available on a government website (www.congress.gov) and is admissible for the same reasons as documents and information from the FEC website.  Defendant's press releases on the same topic are publicly available on his official website (www.fortenberry.house.gov) and constitute the opposing party's statement.  See Fed. R. Evid. 801(d)(2)(A) (statement offered against party and made by the party in individual or representative capacity is not hearsay).

### 3.   Audio/Video Recordings and Transcripts

The government will introduce excerpts of the following audio and/or video recordings:

- April 9, 2018 audio recorded call between defendant and Individual H
- June 4, 2018 audio recorded call between defendant and Individual H
- March 23, 2019 audio/video recorded interview between defendant and FBI/IRS-CI in Lincoln, Nebraska
- July 18. 2019 audio recorded interview between defendant and FBI/USAO in Washington, D.C.
- 2018 Annual IDC Dinner video recording

A recording is admissible upon a showing that it is "accurate, authentic, and generally trustworthy." United States v. King, 587 F.2d 956, 961 (9th Cir. 1978).  For example, testimony that a recording depicts events that the witness observed is sufficient to authenticate the recording.  Fed. R. Evid. 901(b); United States v. Smith, 591 F.3d 974, 979-80 (8th Cir. 2010).

With respect to the two recorded calls, both Agent Carter and Individual H (a participant of the call) observed the events in real-time while the recordings were made and have familiarity with their contents—both of the conversation and the voices of the individuals depicted in the recordings.  Similarly, Agent Carter and Agent O'Leary observed and participated in the events of the recorded March 23, 2019 interview in real-time.  And Agent Carter and Agent Choe observed and participated in the events of the recorded July 18, 2019 interview in real-time.  These witnesses are therefore familiar with what is depicted in the call and interview recordings and are qualified to testify about them.

Baaklini, who was in attendance at the 2018 IDC dinner event, can authenticate the recording of that event.  Alternatively, Agent Choe, who obtained the video

recording of the 2018 IDC dinner from C-Span[5], and is familiar with defendant's appearance and voice, can authenticate the video.

While the recording itself is the evidence, the government has also prepared written transcripts of the recordings as an aid to the jury while listening to and watching the recordings.  See United States v. Turner, 528 F.2d 143, 167 (9th Cir. 1975) (per curiam) (permitting the transcripts of sound recordings to be used contemporaneously with the introduction of the recordings into evidence); see United States v. Chen, 754 F.2d 817, 824 (9th Cir. 1985) (district court has discretion to allow the jury to use written transcripts produced by the government as an aid in listening to the tape recordings).  These transcripts can be authenticated by the agents and/or a participant in the call who reviewed them and confirmed their accuracy.  The government has provided the defense with its proposed transcripts and solicited input regarding their accuracy. The government intends to display the transcripts simultaneously on a screen while playing the respective audio and/or video files through trial presentation software[6], and to additionally provide binders with the transcripts to the jury (in case of any technical error with the scrolling text).

For the jury to consider the evidence on a recording, it must be played in open court.  Allowing jurors to take into the jury deliberation room recordings that were not played in open court is structural error requiring automatic reversal if a defendant objects to allowing the jurors to have the un-played recordings in the jury room.  United States v. Noushfar, 78 F.3d 1442, 1445-46 (9th Cir. 1996).

---

[5] https://www.c-span.org/video/?455484-3/defense-christians-annual-dinner-members-congress

[6] The presentation will also include photographs of the speakers to aid the jury in following who is speaking.

1

### 4.   Summary Charts

2   The government will seek to admit summary evidence of defendant's FEC filings

3   and defendant's contacts with Baaklini, and to have a witness testify concerning those

4   summaries.[7]

5   A "proponent may use a summary, chart, or calculation to prove the content of

6   voluminous writings, recordings, or photographs that cannot be conveniently examined

7   in court." Fed. R. Evid. 1006. "The purpose of the rule is to allow the use of summaries

8   when the documents are unmanageable or when the summaries would be useful to the

9   judge and jury." United States v. Rizk, 660 F.3d 1125, 1130 (9th Cir. 2011) (citation

10   omitted). Rule 1006 does not require that it be literally impossible to examine the

11   underlying records before a summary or a chart may be utilized. "All that is required for

12   the rule to apply is that the underlying 'writings' be 'voluminous' and that in-court

13   examination not be convenient." United States v. Scales, 594 F.2d 558, 562 (6th Cir.

14   1979). A witness may also testify concerning the summaries of voluminous records.

15   Goldberg v. United States, 789 F.2d 1341, 1343 (9th Cir. 1986); see also United States v.

16   Johnson, 594 F.2d 1253, 1255 (9th Cir. 1979) (revenue agent could testify about

17   summaries of voluminous tax records).

