**1**

1        UNITED STATES DISTRICT COURT
      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2     HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

3

4   UNITED STATES OF AMERICA,

5                Plaintiff,

6     v.                              Case No.
                                    2:21-cr-00491-SB-1
7   JEFFREY FORTENBERRY,

8                Defendant.
   _____

9

10

11

12           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                      JURY TRIAL
13                 MARCH 17, 2022
                   A.M. SESSION
14                   8:30 A.M.
             LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22  _____

23              JUDY K. MOORE, CRR, RMR
             FEDERAL OFFICIAL COURT REPORTER
24            350 WEST 1ST STREET, #4455
             LOS ANGELES, CALIFORNIA 90012
25                 213.894.3539

1                         APPEARANCES

2   FOR THE GOVERNMENT:        MR. MACK E. JENKINS
                               MS. SUSAN S. HAR
3                              MR. J. JAMARI BUXTON
                               Assistant United States Attorneys
4                              312 North Spring Street
                               Suite 1500
5                              Los Angeles, California 90012

6

7   FOR THE DEFENDANT:         MR. JOHN L. LITTRELL
                               Bienert Katzman Littrell Williams, LLP
8                              903 Calle Amanecer
                               Suite 350
9                              San Clemente, California 92673

10                             MR. RYAN V. FRASER
                               Bienert Katzman Littrell Williams, LLP
11                             601 West 5th Street
                               Suite 720
12                             Los Angeles, California 90071

13                             MR. GLEN E. SUMMERS
                               Bartlit Beck, LLP
14                             1801 Wewatta Street
                               Suite 1200
15                             Denver, Colorado 80202

16                             MS. KALLY A. KINGERY
                               Kingery Law
17                             9595 Wilshire Boulevard
                               Suite 900
18                             Beverly Hills, California 90212

19

20

21

22

23

24

25

1                           I N D E X

2    GOVERNMENT OPENING STATEMENT:
         By Mr. Buxton, Page 14
3

4    DEFENSE OPENING STATEMENT:
         By Mr. Summers, Page 27
5

6    GOVERNMENT WITNESSES:
         SPECIAL AGENT TODD CARTER
7            Direct Examination by Mr. Jenkins, Page 53

8

9    GOVERNMENT EXHIBITS                    OFFERED     RECEIVED

10   Exhibits 171 through 179                  98          98

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**4**

1          (Proceedings commenced at 8:21 a.m.)

2          COURTROOM DEPUTY:  Calling Item 1, Case Number 21 CR

3   491, United States of America versus Jeffrey Fortenberry.

4          Counsel, please state your appearances starting with

5   the Government.

6          MR. JENKINS:  Good morning, your Honor.  Mack

7   Jenkins, Susan Har, Jamari Buxton, and Special Agent Edward

8   Choe from the FBI.

9          MR. LITTRELL:  Good morning, your Honor.  John

10  Littrell, Glen Summers, Ryan Fraser, Garrison Giali, Kally

11  Kingery, and Congressman Jeffrey Fortenberry.

12         THE COURT:  Good morning, everyone.  Please be

13  seated.  We are outside the presence of the jury, and my

14  understanding is that there are some issues with respect to the

15  opening statement, so let me hear from you, Mr. Summers.

16         MR. SUMMERS:  Thank you, your Honor.  The Court was

17  prescient in suggesting that we confer about the opening

18  presentation.  We have done so.  We have resolved all of the

19  issues save one.  It relates to the transcript of the D.C.

20  interview.  The Government has been working, of course, in good

21  faith to figure out exactly what it intends to present, but

22  there have been changes.  Saturday, they shortened some clips

23  and earlier this week they indicated they weren't going to use

24  some in all likelihood and they said they would object to us

25  using them.  So we went through my deck to make sure that

1  everything we were using in terms of transcripts, you know, we

2  wouldn't have any issues.  We did identify a couple of portions

3  after some great effort trying to sort things out that are in

4  dispute.  We'd like to present them to your Honor.  And I think

5  just getting them resolved will help because they will be used

6  with the witnesses later, assuming they're admitted.

7          THE COURT:  All right.  What are they?

8          MR. SUMMERS:  Your Honor, I'm going to try to

9  display them here on screen.  What we have here again is a

10  portion of the transcript from the Washington D.C. interview.

11  Congressman Fortenberry is discussing the call from Dr. Ayoub,

12  and as you can see in the top -- what we see here on the

13  screen, the top half is a portion that the Government intends

14  to offer into evidence and that has been essentially agreed to

15  be admitted.  The bottom half is the portion that they now

16  object to.  This was in their clip previously, but they have

17  removed it and they're objecting to it on the grounds of

18  hearsay.

19          You will see after questioning about what was said

20  on the call and the Congressman's response there's a question

21  from Mr. Jenkins, what did that mean?  And, actually, so what

22  did he say again?  I sort of tracked, but -- and then

23  Congressman Fortenberry explains, well, I actually, because I

24  was concerned about the comment, I actually went to my wife and

25  talked to her about it, and she remembers it a little bit

1  differently.  They're saying that's hearsay, your Honor, and we

2  think it's admissible for a number of reasons.  First and

3  foremost, that it goes to the scope and content of the

4  disclosures and whether Congressman Fortenberry was being

5  forthcoming and sharing information or not.  That's at the

6  heart of the case.  It goes to scienter and intent.  It also is

7  important because it told the agents that his wife might have

8  percipient information.  They elected never to interview her or

9  to request to speak to her.  There's a lot in here that's

10  relevant, having nothing to do with the truth of the matter

11  asserted.

12          THE COURT:  Well, let me hear first from the

13  Government, and then I may have a question or so.

14          Mr. Buxton?

15          MR. BUXTON:  Your Honor, the Government does not

16  object to the top portion of the transcript that is in white,

17  although we do object to the bottom section which is in blue.

18  And the basis for that is straightforward.  It is hearsay, what

19  the defendant told his wife out of court.  And her reaction to

20  what he said and her recollection of what he said is simply not

21  relevant to his disclosure.  And another thing that counsel has

22  not addressed is marital privilege, which would prevent the

23  agents from interviewing her about whatever the defendant had

24  said.

25          MR. FRASER:  Briefly, your Honor, the marital

privilege can be waived.  He waived the attorney/client

privilege, for God's sake, and he did everything to cooperate,

responded to every request that the Government had and gave him

everything they ever asked for, emails, documents, access to

all of his personnel and lawyers.  And so the marital privilege

notion is kind of silly.  And when we get back to what is said

here, he's not repeating the words his wife used, he's not

restating anything that she said.  It's just the fact of --

it's the fact that they spoke and something that the officers

could have inquired about before bringing this Federal

prosecution.

THE COURT:  Submitted?

MR. SUMMERS:  Yes, your Honor.

THE COURT:  I am going to find that the last

sentence is hearsay.  It is inadmissible.  It is being offered

to demonstrate that he went to his wife and they talked about

it and she remembers it differently, so for that reason, the

objection to that sentence is sustained.  You said there was a

second one?

MR. SUMMERS:  Your Honor, on that, I would just ask

the Court for clarification.  There are two phrases in the

sentence.  The first one says he was concerned -- and there's a

lot of commentary to that effect in the transcript, and then he

says, "I actually went to my" -- is the first portion

permissible and the latter portion not?

1          THE COURT:  Yes.  My understanding is there's no

2    objection to the first sentence about his being concerned about

3    the comment, so that is admissible.  I will allow that.

4          MR. SUMMERS:  Thank you, your Honor.  The next

5    portion --

6          COURTROOM DEPUTY:  Counsel, I'm sorry to interrupt,

7    but if you could speak a bit louder and closer to the

8    microphone for the court reporter.

9          MR. SUMMERS:  I apologize.  Usually I fill up the

10   courtroom and don't need the mic, so I apologize.

11         The next portion follows, I believe, immediately

12   thereafter, and the Congressman says he said -- I think he's

13   referring to Dr. Ayoub.  He says he would have -- said he would

14   have to ask Gilbert.  "I remember it as him saying the amounts

15   won't be as large."  And, again, this goes directly to the

16   question whether he made a false statement.  They're saying

17   that he was concealing this call and the information provided

18   on the call, and here he's telling them what he remembers of

19   the call.  I don't see how this can possibly be excluded in the

20   context of this case under the rule of completeness.

21         THE COURT:  Let me make sure I understand.  What is

22   the portion that is at issue, the first statement?

23         MR. SUMMERS:  Correct.

24         THE COURT:  "He said he would ask -- have to ask

25   Gilbert, I remember it as him saying the amounts won't be as

1 large"?

2          MR. SUMMERS:  That is correct, your Honor.

3          THE COURT:  And let me hear from the Government what

4 the objection is.

5          MR. BUXTON:  Your Honor, the objection to this is

6 similar to the last, in that it is hearsay.  The Government

7 intends to play a clip in which the defendant does say

8 something in substantially similar terms that he was concerned

9 because, during the telephone call, Gilbert said something to

10 the effect of the amounts wouldn't be as large.  We're just not

11 using this particular instance.  And the defense is certainly

12 free to use that other instance, but if they are going to use

13 it, it would constitute hearsay that's not being offered

14 against the party opponent the defendant.

15          THE COURT:  Let me be sure I understand the scope of

16 your objection.  You intend to use either this statement or its

17 functional equivalent.  Your objection is to timing?

18          MR. BUXTON:  My apologies, your Honor.

19          THE COURT:  Your objection is to timing, when this

20 is used?  Or who uses it?  Because the sentence or its

21 functional equivalent is going to be admitted by the

22 Government.  Is that what I heard you to say?

23          MR. BUXTON:  Yes, your Honor.  We are simply opposed

24 to the timing of this particular clip.

25          THE COURT:  And this is for opening statement, and

1    so you object to him presenting this in opening statement in

2    this particular context?

3         MR. BUXTON:  Well, the idea is he would need to

4    introduce it in his case-in-chief and have it authenticated by

5    someone.

6         THE COURT:  All right.  I think I understand the

7    objection.  It is overruled.  That's slicing and dicing it too

8    finely from this Court's perspective.

9         MR. BUXTON:  Understood, your Honor.

10        THE COURT:  And that's it?

11        MR. SUMMERS:  That's it, your Honor.

12        THE COURT:  All right.

13        MR. BUXTON:  Your Honor, if I may, there are just a

14   couple of issues that I believe we haven't addressed.  One of

15   them was some photographs that the defense intends to show in

16   their presentation.  Those photographs include pictures of the

17   defendant's children, as well as a photograph of the

18   defendant's dog and a chicken.  We don't see the relevance of

19   those documents and believe that the purpose of it is to

20   engender sympathy with the jury, so we object on that basis.

21        MR. SUMMERS:  Your Honor, I've already agreed to

22   take them out of my deck.  There's no issue.

23        THE COURT:  All right.  Very well.  And your next

24   issue?

25        MR. BUXTON:  Certainly.  My understanding is that

the defense wants to put up on the screen a document -- and
this has to do with authorization that the FBI received in
order to do this interview of the defendant in March 2019.  And
I believe that the defendant wants to put up on the screen a
document in which the FBI seeks that authorization.  That
document is inadmissible hearsay, and for that reason we ask
that they'd not be allowed to show it in their opening
presentation.

MR. SUMMERS:  Your Honor, my apologies for
forgetting that we had this issue as well.  The document at
issue is a document in which Special Agent Carter obtains
approval to conduct the interview in Lincoln, Nebraska.  It is
an official record where he obtains approval.  It's admissible
under Federal Rule of Evidence 8036 as a business record, and
if I could show it to the Court -- let me just make sure this
isn't being broadcast incompletely.  Sorry, your Honor.  I'm
going to go ahead and put it on the screen for the Court's
benefit.

THE COURT:  While you're looking to display that,
could you tell me, please, Mr. Summers, what is the purpose of
presenting this?

MR. SUMMERS:  Yes, your Honor.  The purpose is
several.  Special Agent Carter gets approval to conduct the
Lincoln interview.  He obtains approval to do certain things.
I will plan to use this document later with Agent Carter if

1   necessary for impeachment to show that he exceeded his approval

2   and that he violated or did things he was not authorized to do.

3   But more importantly, for purposes of the opening statement, it

4   goes to his state of mind in conducting the Lincoln interview.

5         If you look at the portion of the document that's on

6   the screen, you will see that in the memo obtaining approval to

7   conduct the Lincoln interview, Special Agent Carter says, "Case

8   agents will also seek to indict Fortenberry with misprison of

9   felony and conduit contributions.  In addition, if the case

10   agents determine from the interview that Fortenberry is making

11   false statements, he will be charged with false statement."

12   The point here is to show that the agents weren't coming to

13   that Lincoln interview just to have a routine interview of the

14   Congressman to find out what he knew --

15         THE COURT:  Let me cut it short, if I can, because

16   we have the jury waiting.  So this addresses the issue of

17   materiality.  Am I correct?

18         MR. SUMMERS:  In part.  It also goes to the bias and

19   credibility of the Government witnesses.

20         THE COURT:  All right.  I'll hear from you, Mr.

21   Buxton, but I'm inclined to allow this in.  I had issued an in

22   limine ruling where I had indicated that if the Government, as

23   it clearly stated it was, was going to demonstrate that, in

24   fact, there was an actual effect on the Federal investigation

25   that I was going to give some leeway to respond to demonstrate

1  essentially that the Government already had its mind made up,

2  that there really wasn't an effect, so it appears to me it's

3  relevant to that and it's not hearsay.

4          MR. BUXTON:  Well, your Honor, the defendant is

5  certainly entitled to do that, but the Government quibbles with

6  the mechanism by which the defendant does that.  This is

7  impeachment material, but it's still hearsay.  It's an

8  out-of-court statement, and the defendant is offering it to

9  prove that Special Agent Carter actually did seek to indict

10  Congressman Fortenberry.  If they want to cross-examine Special

11  Agent Carter about this, they are fine to do it, but admitting

12  the document itself is inadmissible.

13          And just one other thing, I believe that police

14  reports and FBI reports don't fall into that business records

15  exception.  Otherwise, you could put in a police report in any

16  criminal case and offer it for its truth, which is not

17  something the Government is allowed to do.

18          THE COURT:  All right.  I am going to allow this.

19  The Government's objection is overruled.

20          All right.  Let's go ahead and bring in the jury,

21  please.

22          (Jury in.)

23          THE COURT:  We remain on the record in the case of

24  the United States versus Jeffrey Fortenberry.  We are now

25  joined by our jury.  Good morning, ladies and gentlemen.  You

1    may recall that we left off where we were going to commence

2    opening statements, and they will begin in just a moment.

3         I just want to remind you about what an opening

4    statement is and what it's not.  An opening statement basically

5    is a roadmap that each counsel will give, indicating what they

6    believe that the evidence is going to demonstrate.  What the

7    opening statement is not is it is not argument, and it is not

8    evidence, which means the lawyers don't have an opportunity to

9    argue at this point, and if they do and there are objections,

10   you'll hear me sustaining them.  Also, the lawyers are simply

11   presenting information for you to give you a framework to

12   understand the evidence, but it is not the evidence itself.

13   The evidence will commence as soon as their opening statements

14   have concluded.  With that, we will begin with the Government.

15        Mr. Buxton, you may present the Government's opening

16   statement.

17        MR. BUXTON:  Thank you, your Honor.

18              GOVERNMENT OPENING STATEMENT

19        MR. BUXTON:  May it please the Court?

20        On June 4, 2018, the defendant, Congressman Jeffrey

21   Fortenberry, had a significant ten-minute telephone call that

22   forced him to make a critical decision.  The evidence is going

23   to show that during that telephone call, a person who hosted a

24   fundraiser for the defendant here in Los Angeles in 2016 told

25   the defendant that he and others had made $30,000 in foreign

1  and conduit campaign contributions at that fundraiser, types of

2  contributions, the evidence will show, the defendant knew and

3  understood were illegal.  The fundraiser host also told the

4  defendant that the people who orchestrated those illegal

5  campaign contributions were not some nameless, faceless

6  individuals but, rather, people the defendant knew well, a

7  powerful Washington D.C. political ally who was close friends

8  with the defendant and a foreign national billionaire whom the

9  defendant had met several times in person and knew was a

10  foreign citizen, people who held the same deeply-held beliefs

11  in what they referred to as the cause, the protection of

12  Christians in the Middle East, a cause that represented a

13  reservoir of political support and potential campaign

14  contributions.

15          So how did the defendant react when he heard this

16  information?  The evidence is going to show some of the things

17  that the defendant didn't do, like ask the fundraiser host for

18  more information or say that he was horrified or hang up the

19  phone immediately.  Instead, the evidence is going to show that

20  the defendant told the fundraiser host "No problem" and that

21  the defendant was hopeful to have some continuation of the fine

22  generosity the fundraiser host and others had given.

23          What the defendant didn't know when he said those

24  words was that the FBI had been investigating illegal campaign

25  contributions to the defendant's campaign and to other Federal

campaigns for close to two years.  He didn't know that the
fundraiser host who helped funnel that illegal money to the
defendant's campaign was now cooperating with the FBI.  And
most important, the defendant didn't know that the fundraiser
host had recorded that significant telephone conversation.

When the defendant hung up that telephone call, he
had a choice to make.  He could choose to tell the truth and
reveal that his campaign had received illegal campaign
contributions, which can place his political career and his
rich and powerful friends at risk; or he could choose to lie to
protect himself and his political career, to protect his
friends, and protect his access to their political support and
to their money.  The defendant chose option number two, and
that set him on an illegal path of lies and concealment that
led the defendant to this courtroom.

At each step of the defendant's unlawful path, he
had a way out.  He had an off-ramp, an opportunity to change
course.  One opportunity the defendant had was a voluntary
interview with Federal agents in March 2019 at the defendant's
home in Nebraska.  At the outset of that interview, the FBI
agent warned the defendant that lying to the FBI is illegal.
The evidence is going to show that, despite that warning, the
defendant continued on his path of concealment and deception by
making a number of statements the defendant knew were false or
misleading.

1    For example, the defendant falsely stated that he
2    was not aware of his powerful Washington D.C. friend making any
3    illegal contributions or directing anyone to make any illegal
4    contributions or providing money to other people to make any
5    conduit contributions.  But the evidence is going to show that
6    the defendant discussed this very thing with the fundraiser
7    host during that recorded telephone call.
8    The defendant also falsely stated that everyone who
9    had contributed at the Los Angeles fundraiser was publicly
10   disclosed, but the evidence is going to show that the defendant
11   knew the true sources of that money had not been revealed.  The
12   defendant went on to falsely state that every campaign
13   contribution he received had been publicly disclosed, something
14   the evidence will show again was not true.
15   Defendant had yet another opportunity to correct
16   course in July 2019 when the defendant sat for another
17   interview with Federal investigators in Washington D.C.  The
18   evidence will show that the defendant specifically requested
19   that interview because he claimed he had more information to
20   provide to the Government.  Even then the evidence is going to
21   show that the defendant chose to lie and mislead Federal
22   investigators.  At one point during that interview in
23   Washington D.C., a Federal prosecutor specifically asked the
24   defendant whether the fundraiser host told him during a
25   conversation that the defendant's powerful Washington D.C.

