TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal. Bar No. 342364)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:    (213) 894-3289
    Facsimile:    (213) 894-0141
    E-mail:       mack.jenkins@usdoj.gov
                  jamari.buxton@usdoj.gov
                  susan.har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00491-SB |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL |
| v. | |
| JEFFREY FORTENBERRY, | Hearing Date:    6/28/2022 |
| Defendant. | Hearing Time:    8:00 a.m. |
| | Indictment: 10/19/2021 |
| | Trial: 3/16/2022 at 8:00 a.m. |

Plaintiff United States of America, by and through its counsel of record, the

United States Attorney for the Central District of California and Assistant United States

Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby file its

Opposition to Defendant's Rule 29 Motion for Judgment of Acquittal.

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 25, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division


    /s/
SUSAN S. HAR
MACK E. JENKINS
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                          PAGE

I.      INTRODUCTION ................................................................................. 1

II.     RELEVANT FACTS ............................................................................. 2

        A.      Evidence at Trial About the Federal Investigation ..................... 2

        B.      Jury Instruction on Materiality .................................................. 6

        C.      The Jury's Verdict .................................................................... 7

III.    LEGAL STANDARD ........................................................................... 8

IV.     ARGUMENT ....................................................................................... 9

        A.      Defendant Has Selected an Improper Vehicle to Recycle Failed Legal
                Claims and Sufficient Evidence Supports the Jury's Findings of
                Materiality ............................................................................... 9

        B.      Defendant Has Selected an Improper Vehicle for a Constitutional
                Challenge and Section 1001 Is Not Void for Vagueness ........... 12

        C.      Sufficient Evidence Supports the Jury's Findings That Defendant's
                Statements Were False ............................................................. 16

                1.      Defendant Lied to Federal Investigators That His Contributions
                        Were Publicly Disclosed ................................................. 16

                2.      Defendant Lied When He Falsely Denied Being Aware of
                        Illegal Contributions ..................................................... 19

V.      CONCLUSION ................................................................................... 23

# TABLE OF AUTHORITIES

PAGE

**Cases**

Brogan v. United States,
  522 U.S. 398 (1998) .................................................................passim

Bronston v. United States,
  409 U.S. 352 (1973) .................................................................22

Hussein v. Barrett,
  2017 WL 1133151 (N.D. Cal. Mar. 27, 2017) .........................12

Jackson v. Virginia,
  443 U.S. 307 (1979) ...................................................................9

Kolender v. Lawson,
  461 U.S. 352 ...............................................................................13

Kungys v. United States,
  485 U.S. 759 (1988) ...................................................................14

Thomas v. Bible,
  983 F.2d 152 (9th Cir. 1993) .....................................................10

United States v. Abpikar,
  583 F. App'x 780 (9th Cir. 2014)...............................................18

United States v. Camper,
  384 F.3d 1073 (9th Cir. 2004).............................................20, 23

United States v. Canada,
  2021 WL 3630230 (9th Cir. Aug. 17, 2021) ............................18

United States v. Crowe,
  563 F.3d 969 (9th Cir. 2009) .....................................................10

United States v. Cruz,
  554 F.3d 840 (9th Cir. 2009) .......................................................8

United States v. Culliton,
  328 F.3d 1074 (9th Cir. 2003) .............................................19, 20

United States v. Gaudin,
  515 U.S. 506 (1995) .....................................................................6

United States v. Gibson,
  409 F.3d 325 (6th Cir. 2005) .....................................................12

United States v. Goldfine,
  538 F.2d 815 (9th Cir. 1976) .....................................................10

United States v. Harris,
  705 F.3d 929 (9th Cir. 2013)................................................13, 16

United States v. Hill,
  2020 WL 491261 (D. Utah Jan. 30, 2020) ...............................12

i

United States v. Hurley,
  529 F. App'x 569 (6th Cir. 2013)................................................................12

United States v. Jae Gab Kim,
  449 F.3d 933 (9th Cir. 2006).....................................................................13

United States v. Ji Eon Lee,
  528 F. App'x 773 (9th Cir. 2013)..............................................................21

United States v. Kilbride,
  584 F.3d 1240 (9th Cir. 2009)............................................................13, 14

United States v. Kirby,
  587 F.2d 876 (7th Cir. 1978).....................................................................12

United States v. Larm,
  824 F.2d 780 (9th Cir. 1987).....................................................................14

United States v. Mares,
  940 F.2d 455 (9th Cir. 1991)......................................................................9

United States v. Matanky,
  482 F.2d 1319 (9th Cir. 1973)...................................................................12

United States v. Matthews,
  589 F.2d 442 (9th Cir. 1978)...............................................................21, 22

United States v. McKenna,
  327 F.3d 830 (9th Cir. 2003).....................................................................22

United States v. Mohsen,
  587 F.3d 1028 (9th Cir. 2009)...................................................................23

United States v. Moore,
  612 F.3d 698 (D.C. Cir. 2010)...................................................................12

United States v. Nevils,
  598 F.3d 1158 (9th Cir. 2010).....................................................................9

United States v. Phillipos,
  849 F.3d 464 (1st Cir. 2017).....................................................................13

United States v. Salinas-Ceron,
  731 F.2d 1375 (9th Cir. 1984)...................................................................10

United States v. Stevens,
  559 U.S. 460 (2010) ..................................................................................13

United States v. Swindall,
  971 F.2d 1531 (11th Cir. 1992).................................................................20

United States v. Thomas,
  612 F.3d 1107 (9th Cir. 2010)...................................................................22

United States v. Varani,
  435 F.2d 758 (6th Cir. 1970).....................................................................13

**Rules**

Fed. R. Crim. P. 29(c)(1) ...............................................................................8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

After a seven-day trial, the jury convicted defendant of all three counts: one count for a scheme to falsify and conceal material facts and two counts of making a materially false statement.  The jury also made every available finding in the six-page special verdict form, concluding that defendant falsified, concealed, or covered up five material facts; made three materially false statements during the Nebraska Interview on March 23, 2019; and made two materially false statements during the Washington D.C. Interview on July 18, 2019.

