John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel.: (949) 369-3700
Fax: (949) 369-3701

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>    *Defendant.* | Case No. 2:21-cr-491-SB<br><br>Hon. Stanley Blumenfeld, Jr.<br><br>**JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM**<br><br><br>Sentencing: June 28, 2022, 8:00 a.m. |

# I.

## Introduction

Jeffrey Fortenberry is a committed father of five and devoted husband who served the public with distinction on the City Council of Lincoln, Nebraska, and then in the United States House of Representatives over a combined quarter-century.  He has earned respect, admiration, and meaningful relationships with friends and colleagues from a wide range of viewpoints and backgrounds.  Together with his wife, Celeste, Mr. Fortenberry raised five exceptional daughters, giving them the love and support they needed despite the constant demands of his public service.  The attached letters from friends and family members reveal a life characterized by dignity, compassion, and service to others.

The conviction in this case devastatingly impacted Mr. Fortenberry's life.  Once a revered public servant, Mr. Fortenberry resigned from Congress.  Stripped of the rights to vote and possess a firearm, Mr. Fortenberry cannot even participate in our democracy.  The federal pension that he relied on for retirement is now in jeopardy.

The United States Sentencing Guidelines do not call for imprisonment in this case, and imprisonment is unwarranted.  The advisory Guidelines sentencing range is 0 to 6 months, and, as shown below from the Sentencing Commission's rich data set, United States District Courts rarely impose custody in cases like this one.

Moreover, the painful collateral consequences of this conviction have already achieved any deterrence that this prosecution could achieve.  There is no danger to the public.  Mr. Fortenberry has led an extraordinary and rigorously law-abiding life over his sixty-one years.  He will continue to do good for others.  In these circumstances, imprisonment would be punishment "greater than necessary." 18 U.S.C. § 3553(a).

# II.

## Jeffrey Fortenberry

"Jeff takes life very seriously, always searching to make the right decision along his journey."  Exhibit 7, William C Smith, Jr. (stepfather), Letter.  In Mr. Fortenberry's case,

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

this comes from his innate generosity, his upbringing and faith, and likely also from formative experiences of conflict and loss during his childhood.

**A.    Early Childhood**

Mr. Fortenberry was born and raised in Baton Rouge, Louisiana, to a working-class family.  His father was an insurance salesman.  His mother worked as an agricultural cooperative extension agent for the State of Louisiana.

Childhood presented Mr. Fortenberry with some advantages and some disadvantages. Mr. Fortenberry was blessed with health, two parents who loved him, and strong bonds with his sister and grandparents.  Although the family was not rich, it had enough money to satisfy its basic needs.  But sadly, much of childhood was painful for Mr. Fortenberry.  Two experiences of this time shaped him forever.

First, there was the experience of seeing his parents quarrel, grow apart, and divorce. These events unfolded in front of Jeff's and his sister's eyes before they reached their teen years.  He pleaded with his parents to stay together, and, to this day, he grieves their separation.  Leaving the family home, he and his sister moved to a small apartment where they shared a room.  Mr. Fortenberry's mother worked hard to provide for them, driving many miles to work each day.

Second, this initial trauma was compounded when Mr. Fortenberry's father died in a car accident when Mr. Fortenberry was twelve years old.  Mr. Fortenberry still remembers seeing his mother's face hanging in shock at the news.  Mr. Fortenberry longed for the times when his parents were together and both alive.

As he entered early adolescence, fighting and drugs were prevalent at his middle school.  Mr. Fortenberry was assaulted and ostracized.  He transferred to a new school that provided greater stability when he reached eighth grade.  Among other feelings, Mr. Fortenberry reflects on his teenage years and questions whether he was an adequate older brother to his sister.

Mr. Fortenberry's stepfather and uncles tried to pitch in to fill the void left by his father's death, and they observed him succeed even though he was hurting inside.  As

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

Mr. Fortenberry's stepfather writes, he "was an excellent student in high school. He participated in sports, debate team, and 4-H activities, and won several national awards." Exhibit 7, William Smith Letter. At the 4-H national conference, Mr. Fortenberry's uncle remembers, he "won top prize for judging chickens" and "was offered a job by Kentucky Fried Chicken Colonel Sanders!" Exhibit 37, Joseph Lamendola, M.D., Letter. Young Mr. Fortenberry did begin working around this age, albeit at the grocery store and veterinarian's office, rather than KFC.

Mr. Fortenberry's sister and his cousins describe him in childhood using words much like those used to describe the adult Jeffrey Fortenberry: "kind," with a "love of family." Exhibit 25, Elizabeth Fortenberry Daly Letter. Elizabeth says Jeffrey "is an inspiration to [her] and [she has] always looked up to him." *Id.* Jeffrey's second cousin, Anne Taylor, shares more good insights on young Jeffrey's old soul:

> As a child, I remember Jeff as a kind, sensitive, and compassionate child. Children remember how they are treated by others. As a young adult, I remember Jeff as a conscientious, studious, inquisitive and considerate young adult. He would periodically come over to visit my parents to learn more about his family history on his Dad's side.

