John L. Littrell, State Bar No. 221601
jlittrell@bklwlaw.com
Ryan V. Fraser, State Bar No. 272196
rfraser@bklwlaw.com
BIENERT KATZMAN
LITTRELL WILLIAMS LLP
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Tel.: (949) 369-3700
Fax: (949) 369-3701

Glen E. Summers, State Bar No. 176402
glen.summers@bartlitbeck.com
BARTLIT BECK LLP
1801 Wewatta Street, Suite 1200
Denver, Colorado 80202
Tel: (303) 592-3100
Fax: (303) 592-3400

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>v.<br><br>JEFFREY FORTENBERRY,<br><br>    *Defendant.* | Case No. 2:21-cr-00941-SB<br>Hon. Stanley Blumenfeld, Jr.<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL**<br><br>Hearing Date: June 28, 2022<br>Hearing Time: 8:30 a.m.<br><br>Indictment: Oct. 19, 2021<br>Trial: March 16, 2022 |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 3

I. THE PROSECUTION FAILED TO INTRODUCE SUBSTANTIAL EVIDENCE THAT CONGRESSMAN FORTENBERRY'S STATEMENTS WERE "MATERIAL" ................................................................. 3

    A. The Government Ignores the Context of the Statements at Issue, Creating a Misleading Impression of Mr. Fortenberry's Conduct .................. 3

    B. For a Statement to Be Material, It Must Be Capable of Influencing a Specific Government Decision and not Just Trigger Investigation of the Defendant's Veracity ................................................................. 5

    C. As a Matter of Law, Mr. Fortenberry's Statements Were Not Capable of Influencing Any Specific Government Decision ......................... 7

II. SECTION 1001 IS VOID FOR VAGUENESS .......................................... 8

    A. The Facts of This Case Demonstrate that Section 1001 Is Subject to Abuse ............................................................................................................... 9

    B. This Case and Other High Profile Section 1001 Prosecutions Confirm that Section 1001 Can Lead to Arbitrary and Unjust Outcomes When Applied to the Subjects of Covert Investigations .............. 13

    C. Ninth Circuit Precedent Does Not Preclude Mr. Fortenberry's As-Applied Challenge to the Validity of Section 1001 ...................................... 15

III. CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**   Page(s)

*Bronston v. United States*
  409 U.S. 352 (1973)..................................................................................2, 8

*Kolender v. Lawson*,
  461 U.S. 352 (1983)..................................................................................2, 8

*Kungys v. United States*,
  485 U.S. 759 (1988)..............................................................................2, 5, 6

*Sessions v. Dimaya*,
  138 S.Ct. 1204 (2018) ...................................................................................9

*United States v. Boone*,
  951 F.2d 1526 (9th Cir. 1991).......................................................................8

*United States v. Brogan*,
  522 U.S. 398 (1998)........................................................................1, 6, 7, 9

*United States v. Gaudin*,
  515 U.S. 506 (1995)..............................................................................2, 5, 7

*United States v. Jiang*,
  476 F.3d 1026 (2007)................................................................................2, 7

*United States v. Kim*,
  808 F. Supp. 2d 44 (D.D.C 2011) .................................................................7

*United States v. Mandanici*,
  724 F.2d 914 (2d Cir. 1984)..........................................................................8

*United States v. Matanky*,
  482 F.3d 1319 (9th Cir. 1973).....................................................................15

*United States v. Weinstock*,
  231 F.2d 699 (D.C. Cir. 1956)......................................................................7

*United States v. Yermian*,
  468 U.S. 63 (1984).......................................................................................14

**Statutes**

8 U.S.C. § 1451(a) ...........................................................................................6

# INTRODUCTION

The DOJ and FBI possess "immense power to strike at citizens, not with mere individual strength, but with all the force of the government itself." Robert H. Jackson, The Federal Prosecutor, 24 Judiature 18, 18 (1940) (address delivered at the Second Annual Conference of United States Attorneys, April 1, 1940). The power held by these agencies is so formidable relative to that of an individual that Justice Jackson once admonished federal prosecutors that the "citizen's safety" depends on them acting with exceptional judiciousness and "humility." *Id.*

Against this backgound, distinguished jurists of all political and jurisprudential backgrounds have observed in recent times that Section 1001 has unintentionally conferred "extraordinary authority" on federal agents and prosecutors to "manufacture crimes." *United States v. Brogan*, 522 U.S. 398, 409 (1998) (Ginsburg, J., concurring). As Justices Ginsburg and Souter have explained, law enforcement officers can easily "create crimes" under Section 1001 for false statements that "misled no one," as a "substitute" for crimes they suspect an individual committed but cannot prove. *Id.* at 415-16.

