# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **MICHAEL T. FLYNN,** <br><br> **Defendant** | **Crim. No. 17-232 (EGS)** |

## GOVERNMENT'S MOTION TO DISMISS THE CRIMINAL INFORMATION AGAINST THE DEFENDANT MICHAEL T. FLYNN

The United States of America hereby moves to dismiss with prejudice the criminal information filed against Michael T. Flynn pursuant to Federal Rule of Criminal Procedure 48(a). The Government has determined, pursuant to the *Principles of Federal Prosecution* and based on an extensive review and careful consideration of the circumstances, that continued prosecution of this case would not serve the interests of justice.

Mr. Flynn entered a guilty plea—which he has since sought to withdraw—to a single count of making false statements in a January 24, 2017 interview with investigators of the Federal Bureau of Investigation ("FBI"). *See* ECF Nos. 3-4. This crime, however, requires a statement to be not simply false, but "materially" false with respect to a matter under investigation. 18 U.S.C. § 1001(a)(2). Materiality is an essential element of the offense. Materiality, moreover, requires more than mere "relevance" or relatedness to the matter being investigated; it requires "probative weight," whereby the statement is "reasonably likely to influence the tribunal in making a determination *required to be made*." *United States v. Weinstock*, 231 F.2d 699, 701 (D.C. Cir. 1956) (emphasis added).

After a considered review of all the facts and circumstances of this case, including newly discovered and disclosed information appended to the defendant's supplemental pleadings, ECF Nos. 181, 188-190,[1] the Government has concluded that the interview of Mr. Flynn was untethered to, and unjustified by, the FBI's counterintelligence investigation into Mr. Flynn—a no longer justifiably predicated investigation that the FBI had, in the Bureau's own words, prepared to close because it had yielded an "*absence* of *any* derogatory information." Ex. 1 at 4, FBI FD-1057 "Closing Communication" Jan. 4, 2017 (emphases added). The Government is not persuaded that the January 24, 2017 interview was conducted with a legitimate investigative basis and therefore does not believe Mr. Flynn's statements were material even if untrue. Moreover, we not believe that the Government can prove either the relevant false statements or their materiality beyond a reasonable doubt.

"A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal criminal law to a particular set of circumstances. . . ." Justice Manual § 9-27.001. In the Government's assessment—mindful of the high burden to prove every element of an offense beyond a reasonable doubt, and that "government prosecutors have a duty to do justice," *United States v. Darui*, 614 F. Supp. 2d 25, 37 (D.D.C. 2009)—continued prosecution of the charged crime does not serve a substantial federal interest. The Government respectfully moves to dismiss the criminal information with prejudice against Mr. Flynn.

---

[1] This review not only included newly discovered and disclosed information, but also recently declassified information as well.

## FACTUAL BACKGROUND

The FBI opened a counterintelligence investigation into Mr. Flynn on August 16, 2016, "as part of the larger Crossfire Hurricane umbrella" investigation into the presidential campaign of Donald J. Trump and its possible coordination with Russian officials to interfere with the 2016 presidential election. Ex. 1 at 3; Ex. 2 at 1-2, FBI FD-1057, "Opening of the CROSSFIRE RAZOR Investigation," Aug. 16, 2016. Code-named "Crossfire Razor," the investigation's stated "goal" was to determine whether Mr. Flynn "was directed and controlled by and/or coordinated activities with the Russian Federation in a manner which is a threat to the national security and/or possibly a violation of the Foreign Agents Registration Act, 18 U.S.C. § 951 *et seq.*, or other related statutes." Ex. 1 at 2; Ex. 2 at 2.

In addition to the predication for opening Crossfire Hurricane, which did not specifically identify Mr. Flynn, the FBI predicated the counterintelligence investigation of him on "an articulable factual basis" that consisted of three facts: Mr. Flynn's service as a foreign policy advisor to the Trump campaign, his publicly documented connection to state-affiliated Russian entities, and the fact that he had traveled to Russia in December 2015. Ex. 1 at 3-4; Ex. 2 at 1-2. After approximately four months of investigation, however, the FBI "determined that [Mr. Flynn] was no longer a viable candidate as part of the larger Crossfire Hurricane umbrella case" and prepared to close the investigation. Ex. 1 at 3. At some point prior to January 4, 2017, the FBI drafted a "Closing Communication" to effect the termination of the case. *See* Ex. 1; Ex. 3 at 2, FBI FD-302, Interview of Mary McCord, July 17, 2017 (Date of Entry: Aug. 10, 2017). This document noted the specific "goal" and predication for the investigation. Ex. 1 at 2. It laid out the numerous searches of holdings and investigative steps that had at each step yielded "*no derogatory information*" on Mr. Flynn. Ex. 1 at 2-3 (emphasis added); *see also id.* at 5 (noting

