TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
SUSAN S. HAR (Cal. Bar No. 301924)
J. JAMARI BUXTON (Cal. Bar No. 342364)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:   (213) 894-2091
    Facsimile:   (213) 894-2927
    Email:     mack.jenkins@usdoj.gov
             susan.har@usdoj.gov
             jamari.buxton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-491-SB |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT; EXHIBITS 1-14 |
| v. | |
| JEFFREY FORTENBERRY, | |
| Defendant. | Hearing Date:  June 28, 2022<br>Hearing Time:  8:00 a.m.<br>Location:  Courtroom of the Hon. Stanley Blumenfeld |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Susan S. Har, and J. Jamari Buxton, hereby files its Sentencing Position and Objections to the Presentence Investigation Report for defendant Jeffrey Fortenberry in the above-captioned case.

The government's Sentencing Position and Objections to the Presentence Investigation Report is based upon the attached memorandum of points and authorities, the supporting exhibits, the files and records in this case, the Presentence Investigation Report, the Recommendation Letter, and such further evidence and argument as the Court may permit.

Dated: June 14, 2022

Respectfully submitted,

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
SUSAN S. HAR
J. JAMARI BUXTON
Assistant United States Attorneys
Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

# **Table of Contents**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.       INTRODUCTION ............................................................................................ 1

II.      STATEMENT OF FACTS ............................................................................... 2

         A.       Background and Overview of the Federal Investigation ...................... 3

         B.       2016: Defendant's Campaign Receives Illegal Contributions at a
                  Fundraiser in Los Angeles .................................................................... 5

         C.       2018: Defendant Pushes Dr. Ayoub to Host Another Fundraiser in
                  Los Angeles for Him ............................................................................ 6

         D.       March 2019: Defendant Lies to and Misleads CDCA Investigators
                  about the Illegal Contributions He Received ...................................... 7

         E.       July 2019: Defendant Requests Another Interview with Investigators
                  and Feeds Them More Lies ................................................................... 8

III.     THE PRESENTENCE INVESTIGATION REPORT ..................................... 10

IV.      THE GOVERNMENT'S CALCULATION OF THE GUIDELINES
         RANGE ......................................................................................................... 11

         A.       Defendant Obstructed Justice by Affirmatively Seeking Out a Second
                  Interview and Then Lying During That Interview ............................. 11

                  1.       By His Schemes and Lies at the Washington D.C. Interview,
                           Defendant Obstructed the Investigation into Defendant's
                           Criminal Conduct During the Nebraska Interview ................. 12

                  2.       Defendant's Obstructive Conduct Significantly Impacted the
                           Investigation ......................................................................... 13

                  3.       The USPO's Analysis of the Obstruction Enhancement Is
                           Flawed .................................................................................. 15

         B.       Defendant Abused His Position of Trust ............................................ 17

V.       GOVERNMENT'S SENTENCING RECOMMENDATION ............................. 18

         A.       The Extended, Repeated, and Serious Nature of Defendant's Conduct
                  Warrants a Meaningful Custodial Sentence ...................................... 20

         B.       The Need to Avoid Unwanted Sentencing Disparities ........................ 22

                  1.       United States v. Mitchell Englander (Case No. 2:20-CR-
                           00035-JFW): 14 months' custody .......................................... 22

                  2.       United States v. Byron Dredd (Case No. 15-CR-00569-DSF):
                           12 months' custody ............................................................... 23

3.    A probationary sentence will create unwarranted sentencing disparities with less-culpable defendants who do not enjoy the same status as defendant .................................................................... 24

C.    General Deterrence Is Paramount in Cases Involving Public Officials ...... 25

D.    Specific Deterrence Also Compels a Meaningful Custodial Sentence ....... 27

E.    History and Characteristics of Defendant ...................................... 28

1.    Defendant had many choices; he chose poorly many times ............ 30

2.    Community support for a public official involved in a corruption related offense is of limited mitigation value .................. 30

F.    Fine and Community Service ....................................................... 31

VI.    CONCLUSION ................................................................................ 32

# Table of Authorities

Page(s)

**Cases**

Gall v. United States,
  552 U.S. 38, (2007) .................................................................................29

United States v. Allen,
  341 F.3d 870 (9th Cir. 2003) ...................................................................12

United States v. Bistline,
  665 F.3d 758 (6th Cir. 2012) ...................................................................29

United States v. Bragg,
  582 F.3d 965 (9th Cir. 2009) ...................................................................29

United States v. Brown,
  880 F.3d 399 (7th Cir. 2018) ...................................................................26

United States v. Caldwell,
  626 F. App'x 683 (9th Cir. 2015) .............................................................12

United States v. Coumaris,
  198 F. App'x 9 (D.C. Cir. 2006) ..............................................................17

United States v. Ebert,
  99 F.3d 448 (D.C. Cir. 1996) ...................................................................17

United States v. Garcia,
  700 F. App'x 639 (9th Cir. 2017) .......................................................13, 14

United States v. Kuhlman,
  711 F.3d 1321 (11th Cir. 2013) ...........................................................27, 30

United States v. Livesay,
  587 F.3d 1274 (11th Cir. 2009) ...............................................................26

United States v. Luca,
  183 F.3d 1018 (9th Cir. 1999) ...........................................................11, 15

United States v. Martin,
  455 F.3d 1227 (11th Cir. 2006) ...............................................................25

United States v. McNally,
  159 F.3d 1215 (9th Cir. 1998) ...........................................................11, 16

United States v. Morgan,
  635 F. App'x 423 (10th Cir. 2015) ......................................................22, 31

United States v. Mueffelman,
  470 F.3d 33 (1st Cir. 2006) ......................................................................26

United States v. Prosperi,
  686 F.3d 32 (1st Cir. 2012) ......................................................................29

United States v. Saeteurn,
  504 F.3d 1175 (9th Cir. 2007) ..................................................................24

United States v. Sanders,
    478 F. App'x 374 (9th Cir. 2012)............................................................12, 13
United States v. Spano,
    411 F. Supp. 2d 923 (N.D. Ill. 2006)...........................................................25
United States v. Stefonek,
    179 F.3d 1030 (7th Cir. 1999)......................................................................29
United States v. Thing,
    88 F. App'x 182 (9th Cir. 2004)...................................................................12
United States v. Vrdolyak,
    593 F.3d 676 (7th Cir. 2010)........................................................................30
United States v. Williams,
    160 F. App'x 582 (9th Cir. 2005)..................................................................12

**Rules**

U.S.S.G. § 3C1.1.................................................................................11, 16, 21

**Other Authorities**

1984 U.S.C.C.A.N. 3182 ...............................................................................26

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Defendant Jeffrey Fortenberry was a powerful career politician who swore an oath to support and defend the United States and to serve the interests of his constituents. Defendant violated that oath, and broke the law, when he repeatedly chose to serve himself, his political career, and his ego during the course of a significant federal investigation into violations of the Federal Election Campaign Act ("FECA"), bribery, and foreign influence—paramount matters implicating the core of American democracy. Despite numerous opportunities to correct his course, defendant deliberately and proactively chose the path of self-preservation and abandoned his oath and duty when he made the calculated decision to repeatedly lie to and mislead federal investigators. Defendant then entreated federal investigators for an audience in Washington D.C. and, when they agreed, defendant executed his premeditated plan to intentionally feed the investigators more falsities and misleading information in an attempt to throw them off his trail.  Aggravating matters still, defendant sought to use his status as a lawmaker to deter and even intimidate investigators who were following their own sworn duty and the objective evidence wherever it led them, including to the doorstep of an elected U.S. Congressmember in Nebraska who sat on the influential House Foreign Affairs Committee.  And when all that failed, defendant pursued baseless and personal attacks in litigation against the lead FBI investigator and the prosecutors and even attempted to lay blame on his election lawyer and prior defense attorney—all in an effort to evade defendant's own self-created criminal liability.