18   The summary evidence directly bears on the charged conduct. The government

19   seeks to prove that defendant intentionally failed to file an amended FEC report as part

20   of his scheme to falsify and conceal. The summary evidence will greatly assist the jury

21   by providing a snapshot of the frequency of defendant's FEC filings, including of his

22   amendments for other filings but not for the April 15 Quarterly FEC Report for 2016.

23   Without this summary evidence, the government would otherwise have to present over

24   30 of defendant's FEC filings in court to the jury, which would be inefficient and a waste

25   of the jury's time.

26   The summary chart regarding the frequency of defendant's contacts with Baaklini

27   is also useful to the judge and jury and summarizes voluminous data from pen registers

28

---

[7] The government reserves the right to prepare additional summary charts that may aid the jury and expedite the trial presentation, as it gets closer to trial.

from 2016 and 2017.  That data is unwieldy and impossible to examine in court.  To the contrary, a simple summary chart will provide useful information regarding the nature of defendant and Baaklini's relationship and, specifically, how often defendant and Baaklini were in touch via phone calls and text messages.

Because the government's proffered summary charts are based on admissible materials that were made available for inspection to the defense, the charts may be admitted as substantive evidence.  See Rizk, 660 F.3d at 1130.  Any contention that the chart may contain inaccuracies or omissions goes to the weight of the evidence, not its admissibility.  Id. at 1131 n.2.

### 5. Emails and Text Messages

The government intends to admit several categories of email communications and text messages in which defendant (or his authorized representatives or employees) was a participant, as well as amongst the key witnesses in the case.

#### a. *Defendant's Statements*

Statements by defendant (or his authorized representatives or employees) in emails, text messages, or other written documents are not hearsay and are admissible. When offered by the government, statements by the defendant are admissions by a party-opponent.  Fed. R. Evid. 801(d)(2); United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000).  Courts routinely admit electronic evidence, like emails, as party admissions in criminal cases.  See, e.g., United States v. Safavian, 435 F. Supp. 2d 36, 43 (D.D.C. 2006) ("The statements attributed directly to [defendant] come in as admissions by a party opponent under Fed. R. Evid. 801(d)(2)(A)"); United States v. Siddiqui, 235 F.3d 1318, 1323 (11th Cir. 2000) ("Those [emails] sent by [defendant] constitute admissions of a party"); see also United States v. Moran, 759 F.2d 777, 786 (9th Cir. 1985) (holding that letters and deposit slips signed by defendant are express admissions).  Moreover, statements in documents that: (1) defendant manifested he adopted or believed to be true; (2) were made by a person whom defendant authorized to make the statements; or (3) were made by defendant's agent or employee on a matter within the scope of that

21

relationship and while it existed, are not hearsay under Federal Rule of Evidence 801(d)(2)(B-E).

While the government may present evidence regarding defendant's statements, defendant's statements offered by him are inadmissible hearsay.  Ortega, 203 F.3d at 682 (non-self-inculpatory statements, even if made contemporaneously with other self-inculpatory statements, are inadmissible hearsay); see also United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988); United States v. Collicott, 92 F.3d 973, 983 (9th Cir. 1996) (holding that Fed. R. Evid. 106 does not compel admission of otherwise inadmissible hearsay evidence).

Defendant's direct communications with Baaklini, Individual H and others, as offered by the government, are not hearsay.  Likewise, communications by defendant's representatives, a person authorized to make a statement on the subject, or agent/employee, are not hearsay; namely, such persons are Alexandra Kendrick, Drew Bowling, and Trey Gowdy.

Kendrick's communications with Baaklini, Individual H, and others in her role as defendant's agent or employee (defendant's fundraising consultant), on a matter within the scope of the employment relationship (planning and coordinating the 2016 Fundraiser and conducting other fundraising activities on defendant's behalf) during the existence of the employment relationship (late 2015 to late 2018), are not hearsay.[8]  Fed. R. Evid. 801(d)(2)(D).  Likewise, Drew Bowling was the Assistant Communications Director and Policy Advisor for defendant.  His statements in that capacity, in connection with coordinating the 2016 Fundraiser, publicizing defendant's legislative actions, and relaying direct messages on behalf of defendant (e.g., "Fort told me to tell you…"), are also not hearsay.