1  friend gave the fundraiser host $30,000 in cash to help fund

2  the Los Angeles fundraiser, and the defendant, who was still

3  not aware of that recording, gave the prosecutor a direct and

4  unequivocal answer, "No."  Not only that, the defendant stated

5  that it would have been horrifying -- horrifying -- if that had

6  occurred.  The evidence is going to show that the reason the

7  defendant described this information as horrifying was because

8  he knew that it was a Federal crime to make either foreign or

9  conduit campaign contributions.  The defendant also falsely

10  stated that in the Washington D.C. interview he was not aware

11  of any illicit donations that were made at the Los Angeles

12  fundraiser.  The evidence will show that this, too, was

13  deliberately false.

14          This is a case about choices, ladies and gentlemen.

15  It's about a series of choices the defendant made that led him

16  down an illegal path of lies and concealment and deception.

17  You're going to learn about that path during this trial and the

18  very steps the defendant took to conceal his knowledge about

19  illegal campaign contributions.  The evidence will show that

20  the defendant's choice to break the law was deliberate and

21  calculated and that it was a choice driven by self-protection

22  and money.

23          Now, based on this unlawful path, the defendant is

24  charged in a three-count indictment with Federal crimes.  Count

25  1 of the indictment charges the defendant with engaging in a

scheme to falsify or conceal material information from the FBI.
Count 2 charges the defendant with false statements to the FBI
during that Nebraska interview.  And Count 3 charges the
defendant with making material false statements to the FBI
during the Washington D.C. interview.

Now, during this trial, the Government is going to
prove to you beyond a reasonable doubt that the defendant is
guilty of the crimes charged in the indictment.  Here's a
preview of how we're going to do that:  You're going to hear
from a number of witnesses during this trial.  One of them is
Toufic Baaklini.  He's the defendant's powerful Washington D.C.
friend who facilitated the illegal $30,000 payment at the Los
Angeles fundraiser.  You're going to hear that in 2013, Mr.
Baaklini founded a non-profit organization called In Defense of
Christians, or IDC for short, and that he served as the
president of that organization until recently.  You're going to
hear that IDC's core mission was protecting Christians in the
Middle East, something that Mr. Baaklini and others refer to as
the cause.  You're going to hear that the defendant is also a
passionate believer in the cause and that he regularly speaks
at IDC events.

Mr. Baaklini is going to testify that after meeting
through IDC, he and the defendant became close friends.  And
the evidence is going to back that up.  It's going to show that
Mr. Baaklini and the defendant communicated often, that they

joked about the defendant's family, that they attended events

together, even overseas, and that Mr. Baaklini appeared to have

considerable access to the defendant and vice versa.

You're going to hear that the defendant wasn't the

only person to whom Mr. Baaklini had access.  Mr. Baaklini's

also going to tell you about his close relationship with a

person named Gilbert Chagoury.  He's the foreign national

billionaire who funded the illegal $30,000 payment at the Los

Angeles fundraiser.  You're going to hear that Mr. Chagoury,

who was born in another country and who is of Lebanese decent,

is also a firm believer in the cause and that he bankrolled

IDC's inaugural event in 2014, at which the defendant was one

of the speakers.  The evidence is going to show that the

defendant was keenly interested in Mr. Chagoury and that the

defendant asked Mr. Baaklini on a number of occasions to pass

along messages to the foreign national billionaire.  You'll

also hear that the defendant met Mr. Chagoury in person several

times, including in Paris, about a year before the Los Angeles

fundraiser.

Now, the person who hosted that fundraiser and

eventually cooperated with the FBI is Dr. Elias Ayoub.  You're

going to meet him during this trial.  Dr. Ayoub is going to

testify that in late 2015, Mr. Baaklini connected him with the

defendant's campaign consultant and fundraising consultant so

that they could set up a fundraiser for the defendant in Los

Angeles.  You're going to hear that about a month before that

fundraiser, Mr. Baaklini gave Dr. Ayoub $30,000 in cash and

they agreed that Dr. Ayoub would distribute that money to

others to donate to the defendant's campaign.  And Dr. Ayoub is

going to testify that that is exactly what he did, which is

significant, ladies and gentlemen, because it is illegal under

Federal law for a person like Mr. Baaklini or Dr. Ayoub to

contribute to a Federal campaign in the name of another person

and because it's illegal for a foreign national like

Mr. Chagoury to contribute to a Federal campaign at all.  Even

more significant, the evidence is going to show that the

defendant was aware of these laws and knew that foreign and

conduit contributions were illegal.

You're going to hear that the defendant attended

that fundraiser here in Los Angeles in 2016, that he spent time

with Dr. Ayoub and others during the February event.  You're

going to hear that the Los Angeles fundraiser netted the

defendant's campaign about $36,000, making it one of the

defendant's most successful fundraising events ever.

You're going to hear that the defendant was very

pleased with the outcome of the fundraiser, so much so that

about two years later, in the spring of 2018, that the

defendant spoke with Dr. Ayoub directly and asked him if he

would consider hosting another fundraiser for the defendant in

Los Angeles.  By that time, Dr. Ayoub had begun cooperating

1  with Federal investigators.

2          You're going to hear about the Federal investigation

3  during this trial.  You're going to hear that FBI Los Angeles

4  started the investigation in 2016 and that it initially focused

5  on Dr. Ayoub, who lives here in Los Angeles.  You'll hear that

6  the investigation then zoomed out to include other people, like

7  Gilbert Chagoury, the foreign national billionaire, one of his

8  associates, and Toufic Baaklini, the president of IDC.  You're

9  going to hear that the investigation involved not only illegal

10 campaign contributions but other Federal crimes, including

11 bribery.  You're going to hear that Dr. Ayoub told Federal

12 agents about the illegal $30,000 campaign contribution at the

13 Los Angeles fundraiser, which raised a number of questions for

14 the Federal investigators, like whether the defendant knew

15 about the illegal campaign contribution and, if so, when did he

16 know it; whether the defendant knew about any other illegal

17 campaign contributions; whether Gilbert Chagoury or anybody

18 else had asked the defendant to do anything in exchange for

19 that money; and whether the defendant had, in fact, done

20 anything or promised to do anything in order to receive that

21 money.

22          You're going to hear that the goal of an

23 investigation is to uncover the truth and that lies and

24 misleading statements obstruct that mission.  You're going to

25 hear that the FBI and Dr. Ayoub recorded two telephone calls

between the defendant and Dr. Ayoub in an effort to get answers

to those questions.   You're going to hear portions of those

calls during this trial.   In the first call, you'll hear the

defendant ask Dr. Ayoub multiple times if he would consider

throwing another fundraising event for the defendant here in

Los Angeles.   And you'll hear the defendant explain why it was

he was asking Dr. Ayoub to host another fundraiser, because it

was an election year and the defendant needed to raise money,

which was something the defendant had to do constantly.

Then you'll hear the second call, and this is the

significant June 2018 call that I described at the outset.

You'll hear Dr. Ayoub tell the defendant, not once, not twice,

but three times that Toufic Baaklini had given him cash to fund

the Los Angeles fundraiser.   And you'll hear the defendant say

in his own words in response to one of those times, "No

problem."   And you'll hear Dr. Ayoub tell the defendant that

Mr. Chagoury was probably the source of that money, after which

the defendant talked about the community and the cause and

throwing another fundraising event, even though the evidence

will show the defendant knew those acts constituted Federal

crimes.

In March 2019, an FBI agent and another Federal

agent went to Lincoln, Nebraska, to interview the defendant at

his home to get to the bottom of what the defendant knew about

illegal campaign contributions.   You're going to hear that the

1   agents showed up to the defendant's home unannounced so that

2   the defendant would not have an opportunity to prepare a cover

3   story.  You'll hear that this is a standard practice, something

4   that Federal agents routinely do, and you'll hear that

5   unbeknownst to the defendant, one of those Federal agents video

6   recorded that interview in order to capture exactly what the

7   defendant said exactly the way he said it, which was a good

8   thing because the evidence is going to show that the defendant

9   made a number of deliberately false and misleading statements

10  during that interview.

11        We're going to play clips from that interview during

12  this trial, and you will see and hear the same lies the

13  defendant told investigators, like that he was not aware of

14  Toufic Baaklini being involved in any illegal campaign

15  contributions, that every contribution the defendant had was

16  publicly disclosed, and that everyone who gave at the Los

17  Angeles fundraiser had been publicly listed, all of which

18  statements the evidence will show are refuted by the recorded

19  call between the defendant and Dr. Ayoub.

20        You're going to hear that the agents asked the

21  defendant this information in part to test his credibility to

22  determine whether the agents could trust the defendant's

23  answers to other questions, to test whether the defendant was

24  lying about other things, a test the defendant repeatedly

25  failed.  You're also going to hear that the defendant made some

1   misleading statements during that interview, and in particular,

2   I want you to pay attention to how the defendant reacts and

3   what the defendant says when the agents ask him about Dr.

4   Ayoub, the person the defendant contacted directly in 2018 to

5   host another fundraiser.

6           The defendant had another chance to tell the truth

7   when the FBI and Federal prosecutors interviewed him a few

8   months later in Washington D.C., an interview again the

9   defendant specifically requested because he claimed to have

10   additional information for the Government.  You're going to

11   hear that the defendant did, in fact, provide some additional

12   information to investigators; however, the evidence will show

13   that the information the defendant provided was not complete,

14   nor was all the information truthful.

15           You're going to hear audio clips from that interview

16   which the defendant consented to recording.  So, again, you

17   will hear the defendant's own words.  You're going to hear the

18   prosecutor tell the defendant again that it is a crime to lie

19   to the Government, yet the evidence is going to show that the

20   defendant told investigators a number of things that were not

21   true during that interview.  In particular, you will hear the

22   defendant say that Dr. Ayoub did not tell him during a

23   conversation that Toufic Baaklini gave Dr. Ayoub $30,000 cash

24   to help fund the Los Angeles fundraiser.  You'll also hear the

25   defendant say that it would have been horrifying had this

1    occurred, even though the evidence will show that this did

2    occur and that the defendant did not appear to be horrified.

3    You'll also hear the defendant say that he is not aware of any

4    illicit donations, a statement the evidence will show was

5    deliberately false.

6          These interviews were just two off-ramps the

7    defendant had to tell the truth along his illegal path.  There

8    were others that you will hear about during this trial,

9    including the defendant's ability to correct and amend public

10   filings to reveal the names of the people who had actually made

11   the $30,000 contribution, something the evidence will show the

12   defendant did not do.  Instead, the evidence will show that the

13   defendant ignored these off-ramps and instead continued along

14   his illegal path because it benefitted him, it benefitted his

15   friends, and it preserved his ability to get additional money.

16         Now, at the end of this trial, you, too, will have a

17   choice to make, and the Government is confident that when you

18   consider all the evidence and apply the law that the Court is

19   going to give you, you will find the defendant guilty beyond a

20   reasonable doubt.  Thank you.

21         THE COURT:  Mr. Summers?

22         MR. SUMMERS:  Your Honor, if I might have just five

23   minutes to set up, and maybe the jury can stretch their legs?

24   I'll be very quick, but it may take just a couple of minutes.

25         THE COURT:  All right.  Go ahead.

1           Ladies and gentlemen, if you want to stand up and

2    stretch your legs, feel free to do so.  We just need to arrange

3    for the technology so that the defense can commence.

4                    DEFENSE OPENING STATEMENT

5           MR. SUMMERS:  May it please the Court?

6           Men and women of the jury, it's my great honor and

7    privilege today to be representing Congressman Jeffrey

8    Fortenberry.  I'd like to introduce you to my team.  I know

9    you've heard their names a little bit, but we have John

10   Littrell, my co-counsel; Ryan Fraser; Kally Kingery; Garrison

11   Giali; and, of course, the Congressman himself.  I'd also like

12   to introduce you to his family who will be here during the

13   trial.  In the first couple of rows here, we have their five

14   daughters.  And I won't go through all the names, but we also

15   have their first granddaughter.  Mrs. Fortenberry will be here

16   at times.  She'll be testifying as a witness, so at times

17   she'll be excused so she doesn't hear what the other witnesses

18   are saying and she's not here for the opening statements, but

19   you'll hear from her later during this trial.

20          Now, I'd like to also start by thanking you for your

21   service on the jury today.  The right to trial by jury was

22   viewed as such an important right and safeguard of our liberty

23   that the founders of our country put it in the Constitution.

24   And by serving here today, you're performing an incredibly

25   valuable public service.  You are literally giving life to the

1  Constitution and are the guardians of Congressman Fortenberry's
2  liberty just like any other criminal defendant.  So we want to
3  thank you for the sacrifice that's involved.  I know it's not
4  fun coming through L.A. traffic to get here at 8:00 in the
5  morning.  We know it involves you being away from your family
6  and your work and other obligations, so on behalf of the
7  Congressman, his family, our team, I want to start by thanking
8  you for your service on the jury.

9          Now let's talk about what this case is really about.
10 You heard some things from the prosecution team.  They
11 presented a very simple case.  According to them, the
12 Congressman was told something, he heard it, he understood it,
13 he knew it, he remembered it, and then later he intentionally
14 lied.  That is not what the evidence will show in this case.
15 That is not what happened.

16         Congressman Fortenberry is here defending himself
17 because he is absolutely and completely innocent of all of the
18 charges that have been brought against him in this case.  He
19 didn't lie to the agents ever.  He did not try to scheme.  He
20 did not try to conceal.  Precisely the opposite.  The evidence
21 will show that Congressman Fortenberry did everything possible
22 to cooperate, reasonably possible to cooperate with the agents.
23 They showed up at his house unannounced after a trip to Africa
24 and a day serving flooding in Nebraska, the likes of which had
25 not been seen in decades.  8:40 at night he agrees to meet with

them, for 40 minutes.  He goes and meets with them again for
two hours in Washington D.C.  He turns over emails,
information, lets them speak to his staff, waives the
attorney/client privilege so they can speak to his election
lawyer.  Congressman Fortenberry, what he did in this case is
the opposite of what someone does when they're sneaking and
hiding and concealing information.  He did his level best.

The reason we're really here is because the lead
prosecutors, the lead agents who investigated this case, and
ultimately this prosecution team, they refused -- they assumed
that he was lying.  They assumed on one call that one
statement, one very vague statement that they assume that he
heard it, it registered, he got it, and that he remembered it
almost a year later, nine months later, when they interviewed
him and 13 months later when the second interview occurred.
And they refuse to admit the very real possibility that he made
one small mistake about the details of the setup call that they
placed with him, which we'll talk about in some detail.  Now,
Congressman Fortenberry has made mistakes, he's made choices.
The biggest mistake was agreeing to speak to the officers who
set him up for this alleged crime.

Now, let's dig in.  You heard a lot of scary stuff
in the prosecution's opening statement, foreign names, Gilbert
Chagoury, foreign money, the cause.  Let's talk about
Congressman Fortenberry and how this all started.  Congressman

Fortenberry came -- was raised in a very modest home by a single mother.  His father died in a tragic car accident when he was 12 years old.  Despite his humble beginnings, he went on to be elected United States House of Representatives where he served honorably for 20 years.  From the very beginning of his service in Congress, he got appointed to the Foreign Affairs Committee and to the Middle East Subcommittee.  The Congressman was raised as a devout Catholic.  He cares deeply about those matters.  He even got a Master's degree in theology later in his educational career.  But Congressman Fortenberry, once again on the Congress, became very passionate about the rights of religious minorities throughout the world, partly Christians in the Middle East but other minorities, Muslims and others as well, and he became a champion for them in Congress.

Because of that, because of that, in 2014 when the group In Defense of Christians was formed, they befriended him. And the man you heard of, Toufic Baaklini, who started that organization became friendly with the Congressman.  The prosecution wants to put on a whole bunch of evidence that they were texting and communicating, make it sound real scary.  Yes, they became friendly.  They would have dinner, they would talk, they would text.  There's no dispute about that.  There's no dispute that the Congressman met a couple of times with Gilbert Chagoury.  Yes, he's not an American citizen.  He lives in Paris.  He was born, I believe, in Lebanon and as a Nigerian

1  citizen.  He's a billionaire and he was providing financial

2  support to In Defense of Christians and he decided to meet with

3  the Congressman.

4       The bottom line is that when we get to about 2016,

5  early 2016, they wanted to help the Congressman.  They decided

6  to do something very big for him.  It wasn't the Congressman's

7  idea, but they put on a series of events -- invited him to a

8  series of events here in Los Angeles.  This was the weekend of

9  February 20 to 21, 2016.  And the first of those events --

10 there were really two main events.  The first was a fundraiser

11 on the Friday night, and then there was a big luncheon the next

12 day, something called the Feast of Saint Marian.  And when the

13 Congressman went to the fundraiser, he had -- it's unclear if

14 he had ever met Dr. Ayoub before, maybe once briefly that he

15 didn't remember, but Dr. Ayoub, one of the co-hosts of the

16 fundraiser, picks him up at the airport, drives him to this

17 event.  It's a fundraiser at someone's home in Glendale.  And

18 it was being hosted at the home of Dr. and Ms. Nabil Khoury.

19 This is a photo from the event.

20       The Khourys looked like lovely people.  He was a

21 doctor.  They were perfectly nice.  There was nothing strange.

22 There were 40 to 50 people in attendance, including a Bishop of

23 the Catholic Church, Bishop Zidane, pictured on the left.  The

24 fundraiser seemed totally uneventful.  Dr. Ayoub was a doctor,

25 a medical doctor, of some notoriety.  And you will hear -- he

1  will testify and you will hear about his background, but a man

2  of some standing both in the medical community and the Lebanese

3  community here in Los Angeles.

4         And, importantly, every single person that

5  contributed at the fundraiser was required to fill out a

6  contribution card, putting down all the information required by

7  Federal law, their name, their information, so that that

8  information could be turned over properly to the Federal

9  Election Commission.  The Congressman even took a woman named

10  Alexandra Kendrick, a consultant who did fundraising for him,

11  took her there specifically so that she would be there to sit

12  there and collect all the cards and make sure everything was

13  taken care of properly.  And you'll hear in the evidence that,

14  despite all this talk of cash, you're going to hear the word

15  cash on these transcripts like you can't believe.

16         The Congressman and Ms. Kendrick never saw any cash.

17  Every single person that donated, that contributed, paid by

18  check or online.  Each check was from their own account.  There

19  was nothing that appeared out of the ordinary.  And the

20  Congressman properly disclosed each and every one of those

21  contributions in his Federal election disclosures, just as

22  required by law.