The jury's findings of materiality are well-supported by the government's presentation of significant evidence demonstrating that defendant's lies—denying knowledge of the illegal contributions made to defendant's campaign by Gilbert Chagoury and Toufic Baaklini—had the natural tendency to influence, and did influence, the Federal Investigation into defendant, Chagoury, Baaklini, illegal campaign contributions and foreign influence, and other related federal crimes.  That evidence included extensive testimony about the scope of the Federal Investigation, a detailed chronology of the steps taken, and the investigators' knowledge at various steps.  Likewise, the jury's findings of falsity, based on defendant's intentional lies about his FEC disclosures and denying awareness that Baaklini directed the illegal contributions, are amply supported by the record.

For these reasons, defendant's motion, which largely raises previously rejected or new legal arguments that are not the proper basis for a Rule 29 challenge to the sufficiency of the evidence, fails.  Taking the evidence in the light most favorable to the prosecution, a rational trier of fact reasonably could have found (and clearly and swiftly did find) that defendant made statements and concealed facts that were <u>material</u>, and that defendant intentionally lied when he made <u>false</u> statements about his disclosures and awareness of illegal campaign contributions.  Defendant's motion should be denied.

## II.     RELEVANT FACTS

### A.     Evidence at Trial About the Federal Investigation

Both FBI Special Agents Todd Carter and Edward Choe testified extensively on the scope of the Federal Investigation; the potential federal crimes being investigated; the individuals who were of interest to the Federal Investigation (to include Gilbert Chagoury, Toufic Baaklini, and Dr. Elias Ayoub); the timing of investigative steps taken in the Federal Investigation, including when various individuals interviewed with investigators; the investigators' contemporaneous assessment of individuals' credibility; and the actions that the agents took as a result of defendant's interviews.  That testimony established how and why defendant's false statements denying any knowledge that he received illegal campaign contributions, as facilitated by Toufic Baaklini and Gilbert Chagoury, influenced the Federal Investigation.  Specifically, it forced the federal investigators to explore the possible motives for defendant's lies, including whether he was concealing prior knowledge of the illegal campaign contributions, whether there was a corrupt relationship or conspiracy involving defendant for past or future contributions, whether there were any related bribery or gratuity crimes involving defendant, and whether there were any attempts to commit the forgoing crimes.

Agent Carter testified that Operation Titan's Grip, the code name for the Federal Investigation, was a reference to Chagoury who was "a titan" with "a grip on the community."  (Trial Tr. 3/17/2022 A.M. at 93:11–94:10.)  As part of Operation Titan's Grip, the government was investigating potential violations of the Federal Election Campaign Act ("FECA"), Foreign Agents Registration Act, bribery, conspiracy, honest services fraud, false statements, and public corruption.  (Id. at 88:23–89:13.)  Through the investigation, the government ultimately uncovered that Chagoury, a foreign national, was the true (and illegal) source of campaign contributions to multiple U.S. politicians, including to defendant at the Los Angeles Fundraiser in February 2016, as facilitated by Baaklini and Dr. Ayoub.  (Id. at 97:10-16; Trial Tr. 3/22/2022 P.M. at

8:14-9:4; see also Trial Ex. 197 (Stipulation Regarding Results of the Federal Investigation).)

**_2015-2018._**  The Federal Investigation was officially opened in October 2015. (Trial Tr. 3/17/2022 A.M. at 88:3-5.)  Agent Carter testified about the investigation timeline up through mid-2018.  Specific to the FECA schemes, the government was investigating the following:

- Chagoury's motives for the contributions and whether there were bribes or gratuities to the politicians (id. at 102:5–102:22);

- As it related to the FECA scheme involving defendant, any potential conspiracy between Baaklini and Chagoury to "conduct not only illegal campaign contributions but also a bribe in the form of an illegal campaign contribution" (id. at 104:11-104:19);

- Whether any of the recipient politicians had knowledge of the illegal contributions (id. at 114:5-7);

- Whether there was a corrupt relationship involving defendant, or an attempt to groom one, particularly given defendant's congressional committees and connection to In Defense of Christians—the organization with ties to the main conspirators of the FECA scheme (id. at 108:24-110:4; see also id. at 111:17-112:12 (explaining that a relationship between an illegal donor and recipient politician is relevant because of the "potential to develop into a corrupt relationship . . . or the grooming of one, which could lead to a bribe or a gratuity")).

The jury heard two recorded calls between Dr. Ayoub and defendant that took place on April 9 and June 4, 2018.  (Trial Exs. 112, 113.)  In both calls, defendant repeatedly pushed for a second fundraiser in Los Angeles, and, in the second call, suggested he could reach out to Baaklini to ask Chagoury for more money to donate to defendant's campaign.  (Id.)  These calls added to the investigators' concerns, who thereafter sought to learn, in particular, what defendant knew and did not know about the

3

Los Angeles Fundraiser, and whether there was a potential conspiracy involving defendant, Baaklini, and/or Chagoury, including for a future plan to commit a FECA scheme and funnel illegal campaign contributions to defendant.  (Trial Tr. 3/17/2022 P.M. at 34:16-35:11; 38:3-22; 54:3-13; 62:3-9.)

*2018-2019.*  FBI Special Agent Edward Choe testified extensively on the status of the Federal Investigation from June 2018 (the time of the second recorded call with Dr. Ayoub) to March and July 2019 (the time of defendant's interviews).  Agent Choe testified that, leading up to the Nebraska Interview in March 2019, investigators were focused on Chagoury and Baaklini for the same reasons articulated by Agent Carter, including their involvement in the FECA scheme to funnel contributions to defendant. (Trial Tr. 3/22/2022 P.M. at 8:10-9:14; 10:18-11:5; Trial Ex. 195.)

The government was also looking into defendant for potential FECA violations, whether he had suspected receiving foreign contributions, and whether there was an associated corruption component.  (Trial Tr. 3/22/2022 P.M. at 16:20-17:3; 39:13-25.)  Whether there was a potentially corrupt relationship between defendant and Chagoury was "an open question" during this time period.  (Id. at 32:11-17.)  As part of its inquiry, the Federal Investigation sought to learn from defendant about Chagoury, Baaklini, Dr. Ayoub, and their relationships.  (Id. at 17:6-7.)  Following the Nebraska Interview, federal investigators were still looking at "all of the same suspected violations with respect to this defendant" and were additionally considering a false statement charge. (Id. at 22:19-23:12.)  Agent Choe testified that it is noteworthy when individuals are perceived to be lying after being told it is a federal crime to do so because, naturally, it "begs the question why are they lying and it begs the question of whether they're concealing a greater crime or some other crime that they don't want the FBI to know about."  (Id. at 27:5-14.)