Exhibit 60, Anne Taylor Letter; *see also, e.g.*, Exhibit 34, Barbara Hepp Letter ("Jeff has always been a kind, considerate and honest person. This was true when he was a child, this was true when we were adolescents, and is true today. [\] As children, we would visit our great grandparents together in Baton Rouge. He took extra care to treat them with respect and dignity."). Mr. Fortenberry's family members were struck by his special care for seniors: "A particular aspect of his kindness is his respect for the elderly; as he often accompanied his grandmother to my late father's[ ] birthdays, which occurred many times in the late 1990's as my father lived to be 103." Exhibit 42, Harriet Babin Miller Letter.

Despite the hardship he endured, both at home and in school, Mr. Fortenberry made lifelong friends during his childhood. Those friends are in a unique position to comment on his character and narrate the arc of his life. Mr. Fortenberry's eighth-grade classmate, Kevin Williams, who has maintained a friendship with him for fifty years, says:

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

There were only 35 students in the eighth-grade class, and many of us formed bonds in that class that have lasted a lifetime. Catholic High School was predominantly white. I was the only African-American student in that eighth-grade class and one of only six African-American students in our senior class of 144 students when we graduated in 1978.

You might well imagine that it could be a very isolating and lonely experience for a 12-year-old black child trying to exist in a primarily white environment in the early 1970s. I was fortunate to find a lasting connection with Jeff who was my best friend in eighth grade and throughout our high school years. I spent many hours at his home and he at mine. I grew up with him and his mother, sister, and stepfather. I was welcomed into his home and felt very much a part of his family. Even at that early age, Jeff was able to see people as they were, to ignore skin color and other attributes that did not matter. He embraced me at a time in this country when it was still unusual for black and white children to mingle effortlessly, particularly in the South. There were many homes that would not have welcomed me, even more where the most I could have hoped for would be for my presence in their homes to be tolerated. Jeff did not see any difference between us, a remarkable feat for a 12-year-old white child in a country that had just passed the Civil Rights Act less than a decade earlier. That is who Jeff is and how he has lived his life.

Exhibit 63, Kevin Williams Letter.

## B.    Young Adulthood

At age eighteen, Mr. Fortenberry got an exciting opportunity, particularly for a young American of an Abrahamic faith.   He traveled through the International 4-H Youth Exchange for a semester in Egypt.  Exhibit 3, Celeste Fortenberry Letter.  Mr. Fortenberry has described these travels as a formative event, and it is easy to understand why.  "He lived with different families all over the country, learning everything he could about their culture, education, agriculture, and even some of their language." *Id.*

On entering the Sinai Desert, Mr. Fortenberry encountered graffiti on a twisted pile of concrete and rubble, bearing the message below.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

These experiences mattered deeply to Mr. Fortenberry. "To this day Jeff maintains friendships with people from and in Egypt, including past and present ambassadors to our country." *Id.* After his time in the Middle East, Mr. Fortenberry returned to Louisiana and his undergraduate studies at LSU. Reflecting on another example of how Mr. Fortenberry has reached out to support and engage with people from backgrounds different from his own, his mother recalls Thanksgivings at their home from his college years:

> When Jeff was in college he would, what I called, "bring home strays". These were students, many of them foreign, who had no place to go for Thanksgiving and other holidays. We hosted many people because of his hospitable nature and our [f]amily learned much from those memorable experiences. I told him he couldn't save the whole world, and he would say to me, "Maybe not, but I can save my own little corner, Mom!"

Exhibit 8, Joy Smith Letter.

Mr. Fortenberry completed his bachelor's degree in economics. For a time, he pursued graduate study in economics. But Mr. Fortenberry found that his heart was drawn to the study of the higher ideals of humankind—what *should b*e—rather than the objective abstractions of differential equations. Mr. Fortenberry ultimately completed his master's studies in public policy at Georgetown University and yet another master's degree in

theology from Franciscan University of Steubenville in Ohio. Years later, Franciscan University granted Mr. Fortenberry an honorary doctorate degree.

At one point, Mr. Fortenberry had considered joining the ministry. He ended up meeting his wife, Celeste, while he was a theology student.

**D.    A Dedicated Husband and Father**

Mr. Fortenberry and his wife Celeste are true soul mates. Celeste sums it up:

> After nearly 26 years of marriage I am ineffably proud of my husband, and profoundly grateful for the gift that he is. I love him today more than I ever have. Jeff is, and has always been, an extraordinarily good and loving man . . . .