The Government argues that the materiality element of Section 1001 sufficiently circumscribes Section 1001 to avoid the statute from being unconstitutionally void for vagueness. But Justices Ginsburg and Souter reached the opposite conclusion in their concurring opinion in *Brogan*, observing that "[t]he controls now in place . . . do not meet the basic issue, *i.e.*, the sweeping generality of § 1001's language." *Id* at 416.

This case and other recent high-profile prosecutions have brought the dangers of Section 1001 into sharp focus for all to see. The facts of this case and others show that Section 1001 is particularly subject to abuse when applied to covert investigations. When a person who is interviewed is not fully informed of the nature of the investigation or the true purpose of the questioning, that person necessarily lacks the insight necessary to ascertain what might be material to the investigation. That danger is magnified when federal agents affirmatively mislead a person regarding the true nature and purpose of their questions, as the agents did in the Lincoln interview in this case. Under such circumstances, Section 1001

is susceptible to "arbitrary and discriminatory treatment" that the void-for-vagueness doctrine is intended to prevent. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

Judgment of acquittal should also be entered because the Government has identified no specific Government decision that could have been affected by the statements at issue in any of the three counts against Mr. Fortenberry. The Government contends in its Opposition that it need not make any such showing, and that it is sufficient for false statements to have the potential to cause investigators to further investigate the veracity of the defendant's statements. But the Government's position is contrary to the Supreme Court's decisions in *United States v. Gaudin*, 515 U.S. 506 (1995), and *Kungys v. United States*, 485 U.S. 759, 770 (1988). It is also contrary to positions taken by the Department of Justice in connection with the prosecution of General Flynn, where the Government embraced a test for materiality substantially identical to the one urged here by Mr. Fortenberry.

Before the FBI and DOJ interviewed then-Congressman Fortenberry, they admittedly knew all there was to know about the call he received from Dr. Ayoub. They orchestrated the call, told Dr. Ayoub what to say, and made a complete contemporaneous recording. As Special Agent Choe admitted at trial, the real purpose of the interviews was simply to test Mr. Fortenberry's veracity. There was no pending decision the Government needed to make that Mr. Fortenberry's statements could reasonably have influenced.

The immateriality of the statements at issue are especially clear with respect to the statements underlying Count 2, which are all literally true and which were plainly not misleading when taken in the context of other disclosures by Mr. Fortenberry. Under the Supreme Court's decision in *Bronston v. United States*, such literally true statements cannot be the basis of a conviction under Section 1001, even if they were in some way misleading or "calculated to evade." 409 U.S. 352, 361 (1973). And under the Ninth Circuit's decision in *United States v. Jiang*, 476 F.3d 1026 (2007) (reversing Section 1001 conviction because statements were not misleading in the context of other statements made by the defendant and other relevant circumstances), no reasonable jury could find the statements underlying Count 2 to be material beyond a reasonable doubt.

# ARGUMENT

## I. THE PROSECUTION FAILED TO INTRODUCE SUBSTANTIAL EVIDENCE THAT CONGRESSMAN FORTENBERRY'S STATEMENTS WERE "MATERIAL"

### A. The Government Ignores the Context of the Statements at Issue, Creating a Misleading Impression of Mr. Fortenberry's Conduct.

As an initial matter, it is important to note that the Government significantly mischaracterizes the various statements at issue by ignoring related statements that provide important context. The Government falsely suggests that Mr. Fortenberry made false statements "denying *any* knowledge that he received illegal campaign contributions." Opp'n at 2 (emphasis added). But that's not what happened.

Mr. Fortenberry made extensive disclosures in both interviews about the call from Dr. Ayoub, which he said gave him "concern" that Gilbert Chagoury, a foreign national, might have somehow been involved in his February 2016 fundraiser. *See generally*, Trial Ex. 1108 at 8:36 to 10:55, and 14:18 to 15:56 (portions of Lincoln interview; Exs. 145, 146, 147, 1133 (portions of D.C. interview).