"the absence of any derogatory information or lead information"). It stated that the investigation had failed to produce "*any* information on which to predicate *further* investigative efforts." *Id.* at 3 (emphases added). And it noted that no interview of Mr. Flynn was required "as part of the case closing procedure," before concluding: "The FBI is closing this investigation." The document also stated: "If new information is identified or reported to the FBI regarding the activities of CROSSFIRE RAZOR, the FBI will consider reopening the investigation if warranted." *Id.* at 4. The document had not been approved, however, as of January 4, 2017. *See* Ex. 7 at 1-2, FBI Electronic Communications and Lync Messages (1/4/17; 1/23/17; 1/24/17; 2/10/17).

Before the intended case closing took effect, the FBI learned of communications between Mr. Flynn and Russian ambassador Sergey Kislyak that had taken place in late December 2016 and which touched on matters of foreign policy. *See* Ex. 3 at 2; Ex. 5 at 3-5, *FBI Counterintelligence Investigations*: Permanent Select Comm. on Intelligence, Statement of FBI Director James Comey, Mar. 2, 2017; Ex. 6 at 3-5, FBI FD-302, Interview of Michael Flynn, Jan. 24, 2017 (Date of Entry: Feb. 10, 2017). By this time, Mr. Flynn had already been named by President-Elect Trump as his incoming National Security Advisor. *See* Ex. 3 at 3; Bryan Bender, *Trump Names Mike Flynn National Security Adviser*, Politico (Nov. 17, 2016), *available at* https://www.politico.com/story/2016/11/michael-flynn-national-security-adviser-231591.

The FBI had in their possession transcripts of the relevant calls. *See* Ex. 5 at 3; Ex. 13 at 3, FBI FD-302, Interview of Peter Strzok, July 19, 2017 (Date of Entry: Aug. 22, 2017). Believing that the counterintelligence investigation of Mr. Flynn was to be closed, FBI leadership ("the 7th Floor") determined to continue its investigation of Mr. Flynn on the basis of these calls, and considered opening a new criminal investigation based solely on a potential

violation of the Logan Act, 18 U.S.C. § 953. *See* Ex. 3 at 2-3; Ex. 7 at 1-2; Ex. 8 at 1-5, FBI E-mails RE: Logan Act Jan. 4, 2017. Yet discussions with the Department of Justice resulted in the general view that the Logan Act would be difficult to prosecute. Ex. 3 at 2-3; Ex. 4 at 1-2, FBI FD-302, Interview of Sally Yates, Aug. 15, 2017 (Sept. 7, 2017); Ex. 5 at 9. The FBI never opened an independent FBI criminal investigation.

On January 4, 2017, FBI Deputy Assistant Director Peter Strzok learned that "RAZOR's closure" had not been timely executed, and the counterintelligence investigation into Mr. Flynn was, unexpectedly, still formally open. Ex. 7 at 1-2. Mr. Strzok immediately relayed the "serendipitously good" news to Lisa Page, the Special Counsel to FBI Deputy Director Andrew McCabe, remarking that "our utter incompetence actually helps us." *Id.* at 1. Ms. Page reacted with surprise and relief. *Id.* Mr. Strzok, moreover, instructed agents to "keep it open for now" at the behest of "the 7th Floor." *Id.* Mr. Strzok indicated that there was a "[n]eed to decide what to do with him." *Id.* Other internal FBI messages from that afternoon reflect apparently related conversations about a potential "interview." *See id.* at 2 ("i heard pete say, 'Andy and [redacted] will interview.…"). As of January 4, 2017, then, the FBI kept open its counterintelligence investigation into Mr. Flynn based solely on his calls with Kislyak—the only new information to arise since the FBI's determination to close the case. *See* Ex. 3 at 2; Ex. 5 at 5.

On January 12, 2017, the *Washington Post* reported the December 29 communications between Mr. Flynn and the Russian ambassador. *See* David Ignatius, *Why Did Obama Dawdle on Russia's Hacking*, Wash. Post, Jan. 12, 2017. The next day, January 13, Sean Spicer, the spokesperson for the Trump transition, clarified that the communications had involved only logistics, which seemed to contradict the nature of the calls. Ex. 4 at 2. On January 15, Vice

President-Elect Mike Pence stated in a news interview that Mr. Flynn had suggested that his conversation with Kislyak did not relate to sanctions. Ex. 3 at 4; Ex. 4 at 2-3; Ex. 5 at 4-5.