The effect of defendant's criminal conduct has been to fuel distrust in our federal elected officials.  His conduct further undermined the already fraying public trust of defendant's constituents and citizens nationwide.  Defendant did not engage in this wrongdoing out of an urgent financial need or because of an aberrant life circumstance. Rather, he was motivated by plain, selfish desire to cling to his status as a powerful federal official.  After being provided numerous opportunities to come clean, defendant

unapologetically chose to do the opposite.  Even after being confronted with the overwhelming evidence of his guilt, including before his indictment and long after the federal grand jury returned a true bill, defendant continuously chose hostile defiance and blame.  Defendant's self-preservation strategy was rejected throughout the litigation by the Court and ultimately by the jury, swiftly and firmly.

For his pattern of choosing hubris over honesty and for the trampled public trust that defendant leaves in his wake, a meaningful term of imprisonment is appropriate and necessary.  A meaningful prison term is also necessary to deter other powerful public officials who might venture down defendant's unlawful path of lies and obstruction in hopes their powerful position will shield them from inquiry.  The government respectfully recommends that the Court impose the following sentence: (a) 6 months' imprisonment; (b) two years' supervised release; (c) a $30,000 fine; (d) 150 hours of community service; and (e) a special assessment of $300.  The custodial recommendation is at the low-end of the government's Guidelines calculations, detailed further below.

## II.   STATEMENT OF FACTS[1]

Since 2015, the U.S. Attorney's Office and the FBI were engaged in an expansive inquiry into potential FECA violations, bribery, and foreign influence schemes centered around a Nigerian-born billionaire of Lebanese descent, Gilbert Chagoury, who had financial and personal connections to various U.S. politicians (the "Federal Investigation").  The investigation focused on the anti-democratic efforts of Chagoury and his associates to secretly inject foreign money into the U.S. electoral system in furtherance of Chagoury's own personal and political aims.  As defense witness the Honorable Anna Eshoo testified during trial, transparency in election finance goes to the heart of our democracy because concealing the source of the funds (and ultimately a person's influence on elections) is "anti-democratic."  Circumventing FECA laws allows

---

[1] Unless indicated otherwise, all facts herein are drawn from the Presentence Investigation Report ("PSR").  (See CR 207 ¶¶ 5-24.)

2

wealthy individuals to wield an outsized influence on who is elected and puts a wealthy and foreign finger on the scale of U.S. elections and policy.

This is what the Federal Investigation sought to uncover, prevent, punish, and deter. And it is this investigation that defendant repeatedly sought to obstruct by lying to and misleading federal investigators in his capacity as a sitting U.S. Congressman.

### A.    Background and Overview of the Federal Investigation

Under federal law, it is a violation to knowingly accept campaign contributions from foreign nationals and from conduits. The Federal Election Commission ("FEC") is the entity charged with ensuring transparency in federal elections by administering and enforcing campaign finance law, including by requiring each federal political campaign to submit regular reports to the FEC with information about donors. These FEC forms are one of the country's independent safeguards against federal and/or outsized influences. However, because such forms rely on the candor of the reporting official, it is a check that is easy to evade and difficult to enforce.

The Federal Investigation investigated illegal foreign and conduit contributions and foreign influence schemes orchestrated by Gilbert Chagoury and aided by other individuals, including Toufic Baaklini and Dr. Elias Ayoub. As a foreign national, Chagoury was prohibited from making contributions in support of United States elected officials. As early as 2010, Chagoury had been the subject media reports claiming that he had ties to terrorism financing.[2]   In 2015 and 2016, reporting in this same vein regarding Chagoury intensified and became more widespread. In particular, the reporting focused on, and was deeply critical of, then-presidential candidate Hillary Clinton due to her and her foundation's controversial (but legal) financial connection to Chagoury as a "top Clinton Foundation donor."

Defendant had significant ties to Chagoury, Baaklini, and Dr. Ayoub through the non-profit organization In Defense of Christians ("IDC"). Chagoury was a key initial

---

[2] Chagoury was never charged with any terrorism related offenses.

financial backer for IDC, and defendant personally met with Chagoury twice, in D.C. and in Paris.  Baaklini was the founder of IDC and, until he resolved the criminal charges against him in this case, served as its President.  Baaklini also consistently served as a proxy for Chagoury and has assisted him with financial and political dealings in the United States.  Dr. Ayoub served as a board member with IDC, was very close to Chagoury, and had ties to Baaklini.

At the time of the offenses, defendant was a U.S. Representative for Nebraska, who supported the mission of IDC.  Indeed, defendant became an important political ally for Baaklini and his organization.  As a result, defendant developed a close working relationship and friendship with Baaklini involving regular communication via text messages and emails.  (See Trial Tr. 3/18/2022 A.M. at 138:22-24.)  Through Baaklini, defendant came to know Chagoury based on their shared commitment to IDC.

Federal investigators learned that Chagoury had funneled his money to the campaigns of U.S. political candidates whom Chagoury believed would be supportive to his cause.  The Federal Investigation ultimately revealed that from 2012 to 2016, Chagoury provided approximately $180,000 in illegal political contributions to four political candidates—including defendant—with the assistance of Baaklini, Dr. Ayoub, and others.  The Federal Investigation also revealed that Chagoury separately routed $50,000 to then-United States Secretary of Transportation Ray LaHood, in the form of a purported termless "loan" that LaHood never disclosed as required on government ethics forms and never paid back until after he (LaHood) resolved his matter as part of this investigation.  (Trial Ex. 197 (Stipulation Regarding Results of the Federal Investigation).)

The Federal Investigation sought to learn whether and when any of the recipient politicians were aware of the illicit contributions to their campaigns; whether any person sought to impermissibly influence the recipient politician in exchange for the contribution; and whether any recipient politician took any official acts in connection with the illicit contributions.

**B.    2016: Defendant's Campaign Receives Illegal Contributions at a Fundraiser in Los Angeles**

In late 2015, defendant asked Baaklini to assist him in identifying supporters who would contribute to his re-election campaign.  Baaklini advised defendant that he had a group of Lebanese donors in Los Angeles who wanted to support defendant, and defendant, in turn, directed his fundraising consultant, Alexandra Kendrick, to coordinate the event with Baaklini.   Around the same time, Baaklini directed Dr. Ayoub to host the Los Angeles fundraiser for defendant's re-election.

In 2016, Chagoury arranged to funnel $30,000 of his money to defendant's campaign through Baaklini.  Baaklini, in turn, arranged to provide that money in cash to Dr. Ayoub to fund defendant's campaign through conduits.  Consistent with that plan, Baaklini introduced Kendrick to Dr. Ayoub as the host of the Los Angeles fundraiser (the "2016 Fundraiser").  Kendrick and defendant's campaign team coordinated with Baaklini and Dr. Ayoub to organize the 2016 Fundraiser on February 20.  In the lead-up to the 2016 Fundraiser, Kendrick emphasized to defendant the potential risk of illegal foreign and conduit contributions with this event.

Defendant flew out to Los Angeles for the weekend of the 2016 Fundraiser; Dr. Ayoub picked him up from the airport.  The 2016 Fundraiser was co-hosted by Dr. Ayoub and his family friends at the family friends' home in Los Angeles.  The 2016 Fundraiser raised a total of $36,000, which was one of defendant's most successful fundraising events.  Of that amount, approximately $30,200 was contributed by eight conduits who were reimbursed with Chagoury's cash.  In his April 15 Quarterly FEC Report for 2016, defendant disclosed the eight conduits who had contributed Chagoury's money; the report did not indicate Chagoury or Baaklini provided any contributions.

A short time after the 2016 Fundraiser, defendant saw Baaklini in Washington, D.C.  In a private conversation, defendant asked Baaklini if he thought anything was wrong with the 2016 Fundraiser.  Baaklini falsely told him no and inquired why defendant was asking.  In response, defendant noted that the money had all come from

one family.  (Trial Tr. 3/18/2022 A.M. at 185:18-188:24.)