Finally, communications by Trey Gowdy in his role as defendant's agent or employee (defendant's former counsel), on a matter within the scope of that employment

---

[8] Baaklini's statements to Kendrick, in turn, would be admitted for a non-hearsay purpose to show his involvement and role in setting up the 2016 Fundraiser and the context of relevant steps taken by defendant, Kendrick, and/or Baaklini.

relationship (previously representing defendant in connection with the Federal Investigation) during that relationship, are not hearsay.  See Fed. R. Evid. 801(d)(2)(A), (d)(2)(C).

b.  *Other Nonhearsay Statements*

The government also intends to introduce text and email communications involving Baaklini, Individual H, and Chagoury.   None of these communications are being introduced for the truth of the matters asserted and therefore are not hearsay.  For example, the communications (a) provide context for steps taken by Individual H and Baaklini relevant to the 2016 Fundraiser; (b) are relevant to show the relationship between Baaklini, Individual H, Chagoury, and defendant and their respective roles in that relationship, and (c) demonstrate Individual H's understanding of actions taken by Baaklini and Chagoury.

6.   Photographs

Photographs are generally admissible as evidence.  See United States v. Stearns, 550 F.2d 1167, 1171 (9th Cir. 1977).  "[T]he witness identifying the item in a photograph need only establish that the photograph is an accurate portrayal of the item in question."  People of Territory of Guam v. Ojeda, 758 F.2d 403, 408 (9th Cir. 1985); see also Fed. R. Evid. 901(b)(1).  A photograph is authenticated if the witness testifies that it is an accurate representation of facts of which the witness has personal knowledge, and "the witness who lays the authentication foundation need not be the photographer, nor need the witness know anything of the time, conditions, or mechanisms of the taking of the picture."  32 McCormick on Evid. § 215 (7th ed.).  "The usual course is for a witness on the stand to identify the photograph . . . as a correct representation of events he saw or of a scene with which he is familiar.  In fact he adopts the pictures as his testimony, or, in common parlance, uses the picture to illustrate his testimony."  Fed. R. Evid. 1002 advisory committee's note.  "Photographs are admissible as substantive as well as illustrative evidence."  United States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

23

1       The government will seek to introduce photographs of the various witnesses at

2   trial, including of defendant, Individual H, Baaklini, Chagoury, Kendrick, Johnson,

3   Bowling, and Gowdy.  These photos will be used at various parts of the trial, including

4   during the playing of recordings and during argument, to enhance the jurors' recall of

5   relevant persons and ability to better track their testimony.  The government will also

6   introduce photographs of defendant with other witnesses (like Baaklini) or that defendant

7   sent to, or received from, other witnesses (like Baaklini and Individual H).  The

8   government witness(es) who will authenticate these photographs have had contacts with

9   each individual depicted in the photograph and therefore has sufficient personal

10  knowledge to authenticate them.  See United States v. Beck, 418 F.3d 1008, 1014–15

11  (9th Cir. 2005) ("[A] lay witness may give an opinion regarding the identity of a person

12  depicted in a photograph if that witness has had sufficient contact with the defendant to

13  achieve a level of familiarity that renders the lay opinion helpful." (citation omitted)).

14  Likewise other witnesses who are themselves in the photographs and/or familiar with the

15  individuals and events depicted therein have sufficient personal knowledge to

16  authenticate them.

17              7.     News Articles regarding Gilbert Chagoury

18       Pending the Court's resolution of this related matter, while the government does

19  not seek to affirmatively introduce news articles with negative reporting regarding

20  Chagoury in its case-in-chief, the government seeks the ability to introduce such

21  underlying articles should defendant sufficiently open the door at trial and should the

22  Court find that sufficient foundation has been laid.[9]  (See Dkt. No. 99 (JMIL No. 3 to

23  Admit Evidence of Motive Re: Gilbert Chagoury).)

24

25

26

27          [9] For example, that by the time of defendant's Washington, D.C. interview he had
    admitted he "researched" Chagoury; thus, foundation would exist to explain why
    Chagoury's significantly negative public and political reputation led to defendant's false
28  and misleading statements seeking to minimize his knowledge and suspicion of
    Chagoury's financial role in the 2016 Fundraiser, at least by the time of that second
    interview.

### C.     Lay Opinion Testimony

Government agents will testify about the appearance, demeanor, and conduct of defendant during the two interviews, including their opinions and impressions of what they observed.  Government agents will also testify that defendant's false statements were material to the Federal Investigation, and that defendant omitted facts material to the Federal Investigation.

Federal Rule of Evidence 701 "permits a lay witness to give opinion testimony as long as the opinion is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." United States v. Pino-Noriega, 189 F.3d 1089, 1097 (9th Cir. 1999) (quotation marks omitted).  A non-expert witness "may state his impressions and opinions based upon what he observed." United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982). That is "[b]ecause it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, [or] the emotions manifest by his acts; . . . witnesses may relate their opinions or conclusions of what they observed." Id.  A lay witness may also testify as to an ultimate issue of fact, so long as the testimony is otherwise admissible. United States v. Crawford, 239 F.3d 1086, 1090 (9th Cir. 2001) (citing Fed. R. Evid. 704).