23         Now, before we move on to the other events, there

24  was something that happened after -- after the fundraiser,

25  after the other events that happened that weekend.  The

Congressman noticed -- he got a report of how things went at
the fundraiser.  He got the names and the amounts, and he saw
that there were a bunch of people that contributed that had the
last name Ayoub.  And they were large contributions.  They were
all legal, within the limits, but they were large.  So he
called Mr. Baaklini, the head of the IDC, because he had
instigated this and basically orchestrated it all.  He
called -- I'm sorry, he didn't call him; he spoke with him.
They were at an event, he spoke with him and he asked Mr.
Baaklini, he said, "I noticed that there are some people with
the same names.  Do I have anything to worry about?"  And Mr.
Baaklini said, "No, there's nothing to worry about."

Now, the next day, there was a Maronite mass.  This
is basically your standard Catholic mass but in the Lebanese
cultural tradition.  And the Congressman was invited, it was a
lovely affair, and then afterward they brought him to something
called The Feast of Saint Marian.  It's an annual celebration,
a Lebanese celebration, Catholic celebration.  There were lots
of important people from the church.  There were other
dignitaries.  And something very significant happened at this
event.  It was a lavish affair.  You know, it was at the
Beverly Wilshire Hotel, a very expensive place.  People all
seemed lovely.  The Congressman was awarded by Pope Francis, he
was inducted into the Order of Saint Gregory, one of the
highest awards that the Pope can bestow on a Catholic.  It

comes with incredible privileges, like the right to ride a
horse into any Catholic Church, including the Vatican.  It was
a big deal.  The Congressman was deeply honored.  And this had
all been instigated by the Bishop Zidane who was there and
probably some of these folks by the IDC.

Now, as I mentioned, the people that Congressman
Fortenberry met during this weekend all seemed like lovely
people.  They seemed to be people of great standing, Pius,
Christians.  Everything appeared to be on the up and up.  But,
as you know, looks can be deceiving, and it turns out by the
time of the 2016 fundraiser, that the FBI was already
investigating Dr. Ayoub and they were already investigating Mr.
Baaklini and Mr. Chagoury over in Europe.

But as we fast-forward the next couple of years, the
investigation starts to turn into a big nothing burger.  The
Government had spent years investigating this.  They had a very
audacious name, Operation Titan's Grip, and they were going to
get to the bottom of, you know, these violations of our Federal
election laws.  But turns out, despite all this work -- I mean,
they were tracing money, they were tracking people, they were
monitoring phone records.  They were even looking at a former
Attorney General of the United States.  They were connecting
the dots, doing this work for years.  Toufic Baaklini, you can
see here, is in the middle of it.

But by the spring of 2018, guess how many

prosecutions.  Zero.  Convictions?  Zero.  They had uncovered

only about $180,000 in illegal contributions over the course of

three different elections, some of Mitt Romney's Presidential

election in 2012, some to Darrell Issa's campaign in 2014.

He's a well-known Congressman from the San Diego area.  And

$30,000 to Congressman Fortenberry's campaign.  Operation

Titan's Grip was turning into much ado about nothing.

But then -- then Congressman Fortenberry, not

knowing that there had been any problem with that prior

fundraiser, he reaches out to Dr. Ayoub about doing another

fundraiser.  Now it's two years later.  As a Congressman, he

has to run for reelection every two years.  He asked for

another fundraiser, and this was a huge opportunity.  Special

Agent Todd Carter, who will testify later today, had been the

lead agent on this for years, and when Dr. Ayoub told him that

the Congressman had reached out, he saw this as the opportunity

finally for a big takedown.  So what he does is he has Dr.

Ayoub place a call to the Congressman.  You heard about that in

the prosecution's opening statement.

But there are some details that the prosecution left

out.  You see, when you hear that tape -- and you'll hear it --

it comes through loud and clear.  How could anyone possibly

miss what was said?  But the Congressman wasn't in the same

room as Dr. Ayoub and Special Agent Carter who had the script

and was telling Ayoub what to say when he was at his home in

1   Lincoln, Nebraska.  He had just gotten there from a week-long
2   trip to Finland and Estonia where he was dealing with issues
3   concerning Russia.  He's jet lagged.  He comes home.  They call
4   him on his cell phone.  They do nothing to test the quality of
5   his cell service.  They do nothing to see what is actually
6   being heard in his home.  They don't even know -- as far as I
7   know, they did no investigation to surveil or see where he was
8   when he got the call.

9         What we know -- and due to the passage of time, we
10  don't know exactly where he was or what he was doing.  We know
11  he was called on his cell phone.  We know that he was in or
12  around his home.  What we do know was he wasn't in Washington
13  D.C. on a land line with some fancy government telephone.  He
14  was at home -- this is a picture of his home office, and as you
15  can see, he was probably not in his home office.  His home
16  office is in the basement, it's in a corner, it's dark.  He
17  pretty much just uses it for storage.  And what you will hear
18  from the witnesses is that when he's home and he just does
19  fundraising calls, because they're not important, when he does
20  these, he walks around the house, does other things, cooks
21  breakfast, does chores, whatever.  So we know he probably
22  wasn't in a quiet office listening carefully, he probably
23  didn't have anything to write any notes on.  He gets this call.

24        And just to be clear about how it happens here, so
25  Dr. Ayoub and Special Agent Carter are in a room somewhere here

1    in Los Angeles.  We'll find out with Agent Carter this

2    afternoon.  We'll be discovering this together.  They have some

3    type of recording device.  What kind, we don't know yet, we'll

4    find out this afternoon, but I think the evidence will show, I

5    think we are going to find out that the recording was made in

6    that room, that there was some kind of recording device in that

7    room with Dr. Ayoub and Special Agent Carter.  The Congressman

8    isn't there, he's all the way over in Lincoln, NE, half a

9    continent away, on a cell phone.

10          And this is sort of overdoing it a little bit, but

11   just to be clear, Dr. Ayoub is speaking, it's going to his cell

12   phone, it's going halfway across the continent, it's coming out

13   of Congressman Fortenberry's iPhone 6, but what we don't

14   have -- what we have is what Dr. Ayoub said on that recording,

15   probably with the recording device right in front of him.  What

16   we don't have in this case is any evidence of what actually

17   comes out of the phone on Congressman Fortenberry's end of the

18   line.  The Government is going to have you assume that

19   Congressman Fortenberry heard every word that Dr. Ayoub said,

20   he heard and understood every word that Dr. Ayoub said, but

21   there's no real evidence of that at all.

22          Let's talk a little bit about what that -- what

23   you're going to hear on that tape of the call from Dr. Ayoub.

24   I'm going to show you the transcript.  The Government likes to

25   characterize it.  I'm going to show it to you.  You'll see

1    there was a routine fundraising call.  The Congressman -- Dr.
2    Ayoub calls the Congressman, they exchange pleasantries for a
3    few minutes.  This was a nine-minute call, most of which were
4    spent with pleasantries at the start.  Then out of the blue Dr.
5    Ayoub says -- he raises the fundraiser.  When we talked last
6    time, we talked about having a fundraiser for you.  You can
7    read all the words.  I'm just going to point out the gist of
8    it.  And he continues.  But we won't be able to donate as much
9    money as we did last time.  Okay.  That happens a lot.  No big
10   deal.  Then he says, because -- because last time, you know,
11   Toufic, he gave me $30,000 cash to give to your campaign, which
12   I agreed to do, you know.  I passed some of my friends -- I
13   asked some of my friends to donate that money, too, and so I
14   don't think I would be able to do that as much as last time.

15          Now, hearing it like that, it sounds like it could
16   be suggestive of conduit contributions.  But what if the
17   Congressman just didn't hear a couple of words?  The entire
18   meaning of that statement could have been lost.  What if he --
19   the connection wasn't perfect on his end?  What if he was
20   distracted?  What if he just wasn't paying attention?  You'll
21   hear evidence from multiple witnesses that he does these
22   fundraising calls on auto pilot and sometimes doesn't remember
23   anything afterward.  But the bottom line is we have one
24   statement -- there's only one statement in the entire record
25   where there's any suggestion of conduit contributions, and when

1  you really look at it, it's clear as mud.

2        We have to keep in mind there's a reference to cash.

3  The Congressman never got any cash.  His campaign never

4  received any cash.  And when Ayoub says, I asked some of my

5  friends to donate that money, too, well, what if the

6  Congressman didn't hear the word "that," I asked my friends to

7  donate money, too?  Nothing wrong with that.  When we continue,

8  Congressman Fortenberry never said anything to indicate that

9  he's heard the comment about conduit contributions, about the

10 money from Baaklini.  He says, well, there would be no

11 expectation of that type of funds and he moves on to talk about

12 doing something simpler, smaller, like a dinner.  If we

13 continue, they're going to say there are other statements, but

14 when we look at the other statements, what do we see?  All

15 Ayoub said is that someone gave him money to help him, to help

16 him, not the Congressman, to help him.  And that the money

17 probably came from Gilbert Chagoury.  Again, these are not

18 definitive, clear statements of conduit contributions or straw

19 man contributions.

20        MR. BUXTON:  Objection, your Honor.  Improper

21 argument.

22        MR. SUMMERS:  I'll move on, your Honor.

23        THE COURT:  It is sustained.

24        MR. SUMMERS:  Now let's talk about what happens

25 after the call.  After the call, the Congressman is concerned.

He did hear something.  There's no dispute about that.  The

Congressman does not deny that he heard something that had him

very concerned.  First thing he does -- apologies -- is he goes

and he speaks with his wife Celeste.  She'll be testifying in

this case later on.  He speaks with her, then he goes and he

speaks to his Chief of Staff Reyn Archer.  Then he goes and he

speaks -- he tries to reach out to Mr. Baaklini.  Mr. Baaklini,

though, has already been confronted by the FBI, and because his

lawyers told him not to say anything to anybody, he basically

says he's unavailable, so Congressman Fortenberry tried to get

additional information, he tried to do diligence with Mr.

Baaklini, and he was unable to do so.  So then he calls his FEC

attorney Jessica Furst Johnson, who may also testify today or

tomorrow.

         And, you know, it's very interesting, you'll hear

the evidence directly from her, but Congressman Fortenberry had

been sort of an annoying client to her because, of all things,

believe it or not, he would call her all the time with concerns

that she didn't think were of any significance.  And she sort

of treated him like the boy who cried wolf.  See, he called her

at an inopportune time.  She was down at the University of

Florida where she's an alum, she's on the alumni board, and she

was down there for an alumni event and she was literally

standing in Gainesville at the football stadium for this event.

It's late in the afternoon on a Friday, and she's eager to join

1  the festivities and she gets a call from, guess who, that

2  annoying guy who's always calling with minor issues that are of

3  no concern, and she basically blows him off.  She hears what he

4  has to say, but she just dismisses it because she assumed it

5  was just like his prior concerns that were of no significance.

6         Now, the prosecution indicated that Congressman

7  Fortenberry didn't return the money because he needed money --

8  he needed money for his campaign.  The evidence will show that

9  at the time of the call from Dr. Ayoub, he had more than

10  $1.5 million in his campaign coffers.  He didn't need $30,000.

11  If he had known what had happened, if he had heard that call

12  clearly, all he had to do was return the money, give it to the

13  Treasury, either one, and amend his FEC reports.  So the

14  prosecution will have you believe -- I don't want to argue.

15  You'll hear the evidence.

16         Now, after this call, what happens, I mean after the

17  call and his follow-up?  You know, Jessica Furst -- Ms. Furst,

18  the lawyer, it's important to note she doesn't tell him to do

19  anything.  She doesn't say you should amend, she doesn't say we

20  need to investigate, she performs no investigation.  She just

21  dismisses it like all of his other concerns in the past.  After

22  that, what happens?  Nothing.  For nine months, for nine

23  months, there's nothing, nothing, to suggest to the Congressman

24  that he needs to keep a record of that call or try to remember

25  that call.  What we see -- what we know instead is that the

1  Congressman didn't have the things you're going to have here.

2  What we're going to see here is that in this courtroom you're

3  going to hear the audio of that call over and over and over

4  again.  You're going to see the transcript of it.  Congressman

5  Fortenberry, during those nine months, had no recording of the

6  call.  He had no transcript of the call.  He had no notes of

7  the call, nothing.  And he had no reason to be concerned about

8  it because his election lawyer said, don't worry about it, it's

9  no big deal.

10          Now, the FBI could have made sure, they could have

11  made absolutely sure that he knew what was said and that he

12  remembered it.  All they had to do was have Ayoub send a little

13  follow-up email with the information in writing, a text.  There

14  was a lot of ways they could have made sure that he got the

15  message they were trying to give to him, but they didn't do

16  anything like that.  Instead, after nine months passes, Special

17  Agent Carter decides to ambush the Congressman.  You heard

18  about this interview in Lincoln --

19          MR. BUXTON:  Objection, your Honor.

20          THE COURT:  Sustained.

21          MR. SUMMERS:  You heard about this interview in

22  Lincoln.  Let me tell you some facts about this interview in

23  Lincoln.  Special Agent Carter and another agent named O'Leary

24  who was with the IRS, they show up in Lincoln the day after the

25  Congressman has now returned from a trip to Africa where he's

1   been dealing with anti-poaching issues and things of that

2   nature, to protect the elephants.  He comes back -- he comes

3   back late at night, he wakes up, and there's been all this

4   flooding in Nebraska.  He's immediately summoned to go out and

5   help deal with the flooding.  The agents show up at his door

6   unannounced.  He's not there.  His wife is.  They catch her by

7   surprise.  They start lying to her.  They lie about the nature

8   of their investigation.

9           MR. BUXTON:  Objection, your Honor.

10          THE COURT:  Less argumentative, please.

11          MR. SUMMERS:  Let me put it this way:  Before that

12   interview, Special Agent Carter went to get permission to

13   conduct it.  There are procedures you have to go through to go

14   and interview a sitting member of the United States House of

15   Representatives, and in the document in which they obtained

16   approval, they told -- they told us what they were planning to

17   do.  They told their superiors what their plan was.  Their

18   intention was not to get information about other people or to

19   try to develop the investigation so much as it was to indict

20   Fortenberry.  They wrote, "Case agents will also seek to indict

21   Fortenberry with misprison of felony and conduit contributions.

22   In addition, if case agents determine from the interview that

23   Fortenberry is making false statements, he will be charged with

24   false statements."  The purpose of this interview, so called

25   interview, was to get him.

1          So they show up at his house.  He's not there.  They

2     then make -- they place phone calls to him.  He's out dealing

3     with the flooding.  And in the voicemails -- you'll hear the

4     voicemails -- they lied about where they're from.  Agent Carter

5     says he's out of the Omaha office.  He's really from Los

6     Angeles and he's calling on a Los Angeles number.  He says that

7     it's a background investigation with a national security

8     component.  He wants to keep it kind of low key, but he also

9     wants to raise national security as a ruse so that the

10    Congressman will feel compelled that it's a very important

11    matter that he has to talk to them right away.  If they wanted

12    information, they could have just met him somewhere for a nice

13    interview in D.C.  This was in purpose -- I'll move on.  You

14    get the point.

15         Now, one thing that's very important, before we get

16    to what happens during this interview...  Sorry about this.  At

17    the very beginning of the interview, it gets off to a very,

18    very bad start.  The Congressman is very upset.  He's tired.

19    He feels that his wife has been ambushed, you know, upset.  The

20    agents have been lying.  He's very suspicious.  It's so bad

21    that he even has the local police come to be present during the

22    interview.  They get off to a very rough start.  He gives

23    Special Agent Carter a hard time.  But eventually he sits down

24    and he gives them the interview that they've requested.  He

25    tries to do his best, even though he tells them he's not in the

1  right frame of mind.  And let's look at what happens in that

2  interview.

3          The Government has suggested that the Congressman

4  was evasive and he didn't want to tell the officers about the

5  call with Dr. Ayoub.  And that is not -- sorry about that.

6  It's technical.  That is not what happens.  The agents actually

7  don't ask questions about the call from Dr. Ayoub.  They ask

8  vague questions sort of beating around the bush of it.  And

9  they ask about Gilbert Chagoury, and in response, the

10 Congressman volunteers, there was a comment made that we would

11 have to ask Gilbert along the way, but I don't know what that

12 meant.  He makes clear that the comment was in relation to the

13 L.A. event.  And he continues to say that he thinks it was Dr.

14 Ayoub.  This interview starts at 8:40 P.M.  It's late at night.

15 They haven't asked a question directly about Dr. Ayoub and --

16 about this call from Dr. Ayoub, and the Congressman is

17 volunteering information about it.

18         Then what happens is the agents start asking the

19 Congressman to answer vague questions about whether he's aware

20 of illegal contributions, whether he knows of any.  And what

21 does he say in response to their questions?  He says, now,

22 remember, I was at an event out in L.A. with that community.

23 He goes back to the events in Los Angeles and the comment from

24 Dr. Ayoub.  And every time he does, the agents actually cut him

25 off and change the subject.  They try to get him to answer yes

1    or no questions, vague yes or no questions whether he's aware

2    of illegal contributions.

3           Here's an instance you'll see and hear when we go

4    through this transcript:  And the Congressman is now -- again,

5    this is the very next line.  He's been talking about the event

6    in L.A.  He's trying to get there and he says, again, if

7    there's money underlying that, he's trying to get to it, and

8    Agent Carter cuts him off and says, "You either would know or

9    you don't know.  I mean, that's the way I would view it, right,

10   Jim?  That's right.  We're just asking what you know.  Yes."

11          MR. JENKINS:  Objection.

12          THE COURT:  Hold on, Counsel.

13          MR. BUXTON:  Objection.  Improper argument.

14          THE COURT:  Counsel, this is varying quite a bit

15   into argument.

16          MR. SUMMERS:  I'll respectfully submit when you see

17   the transcript, you will see that they try to push him into yes

18   or no answers and they don't want him to talk about the call

19   with Ayoub.  When he gives answers that aren't yes or no, they

20   say, that was a no, right?  And there's one example that I

21   think is very, very telling.  At another point he's asked --

22   you can see in the very top line, "So do you have any

23   knowledge" -- they're asking over and over again these very

24   vague questions.  "So do you have any knowledge about illegal

25   campaign contributions?"  Again the Congressman goes right back

to it.  "There were a couple of people -- there were a couple
of people connected to the broader community.  I was at two
events.  One was a fundraiser."  He's talking about the events
in L.A.  And you can see he throws in, "That's all publicly
listed who gave."  That's one of the alleged -- there's another
statement similar to that.  That's one of the alleged false
statements.