As a result of defendant's lies, federal investigators took numerous actions, including obtaining text messages from Baaklini and a cell-site warrant for defendant and Baaklini's phones (id. at 76:15-23); reviewing defendant's FEC filings (id. at 60:18-

4

24); interviewing witnesses identified by defendant in his interview, including Lucas Wenz; Jessica Furst Johnson; Alexandra Kendrick; Andrew Doran; Reyn Archer (id. at 51:22-52:16; 55:3-9; 58:7-17; 81:3-12); and attempting to interview Drew Bowling and Stephen Ralls (id. at 65:23-25; 81:3-12).

***Federal Investigation's Knowledge.***    There was significant evidence presented that, at the time of defendant's two interviews, the Federal Investigation lacked answers to the open questions described by Agents Carter and Choe, in part because the key participants were uncooperative, not credible, and/or lacked knowledge.  Agent Carter testified that Dr. Ayoub, when asked about what defendant knew about the FECA scheme, stated that he (Dr. Ayoub) did not know whether defendant knew about the illegal contributions.  (Trial Tr. 3/18/22 A.M. at 17:16-17:25.)  Agent Carter also testified that, in February of 2017, Baaklini was not cooperating with the Federal Investigation; as a result, he was vague about the details of whether defendant's campaign knew about the illegal contributions and minimized other salient facts.  (Id. at 21:10-19; 67:6-14.)  And Agent Choe testified that Baaklini did not cooperate with the government until his first proffer in October 2019 (months after defendant's two interviews).  (Trial Tr. 3/22/2022 P.M. at 10:18–11:12.)  Agent Choe also testified that at the time of defendant's interviews, Chagoury was not cooperating, and that the FBI was still investigating him for FECA-related violations.  (Id. at 8:10-23; 9:20-25.)  Chagoury's first meeting with the government did not take place until January 2020.  (Id. at 10:1-5.)

Moreover, Agent Choe explained that investigators often seek out the same information from multiple witness in order to corroborate the information received and to determine if there is any contradicting information from the sources.  (Trial Tr. 3/22/2022 P.M. at 56:24-57:8.)  Illustrating this exact need is Baaklini's first proffer in October 2019 with the federal government.  During that proffer, Baaklini disclosed that after the Los Angeles Fundraiser, defendant asked Baaklini if there was anything wrong with the fundraiser.  (Id. at 56:5-18.)  Defendant, on the other hand, never provided this

information and, in fact, repeatedly denied ever talking to Baaklini about the fundraiser. (Trial Exs. 151, 159.)  Federal investigators learned of this information for the first time <u>from Baaklini</u> four months <u>after</u> defendant's second interview.  (Trial Tr. 3/22/2022 P.M. at 56:5-18.)

### B.  Jury Instruction on Materiality

The Court properly instructed the jury on materiality.  <u>See</u> <u>United States v. Gaudin</u>, 515 U.S. 506, 522-23 (1995) (holding that materiality is a question for the jury).  Specifically, the jury was instructed that a fact or statement is material if "it had a natural tendency to influence, or was capable of influencing, the decisions or activities of a government agency.  The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material.  <u>Materiality must be judged by the facts and circumstances of the investigation at issue in this case.</u>" (Dkt. No. 183 at 8, 9 (emphasis added).)  The final sentence, although not appearing in the model instruction, was provided per the defense's request.  (<u>See</u> Dkt. No. 129 at 51; <u>see also</u> Dkt. No. 163 at 2.)

The Court properly rejected defendant's request to instruct the jury as follows: "A false statement is not material merely because it causes the government to investigate the veracity (truth or falsehood) of the statement itself."  (Dkt. No. 142 at 3; <u>see also</u> Dkt. No. 163 at 2.)  In rejecting this proposed instruction, the Court cited <u>Brogan v. United States</u>, 522 U.S. 398 (1998), in which the Supreme Court <u>rejected</u> the argument that the so-called "exculpatory no" statement (falsely responding in the negative to a question for which the agents knew the truth was an affirmative answer) was exempt from criminal liability under section 1001.  <u>Id.</u> at 399-402.  The Supreme Court reasoned:

> We cannot imagine how it could be true that falsely denying guilt in a Government investigation does not pervert a governmental function.  Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any

6

falsehood relating to the subject of the investigation perverts that function.

Id. at 402-03 (emphasis in original).  Put differently, Brogan confirmed that an investigation into the veracity of a lie relating to the subject of the investigation fell squarely within the proper purpose and functioning of the government.  Accordingly, the Court concluded, such a false statement fell squarely within section 1001's proscription and reach.  Id. at 408.

### C.    The Jury's Verdict

On March 24, 2022, the jury returned the six-page special verdict form.  The jury found defendant guilty of all three counts charged in the indictment.  Additionally, the jury affirmatively made each of the available findings supporting each count.  (See Dkt. No. 186.)

With respect to Count One, the jury found that the defendant knowingly and willfully used a trick, scheme or device to falsify, conceal, or cover up each of the following five material facts:

1) Defendant FORTENBERRY's congressional campaign had received illicit contributions at the Los Angeles Fundraiser in 2016;

2) Defendant FORTENBERRY had become aware that his campaign received illicit contributions at the Los Angeles Fundraiser in 2016;

3) Toufic Baaklini had provided $30,000 cash to Dr. Elias Ayoub for Dr. Elias Ayoub and Dr. Elias Ayoub's associates to contribute to defendant FORTENBERRY's congressional campaign at the Los Angeles Fundraiser in 2016;

4) Defendant FORTENBERRY had become aware that Toufic Baaklini had provided $30,000 cash to Dr. Elias Ayoub for Dr. Elias Ayoub and Dr. Elias Ayoub's associates to contribute to defendant FORTENBERRY's congressional campaign; and

5) Gilbert Chagoury was the source of the $30,000 that Toufic Baaklini provided to Dr. Elias Ayoub for Dr. Elias Ayoub and Dr. Elias Ayoub's associates to

7

contribute to defendant FORTENBERRY's congressional campaign at the 2016 Fundraiser.