*Id.* The Fortenberrys are raising their five extraordinary daughters as a team, striving always to pass on the best of what they know. (Two of them are currently in college, and the youngest, C.F., is still living at home.) During Mr. Fortenberry's time in office, this was not always easy, as his daughters Claire and Elizabeth explained:

> The fondest memory I have is checkers. Every evening, my dad would come home from work, kiss my mom and then sit down for a game of checkers with me. This is not a particularly long game, but he would manage to drag it out for as long as possible, just to have that special time with me. When he was elected to congress, our games decreased as he had to spend more time away from home. As a young child this was disheartening, until I realized that he now had thousands of other families that he was taking care of, and everyone needed his checkers time. Thinking about that filled me with pride for my dad.

Exhibit 1, Elizabeth M. Braman Letter; *see also* Exhibit 5, Claire Fortenberry Letter ("His time in Congress has brought us amazing adventures and privileges that we would not have otherwise had. It also required immense sacrifice from our whole family.").

> It would've been easy for him to use fatigue or busyness as an excuse to be absent from my childhood, but he didn't. He would always try to show up to the choir or band concert, and go to my plays and my cheer competitions. When he couldn't he would make it up by inviting me to join him at his events. Even while he was paying attention to constituents, he would make sure to pay attention to me, too. He taught me how to behave in social settings, preparing me for success later on in interviews and events I later attended without him.

Exhibit 4, Christine Fortenberry Letter.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

Mr. Fortenberry's third daughter, Kathryn, required even more from him. She was born with a severe heart defect that required multiple medical interventions. During Kathryn's second open-heart surgery, which occurred when she was four years old, a

 

surgeon nicked her aortic valve. Because of that nick, Kathryn developed congestive heart failure before she was six years old and needed three more open heart surgeries. Exhibit 3, Celeste Fortenberry Letter. Since then, Kathryn has required near-constant medical attention. She was bedridden for much of high school. She has nearly died several times. Kathryn has undergone fifteen surgeries, including five open heart surgeries. Exhibit 6, Kathryn Fortenberry Letter.[1] She is at an elevated risk for stroke, particularly around the time she has surgery, because then she has to stop taking blood thinners. She has had two strokes in the last year. Exhibit 3, Celeste Fortenberry Letter.

Kathryn's medical expenses have been a constant source of stress, above and beyond the typical financial burdens of raising five children. The second of Kathryn's strokes last year required ten days in Georgetown's stroke unit. As Mrs. Fortenberry notes, "we are

---

[1] One of Kathryn's invasive surgeries was scheduled for June 6, 2018, only two days after Dr. Ayoub called Mr. Fortenberry at the FBI's direction to inform him of the illegal campaign contributions he had received two years earlier, and the day before Mr. Fortenberry called Jessica Furst, his campaign finance lawyer, to tell her about the call.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

still paying for that." *Id*. But Mr. and Mrs. Fortenberry have mostly shouldered the burden alone. As Kathryn notes in her letter, "I have never been told and I likely will never know how great of a financial burden I am because of my medical issues. I will also never truly know the depth of worry that consumes my parents." Exhibit 6, Kathryn Fortenberry Letter. Mr. Fortenberry responded to Kathryn's complex health condition with the same vigor and intensity he applied to matters of national security. He "buried himself in research" regarding Kathryn's condition and strove to ensure that Kathryn would have a "long and healthy and 'normal' life." *Id*. Kathryn explains: "he took the lead in exploring education options with my school so that I could continue my education in spite of my disabilities." As a result, Kathryn was able to graduate on time, and even qualify for the honors program at the University of Nebraska. *Id*.

**E. Public Service**

Mr. Fortenberry felt called to run for Lincoln City Council, where he served from 1997 to 2001. Mr. Fortenberry recalls fondly his time on the City Council, describing it as a great place where government functions at its most fundamental level to serve the basic needs of the population. But by 2001, Mr. Fortenberry needed to focus on his children's needs, particularly Kathryn's,[2] bringing his service on the City Council to an end.

In 2004, Mr. Fortenberry was elected to represent Nebraska's First Congressional District in the United States House of Representatives. Mr. Fortenberry went on to be re-elected eight times afterward, each time by a comfortable margin. Mr. Fortenberry ran for office because he wanted to bring integrity and dignity to Congress. Mrs. Fortenberry remembers that "Jeff often says that government's role is to create the preconditions for human flourishing. Societal order should be founded in an understanding of and respect for the dignity of each and every human person." Exhibit 3, Celeste Fortenberry Letter. This philosophy guided Fortenberry's work in Congress. As Fortenberry's chief of staff described at trial, Fortenberry strove to be not merely a politician but a statesman, and he

---

[2]      Kathryn was born August 2000, toward the end of Mr. Fortenberry's final term.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

demanded excellence from himself and his staff.  Many times, Fortenberry and his team achieved it, pursuing the inclusion of "locally-sourced food in federally-funded school lunches; food security initiatives; sustainable agriculture policy, including Farm of the Future; conservation initiatives; diplomacy; clean energy; [and] nuclear nonproliferation." Exhibit 3, Celeste Fortenberry Letter; Exhibit 57, Hon. Chris Stewart Letter (describing collaboration with Fortenberry through the International Conservation Caucus).