During the Lincoln interview, Mr. Fortenberry informed the agents that Dr. Ayoub was involved in a fundraiser he held in Los Angeles. Trial Tr. 3/22/2022 at 107-08. Mr. Fortenberry also stated that Dr. Ayoub made a comment suggesting that Gilbert Chagoury might have somehow been involved in the February 2016 fundraiser. Trial Exs. 129 and 130; Trial Tr. 3/22/2022 at 81-82, 108 ("There was a comment made that we would have to ask Gilbert along the way."). He also disclosed that he believed Mr. Chagoury was a foreign national. Trial Tr. 3/22/2022 at 60-61.

Additionally, Mr. Fortenberry disclosed that he had received two phone calls from Dr. Ayoub within the last two years, that Dr. Ayoub had previously helped to host a fundraiser for him, and that they discussed possibly doing another one. Trial Ex. 128; Trial Tr. 3/22/2022 at 76-79. In addition, Mr. Fortenberry identified Toufic Baaklini as being involved with the fundraiser hosted by Dr. Ayoub. *Id.* at 63-64.

Later in the Lincoln interview, in response to questions about his awareness of any illegal foreign contributions to his campaign,[1] Mr. Fortenberry indicated that he was "concerned" and attempted to discuss the February 2016 events in Los Angeles. Trial Ex. 1108 at 8:36 to 10:55; Exhibit 131; *see also* Trial Tr. 3/22/2022 109, 120:11-19. But Agents Carter and O'Leary interrupted him. *Id.*; see also Trial Tr. 3/22/2022 at 122:2–125:10.

When Agent Carter again asked Mr. Fortenberry if he was "aware of any foreign nationals that may have contributed to his campaigns," Mr. Fortenberry again responded by trying to discuss the February 2016 events in Los Angeles and the people involved. Mr. Fortenberry stated: "The only thing that's concerning me about the conversation is, again there were a couple of people . . . that are connected to the broader community." Trial Ex. 1108; *see also* Trial Tr. 3/22/2022 at 122; 128:1-19. But again, the agents cut off Mr. Fortenberry to prevent him from naming the "couple of people" he was trying to discuss. Trial Ex. 1108; *see also* Trial Tr. 3/22/2022 at 128:23–129:24. Instead of allowing him to fully address their question as to whether he was "aware" of illegal foreign campaign contributions, the agents instead shifted the discussion to the *timing* of the events. *Id.* at 129:15–131:25. Agent Carter then promptly wrapped up the interview without ever asking Mr. Fortenberry to finish what he was trying to tell them.

In the Washington, D.C. interview, Mr. Fortenberry discussed the call from Dr. Ayoub in much greater specificity. Mr. Fortenberry expressly disclosed that Dr. Ayoub made a statement to the effect that if they did another fundraiser, "the amounts wouldn't be as large because Gilbert won't be involved." Trial Ex. 145. Mr. Fortenberry made clear that he believed Mr. Chagoury was a foreign national and that the comment therefore gave him "concern." Trial Exs. 146, 1133. He further indicated that he was concerned by the call from Dr. Ayoub because it suggested that a foreign national could possibly have been involved in some way in the fundraiser, which was a "red flag." *Id.*

Given these disclosures, to the extent the Government has relied on Mr. Fortenberry's statements denying that he was "aware" of illegal foreign contributions to his campaign, the

---

issue is thus not whether it would have been a material false statement to deny *any* knowledge, but whether it was a materially false for Mr. Fortenberry to admit only to having *concern* rather than *awareness*. For the same reason, Mr. Fortenberry's statements to the effect that all of the contributions to his campaigns were disclosed in his FEC reports cannot be construed as some sort of absolute assurance that none of the disclosed contributions originated with or were reimbursed by some other person.

And even Mr. Fortenberry's denial that he was specifically told by Dr. Ayoub that he was given $30,00 cash by Mr. Baaklini (and his related statement that he would have been "horrified" to learn that) must be considered in light of the fact that he did disclose that heard a "concerning" comment suggesting that Gilbert Chagoury (a foreign national) might have been involved. Given Mr. Fortenberry's disclosure of the potential involvement of a foreign national, these statements cannot be seen as a blanket assertion that the call from Dr. Ayoub gave him no reason to suspect that illegal contributions may have been given to his campaign in February 2016.