Around this time, FBI Director James Comey advised DOJ leadership of its investigation into Mr. Flynn, and senior officials at both the FBI and DOJ had concerns that the incumbent White House officials' descriptions of Mr. Flynn's calls with Kislyak were not accurate. Ex. 3 at 4; Ex. 4 at 2-3; Ex. 5 at 4-5. FBI Director Comey took the position that the FBI would not notify the incoming Trump administration of the Flynn-Kislyak communications. Ex. 3 at 4-5; Ex. 4 at 4. Deputy Attorney General Sally Yates and other senior DOJ officials took the contrary view and believed that the incoming administration should be notified. Ex. 3 at 4-5; Ex. 4 at 4. Deputy Attorney General Yates and another senior DOJ official became "frustrated" when Director Comey's justifications for withholding the information from the Trump administration repeatedly "morphed," vacillating from the potential compromise of a "counterintelligence" investigation to the protection of a purported "criminal" investigation. Ex. 3 at 5; *compare* Ex. 5 at 5 ("[W]e had an open counterintelligence investigation on Mr. Flynn"), *with* Ex. 4 at 4 ("Comey had said something to the effect of there being an 'ongoing criminal investigation'"). The Deputy Attorney General, Director of National Intelligence, and Director of the Central Intelligence Agency all agreed that the FBI should notify the incoming Trump administration of what had actually been said on the calls. Ex. 3 at 5. FBI Director Comey continued to refuse to brief the White House in a subsequent conversation with CIA Director John Brennan. *Id.*; Ex. 5 at 5-6. On January 23, 2017, then Acting Attorney General Yates met with senior DOJ officials, and they again discussed the need to press the FBI to notify the White House. Ex. 3 at 5; Ex. 4 at 4.

Matters came to a head on January 24, 2017. That morning, Yates contacted Director Comey to demand that the FBI notify the White House of the communications. Ex. 3 at 5; Ex. 4 at 4. Director Comey did not initially return her call. Ex. 4 at 4. When Director Comey called her back later that day, he advised her that the FBI agents were already on their way to the White House to interview Mr. Flynn. Ex. 3 at 5; Ex. 4 at 4. Acting Attorney General Yates was "flabbergasted" and "dumbfounded," and other senior DOJ officials "hit the roof" upon hearing of this development, given that "an interview of Flynn should have been coordinated with DOJ." Ex. 3 at 6; Ex. 4 at 5.

In fact, in the preceding days, senior officials at the FBI had been engaged in discussions about how to approach Mr. Flynn and whom to notify. *See* Ex. 9, FBI E-mails, Jan. 21-24, 2017. On January 21, 2017, Mr. Strzok proposed to Bill Priestap, the FBI's counterintelligence chief, that Mr. Flynn should be given a "defensive briefing" about an investigation under the Crossfire Hurricane umbrella or alternatively an "interview under light 'defensive briefing' pretext." *See* Ex. 9 at 1. Mr. Strzok also noted that DOJ might "direct[] us" to inform "VPOTUS or anyone else," speculating that this could lead to the "WH specifically direct[ing] us not to" speak with Mr. Flynn. *Id.* On January 22, 2017, a FBI attorney emailed Mr. Strzok and Ms. Page that "if we usually tell the WH, then I think we should do what we normally do," though the official also noted that they could be "told not to [] debrief or interview Razor." *Id.* at 2.

In advance of the interview, Director Comey determined that they would go interview Mr. Flynn the following day without notifying either DOJ or the White House. Ex. 3 at 5-6; Ex. 4 at 4-5; Ex. 5 at 6. In a December 2018 interview with MSNBC and NBC News analyst Nicolle Wallace, he stated this course of action was "something we, I probably wouldn't have done or gotten away with in a [] more organized administration." *See* Interview by Nicolle Wallace with

7

James Comey, Dec. 10, 2018, 14:31-14:55; https://www.youtube.com/watch?v=9xqGu66D6VU. Messages between Mr. Strzok and Ms. Page on January 23, 2017, indicated that "Bill" had conducted "several conversations with Andy [McCabe]" because "he wanted to know why we had to go aggressively doing these things, openly." Ex. 7 at 2.