However, approximately one year later, when defendant sent Baaklini a March 28, 2017 text message stating "We need to see you quicky.  Please call and come over," Baaklini replied by sending defendant the name and contact information for Baaklini's lawyer – criminal defense attorney, and former DOJ prosecutor, James Trusty.  (Trial Ex. 38.)  Baaklini, who had by then been interviewed by the FBI, went on to tell defendant, "My attorney believes it could be productive for all of us to get together including any attorney who represents your interests."  By this text, defendant knew that Baaklini had a criminal defense attorney who thought it would be mutually "productive" for defendant to get an attorney himself and for the four of them to talk – which likely suggested to defendant that Baaklini believed defendant had information relevant to a crime that may implicate Baaklini, defendant, or both.

### C.   2018: Defendant Pushes Dr. Ayoub to Host Another Fundraiser in Los Angeles for Him

After keeping in periodic contact with Dr. Ayoub (largely through text messages), defendant reached out to Dr. Ayoub to ask for a call in the spring of 2018.  By that time, Dr. Ayoub had chosen to cooperate with the FBI.  On April 9, 2018, defendant called Dr. Ayoub, which was surreptitiously recorded at the direction of the FBI.  Defendant asked Dr. Ayoub if he would host another fundraising event in Los Angeles for him, and Dr. Ayoub agreed.  (See Trial Ex. 112T.)

Following up on defendant's request, on June 4, 2018, Dr. Ayoub placed a call to defendant, which was surreptitiously recorded at the direction of the FBI.  During that nine-minute call, Dr. Ayoub repeatedly discussed with defendant that, during the 2016 Fundraiser, $30,000 in cash provided by Baaklini had been donated to defendant's campaign by conduit donors who were reimbursed by Dr. Ayoub (the "June 4 Call"). Dr. Ayoub stated Baaklini's $30,000 cash "probably did come from Gilbert Chagoury."

Defendant did not express surprise or concern or seek clarification about Dr. Ayoub's admissions that illegal foreign cash had been funneled to his campaign by

people known to him and people who sought his legislative support during the time he was up for re-election and received the illegal donations. Instead, defendant continued to push for the second fundraiser, explaining that he hoped to "have some continuation of the fine generosity" that he had received from the first (illicitly funded) fundraiser. Defendant also offered to speak with Baaklini—a key facilitator of the illegal contributions to defendant's campaign—to see if he could again "help" with the fundraiser, including by seeking out whether Chagoury could again serve as a source for the money. (See Trial Ex. 113T.)

Following the June 4 Call—and consistent with defendant's suggestion that he could speak to Baaklini about "help[ing]" with the fundraiser—defendant sent Baaklini a text message that same day asking, "Would you have some time to visit later Thursday evening?" (See Trial Ex. 43.)

Despite what Dr. Ayoub stated during the June 4 Call, defendant did not amend his FEC disclosures regarding the contributions from the 2016 Fundraiser. Defendant also did not disgorge the funds from the 2016 Fundraiser as required by the FEC and which would have required him to publicly disclose that he had received, or he suspected he had received, illegal conduit contributions from Chagoury.

### D. March 2019: Defendant Lies to and Misleads CDCA Investigators about the Illegal Contributions He Received

On March 23, 2019, Agent Carter and Agent O' Leary traveled to defendant's home in Lincoln, Nebraska to interview defendant as part of the Federal Investigation. The interview was surreptitiously video and audio recorded. Defendant asked for, and received, the presence of local Nebraska police to serve as his escort during the entirety of his interview. (Trial Tr. 3/22/2022 A.M. at 52:20-24.)

At the start of the interview, defendant was openly hostile towards the federal investigators and directed that they listen to his grievances before he would participate in any interview. (See Trial Ex. 115T.) After they did so, the federal investigators advised defendant it was a crime to lie to federal agents. (Id.) The investigators' questions

focused on Chagoury, Baaklini, Dr. Ayoub, IDC, and illegal campaign contributions. Defendant repeatedly and falsely denied knowing about any illegal conduit contributions to his campaign, including after being specifically asked about Dr. Ayoub and Baaklini. Defendant denied receiving money from Chagoury.  Defendant also falsely stated that "the only people [he] received money for are on the financial disclosure."

Defendant misleadingly minimized his association and knowledge of Dr. Ayoub. Defendant claimed that he had only a vague recollection of Dr. Ayoub and stated that he "may have" donated to him.  (See Trial Ex. 120T.)  When pressed about whether Dr. Ayoub just donated or held a fundraiser, defendant equivocated, stating he would need to "double check."  (See Trial Ex. 126T.)

Defendant chose not to disclose his conversation with Baaklini after the 2016 Fundraiser.  Similarly, defendant did not disclose that he had also called his election lawyer, Jessica Johnson, after the June 4 Call.

E.    **July 2019: Defendant Requests Another Interview with Investigators and Feeds Them More Lies**

Following the March 23 interview, defendant (through then-counsel Trey Gowdy) proactively reached out to Agent Carter and requested another interview.  A second interview took place in Washington, D.C. on July 18, 2019, at Mr. Gowdy's office.  At the time of the interview, defendant was still unaware that his call with Dr. Ayoub had been recorded or that Dr. Ayoub was cooperating with the Federal Investigation. Defendant was again advised that the interview was voluntary and that it was a crime to lie to the federal government.  (See 7/18/2019 D.C. Interview Transcript at 1-4.)

Defendant then launched into an admittedly prepared speech regarding the origins of his congressional work in the Middle East.  (Trial Tr. 3/22/2022 P.M. at 30:1-22.)  For the first half of the approximately two-hour interview, defendant took painstaking steps to paint himself in a positive light by drawing on his lawmaker status, repeatedly emphasizing his work in Congress, and using that work as "context" in an effort to legitimize his relationship and contacts with Chagoury, Baaklini, and Dr. Ayoub.  (See

8

7/18/2019 D.C. Interview Transcript at 5-25.)  Defendant also described himself as a "lawmaker in charge of a political campaign" and depicted himself as a stickler for fowling the rules.  (See id. at 52.)  By these statements, defendant intended to suggest that he, as a lawmaker, always acted aboveboard and thus investigators could trust his version of events.

Despite the § 1001 warnings he had again received, defendant made numerous false and misleading statements during the D.C. Interview, including that:

- He had not been told by Dr. Ayoub during the June 4 Call that Baaklini had given Dr. Ayoub $30,000 cash to help fund the 2016 Fundraiser;

- He was not aware of any illicit donation made during the 2016 Fundraiser;

- He ended the June 4 Call with Dr. Ayoub after Dr. Ayoub made a "concerning comment" during the call; and

- He would have been "horrified" if he had learned from Dr. Ayoub during the June 4 Call that Baaklini had provided Dr. Ayoub money to contribute to the 2016 Fundraiser.

At no time did defendant cause his campaign to file amended FEC reports with accurate information about the true contributors to the 2016 Fundraiser.

Defendant's lies and obstructive conduct caused the federal government to divert significant resources and delay the investigation, as investigators were now obligated to evaluate and vet the information fed to them by defendant.  (See Trial Tr. 3/22/2022 P.M. at 22:19-23:12 (following the Nebraska interview, investigators were looking into potential FECA violations and corrupt relationship, as well as a potential false statement charge); id. at 27:5-14 (when an individual is perceived to be lying after § 1001 advisement, it obligates the FBI to investigate "whether they're concealing a greater crime or some other crime that they don't want the FBI to know about"); id. at 51:22-52:16; 55:3-9; 58:7-17; 60:18-24; 65:23-25; 76:15-23; 81:3-12 (as a result of defendant's lies, federal investigators obtained text messages from Baaklini and a cell-site warrant for defendant and Baaklini's phones, reviewed defendant's FEC filings, interviewed five

additional witnesses identified by defendant, and attempted to interview two others).)

## III.   THE PRESENTENCE INVESTIGATION REPORT

On May 24, 2022, the United States Probation Office ("USPO") disclosed the PSR and its recommendation letter.  (CR 206 ["PSR"]; CR 207 ["PSR Ltr."].)  The USPO found that defendant's base offense level was 6 under U.S.S.G. § 2B1.1(a)(2) and that no additional specific offense characteristics or adjustments applied, resulting in a total offense level of 6.  (PSR ¶¶ 30-40.)  The USPO further found that "defendant has not clearly demonstrated acceptance of responsibility for the offense."  (Id. ¶ 39.)  The USPO found defendant fell within Criminal History Category I, a conclusion with which the government concurs.  (Id. ¶ 45.)  Based on the foregoing, the USPO concluded that the Guidelines range was 0 to 6 months' imprisonment.  (Id. ¶ 142.)