Based on their direct participation in the Nebraska and DC interviews, Agents O'Leary, Carter, and Choe are in a unique position to explain the events that they observed and participated in, and to describe defendant's appearance, demeanor, and conduct.  Based on their participation in this investigation, they are also familiar with defendant's behavior and demeanor at various stages of it and can provide context for and comparison of any differences.  Their opinion testimony will be helpful to the jury, and their opinions do not require expert knowledge. See United States v. Nelson, 285 F. App'x 491, 493–94 (9th Cir. 2008) ("The officers were in the unique position of observing both the manner in which the vehicle was driven prior to the stop and the

precise location and position in which the gun was discovered, and their opinions did not require scientific, technical or other specialized knowledge.").

Likewise, all three government agents may provide lay opinions that defendant's false statements (or omitted facts) were material to the Federal Investigation.

## D.   Cross-Examination of Defendant

The scope of a cross-examination is within the discretion of the trial court.  Fed. R. Evid. 611(b).  It should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.  The trial court may, in the exercise of its discretion, permit inquiry into additional matters as if on direct examination.  Fed. R. Evid. 611(b).

If defendant chooses to testify, he may be cross-examined as to all matters reasonably related to the issues defendant puts in dispute.  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981); see also United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) (explaining that a defendant who testifies at trial waives his Fifth Amendment privilege and may be cross-examined on matters made relevant by his direct testimony).  Defendant has no right to avoid cross-examination on matters that call into question his claim of innocence.  Miranda-Uriarte, 649 F.2d at 1353-54.

## E.   Affirmative Defenses and Reciprocal Discovery

The government has repeatedly requested notice of any affirmative defenses that defendant intends to raise, including entrapment, mental condition, and duress. Defendant has not identified any affirmative defenses that he intends to assert at trial. Accordingly, the government reserves the right to object to, and move to strike, any affirmative defenses that defendant may raise at trial, and to exclude any evidence related to such a defense that has not been timely disclosed pursuant to Rule 16 of the Federal Rules of Criminal Procedure.

Defendant has identified approximately five defense witnesses and indicated he may call additional unnamed witnesses.  The government has repeatedly requested reciprocal discovery and Jencks material from defendant.  Rule 16 of the Federal Rules

of Criminal Procedure creates certain reciprocal discovery obligations on the part of defendant to produce three categories of materials that he intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure.  Rule 16 imposes on defendants a continuing duty to disclose these categories of materials.  Fed. R. Crim. P. 16(b)(1) and (c).  Where a party fails to produce discovery as required, the rule empowers this Court to "prohibit that party from introducing the undisclosed evidence," or "enter[ing] any other order that is just under the circumstances."  Fed. R. Crim. P. 16(d)(2).

As of the filing of this brief, despite repeated requests, the government has not received any reciprocal discovery from defendant nor has the government received a response to its inquiry as to whether defendant has a timeline for such production (e.g., first day of trial or first day of defense case) or whether defendant was simply refusing all together to provide any of its witness statements or discovery.  To the extent defendant attempts to introduce or use any evidence at trial that has not been produced to the government, such evidence should be excluded.  See Taylor v. Illinois, 484 U.S. 400, 415 (1988) (defendant's failure to comply with, or object to, government's discovery request before trial justified exclusion of unproduced evidence).

### F.    The Jury Should Have a Trial Indictment During Deliberations

The government will prepare and propose a trial indictment to go back with the jury during deliberations.  To the extent necessary, the trial indictment will be sanitized to omit any allegations that were not presented during the trial and will display a clear disclaimer on every page that the indictment is not evidence, which is also set forth in the jury instructions.

A trial indictment will be helpful to the jury to guide them in their deliberations, including to cross-reference the indictment in evaluating whether the government has proven certain allegations and, most importantly, the allegations of specific deception and specific false and misleading statements.   The parties can meet and confer about the content of the Trial Indictment before it is submitted to the jury.

### G.     The Jury Should Have an Exhibit List During Deliberations

Consistent with the Court's standing order, the government will provide the jury with an exhibit list of neutrally described admitted exhibits to aid in its deliberations. The exhibit list would function as an index and would be helpful to the jury in organizing the admitted exhibits.  It would also help the jury efficiently locate specific exhibits that they may wish to review; without an exhibit list, the jury would be left to hunt and sort through a pile of loose exhibits with an insufficient understanding of what the documents purported to be.  The parties will meet and confer about the content of the Exhibit List before it is submitted to the jury.

## V.     CONCLUSION

The government respectfully requests leave to file supplemental trial memoranda before or during trial, as may become appropriate.