And Agent Carter then cuts him off.  "Okay.  And
that's what we're talking about.  We're not" -- and the
Congressman continues, "One of whom was Ayoub at the Lebanese
gathering."  The Congressman is trying to talk about what they
say he withheld, and the agents are cutting him off.  And now
Agent O'Leary jumps in to save the day, to cut off Congressman
Fortenberry.  He says, "For -- for my background, you were
talking two events and you -- we might have covered this, but
the two events, when did they occur?"  He changes the subject
from what was discussed to when.  And I'd like you to listen to
this.  It's very telling.

(Audio playing.)

MR. SUMMERS:  Did you hear -- you can hear the
urgency, the need to cut in and stop him before he continues
talking about Ayoub.  And then you'll see that after that,
after a couple more questions, a few questions from Agent
O'Leary, Agent Carter changes the subject.  The Congressman
keeps trying to go to the call from Ayoub, and they change the

1  subject to essentially whether he's ever been bribed.

2      Now, after that incident in Nebraska, the
3  Congressman reflects, and just everything seemed very odd to
4  him.  You know, it did not go well because he was angry and it
5  was late, and it dawns on him that he was trying to talk about
6  those events and the agents never really gave him a chance.  So
7  he speaks to the lawyer.  They agree -- they volunteer to visit
8  with the agents again and provide any additional information
9  they would like, and ultimately another interview is arranged
10 in Washington D.C. at a law office.

11     So at this meeting you have the Congressman, his
12 lawyer Trey Gowdy, who was then a retired or former member of
13 Congress, and we had Special Agent Carter and Mack Jenkins, the
14 lead prosecutor in this case, and some others.  They get
15 together in a room.  The Congressman answers their questions
16 for two hours.  He answers every question they present to him.
17 He doesn't withhold anything.  He is very forthcoming.  He
18 tells them exactly what he heard on -- and remembered from that
19 call with Dr. Ayoub.  I'll show you some of what he says.
20 These are the actual questions and answers on a transcript of
21 that interview.  He's asked about whether there was discussion
22 of another fundraiser with Dr. Ayoub or Dr. Khoury, and he
23 volunteers, "Well, I did have that conversation with Dr. Ayoub
24 in 2018.  We did have that conversation."  He continues that
25 he -- he said, basically, I'm not really that clear on the

1    exact words, but he said, as I recall, the amounts wouldn't be
2    as large because Gilbert won't be involved.  He mentions the
3    name of the foreign national in connection with the fundraiser,
4    makes clear it's in connection with the fundraiser, and he says
5    that he was concerned about it.  Continues, he said he would
6    ask -- have to ask Gilbert.  "I remember it as him saying the
7    amounts won't be as large."  This was the Congressman telling
8    them what he remembers about the call.

9           MR. BUXTON:  Objection, your Honor.  Improper
10   argument.

11          THE COURT:  I'm going to give you a little more
12   leeway, but please be mindful this does sound a lot like
13   argument.

14          MR. SUMMERS:  And the Congressman continues to tell
15   them that it caused him concern, specifically concern that
16   Gilbert Chagoury was somehow involved in the fundraiser.  The
17   reason we're here is that after all of that, Mr. Jenkins, who's
18   sitting right here, Mr. Jenkins decided to ask a very specific
19   question.  He said, "Okay, during that conversation, did Dr.
20   Ayoub tell you that Toufic Baaklini had given Dr. Ayoub $30,000
21   cash to help fund your fundraiser?"  And the Congressman said,
22   "No."  The Congressman said no because that's not what he
23   remembered of the call.

24          MR. BUXTON:  Objection, your Honor.

25          THE COURT:  Sustained.

1          MR. SUMMERS:   The important thing to remember, what

2    you'll see from the evidence, what you'll see from the

3    evidence, is that the agents and the prosecution team tried to

4    create -- tried to set up a test of honesty.   The prosecution

5    team used the word test.   They tried to set up a test of

6    honesty at these two interviews, and they concluded that the

7    Congressman had failed that test for honesty, but in reality,

8    what they created was a failed memory test.   They tried to

9    put -- plant some information on him in June of 2018, but they

10   did it with a cell phone and no way to make sure that he was

11   hearing and paying attention and remembering.   Then they waited

12   months, giving him no opportunity, no way to recall exactly

13   what was said, and then they asked him a very specific question

14   and they got him.

15          As the judge explained to you yesterday, this is a

16   criminal case.   Congressman Fortenberry is presumed innocent.

17   You may convict him of these charges only if you find each and

18   every element to have been proven beyond a reasonable doubt.

19   So as you listen to the evidence, I'd like to ask you to

20   consider not whether you think it's more likely or less likely

21   that he -- that he made a false statement, but whether the

22   evidence excludes any reasonable possibility that he didn't

23   hear it correctly, that he didn't hear every single word, that

24   he didn't understand it exactly the way it was intended, or

25   that he just didn't remember it so many months later.

1          Now, I respectfully submit when you hear all the

2  evidence, you will see that those are all reasonable

3  possibilities.  When I sit down, the prosecution will get to

4  put on its case.  They get to call their witnesses first.  We

5  get to cross-examine, but we don't get to call any of our

6  witnesses until they're done, so I'd ask you to please just

7  keep an open mind, be patient, refrain from making any

8  judgments until you hear from us, and I can assure you we're

9  going to have several witnesses and a lot to say.  So thank you

10 for your time.

11         THE COURT:  We are going to take our morning break.

12 It is now 9:44.  We're going to break until 10:00.  And just a

13 reminder, we're going to take, generally when we're going from

14 8:30 to 2:30, approximately three breaks, two or three,

15 depending, one in the morning at about 15 minutes, then we'll

16 break about 12:00 or 12:30, thereabouts, for 30 minutes and

17 then maybe another afternoon break.  So please just make sure

18 that you're mindful of that and that you prepare for that.  So

19 please make sure that you don't speak to anyone about the case,

20 the people, or the subject matter.  You're not allowed to

21 communicate with each other when you are together or anyone

22 else with respect to this case.  And I remind you of what I

23 told you yesterday, that if you do obtain any information about

24 this case from any source other than what's inside this

25 courtroom, you are duty-bound to disclose it to the Court.  So

1   if you do have any information that you have received, please

2   let my courtroom deputy know, and she'll communicate with me,

3   and then I will have a discussion with you.  So enjoy the

4   break.  We'll see everyone in 15 minutes.

5            (Jury out.)

6            THE COURT:  And we are in recess until 10:00.

7            (Recess from 9:46 a.m. to 10:09 a.m.)

8            (Jury in.)

9            THE COURT:  Back on the record in United States

10  versus Jeffrey Fortenberry with all present who were present

11  before the break, including the jury.  And we will now begin

12  with the Government's case-in-chief.

13           Mr. Jenkins, call your first witness, please.

14           MR. JENKINS:  Yes, your Honor.  The Government calls

15  Special Agent Todd Carter.

16                SPECIAL AGENT TODD CARTER,

17  called as a witness by the Government, was sworn and testified

18  as follows:

19           COURTROOM DEPUTY:  Would you please state and spell

20  your full name and title for the record.

21           THE WITNESS:  Todd M. Carter, T-O-D-D, M,

22  C-A-R-T-E-R.  Supervisory Special Agent with the FBI.

23           COURTROOM DEPUTY:  Thank you.

24           THE COURT:  And do please make sure that you're

25  speaking into the microphone.  Adjust the microphone or your

1    chair, if you would kindly do so.

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  Thank you.

4              Mr. Jenkins, you may inquire.

5              MR. JENKINS:  Thank you, your Honor.

6                        DIRECT EXAMINATION

7    BY MR. JENKINS:

8    Q.    Good morning, Special Agent Carter.

9    A.    Good morning.

10   Q.    Could you just repeat your job and title for the jury?

11   A.    I'm a Supervisory Special Agent.

12   Q.    For which agency?

13   A.    Oh.  For FBI.

14   Q.    And what are your current assignment and responsibilities

15   as a Supervisory Special Agent with the FBI?

16   A.    Currently, I'm assigned to Internal Affairs with the FBI,

17   investigating employee misconduct matters, supervising other

18   supervisors in investigating those matters as well.  And I

19   assist the DOJ OIG, Department of Justice, Office of Inspector

20   General, in investigating our employees for criminal matters.

21   Q.    How long have you been employed by the FBI?

22   A.    About 18 years.

23   Q.    Coming up on retirement?

24   A.    Yes, I am.  Eligibility, actually.

25   Q.    Let's outline for the jury your prior assignments and

1   approximate time frames in those 18 years at the FBI.

2   A.     Well, from 2004 to 2010, I worked counterintelligence and

3   espionage in Long Beach.   From 2010 to 2013, I was in West

4   Covina.   These are different locations for the FBI, just for

5   the jury's clarity, even though the FBI's all Los Angeles.   So

6   in West Covina, once again I worked public corruption and civil

7   rights from 2010 to 2013.   I was promoted to a Supervisory

8   Special Agent working counterintelligence.   I was the

9   counter -- I was the program coordinator, so what that is, the

10  coordinator develops the overall counterintelligence strategy

11  for the L.A. office.   And I maintained the counterintelligence

12  budget.   And I did that from 2013 until 2014, when I had the

13  opportunity to return to Long Beach, so I stepped down as a

14  supervisor to go to Long Beach again, 2014 to 2020, to work

15  public corruption and civil rights.

16  Q.     What happened in 2020 and what was your next assignment

17  starting in 2020?

18  A.     Well, before that, in 2020, I was actually overseas for a

19  little bit before it got curtailed.   So from January 2020 to

20  March 2020, I worked international corruption, working with the

21  South African police and their prosecuting authority

22  investigating corrupt activities of Jacob Zuma, the former

23  President.

24         And then I was promoted once it was curtailed, I was

25  promoted to FBI headquarters to the Internal Affairs section.

**55**

1  And that's where I currently am.

2  Q.    And when you say it was curtailed in 2020, your

3  assignment in South Africa --

4  A.    It was due to Covid.

5  Q.    Special Agent Carter, just let me finish my question for

6  the benefit of the court reporter and the jury.

7          After Covid caused the curtailing of that

8  assignment; is that correct?

9  A.    That is correct, yes.

10 Q.    Prior to the FBI, where were you employed?

11 A.    Do you want me to go through a timeline or...

12 Q.    You can start just in your basic professional career.  We

13 don't need the entire resume, just the highlights, please.

14 A.    From 1991 to '96, I enlisted in the Navy.  I was a naval

15 intelligence specialist.  I served in the Gulf War.  From '97

16 to 2002, I was a CIA officer serving in Middle East and in

17 Eastern Europe.  And then in 2002, I received a direct

18 commission as a reserve naval intelligence officer and I worked

19 at the Joint Intelligence Center Pacific working Middle Eastern

20 terrorists in terrorism.  And then I joined the FBI.

21 Q.    During that history you just described, did you ever work

22 in Lebanon?

23 A.    Yes, I did.

24 Q.    When was that?

25 A.    That was in 2000 when the USS Cole was hit.

1  Q.    Was that during your time with the CIA?

2  A.    Yes, I was.

3  Q.    Now, focusing on 2015, you're at the FBI.  What is your

4  specific assignment and location in 2015 with the FBI?

5  A.    In 2015, I was assigned to the Long Beach Resident

6  Agency.  That's where I was assigned working public corruption

7  and civil rights.

8  Q.    And while investigating public corruption and civil

9  rights in Long Beach, can you give us a little more specificity

10 about what those investigations looked like, what type of

11 investigations?

12 A.    Those investigations included investigations into

13 bribery, Federal bribery; honor services fraud; then FARA

14 violations as well, Foreign Agents Registration Act,

15 investigations; civil rights, which included, you know,

16 police -- when police abuse people.  I did one of those.

17 Q.    Let me ask you a more specific question.  Thank you for

18 that background.  Did that also include investigations of the

19 Federal Election Campaign Act or violations of that act?

20 A.    Yes, it did.

21 Q.    Is that also known as -- the Federal Election Campaign

22 Act also called FICA?

23 A.    It's called FICA.  We call it election fraud, but yes.

24 Q.    Okay if we go with FICA for the purposes of this

25 examination?

A.     Yes.

Q.     Approximately how many years have you been investigating FICA crimes?

A.     Approximately seven.

Q.     What types of training have you had as an FBI agent in investigating FICA crimes?

A.     Well, other than on the job, I've attended seminars virtually.  There's a four-hour seminar that details out what FICA crimes are.  I've reviewed the statutes as well.  It's something you do with any crime with the FBI, you evaluate the statutes so you can fulfill the elements of those crimes and present that evidence.

Q.     Is there training at Quantico, the FBI training center, for FICA-type crimes?

A.     They cover it in brevity.  A lot of your training at Quantico is just basic.  You do most of it on the job.

Q.     Most of that training is on the job?

A.     Yes.

Q.     Generally speaking, what types of limitations does FICA put on Federal election campaigns?

          MR. SUMMERS:  Your Honor, objection.  Foundation.

          THE COURT:  Sustained.

BY MR. JENKINS:

Q.     You mentioned that you reviewed the laws and statutes as part of your FICA investigations, correct?

1  A.    Yes, I did.

2  Q.    And are those laws and statutes available on publicly

3  available government websites?

4  A.    Yes, they are.

5  Q.    Now, turning to FICA, the Federal Election Campaign Act,

6  what types of legal limitations does FICA place on campaigns

7  for Federal officials?

8            MR. SUMMERS:  Your Honor, again objection.  He

9  shouldn't be instructing the jury on the law and he's not a

10  legal expert.

11            THE COURT:  I'm going to sustain it but not on those

12  grounds.  The reason I sustained it previously is it's a bit

13  vague.  Why don't you go directly to what I don't think is

14  necessarily controversial here, but I'll hear from Mr. Summers

15  if it is.

16  BY MR. JENKINS:

17  Q.    Are you aware of the Federal Election Campaign Act

18  putting limitations on the amount individuals can donate?

19  A.    Yes, I am.

20  Q.    And what's the basis for that knowledge?

21  A.    The basis is the FEC -- FEC has a website, FEC.gov, and

22  on that website you can review it and it also has the statute.

23  The statute went from Title 2 to Title 52, and in those

24  statutes it explains who can contribute.

25  Q.    And is that from an official publicly available

1  government website?

2  A.    Yes, it is.

3  Q.    And does that same website provide limitations on who can

4  donate?

5  A.    Yes, it does.

6  Q.    And does it document certain -- does it require certain

7  documentation requirements on when people donate?

8  A.    Yes, it does.  It's called the FEC's Schedule 3.  It

9  comes in A.  That's where the donors are, and then Schedule B

10 are the disbursements.  It's all one FEC-3 form, but you can

11 look it up on the website, Google names of donors, where the

12 campaigns, the years.  It's very user friendly.  It's publicly

13 available.

14 Q.    You mentioned, I think, in that answer a reference to the

15 Federal Election Commission, or FEC?

16 A.    Yes.

17 Q.    As part of your FICA investigation, did you become

18 familiar with the function of the FEC, or Federal Election

19 Commission?

20 A.    Yes, I did.

21 Q.    I want you to walk the jury through some of those

22 documents.  And you have a witness exhibit binder, I think, to

23 your right behind you.  If you could take a moment, Special

24 Agent Carter, and look at the following exhibits:  Let me do it

25 this way:  We're going to be talking about Exhibits 3, 4, 5, 6,

1  7, 8, 9, 10.  Or I could have said 3 through 10.

2         MR. SUMMERS:  Your Honor, objection.  These are all

3  hearsay documents.

4         THE COURT:  Let me see if there's a foundation

5  before I hear an objection, please.  So go ahead and first try

6  to lay a foundation, and then I'll hear if there's an

7  objection.

8         MR. JENKINS:  Certainly.

9  BY MR. JENKINS:

10 Q.    Special Agent Carter, in preparation for your testimony

11 in trial, did you look at Government's Exhibits 3 through 10?

12 A.    Yes, I did.

13 Q.    And are all of those documents publicly available from a

14 government official website at the FEC.gov?

15 A.    Yes, they are, they're publicly available.

16 Q.    And are you familiar with all of those documents based

17 off your review of the FEC.gov?

18 A.    Yes.

19        MR. JENKINS:  Your Honor, we would ask to admit and

20 publish Exhibits 3 through 10.

21        THE COURT:  Any objection?

22        MR. SUMMERS:  Same objection, your Honor.  And

23 also --

24        THE COURT:  And this is on a hearsay objection?

25        MR. SUMMERS:  Hearsay, 403, and foundation as to --

1              COURTROOM DEPUTY:  Counsel, into the microphone.

2              MR. SUMMERS:  Yes.  Hearsay, 403, and foundation.

3              THE COURT:  Establish a little bit more of a

4    foundation.  You're handling these en masse, and I understand

5    that, but be a little bit more specific with respect to the

6    foundation and the relevance of these documents, please.

7              MR. JENKINS:  Certainly.

8    BY MR. JENKINS:

9    Q.    If you could turn to Exhibit 3, titled "Contribution

10   Limits."  Do you have that before you?

11   A.    I do.

12   Q.    Have you reviewed Exhibit 3 titled "Contribution Limits"?

13   A.    Yes, I have.

14   Q.    Where does it come from?

15   A.    It comes from the FEC website, FEC.gov.

16   Q.    And again is that an official government web site?

17   A.    Yes, it is.

18   Q.    As part of your job investigating FICA crimes, do you

19   investigate violations of contribution limits?

20   A.    Yes, I do.

21   Q.    As part of your role in the investigation that we'll get

22   to in this case, did you investigate potential violations of

23   contribution limits?

24   A.    Yes, I did.

25              MR. JENKINS:  Your Honor, I'd move to admit

**62**

1  Exhibit 3.

2          MR. SUMMERS:  Your Honor, same objections, but I

3  would add there's an issue here, you know, these purport to

4  state the law.  The law is what the law is, and the Court can

5  instruct.  And we're happy to stipulate what the laws were --

6          THE COURT:  Is there a dispute as to whether these

7  documents accurately reflect it?

8          MR. SUMMERS:  Yes.  I think there is a lot of

9  content in these documents that is not necessarily reflective

10 of just the law.

11         THE COURT:  I'm going to sustain the objection at

12 this point.  You could refer to the items that are not in

13 dispute at this point, and we'll sort this out during a break.

14 BY MR. JENKINS:

15 Q.   Special Agent Carter, if you could look at Exhibit 9,

16 which is entitled "FEC mission and History."

17 A.   I'm at Exhibit 9.

18 Q.   And have you reviewed that document as well?

19 A.   Yes, I have.

20 Q.   Generally, what's your understanding of the mission of

21 the FEC?

22 A.   The FEC is a quasi --

23         MR. SUMMERS:  Your Honor, I'm going to continue to

24 object on grounds of 403 hearsay foundation.  There's no

25 dispute in this case about what --

1    THE COURT:  Remember, no speaking objections.  The

2  objection is overruled.  Please proceed.