(Id. at 1-2.)

With respect to Count Two, the jury found that the defendant made the following three materially false statements:

1) Defendant FORTENBERRY was not aware of Toufic Baaklini making any illegal contributions, directing anyone to conduct illegal contributions, or providing money to anyone else to conduct conduit campaign contributions.

2) The individuals who contributed to the Los Angeles Fundraiser were all publicly disclosed.

3) Every campaign contribution that defendant had received was publicly disclosed.

(Id. at 3.)

Finally, with respect to Count Three, the jury found that the defendant made the following two materially false statements:

1) Defendant FORTENBERRY had not been told by Dr. Elias Ayoub during the 2018 Call that Toufic Baaklini had given Dr. Elias Ayoub $30,000 cash to help fund the Los Angeles Fundraiser.

2) Defendant FORTENBERRY was not aware of any illicit donation made during the Los Angeles Fundraiser.

(Id. at 5.)

Following the jury's verdict and after obtaining an extension of the standard timeline for post-trial motions, defendant filed the instant motion.

## III.   LEGAL STANDARD

After a guilty verdict, a defendant may move for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  Fed. R. Crim. P. 29(c)(1).  A Rule 29 motion is a challenge to the sufficiency of the evidence.  United States v. Cruz, 554 F.3d 840, 844 n.4 (9th Cir. 2009) (explaining that a "'motion for judgment of acquittal' and 'challenge

to the sufficiency of the evidence' are functionally equivalent"; "the very nature of [Rule 29] motions is to question the sufficiency of the evidence to support a conviction" (citation omitted)).

In assessing the sufficiency of the evidence for purposes of a Rule 29 motion, the reviewing court's role is limited: the court must (1) review the evidence "in the light most favorable to the prosecution," and then (2) determine whether "<u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Nevils</u>, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)) (emphasis in original).

Under the first step of the two-step <u>Jackson</u> inquiry, the court may not usurp the role of the finder of fact in resolving any perceived conflicts or making inferences; rather, it "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any . . . conflicts in favor of the prosecution, and must defer to that resolution." <u>Nevils</u>, 598 F.3d at 1164 (quoting <u>Jackson</u>, 443 U.S. at 326). Second, the court must determine whether this evidence, so viewed, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. <u>Id.</u> The court may reverse a conviction only on the "rare occasion[]" where <u>no</u> rational trier of fact, construing all the evidence in favor of the government, could find guilt beyond a reasonable doubt. <u>Id.</u> at 1167. Put differently, "[t]he relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict." <u>United States v. Mares</u>, 940 F.2d 455, 458 (9th Cir. 1991).

## IV.   ARGUMENT

### A.   Defendant Uses an Improper Vehicle to Recycle Failed Legal Claims and Sufficient Evidence Supports the Jury's Findings of Materiality

Defendant first attacks the jury's findings of materiality. The jury more than reasonably arrived at its verdict based on the ample evidence presented at trial that defendant concealed and falsified material facts and made materially false statements.

As a preliminary matter, defendant's attempt to re-argue the definition for materiality—arguments that he already raised in his rejected proposed jury

instructions—is procedurally improper for a Rule 29 motion.  See United States v. Crowe, 563 F.3d 969, 973 n.5 (9th Cir. 2009) ("A Rule 29 motion for judgment of acquittal, however, is not the proper vehicle for raising an objection to jury instructions."); 2A Charles A. Wright, Federal Practice and Procedure: Criminal § 466, at 299 (3d ed. 2000) ("There is only one ground for a motion for judgment of acquittal. This is that the evidence is insufficient to sustain a conviction . . . .").  Defendant's failed articulation of the law of materiality is two-fold: (1) that the false statement or act of concealment must be literally capable of influencing a specific governmental decision, and (2) that materiality cannot be based solely on an investigation into the veracity of the statement itself.  (Mot. at 4-7.)  Both arguments are foreclosed by Supreme Court and Ninth Circuit law.[1]  This Court has also foreclosed them.  See also Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993) (explaining that under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.").

The Court provided the correct and controlling standard for materiality: a fact or statement is material if "it had a natural tendency to influence, or was capable of influencing, the decisions or activities of a government agency.  The false statement need not have actually influenced the agency, and the agency need not rely on the information in fact for it to be material.  Materiality must be judged by the facts and circumstances of the investigation at issue in this case."  (Dkt. No. 183 at 8, 9).

The government proved materiality.  Defendant's lies—falsely denying he had received illegal contributions, including from Gilbert Chagoury, and denying awareness

---

[1] See, e.g., United States v. Goldfine, 538 F.2d 815, 821 (9th Cir. 1976) (materiality is "irrespective of whether actual favorable agency action was, for other reasons, impossible"); United States v. Salinas-Ceron, 731 F.2d 1375, 1377 (9th Cir. 1984), vacated on other grounds, 755 F.2d 726 (9th Cir. 1985) (false statements "obviously" material "despite the agents' knowledge of their falsity"); see also Brogan, 522 U.S. at 402 (explaining that "very purpose of an investigation [is] to uncover the truth" and that "any falsehood relating to the subject of the investigation perverts that function").

that such illegal contributions were facilitated by Toufic Baaklini and Dr. Ayoub—were capable of influencing, and did influence, the Federal Investigation.  Agents Carter and Choe testified about the Federal Investigation's open questions into FECA violations, conspiracy, bribery, gratuity, and other related crimes involving Chagoury, Baaklini, defendant, and the Los Angeles Fundraiser.  See supra, Section II.A.  Each of defendant's lies about the contributions at the Los Angeles Fundraiser and the involved persons forced the government to then further explore the possible motives for defendant's lies and concealment, including whether defendant was concealing prior knowledge of the illegal campaign contributions and other crimes, whether there was a corrupt relationship or conspiracy involving defendant for past or future contributions, whether there were related bribery or gratuity crimes, and whether there were any attempts to commit the forgoing past or future crimes.[2]  For these reasons, defendant's claim that there was "no evidence" any of his false statements were capable of affecting "any government decision beyond the decisions to further investigate and prosecute him under Section 1001" is demonstrably inaccurate.  (Mot. at 7.)  To the contrary, there was more than sufficient evidence, particularly when taken in the light most favorable to the prosecution, that permitted a rational trier of fact to find materiality beyond a reasonable doubt.