Part of what made Fortenberry special as a Representative—all the more so for the bitter polarization of American politics that has occurred over the span of his time in office—was his ability to work with colleagues with divergent viewpoints and backgrounds. His friend, Louis Benedetto Jr., writes: "Unlike many politicians, Jeff did not use a confrontational style when working with his colleagues on both sides of the aisle . . . .  In an era where ugliness and backstabbing is a way of life in Washington, D.C., Jeff Fortenberry was a statesman who worked hard, compromised when necessary, and finally got something done."  Exhibit 16, Louis Benedetto Jr. Letter.  As the Court may recall, Mr. Fortenberry worked closely with Anna Eshoo, a Democratic member of Congress from California, to build bipartisan support for a resolution declaring the persecution of Christians and other minorities in the Middle East by ISIS a genocide.  *See also* Exhibit 26, Hon. Anna Eshoo Letter.  Representative Eshoo notes that this was only the third such resolution in the House.  *Id.*  Mr. Fortenberry was a powerful ally to the people of the Middle East who were threatened by ISIS.  "He was always a man of his word and professional in every way."  *Id.*  Ms. Eshoo knows Fortenberry "to be a deeply devoted husband and father, a man dedicated to service to others, a person who possesses humility and integrity, and a person who is devoid of arrogance."  *Id.*  These are especially impressive qualities for someone who has accomplished so much.

Mr. Fortenberry was also known in Congress as a scrupulous and law-abiding person. During trial, Representative Eshoo put it well:  "He's an honorable person. . . .  He's faith-filled.  He's honest. . . . [H]e brings integrity to everything that he does."  Dkt. No. 203 (03/23/22 TX at 108).  Even the government's witnesses acknowledged this.

During his time in office, Mr. Fortenberry reached out to people in need of help regardless of political expedience. The CEO of People's City Mission, Lincoln's primary homeless shelter, notes that Mr. Fortenberry "volunteered at the shelter on numerous occasions, provided financial backing, and promoted our cause to the community at large" but he "never promoted his relationship with [the Mission] to the public or looked to score political points from his support." Exhibit 12, Tom Barber Letter. "Outside this letter to [the Court], few people are aware of his work among the poor in Lincoln." *Id.*

Fortenberry's sincere belief in God and good has inspired many to lead better lives. This included Sidney Robards Bowden, who writes that Jeff's example as a man of Catholic faith led him to convert. Exhibit 18, Sidney Robards Bowden Letter. Another person whom Fortenberry's faith inspired was Alexandra Kendrick, who worked with Fortenberry as a fundraising consultant. She testified in the government's case at trial, but acknowledged Fortenberry enjoyed a sterling reputation in Congress and is an honest person who lives a devout Catholic life. Kendrick testified further that Fortenberry "absolutely did" help her in her own faith journey.

Eileen Cosby, who met Jeff during their studies at Franciscan University writes that Jeff's "compassion runs deep for his friends," and he was with her for "every moment" of the priestly ordination of the man she otherwise might have married. Exhibit 23, Eileen Cosby Letter. She will never forget that Jeff "loved us both like a good brother, encourag[ing] us to be strong when it was difficult." *Id.* Later, Jeff encouraged Ms. Cosby in becoming an advocate for women's rights in the Philippines, and "opened every door that he could" to assist, asking nothing in return. *Id.* "He knew it was his mission to help those without a voice. The children and mothers in the barrios of the Philippines who were targeted by coercive violations would never be able to thank him, but I do." *Id.* Former Chief United States Probation Officer Eddie Samson has "never met a more honorable, honest, dedicated and caring man, son, husband, father and committed representative of his constituents, community and country. Exhibit 52, Eddie Samson Letter.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

Fulfilling though public service was for Mr. Fortenberry's soul, it also took a significant personal toll. It would not have been possible without the frequent strain of distance from the people Mr. Fortenberry loves most. Over his seventeen years in Congress, balancing the responsibilities of his office with his responsibilities as a husband and father was truly challenging. Mr. Fortenberry made great personal sacrifices to serve his country and has never sought to profit from that work in any way. Indeed, because of his significant family obligations and lack of personal or family wealth, Mr. Fortenberry slept on an air mattress or the couch in his office in Washington, D.C., for years. *See* PSR ¶ 128. Professor Barbara Harrington writes, "I remember being shocked to discover that he was living in his Congressional office for many years because the family couldn't afford to maintain residences in both Nebraska and Washington, DC. Jeff wasn't complaining about this ongoing personal inconvenience. In fact, he shrugged it off as being a small sacrifice beside the great honor of serving in Congress." Exhibit 33, Letter from Barbara Harrington, Ph.D. Clearly Mr. Fortenberry did not serve in Congress for money.