**B.  For a Statement to Be Material, It Must Be Capable of Influencing a Specific Government Decision and not Just Trigger Investigation of the Defendant's Veracity.**

In *United States v. Gaudin*, 515 U.S. 506, 511 (1995), the Supreme Court made clear that "[d]eciding whether a statement is 'material' requires the determination of at least two subsidiary questions." *Id.* at 512. First, one must determine "what statement was made." *Id.* Second, one must determine "what decision was the agency trying to make." *Id*. Only after a court has identified the "statement" and the relevant "decision" can the court determine "whether the statement was material to the decision." *Id*. In *United States v. Kungys*, the Supreme Court went further, explaining the need to "fix as the central object of the inquiry" whether the misrepresentation or concealment was capable of affecting the "official decision in question." 485 U.S. at 771-72.

Despite it being the "central object of the inquiry," the Government's Opposition fails to identify any *evidence* that it was presented with any specific decision that could have been influenced by Mr. Fortenberry's statements. The Government speaks vaguely

about various "open questions" that remained at the time of the interviews. Opp'n at 4, 5, 11 & n. 2. But the Government fails to show how knowledge of the true facts (as opposed to whether Mr. Fortenberry was being entirely truthful and forthcoming) could have affected any specific government decision.

*Gaudin* and *Kungys* also make clear that materiality in a false statements case cannot be based solely on an investigation into the veracity of the statement itself. In *Kungys*, the Supreme Court held that a petitioner's misrepresentations about his date and place of birth on his naturalization petition were not material for purposes of the "concealment or misrepresentation" provision of 8 U.S.C. § 1451(a). The Court explicitly rejected the Third Circuit's reasoning that if Kungys had "told the truth at the time he applied for citizenship, the discrepancies between the truth and his visa materials would have *resulted in either a field investigation or an outright denial of the petition*." *Id.* at. 774-75. Justice Scalia explained that "for purposes of determining the natural tendency of a misrepresentation to affect a decision . . . what is relevant is what would have ensued from *official knowledge of the misrepresented fact* (in this case, Kungys' true date and place of birth), not what would have ensued from *official knowledge of inconsistency*" between the truth and his statement. *Id.* at 775.

The Supreme Court's decisions in *Gaudin* and *Kungys* make clear that the statements underlying all three counts against Mr. Fortenberry were immaterial as a matter of law. After all, the Government had complete audio recordings and transcripts of the call from Dr. Ayoub which formed the entire predicate for the Government's Section 1001 case. The Government already had actual knowledge of the "misrepresented fact[s]" pivotal to the materiality inquiry. *Kungys*, 485 U.S. at 775.

The Government asserts that the Supreme Court's decision abrogating the "exculpatory no" doctrine in *Brogan v. United States*, 522 U.S. 398 (1998) requires the opposite conclusion. Not so. *Brogan* did not address the test of materiality. *Id. Brogan* merely held that there was no categorical exception in Section 1001 for false statements in the nature of a denial of wrongdoing. *Id.*

The Government's assertion that a false statement is material if it triggers "an investigation into the veracity of a lie" (Opp'n at 7) is foreclosed by *Gaudin* and *Kungys*. It is also contrary to the Government's positions the case against General Flynn. In that case, the Government itself urged that a statement must be material "to the underlying investigation." *See* Exhibit A, Gov.'s Mot. Dismiss Crim. Info. Against Def. Michael T. Flynn, Case No. 1:17-cr-232-EGS (D.D.C. 2021) at 12 (citing *Gaudin*, 515 U.S. at 509, and *United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C 2011)). The Government further acknowledged that the statement must be "reasonably likely to influence the tribunal in making a determination *required to be made*." *Id.* at 1, 12 (citing *United States v. Weinstock*, 231 F.2d 699, 701 (D.C. Cir. 1956)).

### C. As a Matter of Law, Mr. Fortenberry's Statements Were Not Capable of Influencing Any Specific Government Decision.