On the morning of January 24, 2017, follow-up messages between Mr. Strzok and Ms. Page indicated that "Bill … brought [it] up – again, this time in front of D[irector Comey]" and that Deputy Director McCabe was "frustrated" and "cut him off." Ex. 7 at 3.[2]  In any event, that morning, Deputy Director McCabe called Mr. Flynn to arrange the interview.  *See* Ex. 11, Deputy Director Andrew McCabe, Untitled Memorandum, January 24, 2017.  He explained that recent media statements about his contacts with Kislyak merited a "sit down" and expressed the FBI's desire to accomplish the interview "quickly, quietly and discretely as possible."  *Id.* Deputy Director McCabe further advised that if Mr. Flynn wished to have anyone else at the meeting, including the White House Counsel, the FBI would have to elevate the issue to DOJ. *Id.*  Mr. Flynn, himself a former Director of the Defense Intelligence Agency, stated that he readily expected that the FBI already knew the contents of his conversations with the ambassador, stating: "you listen to everything they say."  *Id.*  Mr. Flynn then agreed to meet with the interviewing agents in his office less than two hours later.  *Id.*

Mr. Flynn was "unguarded" in the interview and "clearly" viewed the agents as "allies." Ex. 13 at 3. When interviewing Mr. Flynn, Mr. Strzok and the other agent "didn't show him the

---

[2] Priestap's notes dated January 24 state, "What's our goal?  Truth/Admission or to get him to lie, so we can prosecute him or get him fired?"  On the same paper, Priestap wrote, "If we're seen as playing games, WH will be furious.  Protect our institution by not playing games."  Ex. 10, FBI Handwritten Note, Jan. 23/24, 2017.  Another note stated, "We regularly show subjects evidence, with the goal of getting them to admit their wrongdoing.  I don't see how getting someone to admit their wrongdoing is going easy on him."  *See id.*

8

transcripts" of his calls. Ex. 5 at 7; *see also* Ex. 3 at 6; Ex. 4 at 5; Ex. 6. Nor did the agents give, at any point, warnings that making false statements would be a crime. Ex. 3 at 6; Ex. 4 at 5; Ex. 9 at 5-6; *see also* Ex. 6. According to the FBI agents' recollections, when asked if Mr. Flynn recalled any conversation in which he encouraged Kislyak not to "escalate the situation" in its response to American sanctions, Mr. Flynn responded uncertainly, stating, "Not really. I don't remember. It wasn't, 'Don't do anything.'" Ex. 6 at 5. Mr. Flynn also stated that although it was possible, he did not recall any conversation in which the ambassador stated that Russia would moderate its response due to Mr. Flynn's request. *Id.* He stated that he did not have a long conversation with Mr. Kislyak to "don't do something." *Id.*

Meanwhile, when asked if he recalled asking countries to take certain actions on the United Nations vote on Israeli settlements, Mr. Flynn explained that the conversations were "along the lines of where do you stand and what's your position" and that "he did not believe his calls to the various countries would change anything." *Id.* at 4. He also stated that his calls did not involve any requests for how to vote, and answered "no" when asked if he discussed delaying or defeating the vote. *See id.* at 4. The FD-302, moreover, indicates that Mr. Flynn denied that Kislyak described any Russian request to his response. *Id.*; *see* Ex. 12, FBI Handwritten Notes of Michael Flynn Interview (January 24, 2017).

After the interview, the FBI agents expressed uncertainty as to whether Mr. Flynn had lied. *See* Ex. 4 at 5. FBI agents reported to their leadership that Mr. Flynn exhibited a "very sure demeanor" and "did not give any indicators of deception." Ex. 13 at 3. Both of the agents "had the impression at the time that Flynn was not lying or did not think he was lying." *Id.* When Director Comey was asked, based on his evaluation of the case: "Do you believe that Mr. Flynn

lied?" Director Comey responded: "I don't know. I think there is an argument to be made he lied. It is a close one." Ex. 5 at 9.

On November 30, 2017, the Special Counsel's Office filed a criminal information against Mr. Flynn charging him with a single count of making false statements in violation of 18 U.S.C. § 1001(a)(2). ECF No. 1. Mr. Flynn pleaded guilty to that offense, *see* ECF Nos. 3-4, but moved to withdraw that guilty plea on January 14, 2020, ECF Nos. 151, 154, 160. On January 29, 2020, Mr. Flynn also filed a "Motion to Dismiss Case for Egregious Government Misconduct and in the Interest of Justice," ECF No. 162, and supplemented that motion on April 24 and 30, 2020 based on additional disclosures, *see* ECF Nos. 181, 188-190. Both Mr. Flynn's motion to withdraw his guilty plea and motion to dismiss the case remain pending before the Court.[3]

## LEGAL BACKGROUND

Federal Rule of Criminal Procedure 48(a) permits the Government, "with leave of court," to "dismiss an indictment, information or complaint." Fed. R. Crim. P. 48(a). It is also "well established that the Government may move to dismiss even after a complaint has turned into a conviction because of a guilty plea." *United States v. Hector*, 577 F.3d 1099, 1101 (9th Cir. 2009) (collecting cases); *see also Rinaldi v. United States*, 434 U.S. 22, 31 (finding an abuse of discretion to refuse to grant post-conviction Rule 48(a) motion).