As noted in the PSR, the government previously provided its position on the Guidelines to the USPO; specifically, that the obstruction of justice (U.S.S.G. § 3C1.1) and abuse of trust (U.S.S.G. § 3B1.3) enhancements applied.[3]  (See PSR ¶¶ 33-36.) Support for these enhancements is detailed below.  Even if the Court finds that the legal requirements for these two enhancements have not been met, the underlying facts still reflect aggravating conduct warranting a meaningful custodial sentence under 18 U.S.C. § 3553(a).

With respect to imprisonment, the USPO recommended a mid-range sentence of three months' imprisonment based on the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense involving false statements and the concealment of material facts on more than one occasion."  (PSR Ltr. at 1, 5.)  The USPO also highlighted the damage to the "public trust" caused by defendant's actions.  (Id. at 5.)  The USPO also found that the

---

[3] Government counsel also met and conferred with counsel for defendant regarding defendant's sentencing in early May 2022.  At this meeting, government counsel advised defense counsel the government would be seeking these two enhancements, that it calculated defendant's Guidelines range as 6-12 months' custody, and that it intended to seek a custodial sentence within that range.

relevant factors called for the imposition of a fine at the high-end of the range and recommended a $9,500 fine, along with the $300 mandatory special assessment.  (Id. at 1, 6).  The USPO recommended one year of supervised release to follow defendant's custodial term.  (Id. at 2.)

## IV.    THE GOVERNMENT'S CALCULATION OF THE GUIDELINES RANGE

The government submits that the following Guidelines apply:

| Base Offense Level | 6 | U.S.S.G. § 2B1.1(a)(2) |
|---|---|---|
| Obstruction or Impeding the Administration of Justice | +2 | U.S.S.G. § 3C1.1 |
| Abuse of Position of Trust | +2 | U.S.S.G. § 3B1.3 |
| **Total**: | **10** | |

With a Total Offense Level of 10 and a Criminal History Category of I, defendant's advisory Guidelines range is 6 to 12 months' custody, a $4,000 to $40,000 fine, and 1 to 3 years of supervised release.

### A.    Defendant Obstructed Justice by Affirmatively Seeking Out a Second Interview and Then Lying During That Interview

Section 3C1.1 of the Sentencing Guidelines provides for a two-level enhancement where "(1) the defendant willfully obstruct[s] or impede[s], or attempt[s] to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct relate[s] to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense."  This enhancement applies for "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."  U.S.S.G. § 3C1.1 cmt. n. 4(G). "Willfully providing material false statements to federal law enforcement officials undisputedly justifies the obstruction enhancement where actual obstruction occurs." United States v. Luca, 183 F.3d 1018, 1023 (9th Cir. 1999); see also United States v. McNally, 159 F.3d 1215, 1217 (9th Cir. 1998) (applying enhancement for false

information provided to law enforcement, which created an actual impediment or obstruction to government's efforts); <u>United States v. Caldwell</u>, 626 F. App'x 683, 687 (9th Cir. 2015) (same); <u>United States v. Williams</u>, 160 F. App'x 582, 586 (9th Cir. 2005) (holding that defendant's conviction under 18 U.S.C. § 1001 was sufficient under U.S.S.G. § 3C1.1 to warrant an obstruction of justice adjustment).   Conduct is material where, if believed, it "would tend to influence or affect the issue under determination." <u>United States v. Allen</u>, 341 F.3d 870, 897 (9th Cir. 2003) (cleaned up).   Significant obstruction can mean the conduct was "disruptive" to the investigation or "significantly delayed" it.  <u>United States v. Sanders</u>, 478 F. App'x 374, 376 (9th Cir. 2012).  A "hindrance to the investigation to the point of diversion of resources" can also support the adjustment.  <u>See</u> <u>United States v. Thing</u>, 88 F. App'x 182, 185 (9th Cir. 2004).

      1.   <u>By His Schemes and Lies at the Washington D.C. Interview,<br>Defendant Obstructed the Investigation into Defendant's Crimes in<br>the Nebraska Interview</u>

     This adjustment for obstruction of justice applies to defendant's conduct supporting his conviction for Count Three because that criminal conduct obstructed the government's investigation into Count Two (a "count of conviction").  Specifically, after making numerous materially false and misleading statements in his first interview in Nebraska (Count Two), it is undisputed that defendant affirmatively sought out a second interview in Washington, D.C., ostensibly to provide "additional information" related to the topics of the first interview.  (PSR ¶ 23).  Federal investigators traveled to D.C. to interview defendant pursuant to his request, which took place at his lawyer's office.  But instead of coming clean during his second interview or correcting his false statements, defendant doubled down on his lies from the first interview, made additional false statements, and provided new misleading information meant to cover up his lies during the first interview.  (<u>See</u> <u>id.</u>)  All of this caused a direct and significant diversion of resources, as well as delay because investigators were now obligated to evaluate this new information provided by defendant to verify or disprove it.  (<u>See</u> <u>supra</u> Section II.E.)

     Defendant's conduct "disrupted" and "significantly delayed" both the broader

investigation into the underlying FECA and bribery schemes <u>and</u> the nascent investigation into whether defendant willfully and materially lied during his first interview in Nebraska.[4]  <u>Sanders</u>, 478 F. App'x at 376.  This enhancement is especially proper given the calculated way defendant sought out the second voluntary interview and fed the government false and misleading information.  Having chosen to do so, the law dictates that he should be held responsible for his choices to further materially lie and impede the investigation into him and to divert investigative resources towards vetting his separate lies from both interviews.  Importantly, as the jury and USPO found, this second interview was not limited to defendant repeating the same lies from his first interview.  (<u>Compare</u> PSR ¶ 22 <u>with</u> <u>id.</u> ¶ 23.)  He pushed new lies, included new narratives that omitted new material facts, and offered new purportedly exonerating witnesses and documents.  (<u>See, e.g.</u>, Trial Tr. 3/22/2022 P.M. at 51:10-53:25 (defendant falsely advised investigators that he told his aide, Lucas Wenz, not to move forward with the second fundraiser and providing a purportedly corroborating email that, in fact, <u>pre-dated</u> the June 4 Call with Dr. Ayoub).)

   2.   <u>Defendant's Obstructive Conduct Significantly Impacted the Investigation</u>

   <u>United States v. Garcia</u>, 700 F. App'x 639 (9th Cir. 2017), is instructive.  There, the Ninth Circuit found the defendant's lies actually impeded the investigation and applied the obstruction enhancement because:

> Garcia did not simply deny guilt; he lied by saying that he was
> taking a friend to apply for a job at MGM and that the gloves
> and duct tape belonged to the registered owner of the car.
> Officers tracked down, interviewed, and called as witnesses
> MGM employees and the car's owner in order to refute
> Garcia's exculpatory statements.  None of that investigation
> would have occurred without Garcia's lies, so it cannot be
> characterized as "routine" background investigation or

---

[4] The government also asserts application of the enhancement is supported based on defendant's obstruction of "a closely related offense," under U.S.S.G. § 3C1.1, namely the closely related offense of FECA violations by way of his campaign's receipt of illegal contributions from defendant's friends.

1

2

> otherwise ordinary investigation that would have occurred
> even without the lies.