3  BY MR. JENKINS:

4  Q.    Please proceed, Special Agent Carter, in explaining,

5  what's your understanding based off your training and

6  experience in FICA investigations what the FEC's mission is?

7  A.    Generally, their mission -- it's a quasi government

8  agency to oversee fair and balanced elections.  So they provide

9  the public the ability to see who's donating to whom and how

10  much so that it's -- it's pretty much, in my opinion, the

11  pillar of our democracy.

12  Q.    Special Agent Carter, is that sometimes just referred to

13  as election integrity?

14  A.    Yes, it is.

15  Q.    And we talked about contribution limits, and you're

16  familiar with contribution limits as it relates to Federal

17  election campaigns?

18  A.    Could you please repeat that?

19  Q.    Are you familiar with the existence of contribution

20  limits for Federal --

21  A.    Yes.  Yes, I am.

22  Q.    And, generally speaking, let's focus specifically on the

23  time frame 2016, did you review the FEC website to identify

24  what the contribution limits are for an individual who wants to

25  donate to a Federal campaign?

**64**

1    A.    Yes.  During -- yes, I did.

2    Q.    And according to your view of the publicly available

3    official government website, FEC.gov, what is that individual

4    limit?

5    A.    Well --

6    Q.    In 2016?

7    A.    2016, it was 2,600, I believe.

8    Q.    Special Agent Carter, can you look at Exhibit 3, Page 3.

9          MR. SUMMERS:  Your Honor, just to -- just for the

10   record, can we ask for a continuing objection to these

11   questions?  I'm not even sure the answers are going to be

12   accurate, and I just want to do it --

13         THE COURT:  No.  You'll need to object.  I'm not

14   sure what the continuing objection would be.

15         Please continue, Mr. Jenkins.

16   BY MR. JENKINS:

17   Q.    If you can look at -- we'll just move to Exhibit 4.  If

18   you could look at Exhibit 4.

19   A.    4?  I'm on Exhibit 4.

20   Q.    Thank you.  You previously testified that there were

21   limitations or rules and laws related to documenting who

22   donates, correct?

23   A.    Yes.

24   Q.    Are you familiar with the term that's sometimes referred

25   to as conduit donations?

1  A.     Yes.  They're also referred to as a straw donor.

2  Q.     And are you familiar with that based off your

3  investigation into FICA crimes?

4  A.     Yes.

5  Q.     In the context of FICA crimes, what is a conduit donor?

6  A.     Well, a conduit donor is someone who donates in the name

7  of another, meaning one person gives that person money or

8  reimburses them for their campaign contribution, but it's not

9  in their name; it's in the giver of that -- of that donation.

10 So I don't know if I'm being clear, but...

11 Q.     And let me ask you this question:  When the FEC requires

12 filings, do they require the name of the true donor whose money

13 is being used to make that donation?

14 A.     Yes, it does.

15 Q.     And you mentioned that the use of a conduit donor is

16 illegal, correct?

17 A.     That's correct.

18 Q.     And so what is the -- how does the conduit donor violate

19 the laws according to who the true donor is?

20 A.     Well, now they're filing falsely that that's the donor,

21 and that person is not the donor; it's the giver that gave the

22 money to that donor.

23 Q.     Do you also call that a straw donor?

24 A.     The straw donor, yeah, if I'm going to use that term, a

25 straw donor.

1  Q.    Based off your investigations, what are some of the

2  concerns about someone conducting a conduit contribution or

3  being a straw donor?  What are some of the concerns about that

4  in a FICA investigation?

5  A.    Well, other than being illegal, you have to think about

6  what the intent was behind it and --

7  Q.    Let me ask you a more specific question.  When you're

8  investigating public corruption and election crimes, are you

9  trying to identify who the true donor is for campaign

10  contributions?

11  A.    Yes.

12  Q.    And when you're investigating FICA crimes, Federal

13  Election Campaign Act crimes, can that sometimes implicate

14  other Federal crimes?

15  A.    Yes.  And I've had experience with this.

16  Q.    How so?  What other -- first, what other crimes can it --

17  A.    What other crimes?  It could be bribery; gratuities; quid

18  pro quo, something meaning for an official act.  So if you pay

19  a bribe, that bribe is actually for an official act, either

20  past or future.  Same with the gratuity.  It could be for an

21  act that happened before or after.  In addition, the act of

22  conspiracy.  We're talking just terms what I would

23  investigate --

24            MR. SUMMERS:  Your Honor, objection.  403.

25            THE COURT:  I'm going to sustain as a narrative at

1  this point.

2        MR. JENKINS:  May the prior answer stand, your

3  Honor?

4        THE COURT:  It does stand.

5  BY MR. JENKINS:

6  Q.    And, Special Agent Carter, if you can just listen to my

7  question as best you can and try and answer it as succinctly as

8  possible, and I'll do a better job of asking questions that

9  allow you to do that.

10       Based off your review of the FEC.gov website and

11  your investigating FICA crimes, is it illegal for a candidate

12  to knowingly receive conduit contributions?

13  A.    Yes, it is.

14  Q.    Now, you also testified earlier about who can donate or

15  limitations and laws on who can donate, correct?

16  A.    Yes, I did.

17  Q.    Is it legal or illegal for foreign nationals to donate?

18  A.    It's illegal for a foreign national to donate to Federal

19  elections.

20  Q.    And what is that knowledge based on?

21  A.    Not only from the statute but from investigating and the

22  FEC website as well, but it's generally accepted as the law.

23  Q.    Have you investigated foreign nationals donating to

24  campaigns?

25  A.    Yes, I have.

1  Q.    What is your understanding of the FEC's definition, from

2  your review of its website, what is a foreign national in terms

3  of the FEC's definition?

4  A.    A foreign national is not a U.S. citizen --

5          MR. SUMMERS:  This is where I'm going to make the

6  403, -- I'm sorry -- the foundation objection, and he's turning

7  into a legal expert now on FEC.

8          THE COURT:  I need just an objection and the legal

9  ground.  And the objection is overruled.

10  BY MR. JENKINS:

11  Q.    And I'll repeat my question if I can remember it.

12  A.    Thank you.

13  Q.    I believe it was, according to the FEC's publicly

14  available official government website, what is a foreign

15  national?

16  A.    A foreign national is not a U.S. citizen and not a

17  permanent resident.

18  Q.    Is it illegal for a candidate or his campaign to

19  knowingly receive donations from a foreign national?

20  A.    Yes, it is.

21  Q.    And I want to back up one step.  You had mentioned other

22  investigations related to FICA that you had participated in,

23  correct?

24  A.    That's correct.

25  Q.    And you mentioned bribery, correct?

1  A.    Yes, I did.

2  Q.    Do you have an -- have you investigated examples of

3  campaign contributions and bribery?

4  A.    Yes, I have.

5           MR. SUMMERS:  Objection.  403, your Honor.

6           THE COURT:  Overruled.

7  BY MR. JENKINS:

8  Q.    And just briefly, in a couple of sentences, what do you

9  mean you've investigated -- what was the context of that

10 investigation --

11 A.    Well, we did an undercover operation and we purported

12 ourselves to be the foreign entity, the foreign national, and

13 we paid a bribe to a political action committee.

14 Q.    And what --

15 A.    In the name of the contribution, an illegal campaign

16 contribution, but it was a bribe in the form of an illegal

17 campaign contribution.

18 Q.    Thank you, Special Agent Carter, but if you could

19 continue to let me finish my question, even if you can

20 anticipate it, it will help everyone.

21 A.    My apologies.

22 Q.    Does the FEC, from your review of the publicly available

23 website, does it outline a lot of these -- these prohibitions?

24 A.    Yes, it does.

25 Q.    Are there sections entitled "Who can contribute" and "Who

1  can't contribute"?

2  A.    Yes.

3  Q.    Now, from your review of that website and your

4  experience, are these FEC filings, the filings a campaign must

5  do, are they publicly available?

6  A.    Yes, they are.

7  Q.    Who is in charge of providing a political candidate's

8  donation information to the FEC?

9  A.    Ultimately the candidate.

10 Q.    And does -- you mentioned they are publicly available,

11 these FEC filings.  Are they also available to law enforcement?

12 A.    Yes, they are.

13 Q.    Could members of the public or law enforcement review,

14 for example, from these filings, who was donating to a

15 particular campaign?

16 A.    Yes.

17 Q.    And could members of the public or law enforcement review

18 these filings to determine how much people were donating?

19 A.    Yes.

20 Q.    And just briefly, how would they do that?

21 A.    Well, it has a search category where you can search for

22 the name of the donor or the year of the campaign, when it

23 occurred, if you suspect when it occurred, an illegal campaign

24 contribution.  And you can go right to the campaign.  They file

25 them quarterly and they do amendments.

1  Q.    And can a candidate or their campaign amend their public

2  filings?

3  A.    As I previously stated before about amendments, yes.

4  Q.    Are those amendments also viewable to the public?

5  A.    Yes, they are.

6  Q.    Is your testimony up to this point based off review of

7  exhibits that we earlier identified?

8  A.    Yes, it is.

9           MR. JENKINS:  And, your Honor, just so I'm clear,

10 are we reserving admission to a later point?

11          THE COURT:  We are.

12          MR. JENKINS:  Thank you.

13 BY MR. JENKINS:

14 Q.    But we'll still continue on the topic of FEC, but now I

15 want to move to guidance -- let me ask this question:  Does the

16 FEC's official government website provide instructions about

17 what one is to do when a campaign receives a questionable

18 contribution?

19 A.    Yes, it does.

20 Q.    And are you familiar with the term disgorged

21 contributions or disgorgement of contributions?

22 A.    Yes, I am.

23 Q.    And just in a few words, what does disgorged

24 contributions mean?

25 A.    It means to take them out, remove them.

1  Q.    And in the context of campaign contributions, what does

2  that mean?

3  A.    Well, in terms of campaign contributions, it is you take

4  it out of your campaign because it's not supposed to be there.

5  Q.    And does the FEC, based off your review of this same

6  website, require specific reporting requirements when a

7  campaign disgorges contributions it suspects as illegal?

8  A.    Yes, it does.  It has --

9            MR. SUMMERS:  Objection, your Honor.

10            THE COURT:  What is the legal ground?

11            MR. SUMMERS:  Foundation and legal -- expert

12  testimony on the law and what the trigger is.

13            THE COURT:  Overruled.

14  A.    Could you please repeat that question?

15  BY MR. JENKINS:

16  Q.    Yes.  Does the FEC.gov publicly available government

17  official website describe what a candidate or a campaign is to

18  do when they have suspected that they've received an illegal

19  campaign contribution?

20  A.    Yes.  There is specific guidance to that.

21  Q.    And from your review, does that guidance include specific

22  reporting requirements?

23  A.    Yes, it did.

24  Q.    And where did those -- what are those reporting

25  requirements, based off your review of that website?

1  A.     The reporting requirements are, first, that you have to

2  send a memo and describe the contribution if it's suspected to

3  be illegal, or illegal.  That's first.  And then they have to

4  amend their schedule, the FEC-3 Schedule B, and in several

5  parts where they have to put that it was disgorged and the

6  purpose of why it is disgorgement.  They can either send it to

7  the Treasury or back to the donor.

8  Q.     And when you provide -- when you take that money out of

9  your campaign and put it somewhere else in the form of a

10 disgorgement, are there forms where you must to identify that

11 purpose?

12 A.     Yes, you do.  That's the FEC-3, from my recollection.

13 That's the Schedule B.

14 Q.     Does the same FEC.gov website talk about how a campaign

15 must document publicly when it does that, meaning when it does

16 a disgorgement?

17 A.     If you're referring to a time -- timing, yes.  Timing --

18 it does have a timing requirement, if I'm understanding your

19 question correctly.

20 Q.     Let's focus on the reporting requirement.

21 A.     Okay.

22 Q.     You mentioned that there's -- you have to put a specific

23 purpose of disgorgement, I believe?

24 A.     Correct.

25 Q.     Where do those forms go, the forms you're talking about?

**74**

1  A.    Those forms get filed with the FEC.

2  Q.    So are those FEC filings listing disgorgement also

3  publicly available?

4  A.    Yes, they are.

5  Q.    Are they also available to law enforcement when a

6  disgorgement is made?

7  A.    Yes, they are.

8  Q.    And in your review of -- is there a section of the FEC

9  website titled "Handling Questionable Contributions"?

10  A.    From my review of the FEC.gov website, yes.

11  Q.    Are there several pages of it?

12  A.    Yes.  There's -- it has different conditions, yes.

13  Q.    Have you reviewed all of those pages entitled "Handling a

14  Questionable Contribution"?

15  A.    Yes, I have.

16  Q.    Are you aware of the guidance the FEC government --

17  sorry -- the FEC website provides on whether a campaign is

18  prohibited from knowingly accepting any contributions from

19  prohibited sources?  Are you aware of that prohibition?

20  A.    I'm aware of that prohibition, yes.

21  Q.    And where is that prohibition listed, the one you're

22  referring to about knowingly accepting any contributions from

23  prohibited sources?

24  A.    It's on the FEC website.

25  Q.    Now, you mentioned there's sort of a few pages about what

1  to do when there's a disgorgement or questionable contribution,

2  correct?

3  A.     That is correct.

4  Q.     And I think you earlier testified about one of the forms

5  of reporting would be if the money went back to the U.S.

6  Treasury.  Do you recall that?

7  A.     Yes.  As I previously testified, U.S. Treasury usually

8  gets it when you don't know who the donor was.

9  Q.     And is there a specific reporting requirement, just

10  focusing on a disgorgement to the U.S. Treasury, what, if any,

11  information must that letter include to the Treasury when

12  disgorging that money?

13  A.     It must -- it also has to state, similarly to the FEC,

14  the purpose of what it was, if it was suspected -- either it

15  was suspected, it was illegal or not, from my recollection.

16  Q.     And when you say whether it was suspected, whether it was

17  illegal --

18  A.     Yeah, if it was illegal.  They have to --

19  Q.      Special Agent Carter, if you can just hold on one

20  second.

21  A.     All right.

22  Q.     When you say specified whether it was illegal or not,

23  what was illegal you're referring to?

24  A.     My apologies.  The contribution, whether the contribution

25  was illegal or not.

1  Q.    Now, in sum, based off your review of this FEC guidance,

2  did you review multiple scenarios where the campaign is to

3  document suspected campaign -- suspected illegal campaign

4  contributions?

5  A.    From my review of the FEC.gov website, it's publicly

6  available, and yes.

7  Q.    In addition to that, are there multiple reporting

8  requirements when that scenario occurs, again, that scenario

9  being suspected receipt of illegal contributions?

10  A.    Yes.  They include -- so you're aware of it, you can read

11  it, and it describes it to you.

12  Q.    My question is just, does that guidance appear multiple

13  times on the website?

14  A.    Yes.

15  Q.    We'll stay here, but I want to talk now just more again

16  on your experience about FICA investigations.  You mentioned

17  you have personally investigated these, correct?

18  A.    Yes, I have.

19  Q.    And you mentioned you have personally investigated when a

20  campaign contribution, you suspect it to be a bribe?

21  A.    Yes, I have.

22  Q.    I want to stay on the topic of other related Federal

23  violations related to FICA crimes.  Okay?

24  A.    Yes.

25  Q.    What does the term foreign influence mean in a Federal

1  criminal investigation?

2  A.    Well, foreign influence to the FBI is when a foreign

3  government covertly or secretly acts to influence the public's

4  opinion or policymakers to its benefit.

5  Q.    Have you personally investigated cases that were assigned

6  with that foreign influence designation?

7  A.    Yes, I have.

8  Q.    You previously, earlier in your testimony, I believe,

9  mentioned you investigated FARA, or the Foreign Agent

10  Registration Act.  Did I recall that testimony correctly?

11  A.    That is correct.

12  Q.    In just a sentence or two, what is a violation of FARA?

13  What does that consist of?

14  A.    Well, the violations in 951, we call it espionage light,

15  and it requires an individual to document his involvement with

16  the foreign interests of a government when they're doing

17  domestic political action or lobbying.  So it's a

18  requirement -- it's the law.  The DOJ, though, they need to --

19  does that answer your question.

20  Q.    Another reporting requirement?

21  A.    It is a reporting requirement, correct.

22  Q.    And is it a criminal offense also?

23  A.    Yes, it is, 951.

24  Q.    Generally, as part of a Federal Election Campaign Act,

25  FICA, investigation, is the FBI interested in determining

1  whether a recipient politician knew he had received an illegal

2  contribution?

3  A.    Yes.

4  Q.    And why is that knowledge of the political official's

5  knowledge of that illegal donation, why is that relevant in a

6  FICA investigation?

7  A.    Well, first, if the -- you know, if the recipient knew,

8  then that in itself is illegal.  And then the other part, at

9  least for us, it could indicate a corrupt relationship between

10  the donor and the recipient, or a grooming of one, so we can

11  prepare to pay bribes, we can prepare to pay gratuities, for

12  example.

13  Q.    In your experience in these types of investigations --

14  and focusing on the ones that ultimately bring charges, do

15  those investigations typically last a few days, several months,

16  years?  In your experience, how would you describe that?

17  A.    Years, four or five, maybe more.  Depends on the

18  circumstances.

19  Q.    Now I want to switch topic and talk a little bit about

20  some of your investigative experience.  Specifically, you

21  testified you've been at the FBI 18 years.  Were you trained in

22  those 18 years on investigative techniques as part of being an

23  FBI agent?

24  A.    Yes.

25  Q.    And just high level, generally, what did that training

**79**

1    include?

2    A.    Interview, interrogation, use of sources, use of

3    undercover operations, surveillance.  There's much more.  You

4    learn a lot on the job.

5    Q.    Have you led or conducted trainings yourself on

6    investigative techniques?

7    A.    Yes, I have.  I teach a course on undercover operations.

8    Q.    And in your 18-year FBI career, have you been trained on

9    how to conduct investigative interviews?

10   A.    Yes, I have.

11   Q.    And in your present assignment as an SSA, or Supervisory

12   Special Agent, with Internal Affairs at the FBI, do you conduct

13   interviews?

14   A.    Several, yes.

15   Q.    And for now just focusing on just your FBI-specific

16   training, what did your training consist of?  What's the

17   training that you received at the FBI?

18   A.    For which...  For interviewing?

19   Q.    Let me ask a more direct question or maybe an easier

20   question for me.  Approximately how many investigative

21   interviews have you conducted?

22   A.    Over the last 18 years?  Hundreds.

23   Q.    You said one of the ways you learn is on --

24   A.    On the job, because, you know, it's -- it's dynamic.  It

25   changes.  Every interview is different.  You learn from that.

1   Q.    When you're trying to determine in an interview whether

2   someone has participated in or has knowledge of criminal

3   activity, what is the goal of that interview, in your view?

4   A.    Well, the goal is the truth, to find out the truth of,

5   you know, what, when, where, why, how, and when.  Those are

6   kind of the pillars of the six.  That's what you want to know?