---

[2] The evidence was also sufficient for the jury to reasonably find materiality even under defendant's elevated and incorrect definition of materiality.  Each of the many open questions regarding potential crimes was a specific decision that the government needed to resolve as part of the Federal Investigation.  The Federal Investigation sought to determine whether defendant's statements were true or false—not simply for the sake of determining if he had, in fact, lied—but to explore defendant's motive and credibility in relation to those open questions.  As explained, if investigators determined that defendant was lying, it naturally and rationally would raise questions as to why defendant would lie and whether those reasons involved criminal ones, including to hide or conceal a corrupt relationship, a separate substantive crime, or attempts at another crime.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### B.   Even if Defendant's Constitutional Challenge Were Procedurally Proper, Section 1001 Is Not Void for Vagueness

Next, defendant argues for the first time that section 1001 is unconstitutionally void for vagueness, "both on its face and as applied."  (Mot. at 10.)  Defendant's claim that the statute is void is properly raised in a motion to dismiss, not a Rule 29 motion.  See United States v. Hurley, 529 F. App'x 569, 572 (6th Cir. 2013) (noting that counsel "made a procedural error by raising what is effectively a constitutional claim in the context of a Rule 29 motion").[3]  For purposes of this response, even assuming defendant's argument is procedurally proper, it fails.

Various courts, including the Ninth Circuit, have repeatedly held that section 1001 is not unconstitutionally vague.  See United States v. Matanky, 482 F.2d 1319, 1322 (9th Cir. 1973) ("[W]e find no vagueness problems with section 1001, either as construed or as applied to this case."); United States v. Gibson, 409 F.3d 325, 334 (6th Cir. 2005) (holding that the language in 18 U.S.C. § 1001 is "not so indefinite as to be void for vagueness"); United States v. Kirby, 587 F.2d 876, 884 (7th Cir. 1978) (same); cf. Hussein v. Barrett, 2017 WL 1133151, at *5 (N.D. Cal. Mar. 27, 2017) (noting that section 1001 has repeatedly survived constitutional challenges on vagueness grounds).  Nothing about the concurring opinions that defendant cites—both of which affirmed convictions under the very statute that defendant claims is invalid—disturbs the holding in Matanky.  See Brogan, 522 U.S. at 408 (Ginsburg, J., concurring) ("Because a false denial fits the unqualified language of 18 U.S.C. § 1001, I concur in the affirmance of Brogan's conviction."); United States v. Moore, 612 F.3d 698, 704 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("[T]here is no legal obstacle to our affirming Moore's § 1001 conviction.").  Likewise, cases addressing the constitutionality of the residual

---

[3] United States v. Hill, 2020 WL 491261, at *1 (D. Utah Jan. 30, 2020) (explaining that "a void-for-vagueness challenge would have been more properly asserted in a pretrial motion to dismiss.  The motion was reasonably available to Defendant before trial and the issue of whether the statute properly gave Defendant fair notice that his conduct was illegal could have been determined without a trial on the merits.").

clause of the Armed Career Criminal Act, the term "crime of violence" in connection with the Immigration and Nationality Act, or 18 U.S.C. § 924(c)(3)(B), have no bearing on the constitutionality of section 1001.  (See Mot. at 13.)

Nor is section 1001 constitutionally vague as applied to defendant because it did not "fail to put a defendant on notice that his conduct was criminal."  United States v. Kilbride, 584 F.3d 1240, 1257 (9th Cir. 2009) (rejecting the defendants' argument that they lacked notice their actions constituted "material falsification" under the statute).  More importantly, section 1001 established "minimal guidelines to govern law enforcement."  Kolender v. Lawson, 461 U.S. 352, 358 (recognizing that "the more important aspect of [the] vagueness doctrine is not actual notice, but  . . . that a legislature establish minimal guidelines to govern law enforcement" (cleaned up)).  Vagueness challenges that, as here, do not involve First Amendment freedoms are to be "examined in light of the facts of the case at hand."[4]  United States v. Harris, 705 F.3d 929, 932 (9th Cir. 2013) (citation omitted); see also United States v. Jae Gab Kim, 449 F.3d 933, 942 (9th Cir. 2006) ("[V]agueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant.").

As best as the government can understand from his motion, defendant seemingly takes issue with section 1001's prohibition of materially false statements as vague.  (See Mot. 12.)  But a criminal statute is not unconstitutionally vague merely because "it sets forth a standard for determining liability that is not mathematically precise," and the standard of "materiality" is an exceedingly familiar one.  United States v. Phillipos, 849

---

[4] Elsewhere in his motion, defendant inexplicably contends that he had a First Amendment right to "speak in defense of his conduct" during the two interviews.  (Mot. at 17.)  It is well established that "speech integral to criminal conduct" is not protected under the First Amendment.  United States v. Stevens, 559 U.S. 460, 468–69 (2010); see also United States v. Varani, 435 F.2d 758, 762 (6th Cir. 1970) "[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself.").  Similarly, "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie to federal officers.  '[P]roper invocation of the Fifth Amendment privilege against compulsory self-incrimination allows a witness to remain silent, but not to swear falsely.'"  Brogan, 522 U.S. at 404 (citation omitted).

F.3d 464, 477 (1st Cir. 2017) (affirming § 1001(a)(2) convictions and rejecting vagueness challenge to the materiality requirement).  Indeed, the use of the term "material" in the context of false statements to public officials "goes back as far as Lord Coke" in 1680.  Kungys v. United States, 485 U.S. 759, 769 (1988); see also id. at 770 ("The federal courts have long displayed a uniform understanding of the 'materiality' concept."); cf. United States v. Larm, 824 F.2d 780, 784 (9th Cir. 1987) ("Here, the statute [42 U.S.C. § 1396h] forbids knowingly false material statements, terms that are adequate to inform the ordinary person of its bounds.").