Serving in Congress also exposed Mr. Fortenberry and his family to threats and vandalism. On more than one occasion, people who disagreed with Mr. Fortenberry's positions or votes on issues have threatened him and his family. *See* Exhibit 3, Celeste Fortenberry Letter (describing "17 years of lonely and sometimes fearful nights when I've wondered if *that* noise was someone breaking in to carry out one of the multitude threats of rape, violence, and murder leveled against us because of Jeff's work").

In their letters, Mrs. Fortenberry and their daughters all describe how the time lost together with Jeff affected them. It was hard, but tolerable because it was part of the family's shared understanding of his role. As the letters describe, it worked for the Fortenberrys only because Mr. Fortenberry still found meaningful ways to cultivate deep relationships with each of them, expressing his love and support. The six women at the center of Mr. Fortenberry's life have therefore supported and admired him for his public work, enabling him to serve at the high level that he did.

**F.     The Impact of the Conviction**

The devastation of the verdict and the loss of Mr. Fortenberry's ability to continue to pursue his work of the past seventeen years have been staggering.  On March 26, 2022, Mr. Fortenberry formally resigned from Congress, telling his constituents that "[d]ue to the difficulties of my current circumstances, I can no longer effectively serve."  Exhibit 65, March 26, 2022 Resignation Letter.  Just like that, Mr. Fortenberry's career was over.

Mrs. Fortenberry describes some of those consequences in her letter to the Court:

> Jeff lost his job, his reputation, and many friends. He has suffered public slander about his character extending far beyond the counts of his conviction. He has lost the ability to continue to do good and great things for our nation and for the world—the only reason he ever wanted to be in public office. He can no longer vote. He can no longer hunt, a pastime he long enjoyed with friends and his daughters. Jeff's federal pension will most likely be taken away—the majority of our retirement savings. We have mortgaged our home, and personally borrowed (and spent) extraordinary sums of money to pay legal bills; and bills are still coming in. We have two daughters in college—they're wondering if they have to drop out; and another getting married—she's already given up on her parents being able to help her pay for her wedding.

Exhibit 3, Celeste Fortenberry Letter.  He has probably lost the pension that was the primary source of his retirement.  *See* 5 U.S.C. § 8411(l)(2)(B).  That prospective loss hurts all the more because Mr. Fortenberry is not only the primary breadwinner for his family, but he will also support his aging mother and stepfather, as well as his sister.  *See* PSR ¶ 65.

The conviction has already struck Mr. Fortenberry's sixteen-year-old daughter, C.F., particularly hard.  It is evident she speaks for their family in writing that she "just knew [upon hearing the verdict] that [her] life and [her] family's life were about to change drastically." Exhibit 2, C.F. Letter.

### III.

### The Offense Conduct

As the Court will recall, this case arose from an investigation into illegal campaign contributions totaling approximately $30,000 to Mr. Fortenberry's campaign at a 2016

fundraiser.  The contributions originated from a foreign national but were funneled to Mr. Fortenberry's campaign through conduits who were U.S. Citizens.

Mr. Fortenberry did not know about the illegal campaign contributions at the time they were made.  He did not personally profit from them, nor did they materially impact any election.  He has not been charged with violating any laws relating to campaign finance.  Two years after the 2016 fundraiser, a co-host of the fundraiser, who was then cooperating with the FBI and acting as an informant, conducted two phone calls with Mr. Fortenberry at the FBI's direction.  During the second call, at the FBI's direction, the informant mentioned the illegal campaign contributions.  This second phone call lasted about ten minutes.  Both calls were recorded and transcribed by the FBI.

The charges in this case stem from statements Mr. Fortenberry subsequently made to FBI agents and prosecutors in 2019—first, during the FBI's night-time visit to his home in Lincoln secured using a ruse, and then at a follow-up interview in Washington, D.C.

The encounter at Mr. Fortenberry's home in Lincoln, Nebraska, occurred on the night of March 23, 2019.  In an informal setting in Mr. Fortenberry's living room, then-Congressman Fortenberry was asked a series of questions by FBI Special Agent Todd Carter and an IRS agent.  The questions first centered on Mr. Fortenberry's knowledge of In Defense of Christians and its leaders, and then turned to whether his campaign had ever received illegal campaign contributions.  During the discussion, Mr. Fortenberry volunteered that he heard comments from the co-host of the fundraiser that gave him concerns, but denied being aware of any illegal contributions to his campaign.  Mr. Fortenberry also said all the contributions to his campaign, including those at the 2016 fundraiser, were publicly disclosed in his FEC reports.