The Government has identified no specific decision it needed to make that could have been affected by any of the statements or alleged acts of concealment at issue in this case. The Government indisputably knew the truth with respect to every single one of the misstatements alleged in Counts 2 and 3, and with respect to each items of information allegedly concealed by Mr. Fortenberry in Count 1.

The statements at issue in Count 2 are also immaterial as a matter of law when viewed in the context of Mr. Fortenberry's other related statements on the same subjects. Mr. Fortenberry's insistence at both interviews that he was not "aware" of any illegal foreign contributions to his campaigns must be considered in the context of the fact that he admitted to being "concerned" about the very same thing. *Jiang*, 476 F.3d 1026. Fine distinctions, such as the one drawn by Mr. Fortenberry in his discussions with the FBI agents and AUSA's who questioned him, are common in modern litigation. To condemn Mr. Fortenberry for those statements is to condemn our entire system of justice.

The same is true of Mr. Fortenberry's statements to the effect that all of his campaign contributions were publicly disclosed. In the Lincoln interview, Mr. Fortenberry volunteered that "[e]very contribution I have is publicly disclosed" and "that's all publicly

listed, who gave." Trial Ex. 129; Trial Tr. 3/22/2022 at 79. In the context of Mr. Fortenberry's extensive disclosures regarding the call from Dr. Ayoub, including that it gave him "concerns" about possible funding from Gilbert Chagoury, these statements were not materially false or misleading. Instead, they were literally true and therefore incapable of supporting a conviction. *Bronston v. United States*, 409 U.S. 352, 361 (1973).

The Government argues that these statements were untrue because the FEC reports did not disclose the "true sources" of the funds. Opp'n at 18. But Mr. Fortenberry did not say that they did. The Supreme Court in *Bronston* was clear that a literally truthful answer cannot support a perjury conviction even if the witness "intended to sidetrack his questioner" and "shrewdly calculated to evade." *Id.* at 361-62.

The Government argues that *Bronson* applies only to statements that are "merely nonresponsive to the question posed." Opp'n at 22 n. 8. But the Ninth Circuit has interpreted *Bronston* more broadly to foreclose prosecutions for statements that are literally true "even assuming the witness intends to mislead his questioner by the answer." *United States v. Boone*, 951 F.2d 1526, 1536 (9th Cir. 1991); *see also United States v. Mandanici*, 724 F.2d 914, 921 (2d Cir. 1984) ( "a defendant may not be convicted under § 1001 on the basis of a statement that is, although misleading, literally true").

The Supreme Court in *Bronston* observed that "the burden [is] on the questioner to pin the witness down to the specific object of the questioner's inquiry." 409 U.S. at 360. The Government should not be allowed to ask deliberately vague questions, cut off the witness and then fail to follow up when the witness attempts to provide information other than a simple "yes or no," and then prosecute the witness under Section 1001.

## II.   SECTION 1001 IS VOID FOR VAGUENESS

As discussed in Mr. Fortenberry's opening brief, it is well-established as a matter of due process that a penal statute is void for vagueness if it fails to define the criminal offense with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory treatment." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The void-for-vagueness doctrine "not only guarantees

that people have 'fair notice' of the conduct a statute proscribes" but also, and more importantly, "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018).

### A. The Facts of This Case Demonstrate that Section 1001 Is Subject to Abuse

Justices Ginsburg and Souter warned that Section 1001 permits "an overzealous prosecutor or investigator" to "create a crime" by "surprising the suspect," sometimes in "extremely informal circumstances," and asking about things the prosecutor or investigator already know and provoking "a false denial." *Brogan*, 522 U.S. at 416-17. Sadly, the uncontroverted evidence at trial established a number of undisputed, objective facts that reveal that what Justices Ginsburg and Souter feared is precisely what happened in this case, most clearly during the Nebraska interview at the heart of Count 2:

**Suspicions of Other Crimes by an Overzealous Investigator**: The lead FBI agent on the case at the time of the Lincoln interview was Agent Todd Carter. Agent Carter testified extensively that he suspected that the February 2016 illegal campaign contributions were essentially a "bribe" in exchange for Mr. Fortenberry's support for the Genocide Resolution.[2] *See, e.g.*, Trial Tr. 3/17/2022 AM at 104:13-19, 111:23–112:25; *see also* Trial Tr. 3/17/2022 PM at 57. He also expressly used this suspicion to secure approval from FBI and DOJ leadership for key steps he took investigating then-Congressman Fortenberry. Trial Ex. 1057 at 36-37, 39-40.