When the Government so moves, the role for courts addressing Rule 48(a) motions is "narrow" and circumscribed. *United States v. Fokker Servs., B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016). The "leave of court" provision serves "primarily to guard against the prospect that dismissal is part of a scheme of 'prosecutorial harassment' of the defendant" through repeated

---

[3] On May 7, 2020, defense counsel confirmed with the prosecution team that upon the Government filing this motion to dismiss, the defense would move to withdraw all pending defense motions without prejudice.

prosecutions—a prospect not implicated by, as here, a motion to dismiss with prejudice. *Id.* at 742 (citing *Rinaldi*, 434 U.S. at 29 n.15); *see also In re United States*, 345 F.3d 450, 453 (7th Cir. 2003) (no such concerns where "[t]he government wants to dismiss the civil rights count with prejudice, and that is what [the defendant] wants as well").

The discretion accorded the DOJ under Rule 48(a) recognizes that "decisions to dismiss pending charges … lie squarely within the ken of prosecutorial discretion" and "'at the core of the Executive's duty to see to the faithful execution of the laws.'" *Fokker Servs.*, 818 F.3d at 741 (citation omitted); *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). As the Supreme Court has explained, the factors relevant to carrying forward with a prosecution, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," are "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985).

For those reasons, a court should not deny the Government's motion to dismiss "based on a disagreement with the prosecution's exercise of charging authority," such as "a view that the defendant should stand trial" or "that more serious charges should be brought." *Fokker Servs.*, 818 F.3d at 742-43. Nor should a court second-guess the Government's "conclusion that additional prosecution or punishment would not serve the public interest." *Id.* at 743; *see also In re United States*, 345 F.3d at 453 ("We are unaware … of any appellate decision that actually upholds a denial of a motion to dismiss a charge" on grounds that dismissal would not serve the "public interest.").

11

## <u>DISCUSSION</u>

Based on an extensive review of this investigation, including newly discovered and disclosed information attached to the defendant's supplemental pleadings, *see* ECF Nos. 181, 188-190, the Government has concluded that continued prosecution of Mr. Flynn would not serve the interests of justice.

Under the *Principles of Federal Prosecution*, the Government should not prosecute a defendant "unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact." Justice Manual 9-27.220. "A determination to prosecute represents a policy judgment that the fundamental interests of society require the application of federal criminal law to a particular set of circumstances. . . ." Justice Manual 9-27.001. The particular circumstances of this case militate in favor of terminating the proceedings: Mr. Flynn pleaded guilty to making false statements that were not "material" to any investigation. Because the Government does not have a substantial federal interest in penalizing a defendant for a crime that it is not satisfied occurred and that it does not believe it can prove beyond a reasonable doubt, the Government now moves to dismiss the criminal information under Rule 48(a).

Proof of a false statement to federal investigators under Section 1001(a)(2) requires more than a lie. It also requires demonstrating that such a statement was "material" to the underlying investigation. *See United States v. Gaudin*, 515 U.S. 506, 509 (1995); *United States v. Kim*, 808 F. Supp. 2d 44, 59 (D.D.C. 2011). Section 1001 prohibits "knowingly and willfully ... mak[ing] any *materially* false, fictitious, or fraudulent statement or representation" in a "matter within the jurisdiction of the executive … branch of the Government of the United States." 18 U.S.C. § 1001(a)(2) (emphasis added). As is well-established, materiality does not equate to mere

12

"relevance"; rather, "[t]o be 'material' means to have probative weight"—that is, to be "reasonably likely to influence the tribunal in making a determination *required to be made*." *Weinstock*, 231 F.2d at 701 (emphasis added).

The materiality threshold thus ensures that misstatements to investigators are criminalized only when linked to the particular "subject of [their] investigation." *Kim*, 808 F. Supp. 2d at 59; *cf. Kungys v. United States*, 485 U.S. 759, 774 (1988) (false date and birthplace statements in immigration application were not "material" as they were not "relevant to his qualifications [for citizenship]"). And it prevents law enforcement from fishing for falsehoods merely to manufacture jurisdiction over any statement—true or false—uttered by a private citizen or public official.