3  Id. at 643.

4       Defendant's obstructive conduct during the second interview caused investigators

5  to conduct numerous additional interviews of persons (including multiple out-of-state

6  witnesses) identified by defendant to determine whether he had affirmatively lied during

7  the first interview.  (See PSR ¶ 23 fn.3).  Here, the government would not have

8  interviewed defendant's FEC lawyer (Jessica Johnson Furst), his chief of staff (Reyn

9  Archer), or Luke Wenz had defendant not provided false exculpatory statements related

10 to them during the D.C. interview.  Similarly, the government would not have sought

11 and reviewed these same witnesses' email and text communications.  Agents likely

12 would not have reviewed Baaklini's GPS location for that 2018 time period and cross-

13 referenced it with defendant's GPS location in order to determine whether they met after

14 the call with Dr. Ayoub, had defendant not claimed in the second interview that he never

15 spoke with Baaklini about the Dr. Ayoub call.  Yet the government was forced to take all

16 these steps and more.

17      Defendant's obstructive conduct also caused federal investigators to focus more

18 on the relationship between defendant, Baaklini, and Chagoury to determine, among

19 other things, whether or not defendant lied to conceal a past, present, or developing

20 corrupt relationship.  The net result was to cause an overall delay to the investigation.

21 After defendant's March 2019 Nebraska interview, Chagoury did not resolve his case

22 until October 2019, Baaklini did not resolve his case until March 2021, and defendant

23 was not charged for any offenses until October 2021.[5]

24      In sum, the jury's verdicts and specific findings on Count Three (the D.C.

25

26      [5] See United States v. Toufic Baaklini, No. 2:21-cr-00160-DMG, Deferred

27 Prosecution Agreement (C.D. Cal. Mar. 31, 2021); see also
   https://www.justice.gov/usao-cdca/pr/lebanese-nigerian-billionaire-and-two-associates-
   resolve-federal-probe-alleged (link to full resolution for Gilbert Chagoury, signed

28 October 2019).

interview) confirm not only that defendant's false and misleading statements were intended to "obstruct" and "impede" federal investigators' inquiry into FECA and bribery, but <u>also</u> the investigation into whether defendant committed willful false statements in the Nebraska interview.  (CR 186.)  And defendant was successful in his efforts to impede the investigation into the false statements he made during the Nebraska interview, as evidenced by the fact that investigators embarked on a new series of interviews and took a number of investigative steps in response to defendant's false statements in order to uncover whether defendant willfully lied in Nebraska.  Had defendant simply told the truth and come clean during the second interview, it would have: (a) saved the government a vast amount of investigative resources and time by not conducting interviews to vet defendant's witnesses and their resulting versions of events, which included review of phones, GPS data, and email records; (b) allowed investigators to return focus to the underlying and priority FECA, bribery, and foreign influence investigation into Chagoury and his associates; and (c) perhaps altered the charging decisions related to defendant in the first place, which would have saved the parties tremendous resources.

This significant and avoidable expenditure of investigative resources and delay in the investigation into FECA/bribery crimes and defendant's false statements in the Nebraska interview, defendant's "false information provided to law enforcement" "significantly obstructed" the investigation in a manner warranting an increased offense level and consistent with Ninth Circuit law.  See <u>Luca</u>, 183 F.3d at 1023.

> 3.    <u>The USPO's Analysis of the Obstruction Enhancement Is Flawed</u>

In declining to apply the obstruction of justice enhancement, the USPO only provided a conclusory summary largely repeating the text of the applicable Guideline (while correctly noting the government's position).  Its analysis is summarized in a sentence arguing that defendant's "actions in the second interview constitute a continuation of the relevant conduct of falsifying and concealing material facts and

making false statements." (PSR ¶ 36.)[6]  This analysis is problematic in that it conflates Counts One and Two, and it makes it virtually impossible for a defendant to be held accountable for his obstructive conduct when he is charged with both a prior false statement <u>and</u> an underlying scheme to conceal material facts supporting the false statement because the scheme makes it all part of a single offense.  The government is not aware of any case law or commentary supporting this position that because defendant lied multiple times, he cannot be held responsible for obstruction in the manner that the Guidelines otherwise say plainly would apply (provided actual obstruction is demonstrated).  <u>See</u> U.S.S.G. § 3C1.1 cmt. n. 4(G).  (obstruction enhancement includes "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense").  Put another way, if defendant had paid a witness to commit perjury to thwart the investigation into his Nebraska false statements or if defendant had perjured himself on the stand regarding the same,[7] there would be no dispute that such conduct triggers the obstruction enhancement even though such conduct could be characterized as a "continuation of the relevant conduct of falsifying and concealing material facts and making false statements."

Put simply, though all defendant's false material statements involved the same general <u>topics</u>, defendant's lies during the second interview sprang from, and were designed to conceal and smooth over, defendant's lies during the first interview.  The

---

[6] The government notes that this paragraph also states "currently available information does not support that the defendant . . . *attempted* to obstruct or impede, the administration of justice[.]"  PSR ¶ 36 (emphasis added).  The government believes this statement to be in error because, at minimum, defendant's lies in the second interview demonstrated an "attempt" to impede the investigation into his lies in the first one.  However, while this statement in the PSR is factually incorrect, it is moot because the commentary to the Guidelines and case law set forth that a mere "attempt" is insufficient to apply this enhancement – *actual* obstruction must occur.  U.S.S.G. § 3C1.1 cmt. n. 4(G); <u>see also</u> <u>McNally</u>, 159 F.3d at 1217.

[7] U.S.S.G. § 3C1.1 cmt. n. 4(A), (B).

16

USPO's analysis overlooks this subtle, yet important, point.  The obstruction enhancement should apply.

## B.  Defendant Abused His Position of Trust

The two-level enhancement for abuse of position applies because defendant, a then-sitting member of the United States Congress, occupied a position of trust and used that position to significantly facilitate the commission of the offense.

Because the base offense level for 18 U.S.C. § 1001 does not take into account defendant's position as an elected public official, the § 3B1.3 adjustment is the only guideline section that takes into account that defendant abused his position of trust in the commission of the offense.  As the court explained in United States v. Ebert, 99 F.3d 448 (D.C. Cir. 1996) (unpublished), "section 1001 can be violated by anyone making a false statement 'in any matter within the jurisdiction of any department or agency of the United States,' not only by someone in a position of trust."  Id.

The § 3B1.3 adjustment applies when a defendant holding a position of trust lies during the course of an investigation.  For example, in United States v. Coumaris, 198 F. App'x 9, 10-11 (D.C. Cir. 2006), "[w]hen conveying false information to local law enforcement officers, [the defendant] repeatedly referred to himself as an 'IRS Agent' or 'Agent,' and at one point even gave the police his badge number."  The court affirmed the application of the § 3B1.3 adjustment, explaining that as an IRS agent, the defendant occupied a position of trust and "abused it on multiple occasions using his special credibility with law enforcement officials in an attempt to avoid detection and to divert attention from his criminal conduct."  Id.

Here, too, defendant made false statements to federal investigators while he occupied a position of public trust.  On multiple occasions, defendant invoked this position in attempting to falsely bolster his credibility.  (PSR ¶ 34; see 7/18/2019 D.C. Interview Transcript at 5-25.)  Defendant's repeated reliance on his status as an elected official during both interviews was designed to convince or even intimidate the investigators into believing that defendant's elected status and background meant they

17

should simply take his version of events at face value. Indeed, defendant's demonstrated hostility to investigators when pressed to explain certain inconsistencies and problems with his story was (at least in part) based on his feigned incredulity that investigators could believe that he, as a sitting U.S. Congressmember, had participated in or had knowledge of a federal crime. (See Trial Ex. 128T; see also 7/18/2019 D.C. Interview Transcript at 52.) As a federal political candidate, defendant was also obligated to submit truthful and accurate FEC reports. Defendant used that position and obligation to significantly facilitate the commission of his scheme when he pointed federal investigators to those false reports as evidence that he was providing truthful information, knowing all the while that he had intentionally chosen not to amend them.