7   Q.    And in seeking that truth in that interview, is

8   credibility of the interviewee important?

9   A.    Yes.

10  Q.    As an FBI agent interested in the truth and credibility,

11  what type of ways do you evaluate an interviewee's credibility?

12  A.    Well, there's two that I can think of.  I ask questions

13  that I know the answer to, and then I ask that question several

14  different ways, starting off, you know, generally, and then I

15  narrow it down like a funnel.  But I ask it several different

16  ways, the same question that I know the answer to.

17  Q.    In addition, what type of indicators do you look for in

18  the interviewee's responses that, in your view, may impact

19  credibility?

20  A.    Well, what may impact it because it could be minimizing

21  or minimize their answers, or they just don't answer your

22  question at all, or they go off on these long protracted

23  tangents to distract you away from the question.  That's been

24  my experience.

25  Q.    Along with the factors you just mentioned, is demeanor of

1  the interviewee a factor that you assess as part of that

2  credibility determination?

3  A.    Yes.  It's a piece of the puzzle.

4  Q.    And maybe just a few examples of what types of demeanor

5  observations are pieces of that puzzle, in your mind?

6          MR. SUMMERS:  Your Honor, I'm going to object that

7  we seem to be getting into the MIL issue.

8          THE COURT:  Overruled.

9  A.    Could you please repeat that question?

10  BY MR. JENKINS:

11  Q.    Certainly.  You mentioned certain indicators you've

12  looked for when trying to determine an interviewee's

13  credibility.  We just talked about demeanor being one of those.

14  My question now is just a few examples of what types of

15  demeanor do you find relevant to a credibility determination in

16  an interview?

17  A.    Well, a few I can think of is they're overly anxious,

18  they get accusatory and overly defensive, you know, especially

19  specific to the questions that may indicate some crime,

20  especially if I know the answer.

21  Q.    When you conduct these investigative interviews seeking

22  the truth, do you warn individuals --

23          MR. SUMMERS:  Your Honor, I have to object to

24  vouching now, that we had it a couple of times, seeking the

25  truth.

1          MR. JENKINS:  I can rephrase, your Honor.

2          THE COURT:  Rephrase.  And the jury is to disregard

3    that, that is, to disregard the question about seeking the

4    truth and any response about seeking the truth.

5    BY MR. JENKINS:

6    Q.    And when you conduct these investigative interviews, you

7    previously testified about what your goal included, correct?

8    A.    Yes.

9    Q.    With that goal in mind, when you're conducting an

10   interview, do you warn or let the people know, the interviewee

11   that is, that lying to the FBI is a crime?

12   A.    Yes, I do, though it's generally known lying to Federal

13   agents is a crime.

14   Q.    Are you required as FBI policy to alert people to the

15   fact that lying to the FBI is a crime?  Is that required?

16   A.    Only in an in-custody situation.

17   Q.    When the interviewee is in jail or something to that

18   effect?

19   A.    Are you saying to remind them they're lying?  No.

20          THE COURT:  Rephrase your question.

21   A.    Could you rephrase that question?

22   BY MR. JENKINS:

23   Q.    You just said the one time it is required is when the

24   interviewee is in custody, correct?

25   A.    No, it's not a requirement.  Correct, no, it's not a

1   requirement to -- it depends.  Not on that.

2   Q.    Let me rephrase my question, back up.  Are you required

3   per FBI policy to warn interviewees that lying to the FBI is a

4   crime?

5   A.    I'm trying to think of a policy.  No.

6   Q.    If you're not required, why do you personally warn

7   interviewees that lying to the FBI is a crime?

8   A.    Well, it sets the stage.  I let them know so there's no

9   reason -- well, there's no reason to lie at this point because

10  that's going to put you in a deeper -- a bigger situation.  So

11  it levels the playing ground, if I may say that.

12  Q.    In your experience as an FBI investigator, can lies

13  adversely influence a criminal investigation?

14  A.    Yes, they can.

15  Q.    How?

16  A.    Well, if we're focusing on the primary investigation and

17  then we're interviewing one of the subjects and they lie, now

18  we have to go and interview -- not interview.  Now we have to

19  take the investigation into why they lied, and that takes time

20  and, you know, taxpayer money to investigate that when we could

21  have just continued with our investigation.

22  Q.    Is that true even when you know it's a lie?

23  A.    Yes.  You still need to find out whether or not

24  they're -- the lie and their credibility with that lie.  It's

25  still important.

1  Q.    How does a lie where you know the answer to it, how does

2  that affect the larger investigation, if you're conducting an

3  interview?

4  A.    Well, it certainly brings to the -- if you're referring

5  to an interviewee and they lie to me and I know the answer to

6  that, is that what you're saying?

7  Q.    Yes.  Correct.

8  A.    And I know the answer to it, well, now I've gotta wonder

9  why are they -- why are they lying?  Is there a deeper crime

10 there?  Is there something else going on?  So the focus goes

11 to...

12 Q.    To what?

13 A.    To that individual, the interviewee.

14 Q.    In addition to the focus going now to that interviewee,

15 does it in any way affect your ability to use that interviewee

16 or person as a witness in a bigger investigation?

17 A.    Well, yes, to -- to a degree.  Now they have a

18 credibility issue, and if we're working toward a search

19 warrant, like an affidavit situation, that may impact it.

20 Also, we've gotta trust each other if we're going to work with

21 this like a source situation.  So now every time if I don't

22 trust them and they don't -- so they have a credibility issue,

23 that becomes a problem.

24 Q.    Now I want to focus still on your investigative

25 experience.  Does the law permit law enforcement to use stealth

1  and deception to investigate crimes?

2          MR. SUMMERS:  Objection, your Honor.  This is a

3  matter for the Court.

4          THE COURT:  Sustained, but we'll have to revisit

5  this with an instruction.  All right.  Sustained.

6          MR. JENKINS:  Understood.

7  BY MR. JENKINS:

8  Q.    Special Agent Carter, have you used stealth and deception

9  to investigate Federal crimes?

10 A.    Yes, I have.

11 Q.    Does the FBI train on stealth and deception to

12 investigate crimes?

13 A.    Yes, they do.

14 Q.    Have you personally trained other FBI agents on the use

15 of stealth and deception to investigate crimes?

16 A.    Yes, I have.

17 Q.    Just a few, what are some examples when I'm using this

18 phrase stealth and deception, what comes to your mind in a

19 criminal investigation?

20 A.    Well, for me, it's a use of a ruse, for example, where I

21 will falsely tell somebody -- I'll tell them I'm FBI.  I'll say

22 I'm FBI, but I may not tell them where I'm from because I want

23 to also not tell them -- falsely tell them the purpose of my

24 interview.  And I have a reason for that.

25 Q.    You anticipated my question.  What is the reason you

1  would provide false information to an interviewee?

2  A.    Well, three comes to mind.  It's to minimize them coming

3  up with a cover story, destroying evidence, or colluding with

4  other co-conspirators.

5  Q.    Now, you mentioned ruses.  Are there additional other

6  examples of stealth and deception that you have participated

7  in?

8  A.    The answer is yes.

9  Q.    And what -- just a few handful of other examples in

10 addition to ruses?

11 A.    Surveillance, FICA search warrants.  Do you want me to

12 describe any of these?

13 Q.    That is -- no thank you.

14 A.    And undercover operations as well.

15 Q.    Have you participated in undercover operations?

16 A.    Yes, I have.

17 Q.    Have you served in an undercover capacity?

18 A.    Only as a CIA officer.  I usually am the case agent for

19 these.

20 Q.    When conducting undercover operations, do agents

21 sometimes provide false information to people?

22 A.    Absolutely.

23 Q.    Just yes or no.

24 A.    Yes.

25 Q.    That's okay.  It's a difficult job.

1    In addition to false information, did it include

2  things like false names?

3  A.    False everything.

4  Q.    Now I want to focus -- we talked a little bit, I think,

5  or we'll talk about it now, the use of recordings, meaning

6  recordings of interviews.  Okay?  Do you in your Federal

7  investigative experience sometimes record interviews of people

8  you suspect of crimes?

9  A.    Yes, I do.

10  Q.    Is it required that you make those recordings of people

11  you suspect of crimes?

12  A.    Only in an in-custody situation would you record.

13  Q.    And in other scenarios -- let me rephrase that question.

14  My question -- my first question to you is, is it required to

15  record interviews of people you suspect of crimes?

16  A.    No, it is not.

17  Q.    If it is not required for you to record interviews of

18  people suspected of crimes, why do you do it?

19  A.    Well, it reflects an accurate depiction of what took

20  place during the interview.

21  Q.    All right.  Now I want to focus you on what brought you

22  here today.  In 2015 to 2016, were you involved in a Federal

23  criminal investigation in Los Angeles that ultimately used the

24  code name Operation Titan's Grip?

25  A.    Yes, I was.

88

1  Q.    Were you the lead case agent?

2  A.    From the time of its opening until 2020, yes.

3  Q.    And when was that opening?

4  A.    It was discussed but -- 2015, October.  October 2015 is

5  when it was officially opened.

6  Q.    So 2015 to approximately 2020 you were the lead case

7  agent?

8  A.    Yes, I was.

9  Q.    Can you describe just briefly for the jury, what are some

10  of the responsibilities of the lead case agent in a Federal

11  criminal investigation?

12  A.    Well, the lead case agent has to come up with a case

13  strategy, so that's, you know, collection of evidence,

14  assembling other agencies, if necessary, consulting with other

15  agents that may have worked this particular crime, and

16  coordinating with the headquarters component.

17  Q.    In this particular investigation, did you work with other

18  FBI agents and other agencies?

19  A.    Yes.  I worked with other agents.  I've had a co-case.

20  Also, there are supervisors at headquarters, supervisors here

21  that provide guidance, and other agencies that were involved.

22  Do you want me to go through a list of the agencies?

23  Q.    Not right now.  Thank you.  I want to focus you on just

24  high level -- what were some of the violations you were

25  investigating or crimes you were investigating as part of this

1   investigation?

2   A.     Well, in addition to FICA, bribery, conspiracy, honor

3   services fraud, false statements.  We also had FARA.

4   Q.     Is that the Foreign --

5   A.     Yeah, Foreign Agents Registration Act violation.  Tax.

6   Q.     And what specifically as to tax?  Just what -- just high

7   level, what kind of tax investigation did this include?

8   A.     Well, tax would be their income and failure to disclose

9   and hiding income, basically, from -- I'm not a tax guy, so...

10  Q.     Was this -- on the FBI side, was this qualified as a

11  public corruption investigation?

12  A.     It -- yes, it's a public corruption investigation.  It

13  falls under the public corruption unit at FBI headquarters.

14  Q.     And you at the time were assigned to the public

15  corruption unit at FBI?

16  A.     No.  I was assigned to Long Beach at public corruption,

17  but it falls under that umbrella.  It's the oversight.

18  Q.     So you were assigned to investigate public corruption?

19  A.     Oh, I misunderstood your question.  Yes.

20  Q.     Now, because of this designation, did it change in any

21  way the oversight of this investigation by the FBI?

22  A.     Yes.

23  Q.     And that -- that I referred to, is that because it's

24  qualified as a public corruption investigation?

25  A.     Yes.

1  Q.    When it's a public corruption investigation, what type of

2  additional oversight is involved?

3  A.    For public corruption, because we need to delineate,

4  there's public corruption and election fraud.  There's two

5  different ones.  But to answer your question --

6  Q.    Then thank you.  Let's do the first one.  So the

7  operation we're talking about called Titan's Grip, that was

8  designated a public corruption investigation, correct?

9  A.    That's correct.

10  Q.    And there was also a FICA designation, correct?

11  A.    Yes, an election fraud that I mentioned before, yes.

12  Q.    So first let's take that first bucket of public

13  corruption.  Generally, what type of additional oversight did

14  that require as a result of a designation?

15  A.    That requires not only -- we're a bureaucracy, so it's

16  administration -- it's huge administration, so it goes from

17  myself to the supervisory special agent to the chief division

18  counsel to -- and this is all at the field office level.  And

19  then to the ASAC, or the Assistant Special Agent in charge, the

20  ASAC.  They do the approval, they review it, and then it goes

21  to headquarters and headquarters supervisors review it.  They

22  tell their unit chiefs, assistant section chief, section chief,

23  deputy assistant director, and then the assistant director who

24  reports to the deputy director who reports to the director.  So

25  all those persons from the AD down, they know about it, they

1  have oversight on the public --

2          THE COURT:  Slow it down just a little bit, please.

3          THE WITNESS:  My apologies.

4  BY MR. JENKINS:

5  Q.    Let me ask --

6  A.    Yeah.  It's a lot.  It gets frustrating, actually.

7  Q.    Fair enough.  You mentioned two words I just want to

8  clarify.  You mentioned there's sort of -- you did this sort of

9  vertical chain with the field office, and by field office, do

10  you mean Long Beach?

11  A.    Well, the Los Angeles field office.

12  Q.    The Los Angeles field office here in California, correct?

13  A.    Yes.

14  Q.    And you did another list of a lot of acronyms and you

15  mentioned the word headquarters, correct?

16  A.    Correct.

17  Q.    Is headquarters Washington D.C.?

18  A.    That is in Washington D.C., yes.

19  Q.    Okay.  Now switching to the other bucket you referenced,

20  that this is election fraud, or a FICA investigation, were

21  there any separate approvals or oversight there?

22  A.    Yes.  Before the opening of an election fraud, or the

23  FICA, we have to not only consult with the U.S. Attorney's

24  Office but Department of Justice Public Integrity, DOJ PIN.

25  DOJ PIN must prove it, and then AUSA, the U.S. Attorney's

1  Office, needs to concur, and then we can begin the opening.

2  And then that chain I talked about, the field office and the

3  headquarters, happens.

4  Q.   Just don't repeat it again.   Just back --

5  A.   Right.

6  Q.   Back to DOJ PIN, Public Integrity, is that in D.C.?

7  A.   That is in Washington D.C., yes.

8  Q.   Okay.   Now, a couple more geography questions.   The FBI

9  Long Beach is part of the Long Beach FBI, correct?

10  A.   If you want me to describe -- yes, it is.

11  Q.   FBI Long Beach is part of the Los Angeles field office of

12  the FBI, correct?

13  A.   That is correct.

14  Q.   And are you familiar with the term the Central District

15  of California, the district we're in right now?

16  A.   Yes, I am.

17  Q.   Was your area of responsibility when you were

18  investigating public corruption crimes for the FBI in Long

19  Beach, did that cover the Central District of California?

20  A.   Yes.

21  Q.   And then did that cover Los Angeles?

22  A.   Yes.

23  Q.   And now --

24  A.   And Orange County.

25  Q.   And Orange County, thank you.   You mentioned earlier, and

1  I think I cut you off, a reference to the other Federal

2  agencies that were involved in this investigation that we're

3  talking about.

4  A.    Yes.

5  Q.    Have you outlined just briefly again what other Federal

6  agencies were a part of this investigation?

7  A.    Yes.   IRS, Internal Revenue Service; Department of

8  Transportation, Office of Inspector General; the Department of

9  State, Office of the Inspector General; DEA; CIA; and the U.S.

10  Attorney's Office.

11  Q.    What individual or individuals were originally the focus

12  of this investigation?

13  A.    Well, upon the opening, it was Dr. Ayoub and Mr.

14  Chagoury.

15  Q.    Just briefly, who is Mr. Chagoury?  What's his full name?

16  A.    His name is Gilbert Chagoury.

17  Q.    Now, we referenced, I think at the beginning, that this

18  was called Operation Titan's Grip.  Why did it have that name?

19  A.    It had that name, and that was based from our interview

20  of Dr. Ayoub, the second one.  He described -- can I just call

21  him Chagoury, or should I say his full name?

22  Q.    Refer to him as Mr. Chagoury.

23  A.    Mr. Chagoury --

24          THE COURT:  Just a second.

25          MR. SUMMERS:  Objection.  Hearsay.

1          THE COURT:  The objection is overruled.  This is not

2    being offered for the truth of the matter but to describe the

3    reason for the name.

4          MR. JENKINS:  Thank you.

5    BY MR. JENKINS:

6    Q.    Just briefly, what caused you when you heard about it to

7    name it Operation Titan's Grip?

8    A.    He was described to me as a titan of the community, and

9    when he asked for you to do something, you do it.  So he was a

10   titan and he had a grip on the community, so Titan's Grip.

11   Q.    And for purposes of this trial, I'm just going to refer

12   to Operation Titan's Grip as the Federal investigation.  Would

13   you understand what I mean?

14   A.    So it's the Federal investigation?

15   Q.    Correct.

16   A.    As Titan's Grip?  Okay.

17   Q.    Now, you referenced -- and we'll call him Mr. Chagoury.

18   What donations were initially the focus of this Federal

19   investigation?

20   A.    It was a donation to the Darrell Issa PAC.

21   Q.    And who is Darrell Issa, I-S-S-A?

22   A.    Darrell Issa was a former Congressman in the 49th

23   District of California.

24   Q.    And does the -- another geography question.  Does the

25   49th District of California stretch into the Central District

1  of California?

2  A.    Yes, it does.

3  Q.    And that's your area of operation at the FBI?

4  A.    Yes, it is.

5  Q.    Now, once you began your investigation into these

6  suspicious contributions to Congress member Issa's campaign,

7  did you identify any additional suspicious donations?

8  A.    Yes, we did.  After review of records and -- do you want

9  me to go through the records or just say specific?

10 Q.    First, you identified, yes or no?

11 A.    Yes.

12 Q.    Just -- now, what additional ones did you identify as

13 potentially being suspicious contributions?

14 A.    One belonged --

15 Q.    To -- I cut you off.  I apologize.  To what campaigns?

16 Or specify the donations, to the extent you can.

17 A.    Well, one campaign was former Congressman Lee Terry out

18 of Omaha, Nebraska.  And then I had suspected a Presidential

19 campaign of belonging to Mitt Romney.

20 Q.    So we've referenced Congress member Issa, Congress member

21 Terry, former Presidential candidate Mitt Romney.  These were

22 the contributions we're talking about initially?

23 A.    Yes.

24 Q.    Who was the donor or donors that made those

25 contributions?

1  A.     Well, the ultimate --

2  Q.     Just who is listed as the donor?

3  A.     The donor was Dr. Ayoub and his nephew Naji Ayoub for Lee

4  Terry and then Dr. Ayoub and his wife Mariel, from my

5  recollection, for the Darrell Issa one.  And for Romney, it was

6  Dr. Ayoub and I believe his wife as well.

7  Q.     And Dr. Ayoub, A-Y-O-U-B?

8  A.     Yes, A-Y-O-U-B.  His name is Dr. Elias Ayoub for a full

9  name.