Under even an enhanced standard of clarity, section 1001, as applied to the facts of this case, amply put defendant on notice that his conduct was criminal.  See Kilbride, 584 F.3d at 1257 (although statutes involving criminal sanctions have an enhanced requirement for clarity, "due process does not require impossible standards of clarity").  In addition to the plain and clear language of the statute, defendant was specifically advised in both interviews that lying to federal officers was a crime.  During the Nebraska Interview, defendant was advised at the outset that "As part of any investigation, and to preserve the integrity of it, I want to remind you that lying to the FBI is illegal."  (Trial Ex. 115.)  During that same interview, defendant was again reminded "Your being honest is extremely important.  Any misleading or even untruthful [statement] is illegal."  (Trial Ex. 127.)

At the outset of the D.C. Interview, defendant was advised of the same: "Lying to the FBI or federal government is a federal crime."  (Trial Ex. 134.)  A few moments later, that admonition was repeated: "the only option you do not have . . . is obviously lying."  (Id.)  Defendant not only appeared to be listening to these advisements (Trial Tr. 3/22/2022 P.M. at 27:15-20), but he also verbally confirmed he understood the parameters of the interview (Trial Ex. 135).  Later in the interview, defendant specifically demonstrated his awareness of the prohibition on lying by expressing that he did not want to "say something that might seem inconsistent with what" he had previously said during the Nebraska Interview.  (Trial Ex. 143.)

14

Moreover, in advance of both interviews, defendant was specifically advised about what the federal government was investigating and the topics of interest, so that there could be no question as to what was material to the Federal Investigation.  During the Nebraska Interview, Agent Carter advised that he and Agent O'Leary were "here to discuss . . . In Defense of Christians and campaign funding" (Trial Ex. 115), and that they were "trying to find out our base knowledge about campaign contributions and IDC . . . and specific to illegal campaign contributions" (Trial Ex. 129).  Similarly, at the outset of the D.C. Interview, defendant was advised that the government was interested in defendant's "relationships and knowledge" of Chagoury, Baaklini, and Dr. Ayoub, as well as defendant's first interview.  (Trial Ex. 136.)

Consistent with those advisements, both interviews focused on the articulated topics.  In both interviews, the federal government repeatedly asked about the Los Angeles Fundraiser and defendant's awareness of any illegal campaign contributions, including as specifically facilitated by Chagoury, Baaklini, and Dr. Ayoub.  Defendant clearly understood that his discussion with Dr. Ayoub on the June 4 Call was a critical and material topic of interest to the government—so much so that defendant requested a second interview, purportedly to "provide some additional information" about that call. (Trial Ex. 145; see also Trial Tr. 3/22/22 P.M. at 23:18-24:6 (D.C. Interview requested by defendant because he "had additional information which he wanted to provide".) And after defendant finally brought up the June 4 Call in the D.C. Interview halfway through the two-hour interview, federal investigators largely spent the rest of the D.C. Interview discussing the call and defendant's knowledge of it.  (See Trial Ex. 145; Trial Tr. 3/22/2022 P.M. at 24:21-22; 40:19-24.)

Contrary to defendant's unsupported and exaggerated claim that he "had no way to know with reasonable certainty what information might or might not be material" (Mot. at 12), the actual evidence shows that defendant had copious and specific notice of what was prohibited under section 1001.  He fully understood not only that lying to federal officers was a crime, but he also understood in exacting detail what the Federal

Investigation was looking into and what it deemed material.  Indeed, he sought out the second interview ostensibly to provide additional information specifically related to those topics.  It is inconsistent with the evidence and common sense that defendant—a then-member of Congress serving on powerful House committees who repeatedly touted his understanding of relevant laws—lacked notice that section 1001 prohibited lying about the very people (Baaklini and Chagoury) and topics (illegal campaign contributions) at the heart of the Federal Investigation.  See, e.g., Harris, 705 F.3d at 933 (reasoning that common sense definition of "dangerous weapon" provided sufficient notice that the statute prohibited carrying such weapons on an aircraft, particularly given the defendant's status as an airport employee).

Because section 1001 is not unconstitutionally vague, either on its face or as applied, defendant's argument fails.

## C.  Sufficient Evidence Supports the Jury's Findings That Defendant's Statements Were False

Finally, defendant contends that the Court should grant a judgment of acquittal on Count Two because each of the three statements supporting that count were "literally true."[5]  (See Dkt. No. 186 at 3.)  Specifically, defendant argues that his statements—that (1) his contributions were publicly disclosed, and (2) that he was not aware of any illegal contributions—were "literally true" and therefore cannot support his conviction. Defendant's arguments fail.  The jury more than reasonably arrived at its verdict that these statements by defendant were false.

### 1.  Defendant Lied to Federal Investigators That His Contributions Were Publicly Disclosed

The jury reasonably found that defendant willfully lied to federal investigators during the Nebraska Interview when he falsely stated that every campaign contribution he had was publicly disclosed.  The jury also reasonably found that defendant lied when he falsely claimed everyone who gave for the Los Angeles Fundraiser was "publicly

---

[5] Defendant does not argue that each of the concealed/falsified material facts or materially false statements on which Counts One and Three are based were "literally true."

listed." Notably, these two false statements by defendant were <u>not made in response to a question</u>. Indeed, defendant <u>interrupted</u> Agent Carter to voluntarily make these affirmative false statements:

> AGENT CARTER: And--that's I mean--just trying to find out our base knowledge about campaign contributions and IDC.
> FORTENBERRY: Right.
> AGENT CARTER: And specific to illegal campaign contributions--
> FORTENBERRY: **Every contribution that I have is publicly disclosed.**
> AGENT CARTER: Yes.

(Trial Ex. 129.)