At a follow-up interview in Washington, D.C., in July 2019, then-Congressman Fortenberry provided additional information in an interview that lasted almost two hours.  In that interview, Mr. Fortenberry told the agents and prosecutors that he had received a call from the co-host of the fundraiser and that he heard a concerning comment during that call.  He indicated that the comment related to Gilbert Chagoury, who he understood to be

a foreign national, and that it gave him concern that Mr. Chagoury had somehow contributed to his 2016 campaign. However, Mr. Fortenberry maintained that he was not aware of any illegal contributions to his campaign. In response to questioning by the lead prosecutor in this case, who apparently was relying on a transcript of the 2018 call, Mr. Fortenberry denied that he was told by the FBI informant that the informant was given $30,000 cash by IDC President Toufic Baaklini to contribute to his campaign. Mr. Fortenberry told the prosecutor that he would have been "horrified" to learn that.

In addition to the two voluntary interviews described above, Mr. Fortenberry also cooperated with the government by providing agents with several emails to aid their investigation after his second government interview, and he waived his attorney-client privilege so that the FBI could interview the attorney who advised him on election-law issues and with whom he consulted about his concerns after receiving the informant's call.

After the second interview in July 2019, and long before he knew that the government had targeted him for prosecution, Mr. Fortenberry immediately sought to return the donations from the 2016 fundraiser. The government requested that he not return the money, indicating that doing so would interfere with the investigation, but ultimately suggested that Mr. Fortenberry could donate the money to charity instead.

On September 30, 2019, Mr. Fortenberry caused his campaign committee to donate $10,000 to St. Gianna Women's Home. On October 28, 2019, he caused his campaign committee to donate $20,000 to People's City Mission.

## IV.

## Analysis of Guidelines and Statutory Sentencing Factors

Both the United States Sentencing Guidelines and the statutory sentencing factors set forth in 18 U.S.C. § 3553(a) strongly support a non-custodial sentence.

## A.    The Guidelines support a sentence of probation.

The Sentencing Guidelines, which are "the starting point for every sentencing calculation in the federal system," *Peugh v. United States*, 569 U.S. 530, 542 (2013), do not require imprisonment. The probation officer correctly concluded that the offense level in

1   this case is 6, and the applicable advisory custodial range is 0 to 6 months.  *See* PSR at ¶

2   40.  Neither party objected to that calculation.[3]

3         Under Guidelines § 5C1.1(b), "a sentence of imprisonment is not required."  And

4   because this case falls within the lowest possible sentencing range, and Zone A of the

5   Sentencing Table, a sentence of probation is appropriate.  *See* U.S.S.G. § 5B1.1(a)(1).

6   Indeed, "[i]n some cases, a fine appropriately may be imposed as the sole sanction" for

7   Zone A offenses.  U.S.S.G. § 5C1.1, cmt. n.2.  For nonviolent first offenders whose offenses

8   fall within either Zone A or B of the sentencing table, a non-custodial sentence is

9   *encouraged*.  *See* U.S.S.G. § 5C1.1, cmt. n.4. ("If the defendant is a nonviolent first offender

10  and the applicable guideline range is in Zone A or B of the Sentencing Table, the court

11  should consider imposing a sentence other than a sentence or imprisonment, in accordance

12  with subsection (b) or (c)(3).").  The Commission added application note 4 to § 5C1.1's

13  commentary in 2018 to reflect the "general appropriateness of imposing a sentence other

14  than imprisonment" for "a first offender who has not been convicted of a crime of violence

15  or    an    otherwise    serious    offense."    *See*    https://www.ussc.gov/sites/defaul

16  t/files/pdf/guidelines-manual/2018/APPENDIX_C_Supplement.pdf, Amendment 811.

17        Though this, in itself, does not *dictate* a non-custodial sentence, it is an important

18  sign that imprisonment could be "greater than necessary" to satisfy the other, interrelated

19  factors of § 3553(a).  Indeed, it would be, as the following discussion shows.

20  **B.    Custody is Unnecessary and Inappropriate Under 18 U.S.C. § 3553(a).**

21        Section 3553(a) requires to the Court to consider, among other things, the nature and

22  circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C.

23  § 3553(a)(1), as well as the need for the sentence imposed to accomplish the goals of just

24  punishment, adequate deterrence, and protection of the public, § 3553(a)(2).  The Court's

25  ultimate duty is to ensure that the sentence imposed "is appropriate for the individual

26

27  [3]     No objections to those sentencing calculations were filed within the time allowed
    for doing so under Federal Rule of Criminal Procedure 32(f)(1).