**Pre-existing Plan to Seek Indictment**: Prior to the agents' surprise visit to Mr. Fortenberry's home in Lincoln, lead FBI agent Todd Carter had already documented his

---

[2] Agent Carter's suspicions were founded on a basic misunderstanding of the legislative history. Carter incorrectly believed that Congressman Fortenberry "proposed HR75 on or about March 15, 2016 . . . just 24 days after [the February 2016 fundraiser]." Trial Ex. 1057 at 39-40. HR75 was actually introduced in the House by Congressman Fortenberry much earlier; March 2016 was when it was received in the Senate. Trial Ex. 1120.

plan to seek the indictment of then-Congressman Fortenberry. In the memo used to obtain approval for the Lincoln interview, Agent Carter wrote: "Case agents will also seek to indict Fortenberry with Misprison of Felony and Conduit Contributions. In addition, if case agents determine from the interview that Fortenberry is making false statements he will be charged with False Statement." Trial Ex. 1129. This memo makes clear that the lead FBI agent who conducted the Lincoln interview had already determined that he would "seek to indict Fortenberry" and that one of the potential charges he would develop was a false statement charge under Section 1001.

**Informal Context of Discussion**: The evidence at trial established that the statements at issue in Count 2 were made during a discussion late on a Saturday night (from 8:25pm to about 9:05pm) in the living room of Mr. Fortenberry's home. Trial Tr. 3/22/2022 at 40, 48. Agents did not inform House Counsel or Mr. Fortenberry's staff in Washington, D.C. Nor did they suggest that Mr. Fortenberry was a subject of the investigation or that he should seek the advice of counsel.

**Intentional Deception**: The agents who conducted the Nebraska interview admittedly tricked Mr. Fortenberry by using a "ruse" – *i.e.*, lying to him about the purpose of the interview. Trial Tr. 3/22/2022 at 41-42. As the Government admits, the agents told Mr. Fortenberry at the outset that they wanted to speak with him about a "background investigation" with a "national security" aspect. *Id.*

According to Agent O'Leary, the purpose of the ruse was to "set people at ease."[3] *Id.* However, the "ruse" fundamentally misled Mr. Fortenberry about the agents' true intentions and the nature of their investigation. According to Special Agent Choe, the only FBI witness

---

[3]   Agent Carter also falsely told Mrs. Fortenberry that Mr. Fortenberry's staff was aware of what was going on. Trial Tr. 3/22/2022 at 42. He also repeatedly stated that he was from the Omaha office. *Id.* at 43-44. Prior to the interview, Mr. Fortenberry learned that these were lies, which caused him to be so distrustful of the agents that he called the local police and requested that they be present for the interview. *Id.* at 44-45.

who testified on the subject,[4] the actual purpose of the interview in Lincoln was "to see what information, if any, the Congressman would provide about the June 4th, 2018, phone call" and to "test his credibility." Trial Tr. 2/23/2022 124:12-17; 125:19-21. The agents of course never told Mr. Fortenberry that.

**Ambivalence About the Individual's Ability to Recall**: The agents conducted the Nebraska interview late at night after then-Congressman Fortenberry had returned home from a long day of touring extraordinary flood damage the first day after returning from a week of sleepless travel to Africa. Moreover, the agents proceeded with the interview even though Mr. Fortenberry was clearly suspicious and angry at them after catching them in numerous lies. See footnote 4 above. Mr. Fortenberry was so aggravated by the agents' lies and "unprofessional" behavior that he even insisted on having a "conversation before the conversation" in which he admonished the agents that he was "not in the right frame of mind." Trial Ex. 115; Trial Tr. 3/22/2022 at 47-48. In proceeding with the interview at that time, the agents surely knew that Mr. Fortenberry would be fatigued, distrustful of them, and presumably less cooperative than he otherwise would be.

**Indications Agents Were Not Seeking the Facts, But Were Instead Deliberately Building a Section 1001 Charge**: After proceeding with the interview under these conditions, the agents at the Lincoln interview:

- Pressed for unequivocal denials to vague questions as to whether Mr. Fortenberry was "aware" of illegal campaign contributions. *See* Trial Ex. 1108 at 8:36 to 10:55 and 14:18 to 15:56: O'Leary: "We're just asking what you know"; Carter: "you either would know or your don't know"; Carter: "So, no?"; Carter: "But you're not aware of that."; Carter: "But the answer was no, right?".