In the case of Mr. Flynn, the evidence shows his statements were not "material" to any viable counterintelligence investigation—or any investigation for that matter—initiated by the FBI. Indeed, the FBI itself had recognized that it lacked sufficient basis to sustain its initial counterintelligence investigation by seeking to close that very investigation without even an interview of Mr. Flynn. *See* Ex. 1 at 4. Having repeatedly found "no derogatory information" on Mr. Flynn, *id.* at 2, the FBI's draft "Closing Communication" made clear that the FBI had found no basis to "predicate further investigative efforts" into whether Mr. Flynn was being directed and controlled by a foreign power (Russia) in a manner that threatened U.S. national security or violated FARA or its related statutes, *id.* at 3.

With its counterintelligence investigation no longer justifiably predicated, the communications between Mr. Flynn and Mr. Kislyak—the FBI's *sole* basis for resurrecting the investigation on January 4, 2017—did not warrant either continuing that existing counterintelligence investigation or opening a new criminal investigation. The calls were

entirely appropriate on their face. Mr. Flynn has never disputed that the calls were made. Indeed, Mr. Flynn, as the former Director of Defense Intelligence Agency, would have readily expected that the FBI had known of the calls—and told FBI Deputy Director McCabe as much. *See* Ex. 11. Mr. Flynn, as the incumbent National Security Advisor and senior member of the transition team, was reaching out to the Russian ambassador in that capacity. In the words of one senior DOJ official: "It seemed logical . . . that there may be some communications between an incoming administration and their foreign partners." Ex. 3 at 3. Such calls are not uncommon when incumbent public officials preparing for their oncoming duties seek to begin and build relationships with soon-to-be counterparts.

Nor was anything said on the calls themselves to indicate an inappropriate relationship between Mr. Flynn and a foreign power. Indeed, Mr. Flynn's request that Russia avoid "escalating" tensions in response to U.S. sanctions in an effort to mollify geopolitical tensions was consistent with him advocating for, not against, the interests of the United States. At bottom, the arms-length communications gave no indication that Mr. Flynn was being "directed and controlled by … the Russian federation," much less in a manner that "threat[ened] … national security." Ex. 1 at 2, Ex. 2 at 2. They provided no factual basis for positing that Mr. Flynn had violated FARA. Nor did the calls remotely transform Mr. Flynn into a "viable candidate as part of the larger … umbrella case" into Russian interference in the 2016 presidential election. Ex. 1 at 3.

In any event, there was no question at the FBI as to the content of the calls; the FBI had in its possession word-for-word transcripts of the actual communications between Mr. Flynn and Mr. Kislyak. *See* Ex. 5 at 3; Ex. 13. at 3. With no dispute as to what was in fact said, there was no factual basis for the predication of a new counterintelligence investigation. Nor was there a

14

justification or need to interview Mr. Flynn as to his own personal recollections of what had been said. Whatever gaps in his memory Mr. Flynn might or might not reveal upon an interview regurgitating the content of those calls would not have implicated legitimate counterintelligence interests or somehow exposed Mr. Flynn as beholden to Russia.

Notably, at this time FBI did not open a *criminal* investigation based on Mr. Flynn's calls with Mr. Kislyak predicated on the Logan Act. *See* Ex. 7 at 1-2.[4] *See* Ex. 3 at 2-3; Ex. 4 at 1-2; Ex. 5 at 9. The FBI never attempted to open a new investigation of Mr. Flynn on these grounds. Mr. Flynn's communications with the Russian ambassador implicated no crime. This is apparent from the FBI's rush to revive its old investigation rather than open and justify a new one, *see* Ex. 7 at 1-2, as well as its ongoing inability to espouse a consistent justification for its probe in conversations with DOJ leadership, *See* Ex. 3 at 5. In fact, Deputy Attorney General Yates thought that the FBI leadership "morphed" between describing the investigation into Mr. Flynn as a "counterintelligence" or a "criminal" investigation. *Id.*

In short, Mr. Flynn's calls with the Russian ambassador—the only new information to arise since the FBI's decision to close out his investigation—did not constitute an articulable factual basis to open any counterintelligence investigation or criminal investigation. Mr. Strzok