The USPO declined to apply this enhancement, contending that defendant's references to his status as an elected official did not "*significantly* facilitate" his crimes because "agents had other sources for the investigation, including audio and video recordings, that illustrated the false statements and prevented Fortenberry's offense conduct from being concealed." (PSR ¶ 34) (emphasis in original). This is not compelling. Indeed, had defendant, in his second interview, claimed he simply forgot about the content of this call, or did not hear the content of the call because of bad cell phone reception in Nebraska or distraction, or simply did not grasp the content of the call – all of which were defendant's defenses at trial – and had the government accepted those versions, he would not have been charged with any crimes. As such, defendant's entreaties (both implicit and explicit) during these interviews for federal investigators to weigh his position of trust in favor of believing his story in both interviews makes his crimes aggravating.

The abuse of position of trust enhancement applies.

## V. GOVERNMENT'S SENTENCING RECOMMENDATION

Defendant's false statements and obstruction of justice are not victimless crimes. When a public official is revealed to have betrayed his oath, lied to federal investigators to protect his career and image, and endeavored to impede a significant federal

investigation into matters affecting the core of our democracy, the public's trust in its government is deeply affected.  Uncovering this type of conduct is often exceptionally difficult and requires dedicated investigation, including—in this instance—by obtaining information from witnesses who were long loyal to defendant and even hostile to the government's efforts to do so.  Moreover, the success of these investigations often hinges on a conspirator actually taking accountability for their actions and agreeing to cooperate, in addition to clear objective evidence, such as a recording of the defendant in his own words.[8]  The Court should reject any attempts to minimize defendant's obstructive conduct or its consequent public harm.

The government respectfully requests that the Court adopt the factual findings and criminal history calculation of the PSR in this matter, and the additional factual information in this sentencing position, as supported by the evidence at trial and appended exhibits.  After applying the two enhancements described above, defendant's total offense level should be 10.  However, regardless of the final Guidelines calculation, the government's recommended sentence is grounded in a balancing of the aggravating and mitigating § 3553(a) factors, as set forth below.  Given defendant's repeated conduct over a period of time, lack of remorse, and the strong particularized need for general and specific deterrence here, a meaningful custodial sentence is necessary to reflect all of the § 3553(a) factors and achieve the goals of sentencing.

---

[8] In pre-trial litigation and at trial, defendant made much of the FBI's/USAO's decision to surreptitiously record its interactions with him.  This case proves why such investigative actions are not only entirely legitimate, but necessary.  Had the jury not heard defendant in his own words in his recorded call with Dr. Ayoub and two recorded interviews (and seen him in the Nebraska interview), and only relied on witness testimony alone, it would have made this case exceptionally more challenging.

19

### A. The Extended, Repeated, and Serious Nature of Defendant's Conduct Warrants a Meaningful Custodial Sentence

This was no run-of-the-mill false statements case.  It did not involve just a single lie, which the Department of Justice does pursue and charge.[9]  It did not involve false statements made in the context of an administrative proceeding or even a low-priority criminal federal investigation.  A defendant convicted of a § 1001 violation under such facts would be subject to a similar Guidelines range as the USPO found for defendant here, and a sentence at the low-end of that 0 to 6-month range for those defendants might be appropriate.  This case is wholly distinguishable, and far more aggravating.  Sentencing equity and the Guidelines' purposes make clear there must be some meaningful distinction in sentencing different conduct.  Accordingly, the sentence imposed here must reflect those differences and the aggravating factors that are present.

This defendant was convicted of <u>three</u> separate federal felonies for conduct spanning approximately one year (June 2018 to July 2019).  These counts encompassed, as unanimously found by the jury, lies, concealment, or omission of <u>ten</u> facts related to a significant federal investigation into FECA crimes, bribery, and foreign influence.  That conduct included: (a) willfully making repeated false and misleading statements and intentional omissions during a 40-minute interview in Nebraska; (b) deliberately seeking out a second interview to make additional false and misleading statements and

---

[9] For example, in <u>United States v.  Kevin Clinesmith,</u> Case No. 1:20-cr-00165-JEB (D.D.C.), the Department of Justice charged Clinesmith, a former FBI lawyer, for a single false statement in a single email to an FBI supervisory special agent in an illegal attempt to obstruct a criminal investigation.  Clinesmith pled guilty pre-indictment, engaged in no litigation (frivolous or otherwise), cooperated with a related internal investigation, and showed full remorse and acceptance of responsibility, including by way of stipulation that the abuse of trust enhancement under U.S.S.G. § 3B1.3 applied.  (Clinesmith was sentenced to probation and 400 hours of community service.)  In <u>United States v. Michael Sussmann,</u> Case No. 1:21-cr-00582-CRC (D.D.C.), the Department of Justice charged a lawyer with making a single false statement on a single occasion regarding whether the defendant was working "for any client" at the time he was referring a criminal matter to the FBI.  (Sussmann was acquitted by the jury.)

intentional omissions during a two-hour interview in Washington D.C; (c) intentionally making the calculated decision to not amend his FEC report, despite filing a dozen other FEC reports during that same time period (see Tr. Ex. 11); and (d) intentionally choosing to not disgorge the illegal contributions.  Unlike a § 1001 case in which a single false statement was uttered, the jury's special verdict makes clear that it found beyond a reasonable doubt that defendant's conduct was repeated, sustained, intentional, and varied.  Moreover, defendant did not mislead investigators about peripheral information.  Defendant himself was both the subject of the Federal Investigation and he was concealing his percipient knowledge of others' participation in federal crimes.  A non-custodial or brief custodial sentence is thus inappropriate under the circumstances and would not adequately account for the nature and circumstances of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence.

Defendant's conduct is all the more aggravating because of its actual hindrance to the Federal Investigation and because of the public trust that defendant abused.  Even if the abuse of trust and/or obstruction enhancements are not formally applied, the underlying conduct relevant to those enhancements "warrant[s] a greater sentence within the otherwise applicable guideline range," as they demonstrate why defendant's conduct here is significantly more aggravating than other conduct supporting a traditional § 1001 conviction.  See U.S.S.G. § 3C1.1 cmt. n.5.

Defendant knew that the truth—that Chagoury had funneled his money through Baaklini to Dr. Ayoub and other conduits—would be significant to the federal government and would help uncover the corrupt conduct of those individuals.  Defendant also knew that his false statements would hinder the FBI's investigation; indeed, that was his goal – to protect himself, his political and financial supporters, and his financial future.  Defendant's former constituents, along with citizens nationwide, deserve a representative who they place in a position of trust to support federal criminal investigators, not to hinder them, even when such decisions are difficult.

When faced with sentencing conduct that adversely impacts public trust in the

fairness and integrity of government, also "at stake is the collective reputation of all elected officials, particularly those at the pinnacle of power and prestige. What happens when that public trust is abused by corrupt acts? The offender's reputation is sullied and with it the reputation of honest and stalwart public servants. ***The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself***." <u>United States v. Morgan</u>, 635 F. App'x 423, 447 (10th Cir. 2015) (reversing district court and finding sentence of probation unreasonable in public corruption prosecution of state senator).

## B.    The Need to Avoid Unwanted Sentencing Disparities

The Court is also to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). A review of recent § 1001 cases in this District is instructive.

### 1.    <u>United States v. Mitchell Englander (Case No. 2:20-CR-00035-JFW): 14 months' custody</u>

In one of the most recent similar cases in this district, <u>United States v. Mitchell Englander</u>, defendant Englander, a former Los Angeles City Councilmember, pled guilty to a single count of a violation of § 1001(a)(1). Like defendant here, Englander had no criminal history and a lengthy and decorated career in public service. Unlike defendant here, Englander pled guilty promptly after indictment, admitted a fulsome factual basis, did not engage in frivolous or extended litigation, and expressed remorse at sentencing. In Englander's matter, the USPO recommended a sentence of probation. (Englander Dkt. No. 39 at 1.) However, the Honorable John F. Walter significantly disagreed and sentenced defendant to 14 months' imprisonment, 3 years' supervised release, and a fine of $15,000. (Englander Dkt. Nos. 60, 62.)[10] The government submits that Englander's

---

[10] The Court also disagreed with the USPO Guidelines calculations and followed the government's recommendation in finding that the higher obstruction of justice (U.S.S.G. § 2J1.2) base offense level applied. While Englander's additional admitted conduct involving a witness was surely aggravating and warranting an enhanced sanction, his recent sentence in this District strongly supports that a custodial sentence is appropriate when politicians repeatedly choose to lie to save themselves during serious criminal investigations, as defendant did here.