10  Q.     E-L-I-A-S?

11  A.     Correct.

12  Q.     Now, what criminal violations did you suspect or were you

13  investigating related to Dr. Ayoub's donations to Congress

14  member Terry, Congress member Issa, and former Presidential

15  candidate Mitt Romney?  What violations were you investigating?

16  A.     Well, the FICA violations, but also we were considering,

17  because it was early on and I've had experience with bribes in

18  the form of a campaign contribution, so bribery and all the

19  other investigation -- other, you know, crimes that I would

20  normally investigate as part of public corruption, honor

21  services, conspiracy, wire fraud and the such.

22  Q.     Now, related to Dr. Ayoub's donations, who did you

23  suspect was the true donor?  Just who did you suspect at the

24  time was the true donor of Dr. Ayoub 's donations?

25  A.     Mr. Chagoury.

1  Q.    Now, we used this term earlier, but at some point does
2  this FICA investigation also obtain the designation of a
3  foreign influence investigation?
4  A.    Yes, it did, later.
5  Q.    And why?  Why that additional foreign influence
6  designation?
7  A.    Because it was deemed foreign influence for -- as I
8  previously stated what foreign influence was, it was for those
9  reasons.
10 Q.    Now, the -- we mentioned Gilbert Chagoury.  Based off
11 your investigation, are you aware of whether Gilbert Chagoury
12 is a foreign national?
13 A.    Yes, he's a foreign national based on immigration
14 records, and he holds a Passport, a British Passport, and a
15 Nigerian Passport, and I believe a Lebanese one, too.  And that
16 was based off our immigration records, travel records.
17 Q.    Now, I want you to look at -- I'll ask the question
18 first.  In preparation for this trial, did you look at
19 Government's Exhibits 171 through 179?  They should be -- on
20 the spine of the binder, I think that there is --
21 A.    179?
22 Q.    171 through 179.
23 A.    Yes.  Were these photographs, from my recollection?
24 Q.    And if you could go through 171 and 179.  First I'll do
25 it this way:  Do you recognize each of the individuals depicted

1    in 171 through 179?

2    A.    Well, I haven't got to it yet.

3    Q.    Oh, okay.  There's three binders.  On the spine, it

4    should represent the range.

5    A.    You said 171, correct?

6    Q.    Correct.

7    A.    Okay, I'm on 171.

8    Q.    Through 179?

9    A.    Here, let me -- I'll review them right now.

10   Q.    Thank you.

11   A.    Again.  Okay, I have reviewed them again.

12   Q.    Do you recognize each of the individuals depicted on 171

13   through 179?

14   A.    Yes, I do.

15   Q.    And are all of those individuals relevant persons in the

16   Federal investigation?

17   A.    Yes.

18   Q.    Can you go through --

19          MR. JENKINS:  Your Honor, I'd move to admit Exhibits

20   171 through 179.

21          MR. SUMMERS:  No objection, your Honor.

22          THE COURT:  They'll be received.

23          MR. JENKINS:  Thank you.

24          (Government's Exhibits 171 through 179 were

25   received.)

1  BY MR. JENKINS:

2  Q.    We will start with Exhibit 177 that, with the Court's

3  permission, I would like to publish at this point.

4          THE COURT:  They have all been received.  Once a

5  document is received, it may be published without requesting

6  permission.  That applies to all sides.

7          MR. JENKINS:  Thank you, your Honor.

8  BY MR. JENKINS:

9  Q.    Displaying Exhibit 177, do you recognize the individual

10  depicted on the screen?

11  A.    Yes.  That is Mr. Gilbert Chagoury.

12  Q.    And you mentioned you're aware from your investigation he

13  was not a U.S. citizen?

14  A.    Yes, that's correct.

15  Q.    Under the FEC's definition, was he a foreign national?

16  A.    Yes.

17  Q.    Have you reviewed bank records and financial records

18  associated with Gilbert Chagoury as part of this investigation?

19  A.    Yes, I have.

20  Q.    Have you personally spoken with Gilbert Chagoury as part

21  of the Federal investigation?

22  A.    Yes, twice, once in person in London and then virtually.

23  Q.    Are you aware of where he presently resides?

24  A.    He lives in Paris, but he has other residences.

25  Q.    Was one of those residences ever in the Central District

1  of California?

2  A.     Yes.  He lived in Beverly Hills during the -- during most

3  of the investigation.  He had a residence there.  Correction.

4  Q.     Gilbert Chagoury did?

5  A.     Yes.

6  Q.     And you said during most of this Federal investigation?

7  A.     Correct.

8  Q.     And just again for context, what do you identify as

9  Gilbert Chagoury's suspected role in this Federal

10  investigation?

11  A.     He's the financier behind all of it.

12  Q.     How did Gilbert Chagoury's donations come into focus of

13  this Federal investigation?

14  A.     From bank records, a wire transfer.

15  Q.     We're going to now display previously admitted

16  Exhibit 171.  Do you recognize that individual, and if so, who

17  is it?

18  A.     Yes, I recognize the individual, and it's Dr. Elias

19  Ayoub.

20  Q.     And why was Dr. Ayoub, again for context, refresher, why

21  was he relevant to the Federal investigation?

22  A.     He was the conduit contributor, illegal conduit

23  contributor to the Issa PAC and Lee Terry one.

24  Q.     What type of records did you analyze or review for Dr.

25  Ayoub?

1  A.    You want me to go through an exhaustive one or just pick

2  a few?

3  Q.    Let me ask it in a more efficient way.  Did you review

4  bank records for Dr. Ayoub?

5  A.    Yes, I did.

6  Q.    Did you review checks or cashiers checks?

7  A.    Wires and -- yes.

8  Q.    Did you also investigate Dr. Ayoub's FEC filings?

9  A.    Yes, I did.

10 Q.    And why were those relevant?

11 A.    They were relevant because I wanted to see who else he

12 donated to to see whether or not there were other suspected

13 ones, other -- other anomalies, and based on the financial

14 reviews that I conducted --

15 Q.    When you say "suspected donations," what were you looking

16 for related to Dr. Ayoub?

17 A.    Well, specifically, I was looking for the Issa one and

18 then verifying the Lee Terry one.  And then when I saw kind of

19 another one in 2012, a Romney one, I suspected that one, early

20 on.

21 Q.    And who did you suspect to be the true source of those

22 funds?

23 A.    Mr. Chagoury.

24 Q.    As a result, did you investigate Dr. Ayoub's relationship

25 or connection with Gilbert Chagoury?

1  A.    Yes, I did.

2  Q.    And where did Dr. Ayoub live at the time of this

3  investigation, just by county?

4  A.    Los Angeles County.

5  Q.    Were you also interested, in addition to the relationship

6  between Gilbert Chagoury and Dr. Ayoub, were you interested in

7  why Gilbert Chagoury would be providing this money to provide

8  it to the campaigns?

9  A.    Yes.  It provides you with a motive, why would he do it.

10 Q.    Provides who with a motive?

11 A.    Let me be clear.  It provides Mr. Chagoury with a motive

12 of why he would be donating.

13 Q.    Were you interested in identifying that motive as part of

14 the Federal investigation?

15 A.    Yes.

16 Q.    And what, if any, concerns or what motives did you

17 suspect when a foreign national donates to U.S. campaigns?

18 A.    As I previously testified, not only the foreign

19 influence, I mean, also for me, based on my investigation, I've

20 seen and we conducted a bribe in the form of an illegal

21 campaign contribution.  So bribes and, of course, gratuities

22 for official acts.

23 Q.    And just to clarify, putting aside bribes, was it legal

24 or illegal for Gilbert Chagoury to donate to U.S. campaigns?

25 A.    It was illegal for him to donate.

1  Q.    Was it legal or illegal for any of those recipient

2  politicians you just mentioned, Congress member Issa, Congress

3  member Terry, former Presidential candidate Mitt Romney, if

4  they knew about those illegal donations, would that be illegal?

5  A.    If they knew about it, that, too, would be illegal, yes.

6  Q.    Was that relevant to your Federal investigation?

7  A.    Yes, it was relevant.

8  Q.    Displaying previously admitted Exhibit poorly pixilated

9  173, zoomed in.  Do you recognize that blurry photo?

10 A.    Yes.  I've used this photo before.

11 Q.    And even though it's blurry, can you identify who that is

12 for the jury?

13 A.    Yes, I can.  That is Toufic, T-O-U-F-I-C, Baaklini,

14 B-A-A-K-L-I-N-I.

15 Q.    Thank you for spelling it for the court reporter.

16        Why was Mr. Baaklini relevant to the Federal

17 investigation?

18 A.    Well, from review of my records of...  Well, first, he

19 had a connection to Dr. Ayoub through an organization called In

20 Defense of Christians.  So I knew he was there, and at the time

21 of the donations to the Issa PAC -- because that's what I

22 looked for is, you know, what was going on at the time.

23 Q.    And let me break that up a little bit.

24 A.    Yeah, I know it's --

25 Q.    First, you referenced an organization called In Defense

1  of Christians.  Is that also known as IDC?

2  A.    Yes.

3  Q.    And is that an organization that you referenced that Mr.

4  Baaklini was connected to?

5  A.    Yes.  It's a non-profit organization.  He was the

6  president at the time.

7  Q.    Were you -- in terms of now the question about focusing

8  on Baaklini or why was he relevant, what relationships of

9  Toufic Baaklini's were you interested in investigating as part

10 of this Federal investigation?

11 A.    I was interested in Baaklini's connection, unlike to

12 Ayoub, but Baaklini's connection to Mr. Chagoury.

13 Q.    And what was your suspicion or concern related to that

14 relationship between Toufic Baaklini and Gilbert Chagoury?

15 A.    Well, they're connected, and there could be a conspiracy

16 among them.

17 Q.    To do what?

18 A.    To conduct not only illegal campaign contributions but

19 also a bribe in the form of an illegal campaign contribution.

20 Q.    Now, did you analyze Toufic Baaklini's bank records?

21 A.    Yes, and his business records, too.

22 Q.    And his FEC records?

23 A.    FEC records, yes, and toll records.  Do you want to go

24 on?

25 Q.    When you say "toll records" --

1    A.    Toll records, I'm sorry, I'm referring to telephone, when

2    he's -- when he made his calls, his text message -- not the

3    content, just, like, a phone bill.

4    Q.    So a toll record is the equivalent of a phone bill.  Is

5    that your testimony?

6    A.    Well, it's a little bit -- yes.

7    Q.    Similar information?  Doesn't include what they said to

8    each other.  Is that fair?

9    A.    That's -- that's -- yes, I'll agree to that.

10   Q.    In analyzing Toufic Baaklini's bank records and Gilbert

11   Chagoury's bank records, did you identify anything of interest

12   between the two?

13   A.    Actually, yes.  From the review of Baaklini's bank

14   records, he appeared to receive a significant amount of money

15   from Mr. Chagoury, and with the -- combined with those FEC

16   records, he also was donating to other representatives.  And

17   that became important because we were already looking at

18   illegal campaign contributions.

19   Q.    And let me break that up, if I can.  You mentioned there

20   was a significant amount of money going from Gilbert Chagoury

21   to Toufic Baaklini?

22   A.    Yes.

23   Q.    And when you say "significant," could you put a ballpark

24   numeral on it?

25   A.    Well, at least a million.  He was also receiving funds

1   from another foreign national, but -- okay.

2   Q.    My question, Special Agent Carter, is what is the

3   quantity, approximately, you're referring to when you saw a

4   significant amount of money going from Gilbert Chagoury to

5   Toufic Baaklini?

6   A.    From my recollection, it's approximately a million,

7   during a period of time.

8   Q.    You also just testified that you're also interested in

9   donations that Toufic Baaklini had made, correct?

10  A.    Yes.

11  Q.    And what was the connection you had made between Gilbert

12  Chagoury's money and Toufic Baaklini's donations?  What were

13  you interested in?

14  A.    Well, interested in the timing of the wire transfer of

15  the money and the -- and then the donor records of when the

16  donations were made.

17  Q.    Why?

18  A.    Why?  To -- well, to determine whether or not they were

19  illegal campaign contributions or a bribe in the form of an

20  illegal campaign contribution.  Those were the statutes I was

21  looking -- we were looking at.

22  Q.    In addition to Mr. Chagoury's financial connections to

23  Toufic Baaklini, did you identify through your view of Toufic

24  Baaklini's bank records any other persons of interest?

25  A.    Yes, I did.

1  Q.    Who?

2  A.    Well, Anton Sehnaoui, Mark Coralla.

3  Q.    Who is Mark Coralla?

4  A.    Mark Coralla, he's a media relations, but at the time, he

5  was the spokesperson for President Trump.

6  Q.    In addition to Mr. Sehnaoui -- I can't guess the

7  spelling, but can you?

8  A.    Yeah.  Mr. Sehnaoui was connected to the Lebanese

9  Canadian Bank.

10  Q.    Special Agent Carter, I was trying to help the court

11  reporter with how to spell Mr. Sehnaoui.  If not --

12  A.    I believe it to be S-E-N-A-O-U-I, Sehnaoui.

13  Q.    Thank you.

14  A.    And Anton, A-N-T-O-N.

15  Q.    You mentioned Mr. Sehnaoui, Mr. Coralla.  Did you

16  identify through your view of financial records of Mr. Baaklini

17  any other financial transactions of people of interest?

18  A.    I actually did.  There was a check from Baaklini to the

19  former Secretary of Transportation, Raymond LaHood.  He was the

20  Secretary of Transportation under the Obama administration.

21  Q.    Now, I want to focus you next on...  Are you familiar

22  with a U.S. Congress member from Nebraska named Jeff

23  Fortenberry?

24  A.    Yes, I am.

25  Q.    Do you see Congress member Fortenberry in the courtroom

1  here today?

2  A.    Yes, I do.

3  Q.    What is he wearing and where is he sitting?

4  A.    He's in a blue suit and a green tie, and he's sitting

5  over to my left.

6          THE COURT:  He has identified the defendant Jeffrey

7  Fortenberry.

8          MR. JENKINS:  Thank you, your Honor.

9  BY MR. JENKINS:

10 Q.    We're going to display previously admitted Exhibit 178-1.

11 Is that the defendant pictured in Exhibit 178, Special Agent

12 Carter?

13 A.    Yes.

14 Q.    Are you aware of what, if any, committees, Congressional

15 committees, the defendant served on in Congress during the time

16 of your Federal -- during the time of the Federal

17 investigation?

18 A.    Yes.

19 Q.    And what is that knowledge based upon, just briefly?

20 A.    The house.gov site and some official acts that he

21 participated in.

22 Q.    Did you also review the defendant's government website?

23 A.    Yes, I did.

24 Q.    And were any committees that you identified relevant to

25 the Federal investigation?

1  A.    Yes.

2  Q.    Which?

3  A.    Foreign Affairs Committee, a subcommittee on religious

4  minorities.

5  Q.    Let's take those two and talk about the first one first.

6  Why was it of interest to you that the defendant was a member

7  of the Foreign Affairs Committee?

8  A.    It was relevant because previous investigations of Mr.

9  Chagoury indicated he was interested in our affairs, the United

10 States' affairs.

11 Q.    And we -- the next one we mentioned was the

12 subcommittee -- that you mentioned was subcommittee on

13 religious minorities?

14 A.    I believe that's -- yes.

15 Q.    And why was that of interest to the Federal

16 investigation?

17 A.    Well, that subcommittee shared a common cause that the

18 IDC had as well.

19 Q.    Why was the common cause to the IDC relevant to the

20 Federal investigation?

21 A.    Well, because Toufic Baaklini was the president of IDC

22 and Dr. Ayoub was an honorary board member, and from the

23 records, the bank records, it -- Mr. Chagoury actually financed

24 the IDC in the beginning, in 20 -- for their 2014 summit they

25 had in D.C., in September of 2014.

1  Q.    Did the connections between Baaklini, Dr. Ayoub, and

2  Chagoury's connections to IDC, was that relevant to you in

3  looking at defendant's activities and official acts?

4  A.    Yes.

5  Q.    We mentioned IDC a couple of times now.  What's your

6  understanding of the goal or what's the goal of IDC, as you

7  understand it?

8  A.    As I understand it, they advocate protecting Christian

9  minorities in the Middle East.

10  Q.    And I believe you've called it or it's sometimes -- you

11  called it the cause?

12  A.    Yeah, it's the cause.  And it's referred to that as well

13  by some of its members.

14  Q.    And are you familiar with IDC based off your view of

15  their publicly available information?

16  A.    Yes, their publicly available information on their

17  website.  In addition to that, you can see them on YouTube.

18  They have that as well on their summits.  So, yes.

19  Q.    And have you reviewed IDC's summits, like, big seminars?

20  Is that what you mean?

21  A.    Yes, and their bank records as well.

22  Q.    Okay.  And these summits on YouTube, those are videos of

23  the seminars?

24  A.    Yes.

25  Q.    Based on the Federal investigation, did it appear to you

1    whether or not IDC was interested in engaging with politicians?

2    A.    Yes.  They actually published a list of politicians that

3    attended the 2014 summit, and there was some news about that,

4    too.  It was a -- that I read.

5          MR. SUMMERS:  Your Honor, I'm going to object to

6    this line of questioning on Rule 403 grounds.

7          THE COURT:  Overruled.  I'll allow a little more of

8    this, Mr. Jenkins, but bear that in mind.

9          MR. JENKINS:  Understood, your Honor.  And I had one

10    more, and I'll ask it this way:

11    BY MR. JENKINS:

12    Q.    Did the -- did IDC's interest in engaging politicians,

13    did it influence whether or not the Federal investigation

14    looked into activities or official acts taken by those

15    politicians?

16    A.    Yes, it did.

17    Q.    Now, zooming out a little bit, when conducting a FICA

18    investigation, an investigation into illegal campaign

19    contributions, is the FBI interested in establishing whether or

20    not there's a relationship between the illegal donors and the

21    recipient politicians?

22    A.    Yes.

23    Q.    And why is the FBI interested in identifying, if it

24    exists, a relationship between an illegal donor and a recipient

25    politician?  Why is that relevant?

1  A.     Well, it's relevant because it has a potential to develop

2  into a corrupt relationship between the donor and the recipient

3  or the grooming of one, which could lead to a bribe or a

4  gratuity.

5  Q.     Did you look into those facts or suspicions -- did you

6  inquire into whether those facts occurred in this

7  investigation, those Relationships?

8  A.     We gathered evidence to establish facts, yes.

9  Q.     And were some of the facts that you were gathering

10 targeted at identifying relationships between illegal donors

11 and recipient politicians?

12 A.     Yes.

13 Q.     As a part of this Federal investigation, did the timing

14 of illegal donations to recipient politicians, did that play a

15 role in the Federal investigation?

16 A.     Yes.

17 Q.     Why would the timing of an illegal donation matter in an

18 investigation into foreign campaign contributions, illegal

19 campaign contributions?  Why would the timing of the donation

20 matter?