A few moments later, Agent Carter and defendant had the following exchange:

> AGENT CARTER: So, do you have any knowledge about illegal campaign donations?
> FORTENBERRY: The-the only thing that's concerning me about the conversation is, again, there were a couple of people--
> AGENT CARTER: Huh.
> FORTENBERRY: --that are connected to the broader community--
> AGENT CARTER: Okay.
> FORTENBERRY: --that--I was at two events. **One was a fundraiser for me--**
> AGENT CARTER: Yeah.
> FORTENBERRY: --**that's all publicly listed, who gave.**

(Trial Ex. 131.) In the second exchange, the proximate pending question pertained to defendant's "knowledge about illegal campaign donations" and not his disclosures. But, in an effort to mislead and obstruct the investigators, defendant chose to affirmatively and falsely tell Agent Carter that the contributions for the Los Angeles Fundraiser were "all publicly listed."

In viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found, and clearly did find, that defendant's statements were false. (Dkt. No. 186 at 3.) The evidence at trial showed that defendant knew his FEC

disclosures—and specifically his April 2016 FEC quarterly report covering the time period of the Los Angeles Fundraiser—omitted any mention of Toufic Baaklini and Gilbert Chagoury.  (See Trial Ex. 12 (April 2016 FEC Report naming conduits); Trial Ex. 151 (defendant personal reviews every FEC reports "line by line").)  At the same time, however, defendant knew and understood from at least the time of the June 4 Call that Baaklini and Chagoury were the ones who had, in fact, provided the money for the contributions at the Los Angeles Fundraiser.  The jury also heard defendant, later in the same Nebraska interview, flatly deny being aware that Baaklini made, directed, or facilitated illegal contributions.  (Trial Ex. 130.)  Moreover, during the D.C. Interview, defendant denied that Dr. Ayoub ever said Chagoury or Baaklini had a role in the Los Angeles Fundraiser.  (Trial Ex. 155 (denying that Dr. Ayoub told him during the call that Baaklini had given $30,000 cash to help fund the Los Angeles Fundraiser); Trial Ex. 154 (claiming that Dr. Ayoub did not say Chagoury had some role in the fundraiser).)   Most relevant, during both interviews defendant knew specifically that investigators were interested in learning whether individuals, including foreign nationals, had funneled contributions to defendant's campaign using other people's names, and not simply whether the names on defendant's donor forms matched the names on the checks received by his campaign.

Such evidence demonstrated that defendant's statements were "literally false."  It was not true that "all" or "every" contribution to defendant was disclosed because defendant's contributors included Baaklini and Chagoury, whom defendant knew were not reported on his FEC forms.  To the extent there could be any doubt about defendant's understanding that Baaklini and Chagoury were the true sources for the Los Angeles Fundraiser, or defendant's criminal intent in making these statements to the agents, "the jury was entitled to, and did, resolve that issue against him."  United States v. Abpikar, 583 F. App'x 780, 781 (9th Cir. 2014); see also United States v. Canada, 2021 WL 3630230, at *2 (9th Cir. Aug. 17, 2021) (rejecting defendant's argument that her

statements denying knowledge about an order to purchase property were "literally true" when "a rational jury could have inferred that she was lying").

2.     Defendant Lied When He Falsely Denied Being Aware of Illegal Contributions

In returning a guilty verdict on Count Two, the jury also reasonably found that defendant falsely answered Agent Carter's question when he denied being "aware" that Baaklini made, directed, or facilitated any illegal contributions:

> AGENT CARTER: Are you aware if Toufic uh, made or directed anyone to conduct any illegal contributions?
> FORTENBERRY: **I'm not aware of that.**
> AGENT CARTER: Are you aware if Baaklini ever provided money to anyone to conduct conduit contributions?
> FORTENBERRY: **No I'm not aware of that.**

(Trial Ex. 130; see also Dkt. No. 186 at 3.)  This statement was false because defendant was aware at the time of the Nebraska Interview that Baaklini directed illegal campaign contributions to defendant's campaign for the Los Angeles Fundraiser, and defendant had been aware of this fact since at least the time of the June 4 Call when Dr. Ayoub repeatedly stated as such.[6]

Defendant takes issue with the word "aware," claiming that his answer was "literally true" because he meant to convey he lacked "personal knowledge or belief" that Baaklini facilitated illegal contributions. (See Mot. at 16.)  As a threshold matter, the government submits that having the host of the fundraiser directly confirm with defendant that the host made conduit contributions using money from Baaklini furnished defendant with significant "personal knowledge or belief" of that same fact.  But in any event, even "the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution."  United States v.

---

[6] Defendant more broadly contends that his statements denying awareness, including as it related to Chagoury, were "literally true."  (See Mot. at 15.)  In any event, because Counts One and Three are based on additional facts or statements that are not about defendant's "awareness," those convictions would remain unaffected by this argument.

Culliton, 328 F.3d 1074, 1078 (9th Cir. 2003) (per curiam).  That is because "[i]t is for the jury to decide . . . which construction the defendant placed on a question." Id. Indeed, a defendant's conviction "is not invalidated by the fact that his answer to the question[s] might generate a number of different interpretations." Id. at 1079 (quoting United States v. Swindall, 971 F.2d 1531, 1553 (11th Cir. 1992)).   So long as persons of "ordinary intelligence" can arrive at a mutual understanding of the meaning of the question, it is not impermissibly ambiguous.  United States v. Camper, 384 F.3d 1073, 1076 (9th Cir. 2004).

Here, the context of the question, defendant's denials on other related questions, and other extrinsic evidence relevant to the defendant's understanding of the question allowed the finder of fact to conclude that "the defendant understood the question as the government did and, so understanding, answered falsely." Culliton, 328 F.3d at 1079. Agent Carter posed the question (is defendant "aware" if Baaklini facilitated any illegal contributions) well into the 40-minute interview, after the following had already occurred:

- Agent Carter advised defendant that the government was investigating In Defense of Christians and campaign funding (Trial Ex. 115);
- Agent Carter advised that the agents wished to know if defendant was "aware of any illegal campaign contributions to [his] campaign" (Trial Ex. 128) and to find out "our base knowledge about campaign contributions and IDC, and specific to illegal campaign contributions" (Trial Ex. 129);
- Agent Carter asked a number of questions about Toufic Baaklini (Tr. Exs. 117, 123, 127), Dr. Elias Ayoub (Tr. Exs. 120, 126, 128), Gilbert Chagoury (Trial Ex. 121, 122); about any fundraisers hosted by Baaklini (Tr. 123); and whether anyone from IDC had organized a fundraiser for defendant (Tr. 126).