28

defendant in light of the statutory sentencing factors." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

Mr. Fortenberry's exceptional <u>history and characteristics</u> weigh heavily against a custodial sentence under § 3553(a)(1). As the attached letters and the trial testimony demonstrate, Mr. Fortenberry has impacted many lives for the better through his kindness and commitment to good. Despite this conviction, Mr. Fortenberry has been a law-abiding and productive community member as well as a dutiful son, grandson, father, and husband throughout his sixty-one years. These descriptions continue to apply in light of Mr. Fortenberry's entire record, even taking into account the jury's verdict.

Further under § 3553(a)(1), the <u>nature and circumstances of the offense</u>, are not so aggravated as to necessitate incarceration. Neither Mr. Fortenberry nor his campaign received a dime because of his charged statements—the true answers to which were, in any event, largely known by the government when it asked Mr. Fortenberry the questions. The government had a recording of the 2018 informant's call to Fortenberry, and no reason to believe that Fortenberry contemporaneously knew of the illicit nature of the 2016 donations, when the government asked him about the informant's call in 2019. Mr. Fortenberry voluntarily agreed twice to meet with the government and waived his attorney-client privilege to attempt to assist the government's investigation into the illegal donations. After a lengthy investigation, there is still no credible evidence that Mr. Fortenberry knowingly received an illegal donation. Mr. Fortenberry disgorged the illegal contributions once he received a clear indication that the contributions had, in fact, occurred in an illegal manner—and well before his indictment. In these circumstances, imprisonment would not promote respect for the law or punish justly, but merely tax the exercise of the constitutional right to a jury trial.

///

///

///

The Court must also consider "the need for the sentence imposed . . . to <u>reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>." 18 U.S.C. § 3553(a)(2)(A) (emphasis added). Imprisoning Mr. Fortenberry would go far beyond what is necessary to serve these purposes. Nebraska Lieutenant Governor Mike Foley highlighted Mr. Fortenberry's exceptional service to the state, pointing out in his letter to the Court that "[a] prison sentence would serve no useful purpose as Jeff has already suffered the loss of his position in the US Congress not to mention the damage to his reputation and good name." Exhibit 29, Letter from Lt. Gov. Foley. And as the Bishop of Lincoln, Reverend James D. Conley, elegantly stated in his letter to the Court, "the burden that would be placed upon his beloved wife Celeste and their five daughters if he should [be] sentenced to prison for any length of time, would be nearly unbearable to shoulder. . . . I cannot bear the thought of the pain that might be caused to the Fortenberry[s], should jail time be demanded." Exhibit 22, Letter from the Most Rev. James D. Conley.

"[A]fford[ing] adequate deterrence to criminal conduct" under § 3353(a)(2)(B) (emphasis added) is not a ground to impose imprisonment either. Mr. Fortenberry has never previously committed any crime, and it is highly unlikely Mr. Fortenberry would make false statements to federal agents in the future. This conclusion is further reinforced by the fact that Mr. Fortenberry is sixty-one years old, an age at which recidivism rates for non-violent offenders are quite low to begin wtih. *See* Kim Steven & Billy Easley, U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (2017), available at https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

Finally, there is no need for a custodial term to effect general deterrence. As noted above, the already severe consequences of this conviction—the loss of Mr. Fortenberry's seat in Congress, the anxiety and suffering that came with a jury trial and conviction, the anticipated loss of his federal pension, and the significant legal expenses he has had to pay, would be more than sufficient to deter a similarly situated person from committing the

offense of conviction.  *See United States v. Whitmore*, 35 Fed. App'x 307, 322 (9th Cir. 2002) (unpublished) (stating that the destruction of one's "'professional capacity' and 'ordinary livelihood' constitute[s] a 'pretty serious punishment already inflicted and carried out . . . and one that's likely to be permanent'").

The government may argue that Mr. Fortenberry should be punished more harshly to "send a message" to public officials that lying to the federal government is a serious crime. But a concern for general deterrence cannot make imprisonment "necessary" under § 3553(a) where, as here, every other factor calls for a non-custodial sentence.  And even if the Court perceived a need to use the sentence to serve the need for general deterrence, probation would accomplish that at least as well as prison.  *Cf. United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) ("Section 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration.").

The next factor is the need for the sentence "to protect the public from further crimes of the defendant."  § 3553(a)(2)(C).  This case does not implicate a need to protect the public, particularly in light of Mr. Fortenberry's exceptionally strong and long-term record of good conduct outside the scope of the events at issue in this prosecution.[4]

Finally, a non-custodial sentence is also necessary to avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  According to the Sentencing Commission's Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard, probation is by far the most common sentence type in sentencings involving features similar to the features of this case.  As reflected in the chart below generated by the Interactive Data Analyzer, nationwide, over the past three fiscal years—2019, 2020, and 2021—fifty-four United States-citizen defendants over age sixty were reported to the Commission to have

---

[4]      Under § 3553(a)(2)(D), "provid[ing] the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," can never be a reason for imprisonment. *See Tapia v. United States*, 564 U.S. 319, 327 (2011); 18 U.S.C. § 3582(a).  In any case, that factor also weighs against prison.