- Failed to ask obvious follow-up questions, such as whether he "was ever told," or "had any reason to suspect" that his campaign had ever received any illegal contributions. *See* Trial Exs. 123, 128, 129, 130, 1108.

---

[4] Special Agent Choe was the only FBI agent to testify regarding the purpose of the Lincoln interview. Agent Carter addressed only events through "mid-2018." Opp'n at 3.

- Deliberately cut off Mr. Fortenberry on two occasions when he began to discuss the February 2016 fundraiser and "a couple of people" connected to the community that hosted the fundraiser in direct response to questions about his knowledge of illegal contributions. *See* Trial Ex. 1108 and discussion of Lincoln interview above.
- Methodically developed evidence of Mr. Fortenberry's knowledge of the illegality of foreign and conduit contributions to establish willfulness. *See* Trial Ex. 128.

These actions plainly demonstrate that the purpose of the questioning in the Lincoln interview was not actually to seek any new information about the call from Dr. Ayoub (which the agents of course already knew everything about given that they had recorded and transcribed it), but was instead an effort to provoke "false denials" and other evidence that could be used to support a prosecution under Section 1001.

Perhaps more importantly, the agents who conducted the Lincoln interview failed to inform Mr. Fortenberry of the true nature and purpose of their interrogation. As a consequence, Mr. Fortenberry had no way to know with any precision what information would be material. As discussed above, Special Agent Choe testified that the actual purpose of the interview was "to see what information, if any, the Congressman would provide about the June 4th, 2018, phone call" and to "test his credibility." Trial Tr. 2/23/2022 124:12-17; 125:19-21. But the agents never told Mr. Fortenberry that. Instead, they falsely told Mr. Fortenberry that they were conducting a "background" investigation with a "national security" component. Trial Tr. 3/22/2022 at 41-44.

Later in the interview, Special Agent Carter casually remarked in passing that they whey wanted to discuss "In Defense of Christians and campaign funding." Trial Ex. 115. In its Opposition to this motion, the Government now claims that by making that casual remark Agent Carter "specifically advised about what the federal government was investigating and the topics of interest, so that there could be no question as to what was material to the Federal Investigation." Opp'n at 15. But that one casual statement by Agent Carter did not necessarily negate or retract his prior representations that the agents were merely conducting a "background investigation." Agent Carter never informed Mr.

Fortenberry that his prior statements about the nature of the investigation were untrue.

In its zeal to sustain its conviction of Mr. Fortenberry, the Government goes on to argue that the "Defendant clearly understood that his discussion with Dr. Ayoub on the June 4 Call was a critical and material topic of interest to the government" and that Mr. Fortenberry "had copious and specific notice of what was prohibited under Section 1001." Opp'n at 15. But these statements plainly are not true, especially with respect to the Lincoln interview. During the Lincoln interview, Mr. Fortenberry had no idea what the true purpose of the interview was. He certainly did not know that it was to "test his credibility" (as Special Agent Choe testified) or to "seek to indict [him]" (as Special Agent Carter documented in the memorandum seeking approval for the interview).

> **B.  This Case and Other High Profile Section 1001 Prosecutions Confirm that Section 1001 Can Lead to Arbitrary and Unjust Outcomes When Applied to the Subjects of Covert Investigations.**

As discussed in Mr. Fortenberry's opening brief, Section 1001 is particularly subject to abuse when, as here, it is applied to statements made in connection with a secretive criminal investigation. When a person applies for some government benefit or payment, the applicant typically knows the relevant criteria and thereby has reasonable notice of the type of information that may be material to the government's decision. But when individuals are questioned by law enforcement officers and are not informed of the true purposes of the agents' questions or the exact nature of their investigation, the individuals being questioned have no way to know what sort of statements might impact that investigation and potentially lead to severe criminal penalties.