---

[4] Congress first enacted the Logan Act in 1799 to "guard by law against the interference of individuals with the negotiation of our Executive with the Governments of foreign countries." Joseph Gales & William Seaton, *Annals of the Congress of the United States*, 2494 (1851) (quoting 5th Congress, 3d Session); *see also Waldron v. British Petro. Co.*, 231 F. Supp. 72, 89 n.30 (S.D.N.Y. 1964). The Department of Justice does not appear ever to have brought a prosecution under the statute in the Department's 150-year history, and the Government is aware of only two indictments, in 1803 and 1852, neither of which resulted in a conviction. In the absence of any history of enforcement or any public guidance concerning the scope of its prohibition, the Department does not believe there was a legitimate basis to investigate and prosecute the designated National Security Advisor of the President-Elect under the Logan Act for communicating with a foreign ambassador and seeking to mollify geopolitical tensions in advance of the inauguration of the next President.

and Ms. Page apparently celebrated the "serendipitous[]" and "amazing" fact of the FBI's delay in formally closing out the original counterintelligence investigation. Ex. 7 at 1. Having the ability to bootstrap the calls with Mr. Kislyak onto the existing authorization obviated the need for the "7th Floor" of the FBI to predicate further investigative efforts. In doing so, the FBI sidestepped a modest but critical protection that constrains the investigative reach of law enforcement: the predication threshold for investigating American citizens.

Nor did anything about the statements by Vice President Pence or Sean Spicer in mid-January—weeks after the FBI had resolved to resurrect its dormant investigation into Mr. Flynn—provide a separate or distinct basis for an investigation. Had the FBI been deeply concerned about the disparities between what they knew had been said on the calls and the representations of Vice President Pence or Mr. Spicer, it would have sought to speak with them directly, but did not. Whether or not Mr. Flynn had been entirely candid with the future Vice President or Press Secretary did not create a predicate for believing he had committed a crime or was beholden to a foreign power.

The frail and shifting justifications for its ongoing probe of Mr. Flynn, as well as the irregular procedure that preceded his interview, suggests that the FBI was eager to interview Mr. Flynn irrespective of any underlying investigation. As is undisputed, the agents breached the common practice of arranging for the interview through the White House Counsel. *See* Ex. 3 at 5-6; Ex. 4 at 5; Ex. 5 at 6. Deputy Director McCabe effectively discouraged Mr. Flynn from procuring counsel or even notifying the White House Counsel. *See* Ex. 11. The interviewing agents failed to issue the common Section 1001 admonitions about lying to investigators. *See* Ex. 3 at 6; Ex. 4 at 5; Ex. 9 at 5-6; *see also* Ex. 6. Nor did the FBI even notify Acting Attorney General Yates that the interview was happening until the interviewing agents were already *en*

*route* to Mr. Flynn. *See* Ex. 3 at 5-6; Ex. 4 at 4-5; Ex. 5 at 6. This gambit by the FBI left Yates "flabbergasted" and "dumbfounded." *See* Ex. 3 at 6.

Additionally, prior to the interview, there were internal FBI discussions about whether to show Mr. Flynn the transcripts of his calls with Mr. Kislyak.[5] In light of the fact that the FBI already had these transcripts in its possessions, Mr. Flynn's answers would have shed no light on whether and what he communicated with Mr. Kislyak.—and those issues were immaterial to the no longer justifiably predicated counterintelligence investigation. Similarly, whether Mr. Flynn did or "did not recall" (ECF No. 1) communications already known by the FBI was assuredly not material.

Under these circumstances, the Government cannot explain, much less prove to a jury beyond a reasonable doubt, how false statements are "material" to an investigation that—as explained above—seems to have been undertaken only to elicit those very false statements and thereby criminalize Mr. Flynn. Although it does not matter that the FBI knew the truth and therefore was not deceived by Mr. Flynn's statements, *see United States v. Safavian*, 649 F.3d 688, 691-92 (D.C. Cir. 2011), a false statement must still "be capable of influencing an agency function or decision," *United States v. Moore,* 612 F.3d 698, 702 (D.C. Cir. 2010) (citations and quotation mark omitted). Even if he told the truth, Mr. Flynn's statements could not have conceivably "influenced" an investigation that had neither a legitimate counterintelligence nor criminal purpose. *See United States v. Mancuso*, 485 F.2d 275, 281 (2d Cir. 1973) ("Neither the answer he in fact gave nor the truth he allegedly concealed could have impeded or furthered the investigation."); *cf. United States v. Hansen*, 772 F.2d 940, 949 (D.C. Cir. 1985) (noting that a

---

[5] Priestap's talking points, prepared in advance of a January 24 morning meeting with McCabe reflect this internal debate.