22

sentencing provides a helpful framework for courts to evaluate the seriousness of the offense when elected officials use their position of power to lie, mislead, and effectively obstruct federal criminal investigations, particularly ones into their own misconduct. This remains true even when that underlying investigation results in no additional charges against that official (as was the case with Englander).

2. United States v. Byron Dredd (Case No. 15-CR-00569-DSF): 12 months' custody

In another recent comparable case in our district, defendant Byron Dredd, a then-Los Angeles County Sheriff's Department deputy, was convicted after a re-trial of a single count of § 1001(a)(2).[11] Dredd had lied to FBI agents about what he observed during a use of force incident at the Men's County Jail. Notably, Dredd was not charged with or implicated in use of excessive force, and he was acquitted of an obstruction charge. At sentencing, again the USPO recommended probation. (Dredd Dkt. No. 298.) And again, the court disagreed. Instead, the Honorable Dale S. Fischer, although finding an advisory Guidelines range of 0-6 months' custody and notwithstanding that Dredd was a veteran law enforcement officer who was well regarded, sentenced defendant to 12 months' prison. The court's sentence was based on the seriousness of defendant's lies and the aggravating nature of his repeated conduct,[12] particularly as it related to a significant federal criminal civil rights investigation and that, as a sworn law enforcement officer, Dredd effectively chose to obstruct the law. (Dredd Dkt. No. 321.) Here, defendant was convicted of not just one, but three counts of § 1001, and otherwise shares similar aggravating factors vis-à-vis his public official status and the nature of the investigation he sought to obstruct.

---

[11] Dredd was acquitted at the first trial of obstruction of justice in violation of 18 U.S.C. § 1519.

[12] Dredd also falsely testified during his trial. While defendant here called multiple witnesses, including his wife, he elected not to testify at trial.

23

3. <u>A probationary sentence will create unwarranted sentencing disparities with less-culpable defendants who do not enjoy the same status as defendant</u>

"Congress's primary goal in enacting [18 U.S.C.] § 3553(a)(6) was to promote national uniformity in sentencing." <u>United States v. Saeteurn</u>, 504 F.3d 1175, 1181 (9th Cir. 2007) (citation omitted).

A non-custodial sentence here would mean that defendant would obtain the same sentence as a defendant who was convicted of a single count of making a single false statement on a single occasion. Further, it would mean that a defendant who promptly pleaded guilty (even before indictment), who provided a fulsome factual basis, and who expressed clear and genuine remorse would receive the same sentence as the defendant here who did none of those things. Sentencing such significantly dissimilar defendants to the same (or even similar) sentence cannot be justified under current case law, Guidelines, or simple fairness. Moreover, while recognizing the need for individualized sentencing, a non-custodial sentence is arguably inconsistent with other comparable sentences nationwide, according to available data from the United States Sentencing Commission for fiscal year 2021. That data shows that for 62 nationwide cases, the average imprisonment length for defendants sentenced under U.S.S.G. § 2J1.2 (obstruction of justice) with Criminal History Category I was 21 months. <u>See</u> United States Sentencing Commission Interactive Data Analyzer, <u>available at</u> <u>https://ida.ussc.gov/analytics/saw.dll?Dashboard.</u> Using the more general fraud-based offenses under U.S.S.G. § 2B1.1 (still Criminal History I), data for fiscal year 2021 for 3,001 nationwide cases shows an average imprisonment length of 18 months. <u>Id.</u>

Establishing the appropriate incentives and disincentives through sentencing is critical to our justice system. Accordingly, whatever the ultimate Guidelines range, a meaningful custodial sentence should be imposed to ensure defendant's sentence is appropriately individualized, fair to other defendants, and occasions general deterrence.

24

### C.     General Deterrence Is Paramount in Cases Involving Public Officials

General deterrence is a unique concern in public corruption and public official misconduct cases.  As one court noted:

> We need not resign ourselves to the fact that corruption exists in government.  ***Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable***.  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  ***It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all*** — not only to the average citizen, but to all elected and appointed officials.

<u>United States v. Spano</u>, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added).  General deterrence is a particularly effective tool in corruption and other white-collar cases, as white-collar criminals often premeditate their crimes and engage in a cost-benefit analysis.  <u>See, e.g.</u>, <u>United States v. Martin</u>, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment.").

This analysis applies with equal force here where defendant made numerous deliberate choices to lie and obstruct a major federal criminal investigation into crimes that implicated the foundations of our democracy (election integrity).  And he did so despite having numerous opportunities to change course, to tell the truth, or just say nothing at all.  Making matters worse, defendant leaned into his elected official and reputational status as a (failed) means to deter this legitimate investigation and defend himself at trial.

One of the primary objectives of sentencing elected officials is to make clear to other public officials that abusing their position of trust and violating the law by

obstructing justice is a serious breach of their oath—one that carries with it a correspondingly serious punishment.  See S.Rep. No. 98–225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white collar crime.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").  By their nature, white-collar crimes are often difficult to detect; this makes enhanced general deterrence even more necessary.  See United States v. Brown, 880 F.3d 399 (7th Cir. 2018) (district court did not err in relying on idea that white-collar criminals were prime candidates for general deterrence; district court was entitled to conclude that where there was a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence).

Imposing too lenient of a sentence in this case would send the opposite message.  It would encourage (rather than discourage) public officials to obstruct public corruption probes by sending the message that (1) if caught, they will only face minimal criminal penalty, and (2) if they *successfully* obstruct, they will maintain their political image, power, and pathway to a lucrative future.  In such a calculus, for those inclined toward corruption, obstructing justice simply becomes a worthwhile investment to maintain status as a public official and to exploit it for personal gain.  This calculus cannot be endorsed in a functioning democracy.  In light of the numerous aggravating facts of defendant's conduct here, a lenient sentence threatens the goal of deterrence. "The threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time."  United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir. 2009); see

also <u>United States v. Kuhlman</u>, 711 F.3d 1321, 1328 (11th Cir. 2013) ("We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence.").

### D.      -Specific Deterrence Also Compels a Meaningful Custodial Sentence

Specific deterrence is also a relevant goal here, as defendant has remained defiant before and since being indicted, including up to and even after trial and his convictions. Defendant has expressed no remorse or any semblance of accountability but has instead placed blame on others and even politics for his own conduct and now convictions. (<u>See, e.g.</u>, 3/25/2022 Washington Post article, also available at https://www.washingtonpost.com/nation/2022/03/25/jeff-fortenberry-guilty-conviction/.) (Defendant telling the press "We always felt like it was going to be hard to have a fair process here.")) Defendant targeted and blamed the lead FBI investigator through reckless and ultimately totally refuted allegations (CR 30 (Motion to Compel Discovery); he lobbed personal and rejected attacks against the prosecutors (CR 21 (Motion to Disqualify), CR 35 (Motion to Suppress Statements), CR 97 (Joint Motion in Limine re Political Prosecution); he blamed his election lawyer; and he blamed his initial defense attorney Trey Gowdy. Defendant's continued efforts to minimize his own criminal conduct and to shift the blame by pointing the finger at a multitude of other factors presents a greater risk of recidivism as compared to someone who has fully accepted responsibility.

The PSR asserts its recommended three-month sentence affords adequate deterrence because defendant has "otherwise lived a law-abiding life in service to his family, community, and country." (PSR Ltr. at 5). The government does not contest that defendant lacks a prior criminal history and has held an elected position since 2005. However, the need to afford adequate deterrence must be considered in the context of the conduct of the person appearing now before the Court for sentencing, and not simply on defendant's past. This defendant demonstrated a lack of respect to federal investigators when it came to matters that negatively impacted him, and he acted criminally to serve himself. These facts reflect a strong need for specific deterrence. This is especially so

when defendant's acts are compared to other defendants who engaged in a single act of criminality, who accepted responsibility and pled guilty, and who did not attempt to escape accountability by attacking the motivations of any that would investigate him.