21 A.     Well, if it's illegal campaign contributions and we're

22 looking also at bribes, and bribes require a quid pro quo, so

23 the timing is something.  So the time of the donation and

24 official acts taken after or before, but it could also be a

25 gratuity.

1  Q.    And fair to say it's also true that timing alone doesn't

2  prove anything related to bribery?  Correct?

3  A.    No.  It's just --

4  Q.    Just yes or no?

5  A.    No.

6  Q.    And fair to say that timing alone doesn't prove that a

7  certain donation is a gratuity?  Right?

8  A.    No.

9  Q.    And also fair to say that donations and official acts can

10  be totally legal when done at the same time, correct?

11  A.    That's correct, yes.

12  Q.    As part of the Federal investigation, did you also look

13  into communications between illegal donors in this

14  investigation and recipient politicians?

15  A.    Yes, I did.

16  Q.    And were the timing of those communications significant

17  to the Federal investigation?

18  A.    Yes.

19  Q.    Why would the timing of communications be relevant in

20  this investigation?

21  A.    Well, they're relevant because if they're having

22  communications before or after, kind of like I described

23  before, the official act, that's relevant.  It's another piece.

24  Q.    Another piece of what?

25  A.    Another piece of evidence that we can try to put together

1  if we have bribery or not, you know, because it's relevant to

2  us to see whether or not -- what that relationship was.

3  Q.    And putting aside bribery for a second --

4  A.    Okay.

5  Q.    -- are you also interested in determining whether or not

6  the recipient politician knows he received an illegal donation?

7  A.    Yes.

8  Q.    And is that legal or illegal?

9  A.    If they know about it, then it is illegal.

10  Q.    Now, after conducting the financial analysis and the toll

11  analysis and sort of the historical background of this Federal

12  investigation that we've outlined, did you decide to conduct

13  interviews of individuals relevant to the Federal

14  investigation?

15  A.    Yes.

16  Q.    And I'm going to direct you specifically to August 5th,

17  2016.  Did you, Special Agent Carter, and three other FBI

18  agents, you plus three, go to the house of Dr. Elias Ayoub to

19  interview him and to interview his wife about suspicious

20  donations that they had made?

21  A.    Yes.  He lived in a gated community.  One of the agents

22  had access.  So the answer is yes.

23  Q.    And I'm going to try to make it a little easier to

24  follow.  This is Dr. Ayoub now displayed on Exhibit 171,

25  correct?

1    A.    That is correct.

2    Q.    Now, prior to you going to interview Dr. Ayoub, did you

3    advise Dr. Ayoub in advance that you were coming to interview

4    him?

5    A.    No.

6    Q.    Did you just show up at his home?

7    A.    Just showed up, rang the doorbell.

8    Q.    Prior to that, did you advise Dr. Ayoub that he was under

9    criminal investigation before you showed up at his home?

10   A.    No.

11   Q.    Was he home?

12   A.    No.  His son was home.

13   Q.    Did you talk to Dr. Ayoub's son?

14   A.    Yes, I did.

15   Q.    Did you tell Dr. Ayoub's son that you were coming to

16   interview his dad about a Federal criminal investigation?

17   A.    No.  We just said we wanted to talk to him.

18   Q.    Ultimately, did you arrange to interview Dr. Ayoub?

19   A.    Yes.

20   Q.    And that was in -- how many days after you first went to

21   his house, approximately, did you come back and interview him?

22   A.    Not -- a few days, maybe.  I don't recall the exact

23   dates.

24   Q.    Okay.  And just to put it in context, August 5th, 2016,

25   is the day the actual interview occurred?

1   A.    Right.  Yes.

2   Q.    Is that your recollection?

3   A.    That's my recollection.  It was August.

4   Q.    Did you and the same three other FBI agents return to his

5   house?

6   A.    We did.

7   Q.    So there were four total, in my math?

8   A.    Yes.

9   Q.    Who did you interview on August 5th, 2016?

10  A.    I interviewed Dr. Ayoub.

11  Q.    And who was another agent with you?

12  A.    Yes.  Mark Matthews.

13  Q.    And the other two agents, who did they interview?

14  A.    They interviewed his wife.

15  Q.    Did you, Special Agent Carter, record your interview with

16  Dr. Ayoub?

17  A.    Yes, I did.

18  Q.    Did you advise him you were recording?

19  A.    No.

20  Q.    Did the other agents who interviewed Dr. Ayoub's wife,

21  did they record that interview?

22  A.    Yes.

23  Q.    To your knowledge, did they advise Dr. Ayoub's wife that

24  they were recording that interview?

25  A.    No.

1  Q.    Is it a general practice in Federal investigations to

2  advise suspects of crimes that you are recording the interview?

3  A.    No, we wouldn't tell them.

4  Q.    What donations were you investigating at the time of Dr.

5  Ayoub's August 2016 interview?

6  A.    The Issa donation, the Lee Terry one, and I suspected the

7  Romney one.

8  Q.    As part of that interview, then, did you ask Dr. Ayoub

9  about his donations to Congress member -- Congress members

10  Issa, Terry, and former Presidential candidate Mitt Romney?

11  Did you ask him about those donations?

12  A.    I asked him about donations to their PACs or their

13  campaigns, yes.

14  Q.    Okay.  Not the specifics here, but did Dr. Ayoub talk to

15  you about other politicians or political officials?

16  A.    He did.

17  Q.    Do you recall some of the individuals he did mention

18  during that first interview with Dr. Ayoub?

19  A.    He mentioned -- well, other than the --

20  Q.    Other than the three we just mentioned?

21  A.    Oh, yeah.  So Ray LaHood, who is the former Secretary of

22  Transportation under Obama; Mark Coralla, who was the

23  spokesperson for President Trump.  In addition to that, there

24  was some other foreign -- well, gosh, yeah, that's right, Mark

25  S. Weiner.

1  Q.    Who is Mark S. Weiner?

2  A.    Okay.  Mark S. Weiner was the former chairman of the

3  Democratic National Committee.

4  Q.    Now, in that first interview with Dr. Ayoub, did you ask

5  Dr. Ayoub about the defendant Jeff Fortenberry?

6  A.    No.

7  Q.    In that first interview, did Dr. Ayoub tell you anything

8  about the defendant?

9  A.    No.

10  Q.    In that first interview, did Dr. Ayoub make any

11  admissions of criminal conduct?

12  A.    No, he made no admissions of criminal conduct.

13  Q.    At some point after that August interview with Dr. Ayoub,

14  did you come to learn that he wanted to provide additional

15  information?

16  A.    Yes.

17  Q.    What did you understand as to why Dr. Ayoub wanted to

18  provide the Federal Government additional information?

19  A.    He wanted to correct his statements he made to us.

20  Q.    On September 8, 2016, did you along with other FBI agents

21  and Assistant U.S. Attorneys interview for a second time Dr.

22  Ayoub?

23  A.    Yes.

24  Q.    Did Dr. Ayoub now have retained criminal defense counsel?

25  A.    Yes, he did.

1  Q.    In that second interview -- again, we talked about the

2  first one in August 2016.  We're now going to focus on

3  September 2016, about a month later.  That interview took place

4  at the U.S. Attorney's Office?

5  A.    Yes, it did.

6  Q.    In that second interview, did Dr. Ayoub volunteer

7  information that the FBI was unaware of?

8  A.    Yes, he did.

9  Q.    And was that information that the FBI was unaware of, was

10  that helpful to the Federal investigation?

11  A.    Yes, it was.

12  Q.    In addition to telling you that new helpful information

13  as you described it, did he provide you any evidence to

14  corroborate it?

15  A.    Yes, he did.

16  Q.    And generally, just high level, what types of evidence

17  did Dr. Ayoub provide you to corroborate this new information?

18  A.    Toll records, his email communications, his bank records,

19  his FEC donor records that he had, just to tie it altogether

20  for us, to corroborate what he told us.  It was in a big binder

21  like these.

22  Q.    Was it tabbed with an index?

23  A.    Tabbed, indexed, everything -- it was actually -- yeah,

24  it was very helpful.

25  Q.    Without getting into the specifics of what Dr. Ayoub said

1  during that second interview, did Dr. Ayoub in this interview
2  reference the defendant Jeffrey Fortenberry?
3  A.    During that interview, yes.
4  Q.    Was that the first time the defendant Jeffrey Fortenberry
5  came onto the radar of the Federal investigation?
6  A.    Yes.
7  Q.    As a result of this second interview with Dr. Ayoub, did
8  the FBI begin to focus on the defendant?
9  A.    Yes.
10 Q.    And, specifically, what related to Dr. Ayoub and the
11 defendant was the focus after the second interview, what type
12 of conduct?
13 A.    An illegal campaign contribution.
14 Q.    Related to what?
15 A.    Related to an L.A. fundraiser in 2016.
16 Q.    And who was the host of that Los Angeles fundraiser in
17 2016?
18 A.    Dr. Ayoub.
19 Q.    And who was that fundraiser for in 2016 hosted by Dr.
20 Ayoub?
21 A.    Congressman Fortenberry.
22 Q.    Now move a little bit later.  We're going to go to -- we
23 just left September 2016.  Now we're going to go to
24 November 2016, a couple of months later.  Okay?
25 A.    Okay.

1  Q.    Did you again either meet with or were you provided

2  something on behalf of Dr. Ayoub that was relevant to the

3  Federal investigation?

4  A.    Yes, I was.

5  Q.    And to answer my own question, were you provided

6  something on behalf of Dr. Ayoub?

7  A.    Yes.

8  Q.    In November 2016, what were you provided by Dr. Ayoub's

9  counsel that was relevant to your investigation?

10 A.    Access to his cellular phone.

11 Q.    And what did you do once you were provided access to Dr.

12 Ayoub's cellular phone?

13 A.    They gave us a Cellebrite download of it.

14 Q.    What does that mean?

15 A.    Well, Cellebrite is a forensic download, so it -- and I

16 gave them search terms that we were interested in because we

17 didn't want to be overly intrusive.

18 Q.    Did they provide you another helpful binder?

19 A.    Yeah.  Yes.  Yes, they did, another binder just like the

20 other one, just like these binders here but white.

21 Q.    And what did this new binder contain?

22 A.    It contained emails, text messages that were relevant to

23 the investigation.

24 Q.    And did you review that binder?

25 A.    Yes, I did.

1  Q.    Did you find information and communications that were

2  relevant to the Federal investigation?

3  A.    Yes.

4  Q.    Did you see text messages relevant to the defendant and

5  Dr. Ayoub's communications?

6  A.    Yes.

7  Q.    What about those texts were relevant in terms of the ones

8  related to defendant and Dr. Ayoub?  What about those texts was

9  relevant to your investigation?

10  A.    It showed that they had a relationship, but also, on

11  the -- yeah, on the text messages it showed they had a

12  relationship.

13  Q.    And what type of relationship?  What are you referring

14  to?

15  A.    Well, that they knew each other very well but also were

16  connected to IDC and also to Toufic Baaklini.

17  Q.    And did you receive or review communications for

18  individuals who worked for the defendant?

19  A.    Yes, I did.

20  Q.    And were any of those communications relevant to the

21  Federal investigation?

22  A.    Yes, they were.

23  Q.    How so?

24  A.    They referenced an official act that was conducted that

25  was favorable to IDC.

1  Q.    And why was communication about that official act

2  favorable to IDC relevant to the investigation you were

3  conducting?

4  A.    It was relevant because in order to establish whether or

5  not there was a bribery, there's a quid pro quo, so we're

6  looking into that.  We're aware of it.  So we're establishing

7  evidence, if it happened.

8  Q.    Did you look into the timing of those official acts to

9  determine whether they were relevant?

10  A.    Yes.

11  Q.    And timing compared to what?  There's the official act --

12  A.    There's the --

13  Q.    You can just let me finish my question, Special Agent

14  Carter.  I understand.

15         Timing related to the official act as compared to

16  what?

17  A.    Time and place of the L.A. fundraiser.

18  Q.    Now, why were -- the fundraiser was in February of '2016,

19  and did you also review emails with the defendant on Dr.

20  Ayoub's phone?

21  A.    Yes.

22  Q.    Was it relevant to you in your Federal investigation --

23  in the Federal investigation, was it relevant to you that the

24  defendant and Dr. Ayoub were in email communication?

25  A.    Yes.

1   Q.    Why was that relevant?

2   A.    It was relevant because it showed that they not only

3   shared a common cause but they were in communication.  That

4   could be in support of an affidavit for a warrant.

5   Q.    And this was on November 16th?

6   A.    Yes.

7   Q.    So as of November 16, the FBI was aware that Dr. Ayoub,

8   its cooperator, was in direct communication with the defendant

9   by email and by text, correct?

10  A.    That's correct.

11  Q.    And based off that review, you saw what you called

12  evidence of a common cause, correct?

13  A.    Yes, I did.

14  Q.    And you testified that the timing of official acts were

15  relevant to the Federal -- to the fundraiser, correct?

16  A.    That's correct.

17  Q.    At this point had you established any type of crime, or

18  were you still investigating as it relates to the --

19  A.    No.  We were still investigating, other than we were just

20  told of a crime that Dr. Ayoub had committed, the illegal

21  campaign contribution, so we were --

22  Q.    And -- thank you.  And the knowledge you're talking about

23  is Dr. Ayoub had committed a crime, correct?

24  A.    Correct.

25  Q.    At that time, had you identified any crime committed by

1  the defendant?

2  A.    No.

3  Q.    Was that something you were interested in investigating?

4  A.    Yes.  We have a responsibility to investigate.

5  Q.    Were you also interested in investigating whether Darrell

6  Issa had any knowledge of his illegal contribution?

7  A.    Yes.  And -- yes.

8  Q.    And at that time, had you identified that Darrell Issa

9  had committed any crime?

10 A.    No.  Not to our knowledge.

11 Q.    Now, what types of information did you then proceed to

12 seek about the defendant related to the FBI investigation after

13 you saw these communications?  What types of information did

14 you investigate or seek as to the defendant?

15 A.    We sought bank records, toll records.  That's --

16 Q.    I'm asking --

17 A.    Yes, we did, yes.

18 Q.    Did you, in fact, identify any contributions around the

19 time of the February 2016 fundraiser?

20 A.    Yes.

21 Q.    And was that the -- why was that a particular focus?

22 A.    Well, that was the L.A. fundraiser, and Dr. Ayoub had

23 provided us with his straw donors, so we wanted to see if those

24 straw donors were on that donor list.

25 Q.    Now, did you also investigate whether the defendant

1  Jeffrey Fortenberry, in addition to his direct relationship
2  with Dr. Ayoub, whether he had any other relationships to any
3  other individuals relevant to the investigation?
4  A.    Yes.
5  Q.    For example, were you interested -- in displaying
6  Exhibit 173 previously admitted, were you interested in
7  identifying any relationship between the defendant and Toufic
8  Baaklini?
9  A.    Yes.
10 Q.    And why were you interested in that relationship?
11 A.    We were interested in it because Dr. Ayoub had told us
12 the source of the funds came from Baaklini.
13 Q.    Source of what funds?
14 A.    It was $30,000 cash of illegal campaign contribution.  He
15 said it came from Baaklini.
16 Q.    Were you trying to identify whether Baaklini and
17 Fortenberry, in fact, had a relationship?
18 A.    Yes.
19 Q.    What did you look at in terms of investigating that
20 specific threat, meaning the relationship between the alleged
21 source of the $30,000 cash and defendant?
22 A.    Toll records, FEC records to see time and place, again,
23 you know, timing of the calls, when official acts happened.
24 Q.    Did you also investigate or look into IDC?
25 A.    Yes.  He was the president of IDC, and that was the

cause, and that also was a cause championed by Mr. Chagoury.
Q. Just focusing on defendant's relationship with Toufic Baaklini, who did you understand Toufic Baaklini to be at IDC?
A. He was the president of IDC.
Q. So did you review IDC documents that were linked to the defendant, or IDC information?
A. Yes.
Q. Did you review any YouTube videos from IDC where there is -- that you identified evidence linking the defendant to Toufic Baaklini?
A. Yes, I did.
Q. And just generally, what did that evidence consist of?
A. He spoke at their engagement, and they had some levity together.
Q. Who is "they"?
A. They is Toufic Baaklini and Congressman Fortenberry.
Q. What appeared on the video just generally?
A. Generally, it was at one of the summits and it was a speaking engagement where Congressman Fortenberry was speaking at the IDC engagement.
Q. Did you review emails from Toufic Baaklini that referenced the defendant?
A. Well, that came later. You mean -- there were emails included on the -- you mean the emails that I saw -- sorry for my confusion.

1  Q.    Thank you.  Let me clarify, the apology is mine.  As part

2  of the investigation in Dr. Ayoub's phone, did you also see

3  emails involving Toufic Baaklini?

4  A.    Yes.  He was on --

5  Q.    Just yes or no first.

6  A.    Yes.

7  Q.    Thanks.  Did you also see emails related to the Los

8  Angeles fundraiser in that review?

9  A.    Yes, I did.

10  Q.    And did you see Toufic Baaklini on those emails?

11  A.    I did.  He was on the emails.

12  Q.    And those emails, did they reference the defendant?

13  A.    Yes.

14  Q.    How so?

15  A.    They had a -- the fundraiser.  He was on the emails on

16  the fundraiser.

17  Q.    And when you say "they" and "he," I know --

18  A.    Yeah, I know.  I'm sorry for the pronouns.  Toufic,

19  Ayoub, and Congressman Fortenberry.

20         THE COURT:  Counsel, we are going to take our

21  30-minute break.  It is now just about 11:45.  We're going to

22  break until 12:15.

23         Please remember, do not speak to anyone about the

24  case, the people, or the subject matter involved.  Continue to

25  keep an open mind.  And you're all ordered back here at 12:15,

1   please.

2              (Jury out.)

3              THE COURT:  Just very briefly, Mr. Jenkins, if you

4   could just speak with Agent Carter about making sure that he's

5   not stepping on your questions and that he's pausing.  It is

6   difficult and it has been difficult for the court reporter.  At

7   least that's my perception.  It would have been very difficult

8   for me, and I'm nowhere near as good as she is.

9              MR.  JENKINS:  Understand.

10             THE COURT:  All right.  We're in recess.

11             (Proceedings concluded for the morning at 11:45

12   a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

0

1        CERTIFICATE OF OFFICIAL REPORTER

2

3  COUNTY OF LOS ANGELES    )
                           )
4  STATE OF CALIFORNIA      )

5

6          I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

7  REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8  CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9  TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16

17          DATED THIS 20TH DAY OF MARCH, 2022.

18

19
                    /s/Judy K. Moore
20          _____
                JUDY K. MOORE, CRR, RMR
21            FEDERAL OFFICIAL COURT REPORTER

22

23

24

25