Other evidence at trial showed that, by the time of the Nebraska Interview, defendant had already been put on notice by Alexandra Kendrick that there may be an issue with

1   conduit contributions at the Los Angeles Fundraiser and that defendant himself had

2   previously raised this possibility with Baaklini.[7]

3       It is a plainly reasonable, if not the only reasonable, interpretation that, by his

4   question, Agent Carter was asking if defendant had any knowledge, information,

5   understanding, suspicion, or reason to believe Baaklini made, directed, or provided

6   money for illegal contributions—and that defendant understood the question as such.

7   See United States v. Matthews, 589 F.2d 442, 445 (9th Cir. 1978) ("There is ample

8   evidence from which the jury could conclude beyond a reasonable doubt that [the

9   defendant] understood the question asked of him as pursuing the same inquiry . . . . that

10  was explicitly made the subject of other questions asked in the course of the same

11  interrogation.  Indeed, we do not see how the question could rationally be given any

12  other meaning.").  Given the context of the question and stated purpose of the interview

13  itself, the jury reasonably concluded that defendant understood the question as such and

14  chose to falsely answer that he was "not aware."  See United States v. Ji Eon Lee, 528 F.

15  App'x 773, 774 (9th Cir. 2013) ("Considering the context in which the question was

16  asked, and the broader purpose of the interview itself," the question posed was not

17  fundamentally ambiguous; jury was "free to determine – based on the record before it –

18  how [the defendant] interpreted the question, and whether she answered it truthfully.").

19      Defendant's post hoc interpretation of Agent Carter's question, on the other hand,

20  strains credulity.  Defendant suggests that defendant understood Agent Carter, by using

21  the word "aware," to be asking whether defendant had an unquestioning conviction of

22  the truth that Baaklini facilitated illegal contributions.  (See Mot. at 15 ("Nor did the

23  prosecution introduce any evidence that [defendant] *accepted as fact* everything that Dr.

24  Ayoub said to him during the June 4, 2018 phone call").)  But the question posed was

25  deliberately broad and was whether defendant was "aware" if Baaklini facilitated illegal

26  contributions—not whether defendant had definitive and conclusive proof of that fact

27

28      [7] For this reason, defendant's assertion that "no evidence was offered that the
    Congressman knew of the contributions' illicit character at the time they were made in
    February 2016" is contradicted by the evidence.  (See Mot. at 3.)

beyond all possible doubt.  Nor is it reasonable to think that defendant believed Agent Carter was not asking about, and would have no investigative interest in, the fact that Dr. Ayoub had told defendant that Baaklini (two of the same people Agent Carter had been asking about) facilitated illegal contributions for the Los Angeles Fundraiser.  In effect, defendant argues that had Agent Carter simply asked, "Did Dr. Ayoub tell you Baaklini directed illegal contributions, even if you did not believe a word he said," or whether defendant had "reason to think" the same, this would have then somehow unlocked defendant's truth and he would have responded, "Yes, I am not <u>aware</u> that Baaklini actually did these things, but Dr. Ayoub said those words."  (<u>See</u> Mot. at 16.)  This argument is directly refuted by the evidence at trial.  Even when precise questions were posed about what Dr. Ayoub said, and whether defendant had any "reason" to think there were illegal contributions, defendant flatly denied it.  (<u>See</u> Trial Ex. 155 (answering "no" to the question "during that conversation, did Dr. Ayoub <u>tell you</u> that Toufic Baaklini had given Dr. Ayoub $30,000 cash to help fund your fundraiser"); Trial Ex. 156 (defendant falsely claiming that "up to that point [of the D.C. Interview]," he had "<u>no reason</u> to believe that any of those donations [from the Los Angeles Fundraiser] were illicit").)  For those same reasons, to the extent it might have occurred to the jury to consider this implausible interpretation of Agent Carter's question, they properly rejected it. [8]

---

[8] <u>Bronston v. United States</u>, 409 U.S. 352 (1973), is inapplicable here.  In <u>Bronston</u>, the Court held that a perjury conviction under 18 U.S.C. § 1621 could not be supported by a defendant's answer that was indisputably true but merely <u>nonresponsive</u> to the question posed.  <u>See United States v. McKenna</u>, 327 F.3d 830, 840-41 (9th Cir. 2003) ("<u>Bronston</u>'s rule is limited to cases in which the statement is indisputably true, though misleading because it was unresponsive to the question asked.").  In response to a question about whether the <u>defendant</u> had any Swiss bank accounts, the defendant responded that the <u>company</u> had an account there for about six months.  <u>Bronston</u>, 409 U.S. at 354.  It was undisputed that the defendant's statement about the company was true.  <u>Id.</u>  <u>Bronston</u> is inapposite to this case, both because (1) it <u>is</u> disputed that defendant's statement was true, and (2) defendant's answer "was not unresponsive.  It was a forthright 'no.'"  <u>Matthews</u>, 589 F.2d at 444; <u>United States v. Thomas</u>, 612 F.3d

*(footnote cont'd on next page)*

In sum, even assuming Agent Carter's question was ambiguous and that defendant's claimed interpretation of the question was reasonable, the jury properly decided which of the plausible interpretations of an ambiguous question the defendant apprehended and responded to.  See Camper, 384 F.3d at 1076-78.  The jury correctly concluded that the agent asked, and defendant answered falsely, a question about any information defendant had regarding Baaklini's facilitation of illegal contributions.  See United States v. Mohsen, 587 F.3d 1028, 1032 (9th Cir. 2009) ("There was sufficient evidence for the jury to conclude that [the defendant] understood the question as it was asked, and intentionally lied.").  The entire record contains ample evidence that defendant was motivated by self-interest when he deliberately and repeatedly chose to lie about federal crimes committed by his associates and that benefitted his campaign, and the jury reasonably relied on that evidence to convict him on all counts.  Those findings should not be disturbed.

## V.    CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's Rule 29 motion.

---

1107, 1115–16 (9th Cir. 2010) (distinguishing Bronston because the "allegedly perjurious statements were undisputedly literally true, which is not the case here").