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

been sentenced pursuant to Guidelines § 2B1.1 in Zone A, with criminal-history category I, who had at least a bachelor's degree. Of those, no less than 81.5% received probation only. Only about 9.3% received a traditional custodial sentence.



**Sentence Type for Federal Offenders**
Fiscal Year 2019,2020,2021

Prison and Alternati...
Probation and Alter...

Prison Only 9.3%

Probation Only 81.5%

The figure includes the 54 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
Alternatives include all cases in which offenders received conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2019,2020,2021; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: Over 60; Citizenship: U.S. Citizen; Education: College graduate or more; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: A; Criminal History: I; Career Offender Status: All

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM

Surely Mr. Fortenberry—a dedicated public servant, a loving and committed husband and father, and a non-violent first offender—does not deserve to be part of the small minority of defendants sentenced to custody depite the fact that he falls within the lowest possible sentencing range known under the Guidelines.  To single Mr. Fortenberry out for prison because he is a public figure would be to treat him *less favorably* than others as a result of his extraordiary life achievements.  In this case, probation would better promote respect for the law than imprisonment would.

## C.   The Court Should Not Impose a Fine.

For several reasons, a fine is not warranted. First, the conviction was not for a financial crime.  The charged conduct did not benefit Mr. Fortenberry financially.  As noted above, he caused his campaign to disgorge the tainted campaign funds long before the indictment.

Second, the collateral consequences of the conviction alone already inflict severe economic harm on Mr. Fortenberry and his family.  *Cf.* U.S.S.G. § 5E1.2(d)(5) (calling for considering collateral consequences of conviction in determining a fine).  As a result of the conviction itself, Mr. Fortenberry stands to lose his valuable pension benefits.  *See* PSR ¶ 128.  His future career prospects are also limited by his status as a felon.

Third, several members of Mr. Fortenberry's family will be depending on him for economic support.  Mr. Fortenberry has a daughter still in high school, who is expected to attend college within the next two years.  Another daughter, Christine, is currently enrolled in college at the undergraduate level.  And a third, Kathryn, is soon to begin her graduate university studies.  In addition, Mr. Fortenberry's economic resources will continue to be needed to pay for Kathryn's past and future expected medical treatment.   And Mr. Fortenberry will be financially supporting his aging mother and stepfather, as well as his sister.  *See* PSR ¶¶ 64–66; *cf.* U.S.S.G. § 5E1.2(d)(3) (calling for considering the burden of a fine "on the defendant and his dependents"), § 5E1.2(e) ("If the defendant establishes that . . . imposition of a fine would unduly burden the defendant's dependents, the court

1  may . . . waive the fine.").  For these reasons, a fine would be excessively punitive against

2  Mr. Fortenberry.

3          There is yet another good reason not to fine Mr. Fortenberry—fines are not the norm

4  for sentencings like this one.  *See* 18 U.S.C. § 3553(a)(6) (need to avoid unwarranted

5  disparities).  To see this, consider the 566 cases reported to the Sentencing Commission

6  from fiscal years 2019, 2020, and 2021 involving United States-citizen defendants in

7  criminal history category I over age sixty with at least a bachelor's degree who were

8  sentenced pursuant to Guidelines § 2B1.1.  *See* Interactive Data Analyzer,

9  https://ida.ussc.gov/analytics/saw.dll?Dashboard.  It is important to note that this data set

10 includes *all offense levels* and Zones of the Sentencing Table, because the Interactive Data

11 Analyzer does not appear to allow filtering fine-related data by offense level or Zone.  From

12 this set of hundreds of cases, most of which likely had a significantly higher offense level

13 than this case does, a fine was imposed only 28.6% of the time.  No fine was imposed at all

14 in the vast majority consisting of the remaining 71.4%.  *See id.*  In this Zone A sentencing

15 at total offense level 6, therefore, a fine is not warranted.  PSR at p. 4.

**V.**

**Conclusion**

18         For the foregoing reasons, Mr. Fortenberry respectfully requests that he be sentenced

19 to one year of probation without a fine.

21                                   Respectfully submitted,

22 Dated:  June 14, 2022              BIENERT KATZMAN
23                                    LITTRELL WILLIAMS LLP

24
25                                    By:_____
26                                       John L. Littrell
27                                       Ryan V. Fraser
                                         *Attorneys for Jeffrey Fortenberry*

28

JEFFREY FORTENBERRY'S SENTENCING MEMORANDUM