Federal law enforcement agents may have the right to use ruses and other deception in connection with their work preventing and investigating crime. But that does not give them a license to use such techniques to manufacture crimes under Section 1001 by depriving the persons with whom they interact of the information they need to ensure that they do not break the law by unwittingly making a statement the investigators could deem material to their work. They must instead be mindful when uses ruses and deception that by keeping the nature of their investigation or the true purposes of their questioning secret,

they may make it impossible for the subjects to know what statements would be material and therefore proscribed by Section 1001.

The case of General Michael Flynn is instructive. General Flynn was one of the most powerful leaders in this country and a high ranking member of the intelligence community. Recognizing the vast power that the FBI and DOJ could bring to bear against him and his family, the General initially pleaded guilty to a violation of Section 1001 only for later evidence to establish (even to the satisfaction of the Attorney General himself) that the alleged false statement was utterly immaterial, deliberately manufactured by some of the highest ranking leaders of the FBI, and not the proper subject of a federal prosecution. *See* Exhibit A, Gov.'s Mot. Dismiss Crim. Info. Against Def. Michael T. Flynn, Case No. 1:17-cr-232-EGS (D.D.C. 2021).

Importantly, the Department of Justice noted in a motion later seeking dismissal of the charges that General Flynn "stipulated to the essential element of materiality without cause to dispute it *insofar as it concerned not his conduct but rather that of the agency investigating him.*" *Id.* at 19. In this statement, the DOJ recognized that because materiality is judged by reference to the potential impact on a government decision, it can be impossible for a person interviewed in connection with a covert investigation to know whether any particular statement would be material to the investigation.

As Chief Justice Rehnquist explained Section 1001 is subject to potential abuse in part because the standard of materiality turns on the nature of an investigation that may be kept secret from the defendant or even misrepresented to him.[5] *United States v. Yermian*, 468 U.S. 63, 82 (1984) (Rehnquist, J., dissenting) ("§ 1001 can be used to punish "the most

---

[5] The sweeping breadth of Section 1001 is another problem. *See, e.g.*, Alex Kozinski & Misha Tseytlin, *You're (Probably) a Federal Criminal*, in IN THE NAME OF JUSTICE 43, 47 (2009) ("Your mom taught you not to lie, but she probably didn't tell you that making a false statement to any federal official dealing with any matter in his jurisdiction will make you a federal criminal.") For when the law casts too wide a net, justice depends all too much on the discretion of law enforcement officers and prosecutors–who are subject to bias and error like all other humans.

casual false statements so long as they turned out, unbeknownst to their maker, to be material to some federal agency function . . . [making] a surprisingly broad range of unremarkable conduct a violation of federal law.) (internal quotation marks omitted).

### C. Ninth Circuit Precedent Does Not Preclude Mr. Fortenberry's As-Applied Challenge to the Validity of Section 1001.

The Government asserts that the Ninth Circuit's decision in *United States v. Matanky*, 482 F.3d 1319, 1322 (9th Cir. 1973) precludes Mr. Fortenberry's vagueness challenge to Section 1001. However, *Matanky* is readily distinguishable from this case. In *Matanky*, a medical doctor submitted requests for payments from Medicare that falsely claimed he made certain visits to patients in convalescent hospitals which he had not in act made. *Id.* at 1321. The decision suggests that there was no dispute regarding the materiality of the false Medicare claims, only a dispute as to the amount received by the doctor as a result of the false billings. *Id.* at 1324. Given the totally different fact pattern of the *Matanky* case, it has absolutely no bearing on Mr. Fortenberry's as-applied challenge to Section 1001.

There is also nothing procedurally improper in Mr. Fortenberry challenging the constitutionality of Section 1001 in this Rule 29 motion. Only with the benefit of the trial record could Mr. Fortenberry meaningfully present the facts and circumstances to the Court for an as-applied challenge. The Indictment did not provide sufficient detail regarding the interviews for the Court to assess an as-applied vagueness challenge.

### III. CONCLUSION

For the foregoing reasons, former Congressman Fortenberry respectfully requests that the Court enter judgment of acquittal in his favor on all counts.

Respectfully submitted,

Dated: June 14, 2022

BARTLIT BECK LLP

By: /s/ Glen E. Summers
Glen E. Summers

BIENERT KATZMAN
LITTRELL WILLIAMS LLP
John L. Littrell
Ryan V. Fraser

*Attorneys for Jeffrey Lane Fortenberry*