lie can be material absent an existing investigation so long as it might "influenc[e] the possibility that an investigation might commence."). Accordingly, a review of the facts and circumstances of this case, including newly discovered and disclosed information, indicates that Mr. Flynn's statements were never "material" to any FBI investigation.[6]

And even if they could be material, the Government does not believe it could prove that Mr. Flynn knowingly and willfully made a false statement beyond a reasonable doubt.[7] Based on the facts of this case, the Government is not persuaded that it could show that Mr. Flynn committed a false statement under its burden of proof. The FBI agents "had the impression that Flynn was not lying or did not think he was lying." Ex. 13 at 4. And the statements in question were not by their nature easily falsifiable. In his interview, Mr. Flynn offered either equivocal ("I don't know") or indirect responses, or claimed to not remember the matter in question. *See United States v. Ring*, 811 F. Supp. 2d 359, 384 (D.D.C. 2011) (holding that "faulty memory" is not enough to establish "willful" lie absent proof the defendant indeed remembered the matter in

---

[6] The statements by Mr. Flynn also were not material to the umbrella investigation of Crossfire Hurricane, which focused on the Trump campaign and its possible coordination with Russian officials to interfere with the 2016 presidential election back prior to November 2016. *See* Ex. 1 at 3; Ex. 2 at 1-2. Mr. Flynn had never been identified by that investigation and had been deemed "no longer" a viable candidate for it. Most importantly, his interview had nothing to do with this subject matter and nothing in FBI materials suggest any relationship between the interview and the umbrella investigation. Rather, throughout the period before the interview, the FBI consistently justified the interview of Flynn based on its no longer justifiably predicated counterintelligence investigation of him alone.

[7] The Government appreciates that the Court previously deemed Mr. Flynn's statements sufficiently "material" to the investigation. *United States v. Flynn*, 411 F. Supp. 3d 15, 41-42 (D.D.C. 2019). It did so, however, based on the Government's prior understanding of the nature of the investigation, before new disclosures crystallized the lack of a legitimate investigative basis for the interview of Mr. Flynn, and in the context of a decision on multiple defense *Brady* motions independent of the Government's assessment of its burden of proof beyond a reasonable doubt.

question).  Combining the vague substance of the answers, the FBI's own preliminary estimation of Mr. Flynn's truthfulness, the inconsistent FBI records as to the actual questions and statements made, and Director Comey's own sentiment that the case was a "close one," Ex. 5 at 9, the evidentiary problems that have emerged create reasonable doubt as to whether Mr. Flynn knowingly and willingly lied to investigators during the interview.

Mr. Flynn previously pleaded guilty to making false statements.  *See* Def's Plea Agreement, ECF Nos. 3-4.  In the Government's assessment, however, he did so without full awareness of the circumstances of the newly discovered, disclosed, or declassified information as to the FBI's investigation of him.  Mr. Flynn stipulated to the essential element of materiality without cause to dispute it insofar as it concerned not his course of conduct but rather that of the agency investigating him, and insofar as it has been further illuminated by new information in discovery.

"The advocacy function of a prosecutor includes seeking exoneration and confessing error to correct an erroneous conviction."  *Warney v. Monroe Cty..*, 587 F.3d 113, 125 (2d Cir. 2009).  So in the final analysis, irrespective of Mr. Flynn's plea, "prosecutors have a duty to do justice."  *Darui*, 614 F. Supp. 2d at 37; *see also Marshall v. Jerrico, Inc*., 446 U.S. 238, 249 (1980) ("Prosecutors are also public officials; they too must serve the public interest.") (citation omitted).  Federal prosecutors possess "immense power to strike at citizens, not with mere individual strength, but with all the force of government itself."  Robert H. Jackson, The Federal Prosecutor, 24 Judicature 18, 18 (1940) (address delivered at the Second Annual Conference of United States Attorneys, April 1, 1940).  For that reason, "the citizen's safety lies in the prosecutor who … seeks truth and not victims, who serves the law and not factional purposes, and who approaches [the] task with humility."  *Id.*  Based on a careful assessment of the balance

of proof, the equities, and the federal interest served by continued prosecution of false statements that were not "material" to any bona fide investigation, the Government has concluded that the evidence is insufficient to prove its case beyond a reasonable doubt. The Government therefore moves to dismiss the criminal information under Rule 48(a).

## **CONCLUSION**

The Government respectfully moves under Rule 48(a) to dismiss the criminal information against Mr. Flynn.

Respectfully submitted,

TIMOTHY SHEA

BY: _____*Timothy Shea*_____
United States Attorney
D.C. Bar No. 472845