When confronted with the opportunity to live up to his oath or hide behind it, defendant chose himself and his political interests over his country, his community, and his family.  When combined with defendant's lack of remorse and accountability,[13] plus his public comments and public relations strategy[14] to make himself the purported martyr of a political hit job by "California prosecutors" and a biased FBI agent, it remains to be seen what lessons defendant has taken from his prosecution and convictions.  While defendant is currently no longer be an elected official,[15] he may very well be faced with another opportunity to choose respect for the law or his own self-interest, and a meaningful custodial sentence will impress upon defendant the need to choose the lawful path in the future.

### E.    History and Characteristics of Defendant

Defendant's history and characteristics present both mitigating and aggravating circumstances.

According to the PSR, defendant's parents divorced when he was eight, and his father passed when defendant was thirteen.[16]  (PSR ¶¶ 52, 54.)  Defendant has five daughters (ages 16 to 25), including one daughter who has a history of serious medical challenges.  (Id. ¶ 59.)  The PSR suggests that defendant may provide some financial assistance to his mother and stepfather, as well as to his sister (id. ¶¶ 65-66), although no

---

[13] Defendant did not accept responsibility with the USPO but his counsel stated he would provide the Court a letter.  (PSR ¶ 27.)

[14] Defendant's campaign spent $40,000 on a communications advisor shortly before and after his trial.  https://docquery.fec.gov/cgi-bin/forms/C00395467/1586192/sb/ALL

[15] That said, felony convictions alone do not preclude federal candidates from running for office, and to the government's knowledge, defendant has never claimed he will not later seek a return to elected office.

[16] Defendant objected to this portion of the PSR, noting that he was 12 years old. (CR 210.)

monthly expenses are specifically documented in this regard (id. ¶ 130).  The PSR also describes the many thoughtful letters it received in support of defendant.  (Id. ¶¶ 67-111.)

While reasonable minds can differently weigh the various § 3353(a) factors, the law requires they not be weighed to unjustly favor certain classes of defendants (e.g., those in positions of power and prestige who are better able to compile an army of support letters) and disfavor others; furthermore, no factors should be omitted from the balancing.  See United States v. Bragg, 582 F.3d 965, 969 (9th Cir. 2009) ("The very broad discretion of district judges in sentencing post-Booker does not extend to ignoring sentencing factors mandated by statute."); Gall v. United States, 552 U.S. 38, 49–50, (2007) (district judges are required to "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party") (emphasis added).  Courts have repeatedly made clear that disparate treatment favoring certain classes of defendants is improper.  "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."  United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012).  Collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines.  And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.'"  United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) (citation omitted).

The USPO also points out that defendant "excelled at school," obtained several advanced degrees, and served as a congressman for 17 years.  (USPO Ltr. at 4.)  Many of the letters point to defendant's public service, which defendant was able to pursue due to Mrs. Fortenberry's employment and financial support of the family.  (PSR ¶ 56.)  The combination of these advantages makes him unlike many of the defendants that come before this Court who have committed crimes.  For those defendants, such disadvantages

do not justify but certainly may mitigate their criminal conduct.  By contrast, the <u>lack</u> of such disadvantages makes defendant's criminal conduct here all the more inexcusable. Individuals, like defendant, who have earned significant levels of professional success and thus are able "to make a decent living without resorting to crime ***are more rather than less culpable than their desperately poor and deprived brethren in crime***."  <u>United States v. Stefonek</u>, 179 F.3d 1030, 1038 (7th Cir. 1999); <u>see also</u> <u>Kuhlman</u>, 711 F.3d at 1329 ("The Sentencing Guidelines authorize ***no special sentencing discounts on account of economic or social status***.").

        1.    <u>Defendant had many choices; he chose poorly many times</u>

Defendant is privileged to have family and community support; he does not have mental health or substance abuse problems.  And defendant had a choice.  In fact, he had many options.  This is not the case of a defendant driven to drug sales because he grew up in a drug house and dealing became the only skill he acquired.  This is not the case of a defendant driven to aberrant criminal behavior due to a spiraling addiction.  Defendant was not suffering from the onset of a mental ailment each time he lied to the federal government about his conduct or failed to take any corrective action to conceal the illegal money benefitting his campaign.  Properly evaluated through this framework, defendant's personal status and history during the period of his conduct in this case is also an aggravating factor.

        2.    <u>Community support for a public official involved in a corruption-related offense is of limited mitigation value</u>

The PSR dedicated forty-four paragraphs to defendant's reference letters.  (PSR ¶¶ 67-111.)  Politicians convicted of offenses still often maintain a cadre of support from long-time colleagues and/or allies who seek to highlight their personal view of defendant's laudatory accomplishments; but their import at sentencing should not be overstated.  <u>See</u> <u>United States v. Vrdolyak</u>, 593 F.3d 676, 683 (7th Cir. 2010) ("Politicians are in the business of dispensing favors; and while gratitude like charity is a virtue, expressions of gratitude by beneficiaries of politicians' largesse should not weigh

in sentencing.").  Defendant's ability to gather many letters of support, including from prominent individuals in the community, is "certainly impressive but not surprising.... One does not become [a longtime elected U.S. Congressman] without the confidence of many supporters, some quite influential.  The letters must be viewed in that light." Morgan, 635 F. App'x at 450.

On balance, the relevant mitigating and aggravating factors support the government's recommended sentence of 6 months' imprisonment.

### F.     Fine and Community Service

The PSR calculated defendant's fine range as $1,000-$9,500 and found that defendant had significant assets and a net worth of approximately $1.1 million.  (PSR ¶¶ 140, 153.)  Among his other substantial assets, defendant has secured lucrative employment (*after* his convictions in this case) that pays $12,000 per month with a potential for a $50,000 bonus.  (Id. ¶¶ 129, 138.)[17]  USPO recommended a fine at the high-end of its calculated range.

Under the government's Guidelines calculations, the fine range is $4,000 to $40,000.   See U.S.S.G. § 5E1.2(c)(3).  The government recommends a fine of $30,000, which is the amount of illicit foreign money by which defendant's campaign illegally benefitted until he disgorged the money after his second FBI interview.[18]  Defendant clearly has the present ability to pay this fine.  Indeed, defendant, who utilized the services of four retained attorneys during his trial, largely funded his defense with contributions from political donors, which included having his campaign pay over

---

[17] The PSR notes that counsel for defendant claims defendant may lose his pension and funds in his Thrift Savings Plan (PSR ¶ 140), which counsel also conveyed to the government during pre-trial negotiations.  However, defendant was now convicted months ago and it appears no such action has been taken against these funds (or no such information has been provided to the government or USPO).  As the USPO found, defendant's "current financial condition supports his ability to pay an immediate fine." (Id.)

[18] The government notes that for FECA crimes, the amount of the fine is determined by the amount of illegal monies involved.  52 U.S.C. § 30109(d)(1)(D)(ii) (setting criminal fine amount for conduit contributions as "not less than 300 percent of the amount involved in the violation").

31

$600,000 in legal fees in January and February 2022 alone.[19]  This windfall allowed defendant to retain significant personal funds by taking advantage of a privilege unavailable to almost all other defendants.

Finally, in light of defendant's long public service career and dedication to his community and causes, a term of community service is appropriate for defendant to show true personal accountability for his crimes, while also continuing to benefit his community consistent with the person described in the letters provided to the Court. Defendant can help others avoid the mistakes he made and give back to the community whose trust he violated.  A two-year period of supervised release, during which time defendant would satisfy the 150-hour community service requirement, would still leave defendant sufficient time to maintain employment, manage his numerous family responsibilities, and not be overly burdensome in light of defendant's age and good health.  (See PSR ¶¶ 113-16).

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: 6 months of imprisonment, followed by two years of supervised release, a $30,000 fine, 150 hours of community service, and a special assessment of $300.

---

[19] See Schedule B Itemized Disbursements, also available at
https://docquery.fec.gov/cgi-bin/forms/C00395467/1586192/sb/ALL.